## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE; <br><br> SENIOR SECURITY BENEFITS, LLC, <br><br>     *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; <br><br> CENTERS FOR MEDICARE & MEDICAID SERVICES; <br><br> CHIQUITA BROOKS-LASURE, in her official capacity as CMS Administrator, <br><br>     *Defendants*. | No. _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Americans for Beneficiary Choice (ABC) and Senior Security Benefits, for their complaint against the U.S. Department of Health and Human Services (HHS); Xavier Becerra, in his official capacity as HHS Secretary; the Centers for Medicare & Medicaid Services (CMS); and Chiquita Brooks-LaSure, in her official capacity as CMS Administrator, allege as follows.

## INTRODUCTION

1. This lawsuit, brought under the Administrative Procedure Act (APA), challenges a final Rule governing compensation arrangements for agents, brokers, and other third parties who help Medicare participants select and enroll in appropriate Medicare Advantage plans. The final Rule was published at 89 Fed. Reg. 30448 (April 23, 2024) and codified in relevant part at 42 C.F.R. §§ 422.2274, 423.2274. Plaintiffs will imminently file a motion for a Section 705 stay of the Rule or, alternatively, a preliminary injunction. As explained below (¶¶ 67-73), temporary relief by or before mid-July 2024 is essential to stave off irreparable harm.

**Congress directed CMS to ensure that compensation arrangements
incentivize consumer choice under the Medicare Advantage program.**

2.      At the core of this case is the Medicare Advantage program, which was established by Congress and signed into law by President George W. Bush in 2003. *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified at 42 U.S.C. §§ 1395w-21 to 1395w-28). The program avoids the pitfalls of traditional Medicare (which uses a single-payer, one-size-fits-all approach) by offering plans sponsored by private companies called Medicare Advantage Organizations, or MAOs. These companies offer more tailored Medicare insurance plans according to rules established by CMS. The evidence is clear that Medicare beneficiaries strongly prefer Medicare Advantage over traditional Medicare.

3.      Relevant here, Congress has directed CMS to adopt guidelines to ensure that "compensation" arrangements for health insurance agents and brokers create incentives "to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). Consistent with that statutory language and the agency's own longstanding practices, CMS, in 2008, established guidelines for "remuneration" by Medicare Advantage plans to agents and brokers, including commonsense limits on "commissions, bonuses, gifts, prizes, awards and finders' fees." 73 Fed. Reg. 54,226, 54,238 (Sept. 18, 2008).

**FMOs, including ABC's members and Senior Security Benefits, advance
the statutory goal of ensuring that beneficiaries are matched with the best plans.**

4.      At the same time that it established these guidelines, CMS considered the role of field marketing organizations, or FMOs. Those entities, which long had been key players in the market for private insurance marketing, assumed their role early in the history of the Medicare Advantage program to help agents and brokers operate independently of the plans whose policies they sell. In particular, FMOs provide essential operational support and administrative tools to agents and brokers—services like training programs, back-office and regulatory compliance support, client relationship management tools, and premium-quoting software.

2

5.      Recognizing the critical value of these support services (which are self-evidently distinct from the job of selling insurance products itself), CMS excluded payments of administrative support fees to FMOs from the definition of "compensation" under § 1395w-21(j)(2)(D). And relying on that sensible regulatory framework, FMOs have made substantial investments in their businesses to ensure that agents and brokers have access to the support, information, and regulatory and administrative tools they need to help Medicare beneficiaries identify and select a Medicare Advantage plan that is most suitable for them.

**The final Rule upends the regulatory status quo, dramatically limiting administrative fees that Congress did not intend for CMS to regulate and disrupting arrangements that incentivized informed beneficiary choice.**

6.      The Rule upends this status quo. Citing vague and unsubstantiated concern for, among other things, anticompetitive consolidation in the marketplace—a topic on which Congress has granted CMS no authority to regulate—the Rule jettisons 16 years of settled practice, treating administrative expenses as regulated "compensation," subject to a randomly selected, government-determined fee cap. In doing so, the Rule far exceeds CMS's limited authority and will disrupt long-standing economic arrangements that are essential to the proper functioning of the market for Medicare plans.

7.      The Rule is also self-defeating. It is certain to harm beneficiaries by making it more challenging for agents and brokers to access and use the essential tools they need to match enrollees with the plans best suited to the enrollees' circumstances. The harms to all stakeholders cannot be overstated. Last year, approximately 100,000 independent agents and brokers helped over 30 million Medicare Advantage beneficiaries throughout the United States find the best plans for their needs. But under the Rule, independent agents and brokers will be unable to do their jobs effectively, or consistent with CMS regulations, without the continued support of FMOs and the essential tools and technologies they provide.

8.      Given the Rule's other changes, 30 million Medicare Advantage beneficiaries will receive notice letters in September alerting them that their benefits are changing. The help provided in these circumstances by independent agents or brokers, supported by FMOs, is essential. Without their assistance, countless American seniors will be left to navigate the complex and confusing marketplace for health insurance on their own, to devastating results.

9.      Notwithstanding the pervasive infirmities of the Rule, plaintiffs reaffirm their support of the general goal that CMS asserted to justify it. They, more than anyone, object to bad actors who engage in self-serving activities that increase Medicare Advantage program costs and reduce enrollee choice and satisfaction. They emphatically agree that certain practices—including high-pressure sales tactics, predatory enrollee targeting, and the reselling of sales leads—harm enrollees, waste program resources, and are legally improper. But the cause of these problems is not FMOs, which offer the essential support and administrative services on which independent agents and brokers have come to depend. Indeed, FMOs make it possible for agents and brokers to operate independently of plan sponsors in the first place. Fault for the supposed problems cited by CMS instead lies at the feet of bad actors like fly-by-night call centers and "lead generators" operating without regard for the rules. Addressing their conduct requires targeted action to monitor and correct harmful practices, which were generally barred under the legal status quo ante. It does not call for a wholesale recalibration of an entire industry, which it is hard to understand as anything other than a desire to drive beneficiaries away from Medicare Advantage and into traditional, single-payer Medicare instead.

**The Rule is unlawful three times over and must be vacated.**

10.      The Rule is manifestly unlawful. It reflects an exercise of authority that Congress did not grant to CMS; it is predicated on wholly unsupported, speculative, arbitrary, and capricious reasoning; and it was promulgated without observance of the most basic procedures required by law for rulemakings. For reasons provided more fully below, it must be vacated. In summary:

11.    **The Rule exceeds CMS's statutory authority.** Congress authorized the agency to establish "guidelines" to "ensure that the use of compensation creates incentives for agents and brokers" to act in the best interest of beneficiaries. But the Rule instead regulates the payment of administrative fees to third parties, which have no logical or demonstrated impact on incentives for brokers and agents. That is why the agency itself, for 16 years, held that such payments do not qualify as "compensation" that CMS is authorized to regulate. The Rule also arrogates to CMS authority to enforce the antitrust laws. But if the Executive Branch is concerned with anti-competitive conduct in the marketplace for Medicare Advantage enrollments, it must turn to the Department of Justice or the Federal Trade Commission, not CMS, for enforcement.

12.    **The Rule is arbitrary and capricious.** Despite the sweeping and unprecedented changes imposed by the Rule, CMS has not complied with basic requirements of reasoned decision-making. For instance, CMS grounded the rule on pure speculation, failing to point to an iota of verifiable evidence to support the supposed problems that it promulgated the Rule to solve. The agency also ignored serious objections to the Rule, including the substantial challenges to the factually unsupported premises on which the Rule is based. In addition, CMS failed to address the substantial reliance interests and investment-backed expectations that built up for nearly two decades around its well-settled interpretation of "compensation" as excluding administrative fees. These errors describe textbook arbitrary agency action.

13.    **CMS also committed a major procedural violation under the APA.** As support for the supposed market problems the agency asserted, CMS alluded to studies, meetings, and commentary. But it declined to make any of that evidence available to the public for inspection and comment. The agency also introduced an unforeseeable change to the final Rule, denying the public a chance to comment on a new policy. Public participation in rulemaking doesn't amount to much if the agency refuses to disclose the evidentiary underpinnings of the proposed regulation and springs unforeseeable changes in the final Rule.

**To prevent the irreparable harm that the Rule is certain to inflict on plaintiffs and the beneficiaries they serve, temporary relief is necessary by or before mid-July 2024.**

14.     This Court's intervention is urgently needed by or before mid-July 2024. Absent preliminary relief, the Rule will inflict irreparable harms on FMOs, agents, brokers, and—most important—the Medicare Advantage beneficiaries who depend on agents and brokers to find the right plans to meet their needs. To be sure, the Rule has a nominal applicability date of October 1. But that simply marks the beginning of the next annual enrollment period. A long line of dominoes will begin falling, irreversibly, long before that date. It is no overstatement to say that the Rule fundamentally reorders an entire industry—not just for Medicare Advantage plans, but with spillover effects across insurance products in life, annuities, and property and casualty that likewise follow a prevalent model utilizing FMOs. In very short order, it will be impossible to unwind the pervasive impact that the Rule already is having on the negotiation, consummation, and performance of the countless contracts that underly the MA program.

15.     Come mid-July, it still will be possible (if challenging) to stop the dominoes falling. But relief any later than mid-July will be too late, destroying any practical opportunity for the Court to review the legality of the Rule. Accordingly, plaintiffs intend to move imminently for a stay of the Rule and other appropriate preliminary injunctive relief, so as to preserve the status quo ante pending conclusion of judicial review.

**PARTIES**

16.     Plaintiff Americans for Beneficiary Choice (ABC) is a trade association based in Dallas, Texas. ABC's members include health insurance industry leaders and workers, consumer advocates, and concerned citizens. ABC's mission is to protect the best interests of Medicare and other health insurance beneficiaries through legislative and regulatory advocacy and participation in litigation. Through these efforts, it aims to improve the American healthcare system with sensible, forward-thinking policies that improve health insurance knowledge and education, lower

healthcare costs, and maximize coverage choice for consumers. The interests and objectives that ABC seeks to advance in this litigation are thus directly relevant to its institutional mission.

17.     Plaintiff Senior Security Benefits, LLC, is an FMO headquartered and doing business in Fort Worth, Texas. Senior Security Benefits is a member of ABC. It provides administrative and other support services to independent insurance agents and brokers who work with seniors aged 65 and older. Senior Security Benefits empowers agents and brokers with a range of support services, including an innovative technology platform that combines customer relationship management tools with rate-quoting and enrollment functions in a single, easy-to-use program. The final Rule will directly regulate how Medicare Advantage plan issuers, agents, and brokers pay Senior Security Benefits for the critical training and administrative support services it provides.

18.     Defendant HHS is a cabinet-level executive branch department of the federal government that, among other responsibilities, administers the Medicare program. HHS is headquartered at 200 Independence Avenue SW, Washington, DC 20201.

19.     Defendant CMS is a federal agency within HHS that, among other responsibilities, handles day-to-day operations and administration of the Medicare program. CMS is headquartered at 7500 Security Boulevard, Baltimore, MD 21244.

20.     Defendant Xavier Becerra is HHS Secretary. He was charged with promulgating the final Rule, which he signed. He is sued in his official capacity.

21.     Defendant Chiquita Brooks-Lasure is CMS Administrator. She is responsible for enforcement of the Rule. She is sued in her official capacity.

## JURISDICTION AND VENUE

22.     This action is brought pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. § 2201.

23.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (e) because at least one plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claim and injuries occurred and will continue to occur in this district.

## FACTUAL ALLEGATIONS

### The Medicare Advantage program

25.     Medicare provides health benefits for Americans aged 65 or older or with certain disabilities. It has four parts: A, B, C, and D. *See Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588, 4589 (Jan. 28, 2005).

26.     Medicare Part A is the federally funded, federally administered hospital insurance program. Medicare Part B is the medical insurance program. *Id*. Together, Parts A and B are known as traditional Medicare. *Id*. Traditional Medicare is a single-payer, fee-for-service public health benefit program. It is one-size-fits-all and cannot be customized to beneficiary needs.

27.     Part C, which establishes the Medicare Advantage program, is different. It encourages the development of insurance options that are more tailored to the particular needs of particular beneficiaries. Part C facilitates individual choice by allowing private companies to contract with CMS to provide beneficiaries with Part A and Part B benefits, bundled together with a selection of additional benefits that are not fully subsidized by the federal government. These additional benefits typically include a Part D prescription drug benefit and other benefits such as vision, hearing, dental, and other wellness programs.

28.     To implement the Medicare Advantage program, CMS contracts with private companies called Medicare Advantage Organizations, typically known as MAOs. MAOs are the private companies that sponsor Medicare Advantage plans. They do not receive fee-for-service reimbursements from the federal government for the healthcare services their enrollees receive. *See generally* 42 U.S.C. § 1395w-23(a). Instead, they receive a risk-adjusted, per-person monthly payment to provide coverage for all Medicare-covered benefits to the beneficiaries enrolled in

their plan. *Id*. The more efficiently an MAO manages its Medicare Advantage plans, the greater the share of the government payment it can use to offer supplemental benefits or reduce beneficiaries' out-of-pocket payments. MAOs are thus encouraged to provide the most affordable and generous plans possible, to attract enrollees.

29.     The Medicare Advantage program has been a success by any measure, and Americans prefer the choices that Medicare Advantage plans provide compared with traditional Medicare. The immediate predecessor to Medicare Advantage, called the Medicare + Choice program, had approximately 1.56 million enrollees in 1992. *See* CMS, *Medicare Managed Care Contract (MMCC) Plans Monthly Report*, https://perma.cc/YPK6-DDEW (click Live View). By 2023, that figure had increased to more than 30 million enrollees, surpassing for the first time the number of enrollees in traditional Medicare. Nancy Ochieng, et al*., Medicare Advantage in 2023: Enrollment Update and Key Trends* (Aug. 9, 2023), https://perma.cc/EYE2-4UHR. And shortly before CMS promulgated its final Rule, the Congressional Budget Office had projected that 62% of Medicare beneficiaries would be enrolled in Medicare Advantage by 2033. Ochieng N. et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends*, Kaiser Family Foundation (Aug. 9, 2023), https://perma.cc/FDQ5-8C36.

30.     The substantial increase in Medicare Advantage enrollments has supported the proliferation of many different plans. This past benefit year, there were 43 plans available, on average, to each enrollee shopping for coverage, which is the largest number in the history of the program and more than double the offerings available just six years ago. These expanded options give individuals more flexibility to choose plans that meet their needs.

31.     But with increasing choices has come increasing decisionmaking complexity for would-be enrollees. Industry research has shown that 73% of seniors view their health plan choice as one of the most important financial decisions they will make, and 65% "worry" about that decision. *See* Deft Research, 2023 AEP Gut Check Study. Yet individuals shopping for a Medicare

Advantage plan have few available tools to compare and select among them. CMS does not offer any user-friendly online tools for comparing different Medicare Advantage plans.

32.     Insurance brokers and agents, working with FMOs, have helped to fill this gap, ensuring that individuals are able to select the plan that best suits their needs. As CMS acknowledged in the preamble to the Rule, "[a]gents and brokers are an integral part of the Medicare Advantage and Part D industry, helping millions of Medicare beneficiaries to learn about and enroll in Medicare, Medicare Advantage plans, and [standalone prescription drug plans] by providing expert guidance on plan options in their local area, while assisting with everything from comparing costs and coverage to applying for financial assistance." 89 Fed. Reg. at 30617.

33.     There are two historical models for insurance agents and brokers in the market for Medicare Advantage plans. The first is a "captive agent" model, under which MAOs and their predecessor entities originally managed proprietary networks of dedicated insurance agents who were devoted to selling only that MAO's plans. This approach was a poor fit for the Medicare Advantage program. It conferred competitive advantages to MAOs for having large, expensive agent networks, regardless of the quality of the services provided. And it disserved Medicare Advantage enrollees by depriving them of ready access to the full range of plans—agents could not sell or even present competitors' policies, and they faced incentives to sell prospective enrollees on the most economically advantageous policies for the MAO, no matter the enrollee's needs. IMG Comment Letter 3-4.

34.     The captive agent model had numerous downsides, not only for beneficiaries (whose choices were limited), but also for MAOs (who were saddled with the enormous costs of maintaining redundant networks of exclusive brokers). It also made it more challenging for agents and brokers to reach remote, rural locations, given the relative inefficiency of MAOs maintaining overlapping proprietary networks in those areas.

35.     The captive agent model thus gave way to the second more prevalent model, which utilizes *independent* agents and brokers. Under this model, agents and brokers are unaffiliated with MAOs, which instead pay commissions to agents and brokers and administrative fees to third-party FMOs to support those agents and brokers.

36.     FMOs provide essential services to independent agents and brokers in the form of critical infrastructure and operational support. Such services include plan-comparison and premium-quoting technologies; agent education, training, and regulatory support; back-office services; access to carrier marketing materials; call-recording technology to comply with regulatory requirements; quality assurance; and compliance education, support, and oversight for the complex regulatory regime governing Medicare Advantage. IMG Comment Letter 8-9.

37.     In this alternative model, FMOs effectively operate a two-sided market: First, they contract with multiple MAOs offering a wide variety of Medicare Advantage plans. Second, they contract with agents and brokers who sell those Medicare Advantage plans to prospective beneficiaries. The result is a virtuous loop that benefits consumers by allowing for more coverage choices: The more MAOs that an FMO contracts with, the more agents and brokers the FMO will attract. Conversely, the more agents and brokers that the FMO attracts, the more MAOs want to contract with it.

38.     In this way, agents and brokers, working with FMOs, are able to bring transparency and order to an otherwise confusing and complex marketplace, enhancing enrollees' ability to make informed choices. Enrollees gain access through their agents and brokers to a robust suite of tools and resources to help them make an informed decision about the Medicare Advantage plan that is best tailored to their needs. Enrollees in rural areas also gain better and more reliable access to agents and brokers to help them navigate the complex marketplace.

39.     Simply put, this model better suits everyone: It better suits agents, who are able to give more objective advice because they are not beholden to a single MAO and can offer

beneficiaries a diverse array of Medicare Advantage plans to best meet their needs. It better suits MAOs, which are freed from the strategic pressures and enormous costs of developing proprietary agent networks, allowing them to compete instead on the quality of the Medicare Advantage plans they create. *See* CMS, *Agents and Brokers in the Marketplace* 1 (2020), https://perma.cc/MSA5-WQV4. It better suits enrollees, who receive superior services from agents and brokers and report higher satisfaction when working with them. *See, e.g.*, CMS, *Health Equity*, https://perma.cc/-2VDJ-GYEU; Deft Research, 2023 AEP Gut Check Study. And it better suits the federal government, because it more often directs beneficiaries to higher quality, higher satisfaction Medicare Advantage plans with lower enrollment turnover. *See* Deft Research, 2023 Medicare Member Experience Study.

40.     It is no surprise, then, that industry research shows that 79% of seniors prefer to work with independent agents to navigate their Medicare Advantage plan selection. And with so many Medicare Advantage plan options, 91% of seniors indicated that the reason for working with an independent agent or broker was to obtain a clear plan recommendation. 86% agreed or strongly agreed that independent agents had their best interests at heart, and 87% rated their independent agent seven or higher on a 10-point scale, with 65% rating their agent a 9 or 10, when asked how satisfied they were with their agent. Deft Research, 2023 AEP Gut Check Study; Deft Research, 2023 Medicare OEP and Disenrollment Prevention Study.

**Prior regulation of Medicare Advantage marketing compensation**

41.     Until Congress enacted the Medicare Improvements for Patients and Providers Act in 2008, there was no statutory authorization for CMS to regulate how MA plans are marketed or how compensation is used by brokers and agents. Nonetheless, in its initial 2005 Medicare Marketing Guidelines, CMS defined marketing as "[s]teering, or attempting to steer, an undecided potential enrollee towards a Plan, or limited number of Plans, and for which the individual or entity performing marketing activities expects compensation directly or indirectly from the Plan for such

marketing activities." 2005 Guidelines, at 18 (Aug. 15, 2005). At the time, CMS took the position that "'[a]ssisting in enrollment' and 'education' do not constitute marketing." *Id.*

42.    In 2006, CMS updated its guidelines and clarified that "marketing" included the steering activities "of an employee of an [MAO], an independent agent, and independent broker." 2006 Guidelines, at 135 (May 23, 2006). CMS reasoned that all "such persons affect the choice of plans that a marketing representative may market, thereby contributing to the steering of a potential enrollee towards a specific plan or limited number of plans." *Id.*

43.    Congress enacted the Medicare Improvements for Patients and Providers Act two years later. *See* 42 U.S.C. § 1395w-21. Relevant here, the new statutory provisions did not grant CMS broad ratemaking powers or authorize the agency to assume regulatory control of payments for administrative expenses to FMOs or other third parties. Instead, it granted CMS limited regulatory authority to "establish limitations with respect to," among other subjects, "[t]he use of compensation," in particular to "create[] incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D)).

44.    CMS soon thereafter published an interim final rule that imposed caps on compensation to "independent brokers and agents" selling Medicare Advantage products through FMOs. *See* 73 Fed. Reg. 54,226 (Sept. 18, 2008). The interim final rule defined "compensation" to include "pecuniary or non-pecuniary remuneration of any kind relating to the sale or renewal of a policy including, but not limited to, commissions, bonuses, gifts, prizes, awards and finders' fees." *Id.* at 54,238. CMS excluded from its definition of "compensation" reimbursements for the cost of non-marketing activities such as "training, certification, and testing costs," travel "to, and from, appointments with beneficiaries," and "costs associated with beneficiary sales appointments such as venue rent, snacks, and materials." *Id.*; 42 C.F.R. § 422.2274(a)(1) (2008).

45.    CMS acknowledged in the interim final rule that FMOs "provide additional services beyond selling insurance products (for example, training, document management and storage, office space, supplies, and equipment)." 73 Fed. Reg. at 54,238. And it left unregulated the administrative "fees paid to FMOs" by MAOs. *Id*. The result was to regulate the fees paid to agents and brokers while leaving unregulated the administrative fees that FMOs earned from MAOs for "services beyond selling insurance products." *Id*.

46.    Later, in finalizing the interim rule, CMS clarified that the amount paid to FMOs should be based on market value: "the amount paid to the [FMO] must be fair-market value and must not exceed an amount that is commensurate with the amounts paid by the [MAO] to a third party for similar services during each of the previous two years." 73 Fed. Reg. 67,406, 67,410 (Nov. 14, 2008). But CMS did not, in final rule, attempt to define "compensation" to include administrative fees paid by MAOs or agents to FMOs. *See* 73 Fed. Reg. at 67,409.

47.    This status quo remained in place, largely undisturbed as to administrative fees paid to FMOs, for the next 16 years. In all that time, and consistent with the authority granted by Congress, CMS did not regulate administrative fees paid to FMOs as "compensation" to agents and brokers within the meaning of 42 U.S.C. § 1395w-21(j)(2)(D). *See* 76 Fed. Reg. 54,600, 54,634 (Sept. 1, 2011); 77 Fed. Reg. 22,072, 22,168 (Apr. 12, 2012).

48.    CMS later released Medicare Marketing Guidelines that expressly identified non-enrollment services such as training, customer service, and agent recruitment as "administrative" services, and corresponding payments to FMOs as "administrative fees." CY2018 Medicare Marketing Guidelines, Section 120.4.4 (July 20, 2017). Notably, the section under which this provision appears is titled "Payments other than Compensation." *Id*. There, CMS reiterated only that "[p]ayments made to third parties for services other than enrollment of beneficiaries (e.g., training, customer service, or agent recruitment) must not exceed" fair market value. *Id*.

14

49.     Consistent with this longstanding interpretation, CMS promulgated a regulatory update in 2021, characterizing "administrative payments" as "[p]ayments other than compensation" under § 1395w-21(j)(2)(D) and expanding its illustrative examples of "payments made for services other than enrollment of beneficiaries" to include "assistance with completion of health risk assessments" in addition to "training, customer service, agent recruitment, [or] operational overhead." 86 Fed. Reg. 5864, 6114 (Jan. 19, 2021); 42 C.F.R. § 422.2274(e) (2021).

50.     The 2021 rule reaffirmed that administrative payments "must not exceed the value of those services in the marketplace," while clarifying that "[a]dministrative payments can be based on enrollment provided payments are at or below the value of those services in the marketplace." 86 Fed. Reg. at 6114; 42 C.F.R. § 422.2274(e)(2) (2021). CMS stated that it included this obligation "to ensure that [MAOs] do not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers." 86 Fed. Reg. at 5593.

**Promulgation and content of the final Rule**

51.     CMS published a notice of proposed rulemaking in 2023, proposing to reverse the agency's longstanding position with respect to agent compensation, administrative costs and services, and avoidance of flat rates. *See* 88 Fed. Reg. 78476 (Nov. 15, 2023). The agency took comments on the proposal and issued the final Rule, which implemented the proposal with only minor adjustments. *See* 89 Fed. Reg. 30448 (April 23, 2024). Comments were submitted by thousands of stakeholders, including ABC and many of its members.

52.     As finalized, the Rule accomplishes four sweeping regulatory changes:

        a.      *First*, CMS took the position, for the first time in 16 years, that "administrative payments are included in the calculation of enrollment-based compensation." 42 C.F.R. § 422.2274(e)(2). According to CMS, the term "compensation" now encompasses not only payments to agents and brokers for their services, as the term is commonly understood, but also "any other payments made to an agent or broker" that are in any way "tied to" or "related to" a

15

Medicare Advantage enrollment or are provided "for services conducted as a part of the relationship associated with" an Medicare Advantage enrollment, including fees for administrative services. *Id.* § 422.2274(a). CMS stated in the preamble to the final Rule that "compensation" does not include "payments from an MAO to a [FMO] . . . for activities that are not undertaken as part of an enrollment by an independent agent or broker." 89 Fed. Reg at 30626. But CMS did not define what it means for an activity to be "undertaken as part of an enrollment."

b.      *Second*, instead of allowing for compensation at fair market value, the final Rule establishes a flat compensation cap for agents and brokers, including for contract year 2025 a one-time increase of $100 "to account for administrative payments" now barred as separate payments, to be "included under the compensation rate." 42 C.F.R. § 422.2274(a). For future contract years, the $100 increase will be incorporated into "a new base compensation rate that will be updated annually," but not as a separate line-item. 89 Fed. Reg. at 30626. Moreover, CMS, in the notice of proposed rulemaking, had expressly contemplated payments of these administrative fees from MAOs directly to FMOs. *See* 88 Fed. Reg. at 78555. But in the preamble to the final Rule, it purported to require "the full payments [of administrative fees] directly to the agents and brokers," so that "agents and brokers themselves will have the opportunity to decide which services are truly essential and how much those services are worth." *Id.* at 30624. No such requirement appears in the text of the final Rule itself or anywhere else in the Code of Federal Regulations.

c.      *Third*, CMS adopted a vague and open-ended general prohibition on contract terms between MAOs and agents, brokers, and FMOs that may have "a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 42 C.F.R. § 422.2274(c)(13).

      d.     *Fourth*, in parallel with the changes to compensation, the Rule adds a new paragraph (4) to §§ 422.2274(g) and 423.2274(g) that prohibits third-party marketing organizations, including FMOs, from "distributing any personal beneficiary data that they collect" to any other third-party marketing organizations, including FMOs. *See* 89 Fed. Reg. at 30599. This prohibition covers a beneficiary's "name, address, and phone number," as well as "any other information given by the beneficiary for the purpose of finding an appropriate MA or Part D plan." *Id*. at 30604. Notably, this same data qualifies as "protected health information" under regulations implementing the Health Insurance Portability and Accountability Act (HIPAA). HIPAA broadly governs the handling of private health information and is intended not only to protect patient privacy, but to facilitate the exchange of data to support efficient care coordination, including with respect to benefit plans and coverage. The HIPAA Privacy Rule expressly permits and encourages the sharing of protected health information among certain authorized entities, including FMOs and other third-party marketing organizations in appropriate circumstances. The final Rule overrides that policy to the detriment of beneficiary choice Congress intended to protect.

### The Rule is unlawful and must be vacated

53.     In promulgating the Rule, CMS exercised power not granted to it by Congress, which authorized the agency only to establish "guidelines" to "ensure that the use of compensation creates incentives for agents and brokers" to act in the best interest of beneficiaries. The final Rule depends on a vast overreading of that language. In addition, the Rule is arbitrary and capricious. With the Rule, CMS has established sweeping changes for Medicare Advantage marketing, but without any verifiable evidence to support the supposed problems that it promulgated the Rule purportedly to solve. The agency also ignored serious objections to the Rule, including the challenges to the mistaken premises on which the Rule is based. Moreover, CMS failed to address the substantial investment-backed expectations, declined to make facts and evidence available for

17

comment, and introduced changes to the proposed rule that could not have been anticipated. Rare is the rule that is so obviously unlawful in so many independent ways.

54.   CMS suggested that each of its new "limitations is intended to better align the professional incentives of the agents and brokers with the interests of the Medicare beneficiaries they serve." 89 Fed. Reg. at 30619. It asserted further that "some recent studies suggest that Medicare Advantage plans offer additional or alternative incentives to agents and brokers, often through third parties such as FMOs, to prioritize enrollment into some plans over others." *Id*. But the agency failed to identify or make any such studies available for inspection or comment.

55.   In the notice of proposed rulemaking, CMS had taken the position that it "believes payments categorized by MA organizations as 'administrative expenses,' paid by MA organizations to agents and brokers, have significantly outpaced the market rates for similar services provided in non-MA markets." 88 Fed. Reg. at 78554. As support for this "belief"—an odd characterization for what should be an objectively verifiable fact—CMS cited, but did not provide, "information shared by insurance associations and focus groups and published in research articles." 88 Fed. Reg. at 78554. The only source CMS cited was a single study by a private entity, which relied on personal anecdotes from just 29 agents and brokers. *See* The Commonwealth Fund, *The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents* (Feb. 28, 2023), https://perma.cc/67WG-7NDF (cited in 88 Fed. Reg. at 78,554 nn.136-37).

56.   CMS reiterated the same "belief" concerning increased administrative expenses in the preamble to the final Rule. 89 Fed. Reg. at 30619. For support, it continued to rely on the same report, without more. 89 Fed. Reg. 30619 nn. 154, 155. But it did not explain in the final Rule any ground for concluding that 29 agents and brokers sharing personal anecdotes was reliable or might constitute a statistically significant sample of (by CMS's own estimates) the approximately 100,000 health insurance agents and brokers serving 30 million beneficiaries throughout the United States.

57.     CMS also attempted to justify the Rule on the ground that the agency "is concerned that the more recent increases in fees being paid to larger FMOs have resulted in a 'bidding war' among Medicare Advantage plans to secure anticompetitive contract terms with FMOs and their affiliated agents and brokers." 89 Fed. Reg. at 30619; *see also* 88 Fed. Reg. at 78,552 (noting that CMS "has observed that the Medicare Advantage marketplace, nationwide, has become increasingly consolidated among a few large national parent organizations, which presumably have greater capital to expend on sales, marketing, and other incentives and bonus payments to agents and brokers than smaller market Medicare Advantage plans"). "If left unaddressed," CMS speculated, "such bidding wars will continue to escalate with anticompetitive results." 89 Fed. Reg. at 30619.

58.     In support of the Rule, CMS thus invoked a general mandate to "deter anticompetitive practices engaged in by Medicare Advantage organizations, agents, brokers, and [FMO]s." *Id*. Its basis for this authority was not a statutory provision but rather an executive order "describ[ing] the Administration's policy goals to promote a fair, open, competitive marketplace." *Id*. at 30618-19. The statutory basis cited for that executive order was the federal antitrust laws, and the order made no mention of CMS or its regulation of agent or broker compensation. *See* 86 Fed. Reg. 36987, 36989 (July 9, 2021).

59.     CMS also pointed to alleged (but not proved) consolidation in the FMO industry, surmising that larger FMOs "*presumably* have greater capital to expend on sales, marketing, and other incentives and bonus payments to agents and brokers than smaller market Medicare Advantage plans." 89 Fed. Reg. at 30617 (emphasis added). This consolidation, CMS speculated further, gives large FMOs "a greater opportunity . . . to use financial incentives outside and potentially in violation of the compensation cap set by CMS to encourage agents and brokers to enroll individuals in their plan over a competitor's plans." *Id*. CMS's justification mirrored statements made in the notice of proposed rulemaking, where the agency had asserted that it

"received reports that some larger FMOs are more likely to contract with national plans, negatively impacting competition." 88 Fed. Reg. at 78553. But it disclosed no such reports to the public in the notice-and-comment process.

60.    CMS did not disclose any other data to support its assumption that consolidation in the FMO industry was causing compensation abuses. Instead, it stated only that it had "seen web-based advertisements for agents and brokers to work with or sell particular plans where the agents and brokers are offered bonuses and perks (such as golf parties, trips, and extra cash) in exchange for enrollments." 89 Fed. Reg. at 30617; *accord* 88 Fed. Reg. at 78552.

61.    CMS concluded without support that "[t]hese payments, while being presented to the agents and brokers as innocuous bonuses or incentives, are implemented in such a way that allows the plan sponsor, in most cases, to credibly account for these anti-competitive payments as 'administrative' rather than 'compensation,' and these payments are therefore not limited by the regulatory limits on compensation." *Id.* In reaching this unsupported conclusion, CMS failed to acknowledge that its pre-Rule definition of "compensation" included "bonuses," "gifts," "prizes or awards," and thus that such forms of remuneration could *not* credibly be accounted for as administrative fees earned by FMOs. *See* 42 C.F.R. § 422.2274(a)(i) (2023).

62.    CMS also asserted in the notice of proposed rulemaking that it had "received complaints from a host of different organizations, including State partners, beneficiary advocacy organizations, and Medicare Advantage plans," but again without disclosing any details or data regarding those complaints. 88 Fed. Reg. at 78,552. CMS insisted that "[a] common thread to the complaints is that agents and brokers are being paid, typically through various purported administrative and other add-on payments, amounts that cumulatively exceed the maximum compensation allowed under the current regulations." *Id.* CMS then took an unsupported leap, concluding that "agents and brokers are presented with a new suite of questionable financial incentives that are likely to influence which Medicare Advantage plan an agent encourages a

20

beneficiary to select during enrollment." *Id.* Again, the public were afforded no opportunity to review any data or other evidence that might underlie this bald assertion. CMS cited none in either the notice of proposed rulemaking or the preamble to the final Rule.

63.     CMS expressed a "belie[f] these financial incentives are contributing to behaviors that are driving an increase in Medicare Advantage marketing complaints received by CMS in recent years" (88 Fed. Reg. at 78522), again without detailing or identifying any such complaints.

64.     The notice of proposed rulemaking did not propose to limit or forbid the ability of MAOs to make payments of administrative fees directly to FMOs. Rather, CMS noted that its proposals regarding administrative payment would require "agents and brokers [to be] paid the same amount *either from the Medicare Advantage plan directly* or *by an FMO*." 88 Fed. Reg. at 78555 (emphasis added). The preamble to the final Rule, however, purports to limit or forbid direct MAO-to-FMO payments of administrative fees. *See* 89 Fed. Reg. at 30622 (the final Rule "prohibit[s] separate administrative payments"). Plaintiffs do not concede that the Rule is properly read in that manner, but other stakeholders have disagreed. But no such limit or prohibition on MAO-to-FMO payments was fairly encompassed in the proposed rule, meaning the public were given no opportunity to comment on the issue.

65.     When it proposed a new flat administrative fee in the notice of proposed rulemaking, CMS concluded that "it was necessary to increase the rate for compensation by $31, based on the estimated costs for licensing, training, testing, and call recording that would need to be covered by this single enrollment-based payment." 89 Fed. Reg. at 30624. In response to comments on that amount, CMS acknowledged that it initially lacked "a more complete picture of the many administrative and other services and expenses agents and brokers undertake when assisting beneficiaries with enrollments" and that the $31 proposal "may not have adequately accounted for the array of services that agents and brokers may provide." 89 Fed. Reg. at 30625.

66.     While assuring the public that "[c]ommenters' feedback, both general and specific, was closely considered" and that the agency had come to "believe it is necessary to update the compensation rate increase to better reflect the costs of Medicare Advantage agent or broker services," CMS ultimately concluded that "it would be extremely difficult for [it] to accurately" estimate the true cost of essential administrative services. *Id*. CMS thus selected a number without evidentiary explanation, effectively taking a guess that "the FMV rate for new enrollments" should be increased arbitrarily—instead of $31, now "by a total of $100" to "provide agents and brokers with sufficient funds to continue to access necessary administrative tools and trainings, to offset appointment fees and encourage the representation of multiple plans, and therefore to continue providing adequate service to Medicare beneficiaries." *Id*. at 30626.

**A preliminary injunction postponing the applicability date is imperative
to preserving the Court's ability to conduct meaningful judicial review**

67.     Preliminary injunctive relief is essential to prevent immediate irreparable harm to all stakeholders involved, including (a.) the 30 million Medicare Advantage beneficiaries who, now more than ever, will need to work with "agents and brokers to enroll individuals in the plan that best fits a beneficiary's health care needs" (89 Fed. Reg. at 30450); (b.) the agents and brokers who serve those beneficiaries; and (c.) the FMOs that make an objective assessment of plans in a competitive marketplace possible. Although the Rule has a nominal applicability date of October 1, it soon will be impossible to unwind the Rule's harmful impacts on the many contracts arrangements that undergird the Medicare Advantage program.

68.     CMS requires Medicare Advantage plans to, "[o]n an annual basis, report to the CMS whether the Medicare Advantage organization intends to use employed, captive, or independent agents or brokers in the upcoming plan year and the specific rates or ranges of rates the plan will pay independent agents and brokers." 42 C.F.R. § 422.2274(c)(5). CMS also requires Medicare Advantage plans to, "[o]n an annual basis by October 1, have in place full compensation structures for the following plan year," including "details on compensation dissemination,

including specifying payment amounts for initial enrollment year and renewal year compensation."
*Id.* § 422.2274(c)(6).

69.     Against those deadlines, ABC's members, including Senior Security Benefits, already are devoting significant resources to shifting their business models to accommodate the new standards promulgated under the Rule. This is requiring renegotiation of contractual relationships among all stakeholders: Agents and brokers must renegotiate their relationships with FMOs; FMO's must renegotiate their relationships with MAOs; MAOs must renegotiate their relationships with agents and brokers, and so on.

70.     Consummation of these contracts follows a strict and carefully choreographed timeline that is already underway. The current regulatory framework requires MAOs to submit contract bids to CMS by or before June 6, 2024. Although the final Rule has an "applicability" date of October 1, 2024, which is when sales and marketing activities for the forthcoming annual enrollment period will commence, its "effective" date is June 3, 2024. The Rule therefore will impact the substantive terms of contracts negotiated and entered into for the 2025 benefit year, long before the October 1 applicability date.

71.     MAOs must submit their contract bids to CMS for benefit year 2025 by or before June 6, 2024. They will begin their contract "rollouts" for agents, brokers, and FMOs in connection with those bids around the same time, continuing through July.

72.     Certification of agents and brokers by America's Health Insurance Plans, or AHIP, is a critical step in this process. Agents and brokers who are not certified generally cannot sell Medicare Advantage plans. The certification process will begin in June and will be completed by early August. Once agents and brokers are (re)certified by AHIP, MAOs generally open their own proprietary certification processes. Once that process commences in earnest by the second half of July, it will no longer be possible for the Court to enter meaningful injunctive relief, because compensation arrangements for the forthcoming annual enrollment period will by then be settled.

23

That is to say, there will not be sufficient time to implement changes to the various layers of stakeholder contracts before the annual enrollment period commences in October.

73.     To prevent the irreparable harm that is certain to befall the plaintiffs and the beneficiaries they serve, the Court accordingly must enter an order postponing the applicability date and otherwise enjoining enforcement of the Rule by or before mid-July 2024. Plaintiffs intend to file a motion seeking such relief expeditiously after the filing of this complaint.

## CLAIMS FOR RELIEF

### COUNT I
### Agency Action in Excess of Statutory Authority

74.     Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

75.     Under the Administrative Procedure Act, the Court must set aside agency action that is not in accordance with law or in excess of statutory authority. 5 U.S.C. § 706. An agency action is invalid and must be vacated if it conflicts with the plain language of the statute or exceed the power conferred upon it by that language. *Perez v. Mortgage Bankers Association*, 575 U.S. 92, 104-105 (2015).

76.     The final Rule must be vacated for two independent reasons.

a.     *First*, CMS's definition of "compensation" spurns the plain language, context, and structure of 42 U.S.C. § 1395w-21(j)(2)(D), which authorizes CMS to set guidelines for "the use of compensation" by "agents and brokers" selling enrollments in Medicare Advantage plans. The word "compensation" means remuneration for a service. As CMS has recognized since at least 2005 (*see supra* ¶¶ 44-47), the administrative and support services provided by FMOs to agents and brokers are separate and apart from the sales and marketing services provided by agents and brokers to MAOs. When an MAO pays an FMO for providing those separate and different administrative and support services, it is not in any ordinary sense of the word providing "compensation" that is used by "agents and brokers" to sell enrollments in Medicare Advantage

plans. The Rule is not in accordance with law inasmuch as it defines "compensation" to include administrative fees that historically have been paid by MAOs to third-party FMOs.

b.   *Second*, CMS stated expressly that the Rule was adopted in principal part to implement "the Administration's policy goals to promote a fair, open, competitive marketplace" and to "further[] competition." 89 Fed. Reg. at 30618-19 (citing Executive Order 14306); *see* 88 Fed. Reg. at 78553 (explaining that the Rule "aim[s] to deter anti-competitive practices engaged in by Medicare Advantage organizations, agents, brokers, and TPMOs"). The agency asserted as a primary concern that, "[i]f left unaddressed," FMO pricing behavior will produce "anti-competitive results, as smaller local or regional plans that are unable to pay exorbitant fees to FMOs risk losing enrollees to larger, national plans who can." *Id*. at 30619. The agency thus justified the Rule on the ground that it would "help level the playing field for all plans represented by an agent or broker and [thus] promote[] competition." *Id*. at 30621. But Congress did not grant CMS authority to implement or enforce the Nation's antitrust laws, even with respect to marketing practices related to Medicare Advantage plans. Section 1395w-21(j)(2)(D) directs CMS only to establish incentive for agents and brokers to act in the best interests of Medicare Advantage beneficiaries, not to stave off purportedly anticompetitive conduct of third parties.

77.   Because the Rule exceeds the scope of CMS's limited rulemaking authority, the Court must set aside and vacate the final Rule and declare that it is invalid and unenforceable.

## COUNT II
### Arbitrary and Capricious Agency Action

78.   Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

79.   Pursuant to the Administrative Procedure Act, the Court must set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706. An action is arbitrary and capricious where the agency fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Texas v. Becerra*, 575 F. Supp.3d 701, 723 (N.D. Tex. 2021); *see also Amin v. Mayorkas*, 24 F.4th 383 (5th Cir. 2022) (holding that an

agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made").

80.   The final Rule must be vacated on this ground for five different reasons.

a.   *First*, throughout the notice of proposed rulemaking, CMS assumed repeatedly but without evidentiary support or logical explanation that separate administrative payments paid by MAOs to FMOs have been used as "incentives to agents and brokers, often through third parties such as FMOs, to prioritize enrollment into some plans over others." 88 Fed. Reg. at 78554. CMS did not supply the missing evidence or explanation with the final Rule, even though commenters explained the error of the assumption. The failure to respond to comments on this point by itself renders the rule arbitrary and capricious.

Moreover, there is no factual or logical reason to conclude that payments of administrative fees by MAOs to FMOs would have any bearing on the incentives received by agents and brokers. CMS pointed to a supposed risk that MAOs or FMOs may offer "agents and brokers . . . bonuses or incentives" and "account" for them "as 'administrative [fees]' rather than 'compensation,'" but it did not explain how such accounting might work. Nor could it have worked, because CMS's pre-Rule definition of "compensation" included "bonuses," "gifts," and "prizes or awards," and thus such forms of remuneration could *not* credibly be accounted for as administrative fees earned by FMOs. *See* 42 C.F.R. § 422.2274(a)(i) (2023). Nor did CMS explain why a rule change was necessary to prevent perceived abuses, given that the pre-Rule regulations already specified that administrative payments "must not exceed the value of those services in the marketplace." *Id.* § 422.2274(e)(1) (2023). An expert agency's predictive judgments "must be based on some logic and evidence, not sheer speculation." *Sorenson Communications v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). That is to say, "all agency action, even 'predictive judgment[s] based on the evidence' available, must be 'reasonable and reasonably explained.'" *El Paso Electric Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023) (quoting *FCC v. Prometheus Radio Project*, 141

S. Ct. 1150, 1160 (2021)). And an agency must also "consider the alternatives that are within the ambit of existing policy." *Louisiana v. U.S. Department of Energy*, 90 F.4th 461, 476 (5th Cir. 2024) (quoting *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1913 (2020)). CMS's failure to substantiate or explain the supposed problem that it was purportedly setting out to solve was arbitrary and capricious. *Id.*

   b. *Second*, the final Rule does not provide evidence or adequate explanation for CMS's sudden rejection of its longstanding definition of "compensation." For 16 years, CMS had excluded administrative fees from "compensation" within the meaning of 1395w-21(j)(2)(D). And commenters explained the reliance interests that had built up around that longstanding interpretation. To be sure, "[a]gencies are free to change their existing policies," but they may do so only if they "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citing *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)); *accord Physicians for Social Responsibility v. Wheeler*, 956 F.3d 634, 645 (D.C. Cir. 2020). Such explanation must "display awareness that [the agency] is changing position and show that there are good reasons for the new policy." *Encino Motorcars*, 579 U.S. at 221. Moreover, an agency must provide a "'detailed justification' for its change" from longstanding practice "when its prior policy has engendered serious reliance interests that must be taken into account." *Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357, 381 (5th Cir. 2024) (en banc). Here, CMS did not expressly acknowledge or openly address its prior interpretation of "compensation," and it wholly ignored the very serious reliance interests at stake.

   c. *Third*, the Rule's $100 one-time increase to the compensation cap for administrative costs and services lacks factual support or a reasoned basis. After initially proposing $31, CMS selected $100 from thin air, offering only that "[s]everal commenters suggested that an increase of $100 would be an appropriate starting point." 89 Fed. Reg. at 30636. But the agency gave no explanation for agreeing with those unidentified commenters, which is notable given that

other commenters "suggested an increase of $200 or more." *Id*. In selecting among the numbers on the table, CMS was required to explain itself. But it declined to do so, pointing only to an unsupported and unexplained "belie[f]" that $100 "should provide agents and brokers with sufficient funds to continue to access necessary administrative" and support services. *Id*.

        d.     *Fourth*, to the extent the Rule is read to forbid or limit payments of administrative fees by MAOs directly to FMOs, it is at cross purposes with CMS's mandate to establish guidelines that "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). Independent agents and brokers depend on FMO-provided administrative and support services to provide their own critical services to Medicare Advantage enrollees. FMOs, in turn, have historically relied on payments from MAOs to cover the cost of those services. Assuming the Rule can be read to forbid or limit direct payments to FMOs, it is arbitrary and capricious. It would discourage brokers from acting in the interest of enrollees, since independent agents would have an economic incentive to keep administrative fees for themselves, shunning the service and tools needed to make well-tailored enrollments. Courts must reject agency policy judgments if they are either "wholly unsupported or if they conflict with the policy judgments that undergird the statutory scheme." *Health Insurance Association of America v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994).

        e.     *Fifth*, CMS acted arbitrarily and contrary to law by promulgating a new limitation on sharing or distributing "personal beneficiary data" received a from MAO by an FMO. The HIPAA regulatory framework permits and encourages necessary sharing of protected health information, including "personal beneficiary data" under the Rule, between entities under common control or ownership. *See* 45 C.F.R. § 164.105(b). It likewise permits and encourages necessary sharing of protected health information, including "personal beneficiary data" under the Rule, between third party marketing organizations that act as "business associates" of covered entities.

The Rule prohibits sharing "personal beneficiary data" under both circumstances, despite that HIPAA authorizes—and by purpose and design, encourages—such sharing. When these inconsistencies were brought to CMS's attention, it brushed them aside, asserting that "the HIPAA Privacy Rule contains very specific disclosure and authorization rules that are more stringent" than the final Rule. While it is true that HIPAA and its implementing regulations adopts more reticulated standards for information sharing, it is wrong to say that HIPAA is more restrictive.

81.     The Court should therefore set aside and vacate the Final Rule as an arbitrary and capricious exercise of rulemaking authority, declaring it invalid and unenforceable.

## COUNT III
### Failure to Follow Procedures Required by Law

82.     Plaintiffs incorporate and re-allege the foregoing paragraphs in full.

83.     Pursuant to the Administrative Procedure Act, the Court must set aside agency action that is adopted without observance of procedure required by law. 5 U.S.C. § 706(2)(D).

84.     The final Rule must be vacated on this ground for two independent reasons.

a.     *First*, "[u]nder the APA, agencies must 'give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments.'" *Chamber of Commerce v. SEC*, 85 F.4th 760, 779 (5th Cir. 2023) (quoting 5 U.S.C. § 553(c)). Courts have "interpreted this requirement to mean that an agency must make at least the most critical factual material that is used to support the agency's position on review public" and "an agency cannot rest a rule on data that, in critical degree, is known only to the agency." *Air Transportation Association of America v. Department of Agriculture*, 37 F.4th 667, 677 (D.C. Cir. 2022) (cleaned up). As detailed above, CMS repeatedly failed to identify or disclose the data and analyses it asserted it relied upon in both the notice of proposed rulemaking and preamble to the final Rule. If plaintiffs and their members had been given access to these mystery reports and studies, they unquestionably would have had something "useful to say about this critical data." *Id*. Indeed, they fundamentally disagreed with the assertions that the omitted reports and studies

supposedly supported; given a chance, they would have countered and refuted the assertions appearing in those reports and studies with objective data and examples from their own experience and expertise in the market. This procedural error thus infected the entire rulemaking.

b.    *Second*, to ensure that the public have an adequate opportunity to comment on an agency's proposed action, a notice of proposed rulemaking must fairly apprise interested persons of the actions the agency is considering. Thus, "[f]inal rules under APA notice-and-comment rulemaking must be the 'logical outgrowth' of the proposed rule." *Texas Association of Manufacturers v. U.S. Consumer Product Safety Commission*, 989 F.3d 368, 381 (5th Cir. 2021) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007)). "A final rule is a logical outgrowth if affected parties should have anticipated that the relevant modification was possible." *Allina Health Services v. Sebelius*, 746 F.3d 1102, 1107 (D.C. Cir. 2014). In this case, the notice of proposed rulemaking expressly contemplated that administrative fees, even if regulated as "compensation" to agents and brokers, could and would be paid by MAOs to FMOs. *See* 88 Fed. Reg. at 78555. The notice of proposed rulemaking gave no indication that CMS was considering limiting who could pay and receive administrative fees. But in the preamble to the final Rule, CMS appears to have taken the position that all compensation, including the $100 in covered administrative fees, must be made directly by MAOs to independent agents and brokers. *See* 89 Fed. Reg. at 30624, 30626. Again, plaintiffs disagree with that position and do not concede that the final Rule is correctly interpreted or applied in that manner. But assuming for the sake of argument that the Rule can be construed and applied in such a manner, this additional restriction could not have been anticipated based on the notice of proposed rulemaking. A prohibition or limit on pure third-party MAO-to-FMO payments is not a logical outgrowth of the agency's proposal, and plaintiffs and their members had no opportunity to comment on it.

85.    The Court should therefore set aside and vacate the final Rule as having been promulgated without observance of required procedures, declaring it invalid and unenforceable.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully ask that the Court to enter the following relief with respect to the Rule insofar as it modifies the guidelines for agent and broker compensation and limits information sharing, including any and all revisions to 42 C.F.R. §§ 422.2274, 423.2274:

(a.)   enter an order postponing the applicability date of the Rule pending judicial review and granting all other preliminary relief necessary to protect the status quo;

(b.)   enter final judgment (i) setting aside and vacating the final Rule, (ii) declaring the final Rule to be unlawful and void, and (iii) enjoining defendants or their designees from enforcing, implementing, or otherwise carrying out the final Rule;

(c.)   award plaintiffs their attorney's fees and costs; and

(e.)   award such other and further relief as the Court may deem just and proper.

Dated: May 13, 2024                              /s/ *Michael P. Lynn*

David Keltner                                    Michael P. Lynn
Texas Bar No. 11249500                           Texas Bar No. 12738500
Kelly Hart & Hallman LLP                         Lynn Pinker Hurst & Schwegmann, LLP
201 Main Street, Suite 2500                      2100 Ross Avenue, Suite 2700
Fort Worth, Texas 76102                          Dallas, Texas 75201
Phone: (817) 878-3560                            Phone: (214) 981-3801
Fax: (512) 495-6401                              Fax: (214) 981-3839
david.keltner@kellyhart.com                      mlynn@lynnllp.com

Stephanie A. Webster*                            Michael B. Kimberly*
D.C. Bar No. 479524                              D.C. Bar No. 991549
Christopher M. Nienhaus*                         McDermott Will & Emery LLP
D.C. Bar No. 90008585                            500 North Capitol Street NW
Ropes & Gray LLP                                 Washington, D.C. 20001
2099 Pennsylvania Avenue NW                      Phone: (202) 756-8901
Washington, D.C. 20006                           Fax: (202) 756-8087
Phone: (202) 508-4859                            mkimberly@mwe.com
Fax: (202) 508-4650
stephanie.webster@ropesgray.com                  Ashley C. Parrish*
christopher.nienhaus@ropesgray.com               D.C. Bar No. 464683
                                                 Adam C. Solander*
Casey Kyung-Se Lee*                              D.C. Bar No. 1002511
Ropes & Gray LLP                                 King & Spalding LLP
New York Bar No. 4885927                         1700 Pennsylvania Avenue NW, Suite 900
1211 Avenue of the Americas                      Washington, D.C. 20006
New York, New York 10036                         Phone: (202) 626-2627
Phone: (212) 596-9000                            Fax: (202) 626-3737
Fax: (212) 596-9090                              aparrish@kslaw.com
casey.lee@ropesgray.com                          asolander@kslaw.com

 * *pro hac vice* motions forthcoming