# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> *Defendants*. | No. 4:24-cv-439-O |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A SECTION 705 STAY OF THE FINAL RULE OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION

David Keltner
Texas Bar No. 11249500
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 878-3560
david.keltner@kellyhart.com

Stephanie A. Webster
D.C. Bar No. 479524
Christopher M. Nienhaus
D.C. Bar No. 90008585
Ropes & Gray LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 508-4859
stephanie.webster@ropesgray.com
christopher.nienhaus@ropesgray.com

Casey Kyung-Se Lee
New York Bar No. 4885927
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 596-9000
casey.lee@ropesgray.com

Michael P. Lynn
Texas Bar No. 12738500
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3801
mlynn@lynnllp.com

Michael B. Kimberly
D.C. Bar No. 991549 (PHV motion pending)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C. 20001
Phone: (202) 756-8901
mkimberly@mwe.com

Ashley C. Parrish
D.C. Bar No. 464683
Adam C. Solander
D.C. Bar No. 1002511
King & Spalding LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Phone: (202) 626-2627
aparrish@kslaw.com
asolander@kslaw.com

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................... ii

Introduction .......................................................................................................................... 1

Background ........................................................................................................................... 3

    A.   Medicare Advantage and the roles of agents, brokers, and FMOs ................................ 3

    B.   Prior regulation of Medicare Advantage marketing compensation ............................... 5

    C.   The final Rule ........................................................................................................... 7

Reasons for Granting Preliminary Relief ............................................................................. 9

I.    Plaintiffs are substantially likely to prevail on the merits ............................................. 9

    A.   The Rule exceeds the regulatory authority conferred by Congress ............................... 9

        1.   The statute does not authorize CMS to regulate fees paid to FMOs for administrative and other support services ............................................................. 10

        2.   Congress did not grant CMS authority to enforce the antitrust laws ................... 12

    B.   The Rule is arbitrary and capricious .......................................................................... 13

        1.   The problem that CMS identified and the solution that it adopted are both imaginary and wholly unsupported by evidence ............................................ 14

        2.   Other critical elements of the Rule were unsupported by evidence or rational explanation ............................................................................................. 17

        3.   The final Rule works at cross-purposes with the congressional policy judgment embedded in § 1395w-21(j)(2)(D) .................................................... 19

    C.   The Rule was promulgated without observance of required procedures ...................... 21

II.   Plaintiffs will suffer irreparable harm without an immediate stay of the final Rule ........... 23

III.  The balance of hardships and the public interest favor preliminary relief .......................... 24

IV.  A Section 705 stay of the relevant aspects of the Rule is particularly appropriate in these circumstances .................................................................................................. 25

Conclusion .......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Air Transportation Association of America, Inc. v. Department of Agriculture*,
    37 F.4th 667 (D.C. Cir. 2022) ............................................................................21, 22

*Alliance for Hippocratic Medicine v. FDA*,
    668 F. Supp. 3d 507 (N.D. Tex. 2023) ...........................................................................3

*Alliance for Hippocratic Medicine v. FDA*,
    78 F.4th 210 (5th Cir. 2023) .......................................................................3, 23, 24, 25

*Amin v. Mayorkas*,
    24 F.4th 383 (5th Cir. 2022) ..............................................................................13, 18

*Barber v. Thomas*,
    560 U.S. 474 (2010).............................................................................................10

*BST Holdings v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ...................................................................................3

*Career Colleges and Schools of Texas v. U.S. Department of Education*,
    98 F.4th 220 (5th Cir. 2024) ..............................................................................2, 23

*Chamber of Commerce v. U.S. Department of Labor*,
    885 F.3d 360 (5th Cir. 2018) .............................................................................12, 13

*Clarke v. Commodity Futures Trading Commission*,
    74 F.4th 627 (5th Cir. 2023) ...................................................................................2

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016).............................................................................................17

*FBME Bank Ltd. v. Lew*,
    209 F. Supp. 3d 299 (D.D.C. 2016).............................................................................21

*Health Insurance Association of America v. Shalala*,
    23 F.3d 412 (D.C. Cir. 1994).............................................................................13, 19

*Huawei Technologies USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ..............................................................................14, 17

*Janvey v. Alguire*,
    847 F.3d 231 (5th Cir. 2017) ..................................................................................19

*Kovac v. Wray*,
    660 F. Supp. 3d 555 (N.D. Tex. 2023) ..........................................................................12

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ..................................................................................24

**Cases—continued**

*Louisiana v. U.S. Department of Energy*,
    90 F.4th 461 (5th Cir. 2024) ........................................................................13

*Mock v. Garland*,
    2023 WL 6457920 (N.D. Tex. Oct. 2, 2023) ..........................................24

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)........................................................................................25

*National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
    2024 WL 1349307 (N.D. Tex. Mar. 29, 2024) ........................................3

*Perez v. Mortgage Bankers Association*,
    575 U.S. 92 (2015)............................................................................................9

*Restaurant Law Center v. U.S. Department of Labor*,
    66 F.4th 593 (5th Cir. 2023) ..........................................................................2

*Sorenson Communications Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ..............................................................13, 17

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
    566 U.S. 560 (2012)........................................................................................10

*Texas Association of Manufacturers v. CPSC*,
    989 F.3d 368 (5th Cir. 2021) ........................................................................22

*Texas Gun Rights v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
    2023 WL 8352316 (N.D. Tex. Oct. 4, 2023) ............................................3

*Texas v. Becerra*,
    575 F. Supp. 3d 701 (N.D. Tex. 2021) ....................................................13

*Texas v. Becerra*,
    623 F. Supp. 3d 696 (N.D. Tex. 2022) ....................................................23

*United States v. Gonzalez-Medina*,
    757 F.3d 425 (5th Cir. 2014) ........................................................................10

*United States v. Palomares*,
    52 F.4th 640 (5th Cir. 2022) ........................................................................10

*VanDerStok v. BlackHawk Manufacturing Group*,
    659 F. Supp. 3d 736 (N.D. Tex. 2023) ....................................................24

*Wages & White Lion Investments, LLC v. FDA*,
    90 F.4th 357 (5th Cir. 2024) (en banc) ....................................................17

*Wages & White Lion Investments v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ..................................................................3, 23

**Statutes and regulations**

5 U.S.C.

§ 706 .................................................................................................9, 13
§ 706(2) ..................................................................................................2
§ 706(2)(D) ...........................................................................................21

42 U.S.C.

§ 1395w-21 ..............................................................................................5
§ 1395w-21(j)(2)(D) ...................................4, 5, 6, 7, 8, 10, 11, 12, 13, 17, 19, 20
§ 1395w-23(a) ..........................................................................................3

42 C.F.R.

§ 422.2274(a) ...........................................................................................8
§ 422.2274(a) (as amended) .....................................................................10
§ 422.2274(a) (2023) ..............................................................................11
§ 422.2274(a)(1) (2008) ........................................................................6, 14
§ 422.2274(c)(13) (as amended) ................................................................8
§ 422.2274(e) (2023) ........................................................................7, 11, 14
§ 422.2274(e)(2) (2021) ............................................................................7
§ 422.2274(e)(2) (as amended) ..............................................................8, 11

45 C.F.R.

§ 164.105(a)(2)(iii) .................................................................................20
§ 164.105(b) ...........................................................................................20
§ 164.314 ...............................................................................................20

*Medicare Program; Establishment of the Medicare Advantage Program,*
70 Fed. Reg. 4588 (Jan. 28, 2005) ............................................................3

*Medicare Program; Revisions to the Medicare Advantage and Prescription Drug*
*Benefit Programs, etc.*
73 Fed. Reg. 54226 (Sept. 18, 2008) ......................................................6, 11

*Medicare Program; Revisions to the Medicare Advantage and Prescription Drug*
*Benefit Programs: Clarification of Compensation Plans, etc.*
73 Fed. Reg. 67406 (Nov. 14, 2008) ..........................................................6

*Medicare and Medicaid Programs; Contract Year 2022 Policy and Technical*
*Changes to the Medicare Advantage Program, etc.*
86 Fed. Reg. 5864 (Jan. 19, 2021) .............................................................7

*Promoting Competition in the American Economy, etc.*
86 Fed. Reg. 36987 (July 9, 2021) ...........................................................13

*Medicare Program; Contract Year 2025 Policy and Technical Changes to the*
*Medicare Advantage Program, etc.*
88 Fed. Reg. 78476 (Nov. 15, 2023) ................................................... *passim*

*Medicare Program; Changes to the Medicare Advantage and the Medicare*
*Prescription Drug Benefit Program, etc.*
89 Fed. Reg. 30448 (Apr. 23, 2024) ................................................... *passim*

**Other Authorities**

The Commonwealth Fund, *The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents* (Feb. 28, 2023) ...................................................16

Compensation, *Black's Law Dictionary* 322 (9th ed. 2009)..........................................................10

Compensation, *Websters New Third International Dictionary* 463 (1993).................................10

CY2018 Medicare Marketing Guidelines, Section 120.4.4 (July 20, 2017)...................................6

## INTRODUCTION

The final Rule is a regulation of compensation for independent insurance agents, brokers, and other third parties with respect to sales and marketing of Medicare Advantage plans. It is a dramatic and unjustified break from 16 years of settled practice around which an entire industry has developed. Field marketing organizations (FMOs) provide critical administrative services and regulatory compliance support to independent agents and brokers, who are thus able to operate free from influence from the insurance issuers whose policies they sell. Because of their independence, agents and brokers are able to provide crucial assistance to elderly Medicare beneficiaries in a manner that best serves their needs. But the Rule has dropped a bomb on this arrangement, treating administrative expenses as regulated "compensation" to agents and brokers, subject to a randomly selected, government-determined fee cap and purporting to control who may pay whom. The regulation appears calculated to reverse the growth of the free-enterprise driven Medicare Advantage (MA) program and to steer enrollees back into single-payer Medicare.

All the traditional elements for a Section 705 stay or preliminary injunction are present, and the need for temporary relief is urgent. If the Court does not enter a stay by or before mid-July, it will be impossible to undo the Rule's harms to the market and the FMO business model. Section 705 was enacted for circumstances just like these, to preserve the status quo so that passage of time does not thwart the Court's ability to conduct meaningful judicial review.

To begin, plaintiffs have a substantial likelihood of success on the merits. It is indeed extraordinary for a single case to present so many clear examples of regulatory overreach. In the rulemaking here, the Centers for Medicare & Medicaid Services (CMS) defined the key statutory term, "compensation," well beyond what its plain meaning and context permit. The agency also claimed authority to enforce the antitrust laws that Congress never granted it. Moreover, CMS did these things in a purported effort to solve a problem that is a product of imagination only. The preamble to the rule is literally brimming with unjustified speculation about facts that, if actually

true, easily could have been verified with objective evidence. But the agency had no such evidence to support its conclusory "beliefs" about the workings of the market for MA marketing and sales. Or at least if it did, it didn't make that evidence available to the public for inspection or comment, which is nearly as bad and dooms the final Rule just as well. All told, the Rule is unlawful at least three times over: Its adoption exceeded CMS's statutory authority, it is arbitrary and capricious, and it was adopted without observance of required procedure. *See* 5 U.S.C. § 706(2). There is, in short, more than a substantial likelihood that plaintiffs will prevail on the merits.

In addition, preliminary relief is imperative to ensure that plaintiffs, their members, and other stakeholders do not suffer a variety of irreparable harms. If the Rule is not stayed before the myriad contracts underlying the Medicare Advantage program are finalized beginning in the second half of July 2024, the preexisting FMO business model will be irretrievably altered. By that point, the Rule's new requirements, including its impact on payments of administrative and support fees to FMOs, will be irreversibly baked into thousands of new business arrangements. *E.g.*, A6 ¶ 27; A8 ¶ 38; A13 ¶ 23.

The permanent effects will be felt not only by FMOs, whose existing business model will be upended and who will have to devote substantial resources to rearranging their operations (A8 ¶ 38), but also by agents and brokers, who will be left paying additional money or otherwise foregoing important administrative and support services (A17 ¶ 12; A20 ¶ 24). It also will be felt by Medicare Advantage beneficiaries themselves, who count on access to critical information and decisionmaking assistance from agents and brokers. A25 ¶ 14.

In well more than a dozen recent APA cases, this Court and the Fifth Circuit have not hesitated to enter Section 705 stays or preliminary injunctions when the circumstances have warranted it. *See, e.g.*, *Career Colleges and Schools of Texas v. U.S. Department of Education*, 98 F.4th 220 (5th Cir. 2024); *Clarke v. Commodity Futures Trading Commission*, 74 F.4th 627 (5th Cir. 2023); *Restaurant Law Center v. U.S. Department of Labor*, 66 F.4th 593 (5th Cir. 2023);

*Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210 (5th Cir. 2023); *Wages & White Lion Investments v. FDA*, 16 F.4th 1130 (5th Cir. 2021); *BST Holdings v. OSHA*, 17 F.4th 604 (5th Cir. 2021); *National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 2024 WL 1349307 (N.D. Tex. Mar. 29, 2024); *Alliance for Hippocratic Medicine v. FDA*, 668 F. Supp. 3d 507 (N.D. Tex. 2023); *Texas Gun Rights v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 2023 WL 8352316 (N.D. Tex. Oct. 4, 2023). The same relief is desperately needed and manifestly appropriate in this case.

## BACKGROUND

### A.      Medicare Advantage and the roles of agents, brokers, and FMOs

The underlying regulatory scheme in this case concerns the Medicare program, which provides health benefits for Americans aged 65 or older or with certain disabilities. It has four parts: A, B, C, and D. *See* 70 Fed. Reg. 4588, 4589 (Jan. 28, 2005). Medicare Part A is the federally funded, federally administered hospital insurance program, and Medicare Part B is the medical insurance program. *Id*. Together, Parts A and B are known as traditional Medicare. *Id*. Traditional Medicare is a single-payer, one-size-fits all public health benefit program.

Medicare Part C—otherwise known as the Medicare Advantage, or MA, program—is different. It harnesses market forces and free enterprise to develop innovative insurance options that are better tailored to enrollees' particular needs. Compl. ¶ 27. Part C allows private companies to contract with CMS to provide beneficiaries with Part A and Part B benefits, bundled together with a selection of additional benefits that are not fully subsidized by the federal government. *Id*. CMS thus contracts with private companies called Medicare Advantage Organizations (MAOs), which sponsor MA plans. Instead of fee-for-service reimbursements, however, MAOs receive risk-adjusted, per-person monthly allowances to provide coverage for all Medicare-covered benefits to the beneficiaries enrolled in their plans. *See* 42 U.S.C. § 1395w-23(a).  This is, in effect, the health insurance equivalent of a private school voucher for Medicare beneficiaries.

3

Since its adoption by the Bush administration in 2003, the Medicare Advantage program has grown steadily and today is an overwhelming success. Compl. ¶ 29. Americans prefer the choices that Medicare Advantage plans provide compared with traditional Medicare. *Id.* As of benefit year 2023, more than 30 million enrollees are enrolled in the program, surpassing for the first time the number of enrollees in traditional Medicare. *Id.* (citing sources).

At the same time that beneficiaries enjoy a wide range of choices under the Medicare Advantage program, they now also face increased decisionmaking complexity. Unfortunately, individuals shopping for a Medicare Advantage plan have few tools available to compare and select among them. Compl. ¶ 31 (citing sources). CMS does not offer any user-friendly online tools for comparing different Medicare Advantage plans. *Id.*

Congress intended for insurance brokers and agents to fill this gap. *See* 42 U.S.C. § 1395w-21(j)(2)(D). Agents and brokers help "millions of Medicare beneficiaries to learn about and enroll in" MA plans "by providing expert guidance on plan options in their local area, while assisting with everything from comparing costs and coverage to applying for financial assistance." 89 Fed. Reg. 30617; *see also* A32 ¶ 12; A3 ¶ 17; A5 ¶ 22; A25-A26 ¶¶ 14-19.

There are two historical models for insurance agents and brokers in the market for Medicare Advantage plans. The first is a "captive agent" model, under which MAOs and their predecessor entities originally managed proprietary networks of dedicated insurance agents who were devoted to selling only that MAO's plans. Compl. ¶ 33; A3 ¶ 15; A20 ¶ 22. But this approach was a poor fit for the Medicare Advantage program because it limited choices presented to beneficiaries and also saddled MAOs with the enormous costs of maintaining redundant networks of exclusive brokers. Compl. ¶ 33; A20 ¶ 22.

The captive agent model thus gave way to the second model, which utilizes *independent* agents and brokers. A3 ¶¶ 15-16. Under this model, which is now prevalent across the Medicare Advantage program as a whole, agents and brokers are unaffiliated with MAOs. A3 ¶ 16. MAOs

instead pay commissions to independent agents and brokers, as well as administrative fees to FMOs for services to recruit and support those agents and brokers. A13 ¶ 21. FMOs, in turn, provide essential services to independent agents and brokers in the form of administrative and operational support. A3-A4 ¶¶ 19-20. FMOs are responsible for a wide range of support services and technology, including oversight for regulatory compliance; facilitating agent access to MA plans; customer relationship management software; back-office support; data privacy and security technology and software; coverage of the costs of training, certifications, and licensure; reimbursement for mileage to and from events; and coverage of marketing overhead expenses. A12 ¶¶ 18-19; A3 ¶ 19.

The FMO-facilitated model of independent agents and brokers better suits everyone. It better suits agents, who are not beholden to a single MAO and can offer beneficiaries a diverse array of MA plans to best meet their needs. *E.g.*, A20 ¶¶ 22-23. It better suits MAOs, which are freed from the strategic pressures and enormous costs of developing proprietary agent networks, allowing them to compete instead on the quality of the Medicare Advantage plans they create. Compl. ¶ 33. It better suits enrollees, who receive superior services from independent agents and brokers and report higher satisfaction when working with them. A25 ¶ 14-17. And it better suits the government, because it more often directs beneficiaries to higher quality, higher satisfaction MA plans, which was Congress's express goal with § 1395w-21(j)(2)(D).

### B.   Prior regulation of Medicare Advantage marketing compensation

This lawsuit concerns CMS's regulation of compensation arrangements for independent agents and brokers, and the FMOs that support them, pursuant to the Medicare Improvements for Patients and Providers Act of 2008. *See* 42 U.S.C. § 1395w-21. Consistent with Congress's objective to engage agents and brokers to help effectively market MA plans, the statute directs CMS to establish "guidelines" to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their

health care needs." *Id*. § 1395w-21(j)(2)(D).

Soon after the statute's enactment, CMS published an interim final rule that imposed caps on compensation to "independent brokers and agents" selling Medicare Advantage products through FMOs. *See* 73 Fed. Reg. 54226 (Sept. 18, 2008). The interim final rule defined "compensation" to include "remuneration of any kind relating to the sale or renewal of a policy including but not limited to commissions, bonuses, gifts, prizes, awards and finders fees." *Id.* at 54251. CMS excluded from its definition of "compensation" reimbursements for the cost of non-marketing activities provided by FMOs, including "training, certification, and testing costs," travel "to and from appointments with beneficiaries," and "costs associated with beneficiary sales appointments such as venue rent, snacks, and materials." *Id.*; 42 C.F.R. § 422.2274(a)(1) (2008). CMS left unregulated the administrative "fees paid to FMOs" by MAOs to cover those costs. 73 Fed. Reg. at 54238. The result was to regulate the fees paid to agents and brokers while leaving unregulated the administrative fees that FMOs earned from MAOs. *Id*.

Later, in finalizing the interim rule, CMS clarified that the amount paid to FMOs should be based on market value. 73 Fed. Reg. 67406, 67410 (Nov. 14, 2008). This measure was a prophylactic against a possibility that excess fees paid to FMOs could be passed along to agents and brokers as improper excess commissions or bonuses. Still, CMS did not, in the final rule, define "compensation" to include fair-market administrative fees paid by MAOs or agents to FMOs. *See* 73 Fed. Reg. at 67409.

Other guidance and regulations bear this out. CMS later released Medicare Marketing Guidelines that continued to identify non-enrollment services like training, customer service, and agent recruitment as "administrative" services, and corresponding payments to FMOs as "administrative fees." CY2018 Medicare Marketing Guidelines, Section 120.4.4 (July 20, 2017). The section under which this provision appears was titled "Payments *other than* Compensation." *Id*. (emphasis added). CMS also promulgated a regulatory update in 2021, characterizing

"administrative payments" as "[p]ayments other than compensation" under § 1395w-21(j)(2)(D) and expanding its illustrative examples to include "assistance with completion of health risk assessments" in addition to "training, customer service, agent recruitment, [or] operational over-head." 86 Fed. Reg. 5864, 6114 (Jan. 19, 2021); 42 C.F.R. § 422.2274(e) (2023).

Finally, a 2021 regulation reaffirmed that administrative payments "must not exceed the value of those services in the marketplace," while clarifying that "[a]dministrative payments can be based on enrollment provided payments are at or below the value of those services in the marketplace." 86 Fed. Reg. at 6114; 42 C.F.R. § 422.2274(e)(2) (2021). CMS stated that it included this obligation "to ensure that [MAOs] do not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers." 86 Fed. Reg. at 5994.

The status quo defining "compensation" as payments to agents and brokers, and expressly excluding payments of administrative fees to FMOs from "compensation," thus prevailed effectively undisturbed between 2008 and 2024. During that time, ABC's members, including Senior Security Benefits, invested substantial resources in building out a robust business model dependent on MAOs paying FMOs fair market value for the technology and myriad of services that FMOs provided—and continue to provide—to independent agents and brokers. A2 ¶ 12.

### C.    The final Rule

CMS published a notice of proposed rulemaking in late 2023 (*see* 88 Fed. Reg. 78476 (Nov. 15, 2023)), took comments on the proposal, and issued the final Rule barely five months after the original notice (*see* 89 Fed. Reg. 30448 (Apr. 23, 2024), just in time to ensure that the Rule would govern the annual enrollment period for 2025. To that end, the regulation is "effective June 3, 2024" and "applicable for all contract year 2025 marketing and communications beginning October 1, 2024." *Id*. As finalized, the Rule accomplishes four notable changes.

*First*, CMS takes the position, for the first time in 16 years, that "administrative payments are included in the calculation of enrollment-based compensation" subject to regulation,

eliminating separate administrative payments. 42 C.F.R. § 422.2274(e)(2) (as amended). Now according to the agency, "compensation" under § 1395w-21(j)(2)(D) encompasses not just payments to independent agents and brokers for their services selling Medicare Advantage plans, as the term in context is naturally understood, but also "any other payments" that are in any way "tied to" or "related to" a Medicare Advantage enrollment or are provided "for services conducted as a part of the relationship associated with" a Medicare Advantage enrollment, including reimbursements for hard costs. *Id.* § 422.2274(a).

*Second*, instead of allowing for compensation for administrative services at fair market value, the final Rule engages in government rate setting. For contract year 2025, the permitted rate is expressed as a one-time increase of a flat $100 per enrollee "to account for administrative payments [now] included under the compensation rate." *Id*. For future contract years, the $100 increase will be rolled into a "base compensation rate that will be updated annually." 89 Fed. Reg. at 30626. In its initial proposal, CMS contemplated payments of these administrative fees from MAOs to FMOs. *See* 88 Fed. Reg. at 78555. But the Rule's preamble purported to require "the full payments [of administrative fees] directly to the agents and brokers," so that "agents and brokers themselves will have the opportunity to decide which services are truly essential and how much those services are worth." 89 Fed. Reg. at 30624. Although the requirement does not appear in CMS's amendments to the Code of Federal Regulations, this preamble language could be read to "prohibit separate administrative payments" to FMOs. *Id.* at 30622.

*Third*, CMS adopted a vague and open-ended general prohibition on contract terms between MAOs and agents, brokers, and FMOs that may have "a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 42 C.F.R. § 422.2274(c)(13) (as amended). CMS provided no further guidance concerning the

meaning or application of this provision, leaving uncertain when CMS might further intrude into any economic arrangements having a connection to Medicare Advantage.

*Fourth*, in parallel with the changes to compensation, the Rule adds a new paragraph (4) to §§ 422.2274(g) and 423.2274(g), prohibiting third-party marketing organizations, including FMOs, from "distributing any personal beneficiary data that they collect" to any other third-party marketing organizations, including FMOs. *See* 89 Fed. Reg. at 30599. This prohibition covers a beneficiary's "name, address, and phone number," as well as "any other information given by the beneficiary for the purpose of finding an appropriate MA or Part D plan." *Id*. at 30604. Notably, this same data qualifies as "protected health information" for purposes of the Health Insurance Portability and Accountability Act (HIPAA). HIPAA broadly governs the handling of private health information and seeks not only to protect patient privacy, but to facilitate the exchange of data to support efficient care coordination, including with respect to benefit plans and coverage. The HIPAA Privacy Rule permits and promotes the sharing of protected health information among authorized entities, sometimes including FMOs and other third-party marketing organizations.

## REASONS FOR GRANTING PRELIMINARY RELIEF

All the elements for a 705 stay and preliminary injunction are present: Plaintiffs are likely to succeed on the merits; there is a substantial threat of irreparable harm absent a stay; and the balance of harms and public interest favor an injunction. More fundamentally, a stay of the Rule is necessary to protect the Court's ability to conduct meaningful judicial review given the agency's rushed effort to issue the Rule in time to cover contracting arrangements for benefit-year 2025.

## I.   PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS

### A.   The Rule exceeds the regulatory authority conferred by Congress

An agency action is invalid and must be vacated if it conflicts with the statutory language or exceeds the power conferred upon it by Congress. *Perez v. Mortgage Bankers Association*, 575 U.S. 92, 104-105 (2015); 5 U.S.C. § 706. That is the case here.

### 1.    The statute does not authorize CMS to regulate fees paid to FMOs for administrative and other support services

**a.**    CMS's new definition of "compensation" is incompatible with the language, context, and purpose of § 1395w-21(j)(2)(D). Because the term is undefined in the statute, the starting point is the dictionary definition of the word. *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). According to the dictionary, "compensation" means remuneration for a service. *See Websters New Third International Dictionary* 463 (1993); *Black's Law Dictionary* 322 (9th ed. 2009). Out of the gate, that is a problem for CMS, because substantial portions of the administrative fees paid to FMOs are reimbursements for hard costs incurred by independent agents and brokers. The Rule's plain text makes this clear—it now treats as "compensation" repayments for, among other things, "mileage," licensing fees, costs of obtaining certifications, and all other reimbursable "actual costs associated with beneficiary sales." 42 C.F.R. § 422.2274(a) (as amended). Repayment of hard costs is not remuneration for a service rendered.

Even if some elements of administrative fees could properly be considered remuneration for services, the Rule exceeds the most natural meaning "compensation" read in context. On this score, the Court must "not look at [the] word . . . in isolation" but rather "consider the text holistically," with an eye toward the structure and purpose of the provision as a whole. *United States v. Palomares*, 52 F.4th 640, 642-643 (5th Cir. 2022) (cleaned up). In other words, the Court must interpret the word as it "is most naturally read" in context and "in accordance with what that language makes clear is its basic purpose." *Barber v. Thomas*, 560 U.S. 474, 488 (2010); *see also United States v. Gonzalez-Medina*, 757 F.3d 425, 430 (5th Cir. 2014) ("We must look to the language, structure, and purpose of the statutory provision.").

Viewed through that lens, § 1395w-21(j)(2)(D) does not authorize open-ended regulation of "compensation" of any kind. Quite the contrary, it empowers CMS to regulate only "the *use of* compensation," and even then only insofar as it "creates incentives *for agents and brokers* to enroll

individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D) (emphases added). Two conclusions follow.

First, Congress intended for CMS to regulate only how compensation is *used*. It did not empower the agency with rulemaking authority to set a rate of compensation itself. That is to say, the *rate of compensation* and *how compensation may be used* are two different things. Congress directed CMS to regulate only the latter, not the former.

Second, the only "compensation" with which Congress was concerned was compensation to independent agents and brokers. Only that narrow category of compensation is capable of "creat[ing] incentives *for agents and brokers* to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." *Id*. § 1395w-21(j)(2)(D) (emphasis added). Payments to third-party FMOs for administrative and other support costs logically cannot create incentives for agents and brokers (who are independent of FMOs) to behave one way or the other. Thus, even assuming that fees for administration and support paid to FMOs are properly considered a kind of "compensation" at all, they are not the type of compensation that Congress empowered CMS to regulate.

The Court need not take our word for it on either of these points. CMS itself, for longer than 16 years, held the same view, concluding that payments to FMOs for administrative support and related services "are … not considered compensation" for purposes of § 1395w-21(j)(2)(D). *See* 73 Fed. Reg. at 54239; *accord* 42 C.F.R. § 422.2274(a) (2023) (excluding from "compensation" reimbursement for administrative hard costs); *id*. § 422.2274(e) (2023) (describing "administrative payments" as "[p]ayments other than compensation").

CMS has now codified the opposite view, according to which "administrative payments are included in the calculation of enrollment-based compensation," subject to regulation after all. 42 C.F.R. § 422.2274(e)(2) (as amended). This sudden about-face on the meaning of the statutory term is irreconcilable with the statute's text, scheme, and purpose, and it must be rejected.

11

### 2.     Congress did not grant CMS authority to enforce the antitrust laws

CMS offered a second explanation for its extra-statutory focus on payments by MAOs to third-party FMOs, but that rationale is equally untethered to any statutory text. According to the preamble to the final Rule, CMS adopted its new regulation of administrative fees to further "the Administration's policy goals to promote a fair, open, competitive marketplace." 89 Fed. Reg. at 30618-30619 (citing Executive Order 14036). Thus, as the agency put it in the notice of proposed rulemaking, the Rule "aim[s] to deter anti-competitive practices engaged in by MA organizations, agents, brokers, and [FMO]s." 88 Fed. Reg. at 78553. "If left unaddressed," the agency surmised, FMO pricing will produce "anti-competitive results, as smaller, local or regional plans that are unable to pay exorbitant fees to FMOs risk losing enrollees to larger, national plans who can." 89 Fed. Reg. at 30619.

Whatever the merit of that position—and there is none—it touches on a field of regulation in which Congress has given CMS no authority to act. "Congress enacts laws that define and, equally important, circumscribe the power of the Executive to control the lives of the citizens." *Chamber of Commerce v. U.S. Department of Labor*, 885 F.3d 360, 387 (5th Cir. 2018). "Sometimes, however, agencies 'defy Congressional limits' and aggrandize powers to themselves that Congress never granted." *Kovac v. Wray*, 660 F. Supp. 3d 555, 563-564 (N.D. Tex. 2023). When they do so, they act beyond their authority and in violation of the APA. *Id*.

Just so here. Again, § 1395w-21(j)(2)(D) directs CMS to establish "guidelines" for "use of compensation" to help ensure that "agents and brokers [work] to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." That is all. There is not even a hint in that language that Congress intended to appoint CMS as an antitrust regulator for markets peripheral to the Medicare Advantage program, setting rate caps for third-party services to "level the playing field" and "promote[] competition." 89 Fed. Reg. at 30621.

For its part, CMS did not expressly rely on § 1395w-21(j)(2)(D) to justify its regulatory effort to "deter anti-competitive practices engaged in by Medicare Advantage organizations, agents, brokers, and [FMO]s." 89 Fed. Reg. at 30618-30619. Instead, it cited its supposed authority under Executive Order 14036. But there are two clear problems with that approach. First, Congress does not issue executive orders, the President does. And it is a "fundamental principle[] deriving from the Constitution's separation of powers" that the Executive Branch cannot arrogate to itself power not conferred by Congress. *Chamber*, 885 F.3d at 387.

Second, Executive Order 14036 does not purport to confer any authority on CMS in any event. The Order cites as its own statutory basis "[t]he antitrust laws, including the Sherman Act, the Clayton Act, and the Federal Trade Commission Act." *See* 86 Fed. Reg. 36987, 36989 (July 9, 2021). None of those laws empowers CMS to do a thing. Thus, insofar as the Rule asserts authority to "level the playing field" and "promote[] competition" among market participants (89 Fed. Reg. at 30621), it plainly exceeds the limited rulemaking power conferred by Congress.

### B.    The Rule is arbitrary and capricious

In addition to asserting sweeping regulatory authority that Congress never meant CMS to have, the Rule is arbitrary and capricious. 5 U.S.C. § 706. An action is arbitrary and capricious when the agency fails to "articulate a satisfactory explanation for its action." *Texas v. Becerra*, 575 F. Supp. 3d 701, 720 (N.D. Tex. 2021); *accord Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022). An agency action that is wholly "unsupported" cannot stand. *Health Insurance Association of America v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994). Agencies must base their rulemaking decisions on "logic and evidence, not sheer speculation." *Sorenson Communications Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). They are also required to "consider the alternatives that are within the ambit of existing policy," such as stepping up enforcement of existing rules. *Louisiana v. U.S. Department of Energy*, 90 F.4th 461, 476 (5th Cir. 2024) (cleaned up). Finally, an "agency violates the arbitrary-and-capricious standard if it fails to respond to significant points and consider

13

all relevant factors raised by the public comments." *Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (cleaned up). The final Rule flunks these tests for a range of reasons.

### 1.   The problem that CMS identified and the solution that it adopted are both imaginary and wholly unsupported by evidence

At its foundation, the final Rule rests on a straightforward syllogism:

**Major premise:** If FMOs are paid excessive administrative fees, they will use those excess fees to pay illegal bonuses and other improper incentives to independent agents and brokers to induce them to sell MA plans that are not in the best interests of enrollees.

**Minor premise:** Payments of administrative fees by MAOs to FMOs have been rising faster than market conditions would appear to justify and are now excessive.

**Conclusion:** Therefore, FMOs are paying illegal bonuses and other improper incentives to agents and brokers, and by (i) eliminating separate administrative fees and increasing compensation to agents and brokers by a flat $100 per enrollee and (ii) suggesting in the preamble that agents and brokers should use the $100 to purchase from FMOs any "truly essential" services, CMS will better ensure that agents and brokers are enrolling individuals in plans that best meets their needs. 89 Fed. Reg. at 30624.

There are two glaring problems with this syllogism. First, the major premise—that if FMOs are overpaid by MAOs, they will use the payments for unlawful bonuses and other compensation to agents and brokers—is illogical. The whole point of the current market structure is that neither FMOs, nor the independent agents and brokers they work with, are beholden to MAOs. By design, both are paid uniformly regardless of the particular plan an enrollee selects among a particular MAO's offerings.

Moreover, existing regulations already foreclose the major premise. Since CMS's first regulation on the topic, MAOs have been barred from paying FMOs more than fair-market-value for administrative fees. *See* 42 C.F.R. § 422.2274(e) (2023). And both MAOs and FMOs have long been prohibited by regulation from paying excess compensation to agents or brokers as "bonuses," "gifts," "prizes or awards," and so on. *Id.* § 422.2274(a)(i). The agency's supposition that MAOs are making oversized payments to FMOs, for FMOs to unduly influence agent and broker behavior, is thus irrational—both possibilities already are forbidden by existing regulations.

14

Second, and unsurprising, the factual premises of the syllogism are entirely imaginary. Take first the major premise. Over and over, CMS expressed worriment that "rapidly increasing" payments to FMOs for administrative fees "*may*" be being used to "influence or obscure the activities of agent and brokers." 89 Fed. Reg. at 30618 (emphasis added). It explained only that it "*believe[s]* these financial incentives are contributing to behaviors that are driving an increase in Medicare Advantage marketing complaints received by CMS in recent years." *Id*. On that basis, it speculated that FMOs *might* "use financial incentives outside and potentially in violation of the compensation cap set by CMS to encourage agents and brokers to enroll individuals in their plan over a competitor's plans"; and that "perks, add-on payments, volume bonuses and other financial incentives that are paid by MA organizations to FMOs" *might* be having an "undue influence . . . on agents and brokers." *Id*. at 30617. These conjectures are consistent with the agency's presumptions in the notice of proposed rulemaking, where it likewise expressed vague and un-explained worry that independent agents and brokers are facing "questionable financial incentives" from FMOs, which "are likely to influence which MA plan an agent encourages a beneficiary to select during enrollment." 88 Fed. Reg. at 78552.

The only justification for this worry was CMS's assertion that it had "received complaints from a host of different organizations," to the effect that independent "agents and brokers are being paid, typically through various purported administrative and other add-on payments, amounts that cumulatively exceed the maximum compensation allowed under the current regulations." *Id*. The veracity of those unexplained, undisclosed complaints was thus the factual lynchpin of CMS's decision to regulate payments by MAOs to FMOs for administrative expenses. *See* 89 Fed. Reg. at 30617. And yet, the agency furnished no evidence—*none*—to support it.

Take next the minor premise. Here, again, CMS offered only rank speculation. In the notice of proposed rulemaking, it stated that it "*believe[s]* payments categorized by MA organizations as 'administrative expenses,' paid by MA organizations to agents and brokers, have significantly

outpaced the market rates for similar services provided in non-MA markets." 88 Fed. Reg. at 78554 (emphasis added). As support for this "belief"—an odd characterization for what should be an objectively verifiable fact—CMS alluded to (but did not provide) "information shared by insurance associations and focus groups and published in research articles." *Id*. The only concrete source CMS cited was a single study by a private entity, which itself relied on personal anecdotes from just 29 agents and brokers. *See* The Commonwealth Fund, *The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents* (Feb. 28, 2023), https://perma.cc/-67WG-7NDF (cited in 88 Fed. Reg. at 78554 nn.136-137).

Commenters explained the evidentiary inadequacy of the Commonwealth Fund's report. *See* Council for Medicare Choice Comment Letter 27-30 (CMC Comment Letter), https://-perma.cc/DN2F-7TE5; Greenberg Traurig Comment Letter 8, https://perma.cc/7FQ5-XEGH. Among other things, they showed that 29 anecdotal accounts concerning payment arrangements in a complex market cannot possibly constitute a statistically significant analysis of the approximately 100,000 health insurance agents and brokers serving 30 million MA beneficiaries throughout the United States. CMC Comment Letter 27-28.

Despite these comments, the preamble to the final Rule reiterates the same "belief" concerning increased administrative expenses, continuing to rely solely on the Commonwealth Fund's report. *See* 89 Fed. Reg. at 30619 nn. 154, 155. And as to that lone citation, the agency made no effort to explain in the preamble to the final Rule why, in the face of significant critical comments, it was reasonable to continue to rely on a mere 29 anecdotal accounts.

Finally, the agency engaged in speculation even with respect to the conclusion of its syllogism. On that front, it offered only the limp aspiration that rate-setting for administrative fees "will *hopefully* . . . free" independent agents and brokers "from undue influence" by MAOs and FMOs. *Id*. at 30623 (emphasis added). Of course, it could not have offered anything more, because there was no evidence to support the notion that there was undue influence in the first place.

16

The APA demands more than this. The problems that CMS cited for the Rule were inherently empirical: It asserted that prices for administrative and support fees are rising in "bidding wars" by MAOs (89 Fed. Reg. at 30619) and being used to pay improper and illegal kickbacks to agents and brokers (*id*. at 30617). CMS was not entitled simply to imagine that such a problem exists, nor to "hope" that a grenade-like, industry-upending regulation would solve it. Agencies must base rulemakings on "logic and evidence, not sheer speculation." *Sorenson*, 755 F.3d at 708. In this case, that means CMS was required to substantiate both the problem and its solution with concrete, objective evidence that the public, in turn, could scrutinize in the notice-and-comment process. And with respect to the facially inadequate evidence that CMS did cite, it was required to respond meaningfully to substantial comments received. *Huawei*, 2 F.4th at 449. It did none of that.

### 2.    Other critical elements of the Rule were unsupported by evidence or rational explanation

Several other aspects of the Rule also were unsupported by evidence.

**a.**   The final Rule does not adequately explain CMS's sudden rejection of its longstanding definition of "compensation." Again, between 2008 and 2024, CMS had excluded administrative fees from "compensation" within the meaning of § 1395w-21(j)(2)(D). While "[a]gencies are free to change their existing policies," they may do so only if they "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). That requires the agency at least to "display awareness that it is changing position and show that there are good reasons for the new policy." *Id*. These requirements have special force when the agency's "prior policy has engendered serious reliance interests that must be taken into account." *Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357, 371-372 (5th Cir. 2024) (en banc). In that event, the agency must provide a "detailed justification for its change" that accounts for and overcomes those reliance interests. *Id*. at 381.

CMS did not come close to meeting these obligations. To the extent that the agency addressed its abrupt departure from its longstanding prior interpretation of "compensation" at all, it offered only conjecture. There was no "detailed justification" of any kind on offer. Moreover, the agency did not devote a single word of explanation to the very serious reliance interests on the status quo that were brought to its attention by several commenters. *See, e.g.*, CMC Comment Letter, at 20; IMG Comment Letter 7-10, https://perma.cc/6KCV-YLDY; SelectQuote Comment Letter 4-5, https://perma.cc/NT67-VBSP. These are fatal omissions that further doom the Rule.

**b.** The Rule's $100 one-time increase to the fee cap for administrative costs and services lacks factual support or a reasoned basis, as well. In its original notice, CMS had proposed $31 as the per-enrollment cap for administrative fees. 88 Fed. Reg. at 78556. Commenters objected to that proposal, and in response, CMS selected $100 from thin air. Its only attempt at an explanation was to observe that "[s]everal commenters suggested that an increase of $100 would be an appropriate starting point." 89 Fed. Reg. at 30626. But the agency gave no reason for agreeing with those unidentified commenters, which is notable given that other commenters "suggested an increase of $200 or more." *Id*. CMS's response was simply to shrug its shoulders, note that "it would be extremely difficult for [it] to accurately" estimate the cost of what it took to be necessary administrative services, and pick a number apparently at random. *Id*. at 30625, 30626.

In selecting among the numbers on the table, CMS was required to explain itself. It declined to do so, pointing only to an unsupported, unexplained, and ultimately incorrect "belie[f]" that $100 "should provide agents and brokers with sufficient funds to continue to access necessary administrative" and support services. *Id*. at 30626. That is insufficient to discharge its obligation to "articulate a satisfactory explanation for its action." *Amin*, 24 F.4th at 393.

**c.** Supposing arguendo that CMS's antitrust rationale was a permissible one, its analysis was likewise unsupported. Issues concerning market concentration and supra-competitive pricing are complex and data-driven, requiring an "economic analysis defining the relevant markets,"

demonstrating pricing power, and "showing anticompetitive effects." *Janvey v. Alguire*, 847 F.3d 231, 250 n.33 (5th Cir. 2017) (Higginbotham, J., concurring). CMS offered nothing remotely like that. In the preamble to the final Rule, it simply asserted that "the MA marketplace, nationwide, has become increasingly consolidated among a few large national parent organizations." 89 Fed. Reg. at 30617. From there, CMS offered the self-consciously speculative concern that large FMOs in this supposedly consolidated marketplace are able to command greater prices and thus "*presumably* have greater capital to expend on sales, marketing, and other incentives and bonus payments to agents and brokers." *Id*. (emphasis added). The agency thus concluded, based on no evidence at all, that perceived "increases in fees being paid to larger FMOs," if "left unaddressed," will therefore produce "anticompetitive results." 89 Fed. Reg. at 30617, 30619. The agency cited no market studies or economic analyses to support any of this. On these points, too, the agency offered only surmise. The Rule is thus arbitrary and capricious.

### 3. The final Rule works at cross-purposes with the congressional policy judgment embedded in § 1395w-21(j)(2)(D)

Courts must reject an agency's policy judgments that "conflict with [Congress's own] policy judgments that undergird the statutory scheme" that the agency purports to implement. *Health Insurance Association*, 23 F.3d at 416. That is the case here, in two respects.

First, the limitation of payments of administrative fees by MAOs directly to FMOs, expressed in the preamble, is at cross purposes with CMS's mandate to encourage agents and brokers "to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). Independent agents and brokers depend on FMO-provided administrative and support services to provide their own critical services to Medicare Advantage enrollees. A32 ¶ 13; A19 ¶¶ 19-20; A6 ¶ 30. Forbidding or limiting direct payments to FMOs will discourage brokers from acting in the best interests of enrollees, since independent agents will now have an economic incentive to retain administrative fees (now $100

of additional "compensation") for themselves, possibly shunning the services and tools needed to make well-tailored enrollments. A19 ¶¶ 20-21; A20-A21 ¶¶ 24-27. Forbidding or limiting direct payments to FMOs would also force some FMOs to curtail some of the essential services they provide to the community above and beyond assisting beneficiaries with enrollment. *See, e.g.*, A32 ¶¶ 13-15.

The only rationale that CMS offered is that, with the Rule's restriction in place, "agents and brokers themselves will have the opportunity to decide which services are truly essential and how much those services are worth." 89 Fed. Reg. at 30624. That is all well and good, but it has nothing to do with incentives for selecting plans that are in the best interests of beneficiaries. Because it works at cross purposes with Congress's clear objectives with § 1395w-21(j)(2)(D), it cannot support the agency's action.

Second, the agency's promulgation of a new limitation on sharing or distributing "personal beneficiary data" received from an MAO by an FMO will greatly undermine the ability of FMOs to support independent agents and brokers. The HIPAA regulatory framework permits and encourages necessary sharing of protected health information, including "personal beneficiary data" under the Rule, between entities under common control or ownership. *See* 45 C.F.R. § 164.105(b). It likewise permits and promotes necessary sharing of protected health information, including "personal beneficiary data" under the Rule, between third party marketing organizations that act as "business associates" of covered entities. *See* 45 C.F.R. §§ 164.105(a)(2)(iii), 164.314.

Yet the Rule prohibits sharing "personal beneficiary data" under both circumstances, despite that HIPAA authorizes—and by purpose and design, encourages—such sharing. And such sharing is an essential part of the service that FMOs provide to independent agents and brokers, providing them with the leads they need to do their jobs effectively. A7-A8 ¶ 37. This element of the Rule will leave many elderly would-be enrollees to fend for themselves, without the essential help of independent agents and brokers to direct them toward to most appropriate MA plans. *Id*.

### C.      The Rule was promulgated without observance of required procedures

Pursuant to the Administrative Procedure Act, the Court must set aside agency action that is adopted without observance of procedure required by law. 5 U.S.C. § 706(2)(D). In at least two respects, the agency failed to comply with the settled rules for notice and comment.

***First***, "[t]o fulfill its obligation to provide adequate notice, an agency must make available to the public, in a form that allows for meaningful comment, the data the agency used to develop its proposed rule." *FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 315 (D.D.C. 2016) (cleaned up). "Agencies are required to make these disclosures in order to allow the parties to focus on the information relied on by the agency and to point out where that information is erroneous or where the agency may be drawing improper conclusions from it." *Id*. (cleaned up). Accordingly, "an agency must make [available to the public] at least the most critical factual material that is used to support [its] position," and it "cannot rest a rule on data that, in critical degree, is known only to the agency." *Air Transportation Association of America, Inc. v. Department of Agriculture*, 37 F.4th 667, 677 (D.C. Cir. 2022) (cleaned up).

As we have detailed in the preceding pages, CMS repeatedly failed to disclose the particular data and analyses it relied on in the rulemaking—the "recent studies," "information shared by insurance associations and focus groups," data "published in research articles," "complaints," "reports," "market surveys," "information gleaned from oversight activities," and other supposed data underlying the final Rule. *See* 89 Fed. Reg. at 30617-30622. The agency relied on all of those vaguely-described sources to justify its many suppositions about how the market for agent-and-broker services operates, including market concentration, rising prices, improper forms of remuneration, and so on. But it provided no detail at all concerning the supposed studies, publications, and data—and it declined to make any of it available for public review and comment. This is a clear-cut an example of an agency "rest[ing] a rule on data that, in critical degree, is known only to the agency." *Air Transportation*, 37 F.4th at 677.

21

If CMS had given plaintiffs and their members access to these undisclosed studies and reports, moreover, they unquestionably would have had something "useful to say about" them. *Id*. Plaintiffs vociferously disagree with the assertions that the omitted reports and studies supposedly support; given a chance, they easily would have refuted the assertions appearing in those studies and reports (assuming they exist) with objective data and examples from their own experience and expertise in the market. *See* A24-A28 ¶¶ 12-33.

**Second**, to ensure there is an adequate opportunity to comment, a notice of proposed rule-making must fairly apprise the public of the actions the agency is considering. Thus, an agency may promulgate a rule that differs from a proposed rule only if it is a "'logical outgrowth' of the proposed rule." *Texas Association of Manufacturers v. CPSC*, 989 F.3d 368, 381 (5th Cir. 2021). A final rule is a logical outgrowth "[i]f interested parties should have anticipated that the change was possible." *Id.* at 381-382.

In this case, the agency's initial proposal contemplated that administrative fees, even if regulated as "compensation" to agents and brokers, could be paid by MAOs to FMOs. 88 Fed. Reg. at 78555. The notice gave no indication that CMS was considering limiting who could pay and receive administrative fees. But in the preamble to the final Rule, CMS stated that "the full payments" shall be made "directly to the agents and brokers," thereby "prohibit[ing] separate administrative payments." 89 Fed. Reg. at 30624, 30622. Assuming for the sake of argument that the Rule's amendments to the Code of Federal Regulations can be construed in this way, this additional restriction could not have been anticipated based on the notice of proposed rulemaking. A limitation on MAO-to-FMO payments is a significant change to contractual arrangements common across a multibillion-dollar industry. It is not a logical outgrowth of the original proposal, and plaintiffs and their members thus had no opportunity to comment on it. If they had been afforded such an opportunity, they would have explained that it exceeds the agency's regulatory

authority, which is limited to establishing guidelines for the "use of compensation" that might influence agents and brokers, and nothing more.

Against this background of myriad flaws, there can be no denying that there is a substantial likelihood that the Court ultimately will vacate and set aside the Rule in relevant part.

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN IMMEDIATE STAY OF THE FINAL RULE

If the Rule is not temporarily stayed, plaintiffs will suffer irreparable harm and the Court's ability to conduct meaningful judicial review will be undermined. Injury becomes irreparable when there is no adequate remedy for it at law. *Hippocratic Medicine*, 78 F.4th at 251. "[C]omplying with [an agency rule] later held invalid almost always produces the irreparable harm of non-recoverable compliance costs." *Wages & White Lion*, 16 F.4th at 1142. Such costs include those occasioned by "necessary alterations in operating procedures." *Career Colleges*, 98 F.4th at 235. Moreover, "procedural injury" in APA rulemakings, "by definition, is irreparable injury—harm that cannot be undone through monetary remedies." *Texas v. Becerra*, 623 F. Supp. 3d 696, 736 (N.D. Tex. 2022) (cleaned up).

The circumstances here easily pass muster. Under the Rule, the prevalent business model underlying an entire multibillion-dollar industry is effectively rendered unlawful. The impact from the grenade that CMS has thrown into the marketing industry for MA plans cannot be overstated— it will touch every contractual relationship with any relation to MA marketing. If the Rule is not stayed, at minimum stakeholders will have to rearrange countless terms of agreement, at great direct expense to ABC's members, including Senior Security Benefits. A13-14 ¶¶ 23-24. Already, MAOs "are currently in the process of proposing contracts to CMS, which may set the terms by which FMOs are paid for the important administrative services they provide." A6 ¶ 27. "If the rule is not stopped from taking effect before the contracts are finalized in July and August 2024, there will be no meaningful opportunity to change the contracts" or the payment structures they set. *Id.*;

*see also* A17 ¶ 12. The result will be business and reputational harm to FMOs like Senior Security Benefits, who will see irreversible damage to their businesses, including by irremediably disrupting "the network of good will and business relationships" that they "have worked to build for decades." A6 ¶ 28.

ABC's agent members also will be irreparably harmed. They will lose access to critical support technologies unless they are willing to cover expenses that MAOs traditionally paid for. A19 ¶¶ 19-20. Because MAOs' payments to agents are capped, this new expense cannot be shifted from agents back to MAOs any other way. *Id.* Agents and brokers will thus be left paying more to receive less; the likely result is an exodus of agents from the industry.

## III.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF

The balance of the hardships and public interest also favor an immediate stay or preliminary injunction. These elements "merge when the Government is a party." *VanDerStok v. BlackHawk Manufacturing Group*, 659 F. Supp. 3d 736, 744 (N.D. Tex. 2023) (cleaned up).

It is well established that "the public's interest in having governmental agencies abide by the federal laws that govern their existence and operations weighs in favor of an injunction." *Id.* By contrast, "there can be *no* public interest in the perpetuation of unlawful agency action." *Mock v. Garland*, 2023 WL 6457920, at *17 (N.D. Tex. Oct. 2, 2023); *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). Thus, upon a finding that the agency action at issue is likely to be invalidated, the "the government-public-interest equities [effectively] evaporate." *Mock*, 2023 WL 6457920, at *17; *Hippocratic Medicine*, 78 F.4th at 251.

That is especially so here, because the interests cited by CMS in support of the Rule have been illusory from the start. In contrast, enforcement of the Rule will harm the public interest by limiting agents' and brokers' access to critical technologies, inducing many agents and brokers to leave the market, and reducing beneficiaries' access to information and expert advice regarding

24

MA plan options. *See* A17 ¶¶ 13, A19 ¶¶ 19-20; A14 ¶¶ 24-25. CMS's apparent desire to drive beneficiaries to the single-payer traditional Medicare program will be realized, at great cost to the public's interest in—and Congress's policy of encouraging—participation in MA.

## IV.  A SECTION 705 STAY OF THE RELEVANT ASPECTS OF THE RULE IS PARTICULARLY APPROPRIATE IN THESE CIRCUMSTANCES

Plaintiffs welcome whatever form of preliminary relief the Court concludes is warranted. For the sake of completeness, we submit that a Section 705 stay would be a particularly appropriate temporary remedy. "In the same way that a preliminary injunction is the temporary form of a permanent injunction, a [Section 705] stay is the temporary form of vacatur," which is the traditional relief in an APA suit. *Hippocratic Medicine*, 78 F.4th at 254. "Between vacatur and an injunction, the former is the 'less drastic remedy' . . . because vacatur does not order the defendant to do anything" and instead "only removes the source of the defendant's authority." *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010)). A Section 705 stay, in other words, is not an affirmative judicial order to executive officers to undertake or refrain from specific actions; it merely maintains the regulatory status quo.

A Section 705 stay is also more in keeping with the practicalities of the MA program. Given the complex and interconnected network of contracts among thousands of parties underlying the program (*e.g.*, A3-A5 ¶¶ 17-23), a Section 705 stay would avoid the tremendous practical challenges that would follow from enjoining the Rule on a party-specific basis.

## CONCLUSION

Insofar as the Rule modifies the rules for agent and broker compensation and sharing of personal beneficiary information, the Court should enter a Section 705 stay of the October 1, 2024, applicability date of the Rule pending judicial review. Alternatively, it should enter an injunction temporarily enjoining defendants from enforcing or implementing the Rule.

Dated: May 17, 2024

Respectfully submitted,

/s/ *Michael P. Lynn*

David Keltner
Texas Bar No. 11249500
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 878-3560
Fax: (512) 495-6401
david.keltner@kellyhart.com

Stephanie A. Webster
D.C. Bar No. 479524*
Christopher M. Nienhaus
D.C. Bar No. 90008585*
Ropes & Gray LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 508-4859
Fax: (202) 508-4650
stephanie.webster@ropesgray.com
christopher.nienhaus@ropesgray.com

Casey Kyung-Se Lee
New York Bar No. 4885927*
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 596-9000
Fax: (212) 596-9090
casey.lee@ropesgray.com

Michael P. Lynn
Texas Bar No. 12738500
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3801
Fax: (214) 981-3839
mlynn@lynnllp.com

Michael B. Kimberly
D.C. Bar No. 991549 (PHV motion pending)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C. 20001
Phone: (202) 756-8901
Fax: (202) 756-8087
mkimberly@mwe.com

Ashley C. Parrish
D.C. Bar No. 464683*
Adam C. Solander
D.C. Bar No. 1002511*
King & Spalding LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Phone: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com
asolander@kslaw.com

**ATTORNEYS FOR PLAINTIFFS AMERICANS FOR BENEFICIARY CHOICE AND SENIOR SECURITY BENEFITS, LLC**

*application for admission *pro hac vice* forthcoming

**CERTIFICATE OF SERVICE**

I certify that on May 16 and 17, 2024, counsel for Plaintiffs notified counsel for Defendants of the foregoing document and will provide a courtesy copy upon filing, including an email copy to Mr. Stolz.

Dated: May 17, 2024                     /s/ *Michael P. Lynn*

Michael P. Lynn