# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>    *Defendants*. | No. 4:24-cv-439-O |

## APPENDIX TO PLAINTIFFS' MOTION FOR A SECTION 705 STAY OF THE FINAL RULE OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION

David Keltner
Texas Bar No. 11249500
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 878-3560
david.keltner@kellyhart.com

Stephanie A. Webster
D.C. Bar No. 479524
Christopher M. Nienhaus
D.C. Bar No. 90008585
Ropes & Gray LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 508-4859
stephanie.webster@ropesgray.com
christopher.nienhaus@ropesgray.com

Casey Kyung-Se Lee
Ropes & Gray LLP
New York Bar No. 4885927
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 596-9000
casey.lee@ropesgray.com

Michael P. Lynn
Texas Bar No. 12738500
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3801
mlynn@lynnllp.com

Michael B. Kimberly
D.C. Bar No. 991549 (PHV motion pending)
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C. 20001
Phone: (202) 756-8901
mkimberly@mwe.com

Ashley C. Parrish
D.C. Bar No. 464683
Adam C. Solander
D.C. Bar No. 1002511
King & Spalding LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Phone: (202) 626-2627
aparrish@kslaw.com
asolander@kslaw.com

## TABLE OF CONTENTS

Declaration of Gaylan Hendricks.................................................................A1

Declaration of Greg Johnson ...................................................................A10

Declaration of Nicole Morgan ..................................................................A15

Declaration of George Dippel...................................................................A23

Declaration of Emily Trevino ...................................................................A29

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE; <br><br> SENIOR SECURITY BENEFITS, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; <br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; <br><br> CENTERS FOR MEDICARE & MEDICAID SERVICES; <br><br> CHIQUITA BROOKS-LASURE, in her official capacity as CMS Administrator, <br><br> *Defendants*. | No. 4:24-cv-00439-O <br><br><br> **DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR A SECTION 705 STAY OF THE FINAL RULE OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION** |

## DECLARATION OF GAYLAN HENDRICKS

I, Gaylan Hendricks, declare as follows:

1.      I am a resident of Aledo, Texas.  I am over the age of eighteen, and I am competent to provide this declaration.

2.      I am the Chief Executive Officer at Senior Security Benefits, LLC ("SSB"), which is headquartered in Fort Worth, Texas.  I have held that position for more than 13 years.  Before becoming the company's Chief Executive Officer, I served as Chief Marketing Officer for 8 years.

3.      I previously worked as President of the National Group Underwriters, Inc., where I oversaw all aspects of the business, including the company's operations and sales.

4.      All in all, I have been in the health and life insurance industry for 39 years.  I've been a licensed resident Texas health and life insurance agent and have held licenses in multiple other states since 1988.

5.     My passion for assisting seniors with their healthcare choices is extremely personal to me—my father died of cancer and my mother died while living at a Medicaid living facility.  I am fiercely protective of my own family, my work family, and every family that we serve.

6.     Because of my decades-long work with SSB and my 39 years in the insurance industry, I am familiar with the regulatory requirements that apply to Field Marking Organizations ("FMOs") as well as general regulatory requirements in the insurance industry.

7.     I also have a deep understanding of how Medicare Advantage plans are marketed and sold to beneficiaries as well as the essential role that FMOs perform supporting agents in helping beneficiaries to identify and choose the best plan to meet their needs.

8.     The final rule issued on April 23, 2024 by the Centers for Medicare and Medicaid Services ("CMS") threatens enormous damage to Medicare beneficiaries and their ability to choose their preferred Medicare health insurance options.  CMS's final rule is harming FMOs, like SSB, that perform an essential role in providing valuable administrative services.  Those services ultimately allow beneficiaries to better understand their options and to choose the most affordable and appropriate health plan available to them.

### Senior Security Benefits ("SSB")

9.     SSB is an FMO specializing in supporting independent agents across the United States with a wide range of life and health insurance products.

10.     SSB is a member of the Americans for Beneficiary Choice trade association.

11.     The SSB management team has more than 100 years of combined experience in the health and life insurance industry.

12.     SSB started as a small agency supporting independent agents who primarily wrote Medicare supplement insurance. Those agents were provided four to five preset appointments a day, four days a week, by SSB, and they presented several different Medicare supplement options from which prospective clients could choose from. SSB continues to support independent agents who write a variety of insurance products and has grown into a large FMOs in the last twenty years.  SSB has made substantial investments to achieve this growth.  SSB is at the forefront of insurance product design and many of those products are sold by independent agents in the over age 65 Medicare eligible space.

13.     We take pride in the investments we've made and the relationships we've built over the years with both our independent agents and with insurance carriers, many of which contract with CMS to offer Medicare plans and are thus referred to as "Medicare Advantage Organizations" or "MAOs."  Those investments and relationships have been a key factor in our success and continued growth, and in our ability to help Medicare beneficiaries.  We value and nurture those relationships daily, and the support we provide our agents in turn helps to improve the care and support that beneficiaries receive from their agents—I hear about these stories all the time.

14.     Our greatest differentiator as an organization is our ability to understand agents and the current marketplace.  We use that ability to assist MAOs in the design of leading insurance

A2

products and services in the over and under 65 life and health insurance markets. Our independent agents live in and serve their communities in a highly personal, individualized way.

**The Role SSB and FMOs Generally Play
in the Medicare Advantage Ecosystem**

15.     I have seen significant changes in the health and life insurance industry during my 39-year career. Historically, most business was written through "captive" or career agents who were employed by a specific individual insurance company. That company provided the agent with an office, generated leads for the agent, and gave the agent a business card and marketing materials. In return, that agent exclusively sold that one insurance company's products. The carriers who could invest the most to build out the largest networks, supported with advertising, enjoyed a distinct advantage. Agents were contractually bound to focus on selling only their carriers' plans, regardless of how well those plans matched a beneficiary's particular needs. That captive/career agent system is outdated and has given way to a new, more advanced system that helps beneficiaries by giving them access to truly independent agents and the ability to choose a plan that best suits their needs.

16.     In the last 20 plus years, the insurance industry has benefitted from the emergence of "independent" agents and independent field marketing organizations (or "FMOs") that support independent agent distribution. While the rule refers to "FMOs," organizations like SSB are also generally referred to as independent marketing organizations (or "IMOs"), which is more reflective of SSB's role of helping and supporting agents navigate the challenges of representing and selling products from thirty companies rather than a single carrier.

17.      FMOs like SSB have built a strong bridge of information sharing to educate agents so they can properly present beneficiaries with the wide variety of Medicare plan options available in today's market. More information leads to more choice and is hands down better for beneficiaries.

18.     SSB's independent agents typically contract with and are compensated by multiple insurance companies. Because SSB works with approximately 30 different carriers, the independent insurance agents contracted through SSB can help beneficiaries sort through the many plan options to find the best plan to fit their unique needs. Both the independent agent and the Medicare beneficiaries they assist are made aware of eligible plan options in their area across multiple carriers.

19.     SSB, similar to other FMOs, provides a wide range of valuable services, support, training, education, and more to the independent insurance agents we support, which equips them to assist Medicare beneficiaries. Services that SSB provides include:

- access to a broad range of products from multiple carriers, including regional and local plan options, that are provided not only to beneficiaries in large urban areas but also in underserved and rural communities;

**A3**

- technology that allows independent agents to quickly and accurately compare the costs and benefits of multiple plans and assess whether any particular plan meets a beneficiary's individual needs;

- a customer relationship management system to help agents keep track of beneficiaries from first contact through enrollment and to maintain client relationships post-enrollment;

- agent training and administrative back-office support;

- access to carrier marketing materials;

- educational communication materials, as well as training on different plans and products;

- compliance support for educational events and sales and marketing events;

- compliance oversight;

- advertising communications and marketing material compliance reviews;

- quality assurance for interactions with beneficiaries;

- insurance product certifications;

- reduced rates for AHIP (America's Health Insurance Plans) training;

- compliance education and training on topics including sales practices and cybersecurity;

- coordinating with a carrier if there is an agent who has been terminated by a carrier (e.g., for a state regulatory compliance issue or carrier);

- compliance due to quality of business and service levels;

- premium quoting tools and related technology that allow independent agents to efficiently assess costs, coverage for needed prescriptions, and in-network providers;

- experienced support teams at FMOs with deep industry and product knowledge, as well as expertise serving as former healthcare insurance agents;

- all-recording technology to comply with regulatory requirements; and

- discounted errors & omissions insurance.

20.   Different FMOs have different business models, and it has been my experience that they all look somewhat different and offer slightly different services.  There are many ways in

**A4**

which FMOs support their agents, including paying our agents' marketing overhead expenses in connection with  (1) leads from lead vendors; (2) leads from carriers; (3) direct mailers; (4) social media advertisements; (5) online advertisements; (6) radio and television advertisements; (7) print advertisements such as billboards, newspaper, brochures, and others; and (8) event costs and expenses (signs, hand out materials, invitations, venue rental, snacks and/or meals, mileage).  SSB has utilized some of these support systems in the past, and other FMOs decide how best to support their independent insurance agents using any or all of these programs.

21.     FMOs are able to provide these services to agents because they receive administrative payments from insurance carriers that exceed the value of the individual services in the marketplace.  Because FMOs provide this support, agents are able to remain independent, comply with evolving industry regulations, stay current with technology advancements, and successfully serve beneficiaries by helping them to find the Medicare plan and supplemental/ancillary insurance plans that best suit their needs.  Reducing the burdens on independent agents allows them to focus on helping beneficiaries, including helping beneficiaries to understand their benefits and learn how to use them.

22.     Our agents operate truly independently—they are not employees of SSB.  They rely on the FMO model to have access to numerous carriers' products, in addition to the numerous services and technology that FMOs over time have grown to provide.  Because they are independent, these types of agents have become allies for beneficiaries, and seniors have come to rely on our independent agents throughout their time with Medicare.

23.     As an FMO, SSB strives to create the most transparent marketplace possible with the greatest number of options for beneficiaries. We provide our contracted independent agents access to numerous carriers' products, product training, technology, compliance support, and quality assurance processes to enable them to compliantly serve beneficiaries and offer them choices in coverage.

24.     By focusing on the client's needs, the independent agents are free from financial influences that might otherwise interfere with their objectivity and prevent beneficiaries from being able to choose the Medicare plan that is suitable for them.

### The Impact of the Final Rule on FMOs

25.     On April 23, 2024, CMS issued its final rule amending the regulations for the Medicare Advantage (Part C) program, Medicare Prescription Drug Benefit (Part D) program, Medicare cost plan program, and Programs of All-Inclusive Care for the Elderly (PACE).  89 Fed. Reg. 30448 (April 23, 2024).

26.     To the extent separate administrative payments are eliminated and the $100 agent compensation increase comes at the expense of FMOs receiving administrative fees for the services they provide, either by the letter of the rule or in its application, I have major concerns about the ripple effect that will cause, ultimately to the detriment of Medicare beneficiaries.  My understanding is that CMS is purporting to address a concern that agents may have incentives to steer Medicare beneficiaries to a particular carrier due to the supposed possibility of receiving a higher commission—but that is simply not a meaningful problem and it misunderstands how the

market works.  For many years, MAOs have paid the maximum commission to agents.  As a result, there is virtual uniformity in commissions available, and there is no particular reason for an agent to push a beneficiary to one carrier over another.  If that is the problem that CMS is trying to solve, not only does the problem not really exist, but the rule's "solution" is misguided because it will result in an outcome completely contrary to the stated goal of promoting more choice of Medicare beneficiaries.

27.     The final rule will take effect June 3, 2024.  Although the final rule will not apply to coverage determinations until January 1, 2025, the rule will have irreversible consequences by no later than the end of August 2024.  MAOs are currently in the process of proposing contracts to CMS, which may set the terms by which FMOs are paid for the important administrative services they provide.  If the rule is not stopped from taking effect before the contracts are finalized in July and August 2024, there will be no meaningful opportunity to change the contracts and the payments made to FMOs.

28.     The final rule threatens to cause severe and irreparable harm to FMOs, like SSB, while also undermining the network of good will and business relationships that SSB and the independent insurance agents we support have worked to build for decades.

29.     After the final rule takes effect June 3, 2024, it is my understanding that CMS will eliminate the agent and broker administrative payments and establish a national agent compensation rate.  Because the final rule is ambiguous with respect to whether agent and broker administrative payments include FMOs, creating separate administrative payments to the independent agent may have the unintended effect of potentially capping or eliminating administrative payments from MAOs to FMOs.  If that were to occur, SSB would no longer receive payment from carriers or receive per enrollment overrides at the value of the services in the marketplace to cover administrative services.

30.     Eliminating these payments would mean that SSB, and likely other FMOs, would have to discontinue or significantly reduce the services provided to agents who in turn support beneficiaries for the benefit of the Medicare market. Removing administrative payments from carriers to FMOs would make it difficult, if not impossible, for most FMOs to continue to serve the Medicare market, as they would no longer be able to provide the support to agents that enables the agents to stay independent.  FMO support allows independent agents to focus on delivering the highest level of service, which would be virtually impossible for an independent agent to replicate on their own.

31.     In that situation, instead of providing support services and items to agents for free (because FMO's are compensated by MAOs), SSB and other FMOs would have to sell administrative services to the agents, who will receive only a $100 increase in their agent compensation per enrollment.  Agents will not be able to afford the myriad of services that FMOs provide, and FMOs will lose money, if they are forced to sell these items and services to agents.

32.     Beneficiaries will also be harmed because insurance carriers are not equipped to provide the numerous services offered by FMOs.  The MAOs will either have to rebuild a network of agents who work exclusively for a single MAO or build their own FMOs to train agents to work in locations where only that MAO's plans will be sold.  In either scenario, MAOs will not know

A6

or want to provide information about another MAO's offerings, nor would any individual MAO be motivated to provide those services to the market in an impartial manner.

33.    Administrative fees payments to FMOs from MAOs help pay for agent education, compliance training and support, agent training, and beneficiary events hosted by independent agents and agencies that SSB supports, where different products are presented that are available in their areas.  If those administrative fees are impacted, SSB and other FMOs would similarly be impacted in providing those educational and compliance services.  That would mean that MAOs— who currently provide no such services—would be responsible for educating and training agents, and they would only be incentivized to provide information about their own products, not the wider array of products that FMOs have access to.

34.    Without administrative payments from MAOs, it will be difficult, if not impossible, for FMOs to continue to serve the Medicare market.  And without access to the networks FMOs have established connecting carriers with independent agents and brokers, those independent agents will be forced to contract directly with each MAO whose products they want to offer, without guidance and support from an FMO.  Because contracting is a time and resource intensive process that FMOs streamline, independent agents and brokers will choose a limited number of MAOs to represent, ultimately limiting beneficiary choice.

35.    One likely outcome of the final rule is that FMOs contract with fewer insurance carriers in an effort to limit expenses.  Smaller, local and regional community carriers who do business in limited markets will likely be the ones who FMOs cut back on business with because such carriers are more time and resource intensive to understand, and have a smaller footprint.  It takes an FMO almost as much time to learn the workings of a local or regional plans as it does to learn a national plan.  Moreover, the small local and regional plans need the FMO the most in order to be seen and understood by independent agents—FMOs fill a crucial role in learning those systems and promoting their products.  Either way, the end result will be fewer options and fewer services for beneficiaries.

36.    If the final rule prevents SSB and other FMOs from receiving the administrative fees necessary to provide essential administrative and support services, CMS's sweeping changes to the market will be irreversible.  Beneficiaries from underserved and rural communities will suffer the greatest harm, as they depend most on FMOs to help beneficiaries select the plan that is best for their individual needs and circumstances.

37.    SSB and similar FMOs will also suffer from the data restrictions added by the final rule.  I agree with CMS's decision to limit the manner in which a beneficiary's information is distributed beyond their initial agreement to be contacted regarding their insurance options (i.e., multiple calls, information re-selling, etc.).  I also support efforts to limit bad actors in the insurance field.  But as I understand the rule, once it takes effect, FMOs will no longer be allowed to purchase leads in bulk and distribute or sell to agents because the beneficiary has to consent to the entity purchasing.  SSB does purchase leads for its agents, and in the past, we would distribute those individually to the various independent agents and agencies we support, with the purpose of helping them to reach out once and connect with the individual who had agreed to be contacted regarding their Medicare options.  As I understand the rule, I would no longer be able to support independent agents by purchasing leads for them and training them on pursuing those leads the

right way (e.g., not double calling).  Not allowing FMOs to purchase legitimate leads for their agents without an additional level of consent from the beneficiary will increase costs for agents and reduce their ability to best serve beneficiaries.

38.     The changes imposed by the final rule risk upending SSB's and similar FMOs' business models.  If the rule goes into effect June 3, 2024, it will cause a tidal wave of changes. Medicare Advantage plans must submit to CMS their contract bids by June 3, 2024, and the agreements between Medicare Advantage plans and CMS must be executed by August 31, 2024 for Cost Year 2025.  FMOs are already in discussions with MAOs regarding contracting changes wrought by this rule.

39.     SSB is concerned that carriers will see the $100 commission for new Medicare Advantage enrollments as impacting the need to pay administrative payments to FMOs like SSB. Removing administrative fees and marketing dollars from FMOs' budgets would cause a net loss because the $100 per commission will not cover what was previously covered by the FMO via administrative payments.   If the contracts currently being drafted by MAOs eliminate administrative expense coverage to FMOs then there may be no time left for them to recalculate how, and even if, the MAOs will pay FMOs' administrative costs.  SSB also faces the imminent problem of losing the network of agents it has worked decades to build and the trust of the Medicare beneficiaries the independent agents serve.

*[Signature Appears on Following Page]*

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17ᵗʰ day of May, 2024.

By: _____
Gaylan Hendricks

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE; <br><br> SENIOR SECURITY BENEFITS, LLC <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> CENTERS FOR MEDICARE & MEDICAID SERVICES, <br><br> XAVIER BECERRA, *in his official capacity as Secretary of Health and Human Services*, <br><br> CHIQUITA BROOKS-LASURE, *in her official capacity as CMS Administrator*, <br><br> *Defendants*. | No. 4:24-cv-00439-O <br><br><br> **DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR A SECTION 705 STAY OF THE FINAL RULE OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION** |

## DECLARATION OF GREG JOHNSON

I, Greg Johnson, declare as follows:

1.      I am a resident of Derwood, Maryland.  I am over the age of eighteen, and I am competent to provide this declaration.

2.      I am the Executive Director at Americans for Beneficiary Choice, which is based in Dallas, Texas.

3.      I have worked in the healthcare insurance industry for more than 25 years.

4.      I have extensive background in federal, state, legislative and regulatory policies impacting Medicare, commercial and other aspects of health insurance.

5.      As a result of my professional experiences and background, I am familiar with the insurance industry generally and Medicare Advantage plans more specifically.

**A10**

6.      I am also familiar with the legal and regulatory requirements that apply to the various entities that operate within the insurance industry, including agents and brokers and field marketing organizations ("FMO").

7.      I have serious concerns about the final rule issued by the Centers for Medicare & Medicaid Services ("CMS") on April 23, 2024.  That rule imposes sweeping regulatory changes that  if allowed to take effect, will undermine FMOs' ability to provide the essential support and administrative services that agents and brokers depend on to serve Medicare beneficiaries.

8.      Without the support and services provided by FMOs, agents and brokers will face significant harms, including by having to shoulder substantial and unrecoverable costs on their own.  Those costs are likely to be incurred soon after the rule takes effect on June 3, 2024, and will be impossible to avoid once the new carrier contracts for the coming year are executed, which is expected to occur no later than August 31, 2024.

9.      If it is not corrected, the final rule is likely to cause deep and irreparable harm to the entire Medicare Advantage industry. This harm will extend to Medicare Advantage beneficiaries, by denying them access to vital information and undermining their ability to make informed decisions regarding which Medicare Advantage plan best suits their individual needs and circumstances.

## AMERICANS FOR BENEFICIARY CHOICE

10.      Americans for Beneficiary Choice is a trade association of insurance industry stakeholders. Its membership includes thousands of individuals and entities from diverse backgrounds, including health insurance industry leaders and workers, consumer advocates, and concerned citizens.

11.      United by the common objective of protecting the best interests of beneficiaries of Medicare and other health insurance plans, Americans for Beneficiary Choice was formed to bring together beneficiaries, agents and brokers, and FMOs.

12.      Americans for Beneficiary Choice works to improve the American healthcare system by advocating before lawmakers and regulators for sensible, forward-thinking policies that improve health insurance knowledge and education, lower healthcare costs, and maximize coverage choices for consumers.

13.      Americans for Beneficiary Choice has three nonvoting action committees—Agency, Agent, and Beneficiary.

14.      When CMS issued its proposed rule—entitled "Medicare Program; Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, Medicare Cost Plan Program, and Programs of All-Inclusive Care for the Elderly; Health Information Technology Standards and Implementation Specifications"—on November 15, 2023, multiple members of Americans for Beneficiary Choice submitted comments.

15.      Americans for Beneficiary Choice also submitted comments.  Its comment letter includes more than 1000 pages of signatories (approximately 22 signatories per page), representing

every state in the United States, who oppose CMS's proposed rule and object to CMS's unlawful efforts to undermine patient choice and access to Medicare Advantage plans if the rule is interpreted to eliminate administrative payments and 16 years of settled practice in the healthcare industry.

### THE FINAL RULE WILL CAUSE SUBSTANTIAL AND IRREPARABLE HARM

16.     The Medicare Advantage program is complex, offering a wide array of plan options from which a beneficiary may choose. Because of this complexity, many beneficiaries rely on the assistance of agents and brokers in determining which plan will best serve their individual needs. In my experience, seniors prefer to work with an independent agent or broker in selecting a plan in which to enroll, demonstrating the trust that beneficiaries place in the agents and brokers with whom they work.

17.     If agents and brokers are forced to reduce the number of carriers with which they contract, as would happen if the rule is allowed to go into effect, the effect will be that they will be forced to offer beneficiaries a smaller subset of plan options. The resulting loss of choice for beneficiaries runs counter to the express and foundational purpose of the Medicare Advantage program, which Congress designed to provide beneficiaries with greater choice by "expand[ing] the availability of private health plan options to Medicare Beneficiaries." 70 Fed. Reg. 4588 (Jan. 28, 2005). The final rule would thus undermine the Medicare Advantage program by practically restricting beneficiary choice, frustrating Congressional intent, and causing harm to beneficiaries everywhere.

18.     Agents and brokers rely on the administrative support, training, and compliance programs provided by FMOs to maintain their independence from carriers and continue to serve Medicare Advantage beneficiaries successfully and impartially. The support provided by FMOs would be virtually impossible (and prohibitively expensive) to replicate on an individual agent and broker basis.

19.     The essential services and support provided to independent agents and brokers by FMOs often include (among other things):

- Access to numerous MAOs' plans for beneficiaries to choose from

- Agent education, training, and oversight

- Compliance education, support, and oversight

- Call recording technology and storage to comply with regulatory requirements

- Customer relationship management software

- Back-office support

- Data privacy and security technology and software

- Use of office space or conference room space

**A12**

- Quality assurance

- Client and customer service support

- Coverage of the costs of training, AHIP certification, and state licensure and appointment

- Mileage to and from appointments and events

- Communications materials

- Compliance reviews of communications and marketing materials

- Compliance support in the form of education, trainings, responding to questions, and providing support to clients

- Coverage of marketing overhead expenses, including leads from lead vendors and carriers, direct mailers, advertisements, event costs and expenses, and access to carrier marketing materials

20.     FMOs also make technology available to independent agents and brokers, which allows them to help Medicare beneficiaries compare different products in the marketplace based on features, available doctors, premiums, and prescription drug options.  These comparisons allow agents and brokers to help Medicare beneficiaries choose the health plan that is in their best interest based on all relevant information.

21.     Before the final rule, the costs of the above-described support services would generally be covered by Medicare Advantage Organizations ("MAO"), which pay FMOs administrative fees  (typically on a per-enrollment basis) to cover the cost of providing the administrative and support services that enable agents and brokers to provide Medicare beneficiaries with high quality individualized service.

22.     By incorporating flat administrative fees into the base compensation of agents and brokers, the final rule could be interpreted as prohibiting or limiting MAOs from paying FMOs administrative fees and inducing agents and brokers to use their $100 increased compensation to purchase all the services described above in paragraph 18.  If FMOs are not able to recover their administrative expenses, they would lack the financial resources necessary to continue providing essential administrative services, forcing agents and brokers to pay out of pocket for those services. In those circumstances, CMS's one-time $100 increase in the compensation cap will not go nearly far enough to make up for the vastly increased overhead that agents and brokers will have to shoulder themselves.

23.     Americans for Beneficiary Choice's members are already devoting substantial resources and incurring unrecoverable costs to shift their business models to accommodate the new standards imposed by the final rule.  As part of that shift, they are beginning the process of renegotiating their longstanding contractual relationships—agents and brokers are being forced to

renegotiate their relationships with FMOs, and FMOs are being forced to renegotiate their relationships with MAOs.

24.     The breakdown in the system threatened by the final rule will not only impact the industry, it will also harm beneficiaries.  If the rule is meant to curb payments from MAOs to FMOs, then FMOs could lose access to the networks they have established with carriers, agents and brokers, and such agents and brokers will be forced to contract directly with each carrier whose products they want to offer.  Because contracting is a time and resource intensive process, agents and brokers will be limited in the number of carriers with which they will be able to contract.

25.     If the final rule is allowed to take effect and FMOs are impeded in providing essential administrative and support services, I am concerned that CMS's sweeping changes to the market will be irreversible.  Beneficiaries from underserved and rural communities will suffer the greatest harm.  Working with an FMO provides independent agents and brokers with the networks and resources needed to reach beneficiaries in underserved and rural communities, where the agent or broker can support the most vulnerable Medicare beneficiaries in selecting the plan that is best for their individual needs and circumstances.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of May, 2024.

By: _____
Greg Johnson

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE; <br><br> SENIOR SECURITY BENEFITS, LLC, <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; <br><br><br> XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; <br><br><br> CENTERS FOR MEDICARE & <br><br> MEDICAID SERVICES; <br><br><br> CHIQUITA BROOKS-LASURE, in her official capacity as CMS Administrator, <br><br> *Defendants.* | No. 4:24-cv-00439-O <br><br><br><br> **DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR A SECTION 705 STAY OF THE FINAL RULE OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION** |

**DECLARATION OF NICOLE A. MORGAN**

I, NICOLE A. MORGAN, declare as follows:

1.     I am a resident of Sherman, Texas.  I am over the age of eighteen, and I am competent to provide this declaration.

2.     I am a licensed insurance agent and own my own company, called Morgan Medicare Solutions, LLC.  My independent agency relies on a field marketing organization ("FMO") called Senior Security Benefits, LLC ("SSB"), which allows me to meet my clients' needs more effectively and efficiently.  For example, SSB helps me conduct market research to

determine what Medicare products my clients need the most, speeds up the contracting process, handles commission audits, helps with licensing issues, and provides me with advanced marketing tools that assist clients in optimizing and comparing quotes.

3.      I started my company in 2018.  I have been in the insurance industry for 8 years, and the healthcare industry for over 20 years.  I serve individuals in 29 states, including in rural areas in Northern Texas and Oklahoma.  As an insurance agent, I have always relied on FMOs and particularly since starting my own insurance agency.

4.      My healthcare background began as an Occupational Therapist, and I have worked in many settings including acute care, in-patient rehab, skilled nursing, outpatient care centers, home health, and community care.  I have spent most of my career assisting and understanding the senior community.  It has become my great passion to advise and assist seniors as they enter the stage of life where Medicare becomes an option.  It is a serious undertaking to navigate the healthcare system at that point in life, and I am privileged to be able to assist my clients in doing so.

5.      In my professional role, I assist seniors in choosing the appropriate health insurance options for their unique needs.  As part of the assistance I provide, I help Medicare beneficiaries to select and enroll in Medicare plans that are appropriate for their needs. For many of the seniors I work with these are major life decisions: the choice of plan means the difference between unnecessary financial strain and having access to the doctors and the medications they need to treat their conditions.

6.      A large part of my practice is helping to educate seniors (and those about to turn 65) about their options.  I do this via in-person seminars, virtual webinars, video content, and general advising of clients.  My education speaking events are free to participants; I genuinely want people to understand their options and to make choices about their healthcare that are informed and based on facts.

7.      As one example, I am the Medicare education specialist for a major bank that has branches in Texas and Oklahoma.  In that role, I am asked to travel to different branch locations to speak to employees and customers in their sixties about their Medicare options.  I have a workbook that I bring to those events.  I do not charge for those events, nor do I recuperate travel expenses in any manner.  I educate people in order to get the right information out there and to build relationships naturally.  My events are educational and unbiased; I do not mention specific healthcare plans or carriers.

8.      My responsibility to my clients extends beyond the point of enrollment.  At times, the Medicare beneficiaries with whom I work become confused about the benefits provided under the plans they have chosen.  In those circumstances, if a client reaches out to me personally, I answer their questions and assist them in understanding their benefits and how to use them.

9.      I am a Medicare Certified Agent through the National Association of Benefits and Insurance Professionals ("NABIP"), and I am able to help anyone navigate the entire process of Medicare, from signing up to enrolling in a plan.

**A16**

10.     I am aware of the final rule issued by the Centers for Medicare & Medicaid Services ("CMS") on April 23, 2024.   While the rule is very long and technical, my understanding of it as an agent is that it if it is carried out as written, it could result in many negative changes that would make it more difficult for agents and brokers to help Medicare beneficiaries.  While I agree very much with the stated goal of the rule—to assist beneficiaries in having more choice in their healthcare options—I do not believe that the rule as currently drafted accomplishes that goal.  In fact, it appears to be contrary to that goal.

11.     The final rule threatens to impose unrecoverable costs on agents and brokers, like me, by turning the current compensation and payment structures in the insurance industry upside down.  Agents and brokers will probably begin incurring unrecoverable costs after the rule takes effect on June 3, 2024.  But I expect that broader harm caused by the rule will not be able to be undone once the new carrier contracts for the coming year are finalized.  That typically occurs each year by the end of August.

12.     The costs that may stem from the rule are not only financial—they are structural and operational.  Once agents, brokers, carriers, and FMOs are subject to a new system—one that threatens to limit the choices a Medicare beneficiary will have—it will be difficult and maybe impossible to go back.  It could result in cancelations of policies, unwanted changes to policies, and uninformed decisions regarding plan choices.  It could also undermine the business I have carefully worked to develop in reliance on the regulatory system that has long been in place that has allowed FMOs to provide important administrative support services and is supposed to encourage efforts to improve beneficiary choice.  If those services are no longer readily available, it will be much more difficult to provide seniors the information they need to choose a Medicare plan that is right for them.

13.     CMS's goal is supposed to be to protect Medicare beneficiaries, but its final rule threatens to reduce their access to the agents and brokers and the information they have.  The rule as drafted may cause harm because the rule is not based on data or on commentary from agents, like me, or even beneficiaries.  If CMS is not asked to go back to the drawing board, the final rule could be detrimental to the entire Medicare marketplace.  I understand that during the comment period, CMS was informed about the significant harms that its rule would cause, but as far as I know, the agency did not respond to objections or make changes to reduce the costs and burdens imposed on agents and brokers and the Medicare beneficiaries they serve.  That should not be the case.

### THE FINAL RULE WILL CAUSE FINANCIAL HARM

14.     As noted above, I rely on the support of SSB to maintain my independence and successfully serve the Medicare beneficiaries who are my clients.  The support I receive from SSB, including critical infrastructure and operational support, would be virtually impossible (and prohibitively expensive) to replicate on my own.

15.     SSB's services I rely on (and other agents rely on their FMOs to provide) include:

**A17**

- ***Access to Medicare Advantage Organization ("MAO") plans.***  SSB provides me with access to numerous MAO plans for beneficiaries that I service to be able to choose from.

- ***Agent education, training, and oversight***.  One of SSB's marketing personnel helps and educates me on new products that are available for my clients.

- ***Compliance education, support, and oversight***.  This is one of the most important functions that SSB provides for me, and it is extremely important because independent agents who work on their own often misinterpret the requirements of CMS regulations.  FMOs often help agents with all aspects of compliance, including review of marketing and communications materials.

- ***Call recording technology and storage to comply with regulatory requirements***.  While I had already purchased and begun using a call recording service when FMOs started offering this service, and thus did not take advantage of it, I know that it can be extremely helpful for agents who are just starting out.

- ***Customer relationship management software***.  SSB (and most FMOs) offer this software, and again this is crucial for those agents getting their feet wet.  I personally use the scope of appointment software as well as quoting software.

- ***Back-office support***.  I have worked with FMOs who send out mailers on behalf of their agents, which I paid for but they did the mailing.  I don't personally use this service anymore, but it can be very helpful for agents who are starting out and looking to build their business.

- ***Data privacy and security technology and software***.  This is another major service that FMOs provide and that gives agents peace of mind regarding protecting their clients' sensitive data.  SSB's technology and system that I use is in compliance with all security protocols and CMS regulations, so I don't have to worry about ensuring that my clients' data is protected and secure.

- ***Use of office space or conference room space***.  Certain FMOs pay for individual agents' office space, but that is not something I have used.

- ***Client and customer service support***.  Some FMOs have a whole team of client support that agents can use.  I choose to do all my own client and customer support.

16.    Many of the services that FMOs provide are most important and crucial for the agents who are just starting out in the business and do not have the infrastructure or knowledge to perform many of these functions themselves.  For example, while I do not use leads myself given my length of time in the industry and my business model, many agents who are starting out rely heavily on FMOs to help them market their new business, including through leads, mailers, advertisements, and access to carrier marketing materials.

A18

17.     The technology that SSB makes available to me and to other independent agents and brokers allows us to help Medicare beneficiaries compare different products in the marketplace based on features, available doctors, premiums, and prescription drug options.  The technology allows agents to view and compare multiple plans at once for the beneficiary, taking into consideration each beneficiary's specific doctors and drugs.  Not being able to utilize this technology would decrease efficiency and increase the time spent researching proper plans.  The technology FMOs offer allows us to ensure that Medicare beneficiaries are able to choose the health plan that is in their best interest based on their unique healthcare needs.

18.     Before the final rule, those support services would generally not be purchased by individual agents and brokers.  Instead, the costs of those services would be covered by carriers, which pay administrative fees to FMOs (typically on a per-enrollment basis) so as to cover the cost of providing important administrative and support services to agents and brokers.

19.     In the current system, an independent agent or broker can affiliate with FMOs of their choosing and gain access to a wide array of administrative and support services at no cost, which allows the agent or broker to better serve Medicare beneficiaries in the community.  I selected SSB as an FMO because of the reliable and high-quality services that it provides, which I have been able to use to help countless beneficiaries.  For example, I use without charge SSB's all-in-one technology tool that provides compliance scope of appointment, compliance scripting, and also a quoting tool for all Medicare plans, which makes it possible to view all options on the whole in one location.

20.     One of the biggest issues with the rule as proposed is that it is unclear whether carriers are able to pay FMOs administrative fees.  But if the rule is interpreted to eliminate administrative payments, agents like me will lose access to the wide range of technology and services ordinarily provided by FMOs, forcing us to use a flat fee to cover costs that may go far beyond what that flat fee would cover.  Speaking from my experience, even a $100 flat fee and $100 one-time increase in the compensation cap would not cover the monthly expenses that are covered by my FMO's services.

21.     It is unclear where the $100 flat fee and the $100 one-time increase are derived from.  CMS has provided no facts or data to support that $100-200 would cover those costs or even come close.  It is not even clear to agents whether the fee applies to each plan sold, or some other metric.  If the intent of CMS is forcing independent agents and brokers to personally cover the cost of the services that they previously received from FMOs, that would place financial strain on them, causing disruption to our healthcare system and undermining the ability of independent agents and brokers to provide the best quality service.  They will also have to contract separately for the technology of each carrier, which is inefficient and time consuming, not to mention costly.  That could lead agents to abandon the industry—especially independent agents in smaller markets who serve smaller communities, which would be to the detriment of the beneficiaries in those communities.  Otherwise, agents who want to cut costs will enter in fewer contracts to save on administrative costs, which means fewer plans offered to beneficiaries.  The end result would be to reduce the choices that Medicare beneficiaries have and make it more difficult for them to identify and choose the plans that best suit their individual needs.

**A19**

### THE FINAL RULE WILL CAUSE OPERATIONAL HARM

22.     Before FMOs became part of the Medicare system, carriers marketed their products through captive agents employed by the carrier.  This structure did a disservice to Medicare beneficiaries because under that system, the agent was only knowledgeable of the plans provided by the carrier and was contractually bound to encourage enrollment in their carrier's plans over other plans regardless of whether there was a better plan for a client's personal needs.

23.     FMOs help create a better, more competitive, more choice-driven system.  Given the ambiguity in the final rule, if it were somehow interpreted to say MAOs are not allowed to reimburse administrative costs, FMOs would not have the resources to continue to support independent agents and brokers that sell multiple carrier products.  That would leave agents and brokers to contract separately and directly with each carrier whose products they wish to make available to their clients.  The process of contracting is extremely time and resource intensive for individual agents.  As a result, individual agents could be forced to pursue fewer carrier relationships, ultimately giving potential beneficiaries fewer choices.

24.     If FMOs are no longer able to provide essential administrative and support services, the resulting changes to the market will cause irreversible harm.  Beneficiaries from underserved and rural communities, like the communities in Northern Texas and Oklahoma that I serve, are likely to suffer the greatest harm.  Working with an FMO provides me and other independent agents and brokers with the networks and resources needed to reach beneficiaries in underserved and rural communities, where we can support the most vulnerable Medicare beneficiaries in selecting the plan that is best for their individual needs and circumstances.  Without the networks and resources provided by the FMOs, it will be too costly and burdensome for me to reach into rural areas, and people living in these areas will have fewer opportunities to receive support in choosing the best plan for them.  If agents for individual carriers visit these areas, they have no incentive to explain other plans that may be better for the individual.

25.     As an example, one of my clients who was referred to me lives in a rural area and was mistakenly put on a veteran's plan by the carrier, even though she is not a veteran.  The plan gave her no drug coverage and had other problems that she was not aware of.  I was able to put her on a plan that was appropriate for her—but nonetheless she was assessed a penalty from the government because she had been enrolled in a program that did not have a drug plan, as she was required to have.  I was able to help her fix the issue, but countless problems like this happen on a daily basis.

26.     Without the aid of an FMO, individual agents and brokers would also be forced to obtain all marketing materials directly from each MAO with which they contract, and for each individual product that the agent or broker offers the Medicare beneficiary.  Again, these time-consuming tasks would take away from the time that agents can spend servicing clients, helping them navigate the system, and educating new seniors on their options.  And while CMS suggests that Medicare beneficiaries can get this service through their local support centers, the individuals who answer calls at those centers are not trained or licensed insurance agents, and they have nowhere near the amount of experience and understanding of the variety of options available to seniors as I do and as do most agents that I know.  It is simply not the case that state

**A20**

agencies are equipped to handle the day-to-day concerns that arise from Medicare beneficiaries as they interact with their plans and policies.  For that reason, I much prefer to be available to my clients for the multitude of issues that arise even after their plans have been established than to be responsible for administrative functions that are easily covered by my FMO.

27.    Another important issue that the rule may affect is agent access to FMO software. These software platforms allow for Medicare plan comparison, quoting, and enrollment, allowing an agent or broker to compare various products and provide a full, real-time analysis of options based on plan features, available doctors, premiums, and prescription drug options. Under the final rule as I understand it, agents and brokers may have to pay out of pocket for this technology, which would prove too costly for many, all to the detriment of beneficiaries.  And because contracts between agents and carriers and the required certifications are carried out between June and August each year, most agents will have had to purchase and secure the technology associated with each of their individual carrier contracts by August 2024.  Without access to this technology, and with a limited network of MAO contracts, agents and brokers will be forced to search each MAO separately to determine plan options, and will be able to search only the plans of those MAOs with which they have active contracts.  That will lead to fewer options available to beneficiaries because agents will likely reduce the number of carriers they offer to save money.

28.    And finally, without all of the administrative support currently provided by FMOs, agents and brokers will be forced to manage commissions with every MAO with which they are contracted, or pay an FMO out of pocket to provide this service.  This process will likely be time and resource intensive, requiring tracking of applications, ensuring timely and accurate commission payments, tracking and refunding any amounts owed, managing chargebacks and more.

### THE FINAL RULE WILL CAUSE COMPLIANCE HARM

29.    If the final rule is implemented, agents and brokers may no longer have access to invaluable compliance support, or that support will significantly change.  Losing this resource would put agents and brokers at risk of non-compliance with multiple complex CMS rules because they lack the resources to review compliance materials, understand and learn the rules, and ask the right questions.  That may have a ripple effect of resulting in MAO actions against agents, as well as increased complaints against agents who are trying to comply in good faith but no longer have the resources needed to fully support compliance functions.  In addition, it is entirely unclear, and at this point unlikely, that MAOs will have the infrastructure and ability to support all the agents in the field with the needs that were previously met by FMOs with regard to compliance.

30.    In this digital age, agents and brokers are vulnerable to cybersecurity threats, which leads to beneficiary harm, as well as complaints and enforcement actions.  Without the support of FMOs to help navigate data privacy and security compliance, agents and brokers face a high risk of noncompliance with those requirements.  Again, that risk will mainly affect agents who operate small businesses in smaller markets, given their lack of time and access to central resources.

\* \* \*

31.     The harms I described above could begin when CMS's final rule takes effect on June 3, 2024, and will only continue to snowball the longer the rule is allowed to be in effect. Carriers will be proposing new contracts with CMS that may govern the payment of administrative expenses for the coming year.  Those contracts will be finalized by no later than August 31, 2024.

32.     If CMS is not stopped from implementing its rule before that date, the dramatic changes to the market caused by the rule will be effectively locked in until new contracts can be proposed in a year's time.  Because the harms caused by the final rule will be sweeping and irreversible, it is important for the rule to be stayed before contracts are finalized on August 31, 2024.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of May, 2024.

By: _____
         Nicole A. Morgan

8   **A22**

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

AMERICANS FOR BENEFICIARY
CHOICE;

SENIOR SECURITY BENEFITS, LLC

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

CENTERS FOR MEDICARE &
MEDICAID SERVICES,

XAVIER BECERRA, *in his official capacity
as Secretary of Health and Human Services*,

CHIQUITA BROOKS-LASURE, *in her
official capacity as CMS Administrator*,

*Defendants*.

No. 4:24-cv-00439-O

**DECLARATION IN SUPPORT OF
PLAINTIFF'S MOTION FOR A
SECTION 705 STAY OF THE FINAL
RULE OR, IN THE ALTERNATIVE,
A PRELIMINARY INJUNCTION**

## DECLARATION OF GEORGE DIPPEL

I, George Dippel, declare as follows:

1.      I am a resident of Auburn, Alabama.  I am over the age of eighteen, and I am competent to provide this declaration.

2.      I am the President of Deft Research, which is headquartered in Minneapolis, Minnesota.  I have held that position since August of 2022, before which time I was the Executive Vice President of the company starting in December of 2020 and in Sr. Vice President and Vice President roles before then beginning in February of 2010.

3.      I have worked in the sales, marketing, and market research industry for more than 25 years, with a primary focus on healthcare consumer research over the last 19 years.

4.      I am familiar with consumer perceptions of their experiences with the healthcare system, including understanding how consumers depend on access to information in the Medicare Advantage system.

1

A23

5.    I am concerned that the regulatory changes that will be imposed by the final rule issued by the Centers for Medicare & Medicaid Services ("CMS") on April 23, 2024 will have unintended negative consequences on the Medicare Advantage industry.

6.    The services provided to beneficiaries by independent agents and brokers have a positive effect on the experience of beneficiaries during enrollment and beyond.    The administrative support provided to independent agents and brokers by Field Marketing Organizations ("FMO") facilitates those services.    If it is allowed to go into effect, the final rule could make it difficult for FMOs to continue providing the essential support that independent agents and brokers rely on to best serve consumers.

7.    This declaration presents data gathered during some of Deft Research's more recent studies in order to demonstrate the vital role played by independent agents and brokers in serving Medicare beneficiaries and to dispel certain misconceptions surrounding the recent developments in the marketplace for Medicare Advantage plans.

### DEFT RESEARCH

8.    Deft Research was established in 2005 with the goal of better understanding the shopping habits and motivations of seniors purchasing health insurance coverage through the newly created Medicare Part D program.    Since that time, Deft Research has expanded its focus to include all major health insurance products and markets in the United States.

9.    Since the company's founding, Deft Research has provided health insurance insights to more than 130 insurance carriers and dozens of agencies and consultancies. Specifically, and over just the last two years, 85 Medicare Advantage carriers as well as CMS have relied on Deft Research's Medicare market insights.    Deft Research services carriers of all sizes, from the largest national carriers to the smallest local provider-owned plans.

10.    Deft Research brings together strong market research credentials and a leadership team that has decades of industry experience in product management, marketing, and sales services.    This deep health insurance industry background enables Deft Research to both produce high value research and ascertain the business implications of those research results.

11.    Deft Research believes that consumer insights are important, and it seeks to help health insurance industry stakeholders better understand and serve consumers.    Deft Research accomplishes this by conducting large, national quantitative surveys of Medicare beneficiaries and also by analyzing publicly available data regarding Medicare Advantage benefits and enrollment.

### FMOS AND INDEPENDENT AGENTS AND BROKERS INCREASE CONSUMER CHOICE AND IMPROVE THE CONSUMER'S OVERALL EXPERIENCE

12.    Under the existing system, and before CMS's final rule, beneficiaries had access to a wide array of options when choosing a Medicare Advantage plan.    For the 2024 plan year, counties with less than 10,000 Medicare-eligible individuals have on average 25 Medicare Advantage plans available; counties with 10,000 to 100,000 Medicare-eligible individuals have on average 34 plans available; and counties with 100,000 or more Medicare-eligible individuals have on average 50 plans available.

2

**A24**

13.     Across the country, two-thirds of all counties experienced an increase in the number of plan options for the 2024 plan year.  Only 15% of counties lost one or more plan options, while 18% of counties gained five or more plan options.

14.     In navigating the complex world of selecting a Medicare Advantage plan from the many options available, beneficiaries largely prefer to work with an independent agent or broker, with 79% of seniors indicating that working with an independent agent or broker is their preference.  72% want to work with an agent who is consultative and can explain the benefits and downsides of each plan, but who does not tell the senior which option they should choose.

15.     Overall, consumers view independent agents far more positively than agents with whom they speak on 800 number calls from aggregator websites.  Across every agent attribute Deft Research tested, seniors rated their perception of the service received with an independent agent higher than the service received with an 800 number agent.  Independent agents scored 21 percentage points higher than 800 number agents on the metric of whether the agent "was more interested in putting me in the right coverage than making a sale," with 89% of beneficiaries indicating that their independent agent had this quality.  On the metric of whether the beneficiary felt that the agent listened to them, independent agents scored 25 percentage points higher than 800 number agents, with 85% of beneficiaries indicating that they felt that their independent agent listened to them.  Independent agents also scored 32 percentage points higher than 800 number agents when beneficiaries were asked whether their agent was truthful.

16.     Beneficiaries are largely satisfied with their experience working with an independent agent.  For example, when evaluating their level of satisfaction with the help their agent provided in understanding their coverage, 70% of seniors rated their independent agent a 9 out of 10 or a 10 out of 10.  Even among seniors who were frustrated that their carrier was not helping them understand their coverage well enough, most indicated that their independent agent was helpful in meeting this need, with 72% of those seniors rating their independent agent a 7 to 10 out of 10 on the metric of helping them understand their coverage.  Seniors care deeply about receiving help in understanding their coverage, with this factor being one of the top drivers for why seniors rate their health plan as the "Best Health Plan Possible."  Overall, seniors view independent agents as superior in providing this assistance compared to their carrier.

17.     The most vulnerable Medicare beneficiaries overwhelmingly value the assistance of an agent or broker.  Across fully dual eligible individuals (individuals who are eligible for both Medicare and Medicaid), partially dual eligible individuals, dual eligible individuals under 65, and low-income seniors, all four groups valued the assistance they received from an agent or broker during the 2024 annual election period.  On the high end, 92% of partially dual eligible individuals said that the agent they worked with was either extremely helpful or very helpful.  Even on the low end, 76% of dual eligible individuals under 65 said that the agent they worked with was either extremely helpful or very helpful.  Across each of the four groups, only 5% or less rated their agent as either not very helpful or not at all helpful.

18.     The independent agent's relationship with and support for the beneficiary frequently extends beyond the point of enrollment.  Of seniors who recently enrolled and used the assistance of an independent agent, 70% indicated that their agent stayed in contact with them after the point of enrollment.

**A25**

19.     Agents who remained in contact with their recent enrollees generally are prepared to drive higher health plan ratings.  Over half (53%) of seniors with agents who stayed in contact after enrollment rated their health plan as a 9 out of 10 or a 10 out of 10 on the "Best Health Plan Possible" metric compared to only 35% of seniors with agents who did not maintain contact.

### SMALLER, REGIONAL CARRIERS ARE GROWING FASTER THAN MOST NATIONAL CARRIERS

20.     The suggestion that FMOs are responsible for a lack of growth among smaller, regional carriers and an outsized success among larger, national carriers is not reflected by current data.

21.     Among the four largest carriers in the non-Special Needs Plans ("non-SNP"), non-Employer Group Waiver Plans ("non-EGWP") market, only two saw growth in the 2024 benefit year—Kaiser and CVS Aetna.  While CVS Aetna grew substantially (18.4%), Kaiser gained only 511 members (0.04%).  In contrast, the sixth largest carrier in the nation, Centene, lost 16.4% of its membership; the fifth largest carrier, Elevance, lost 3% of its membership; and the seventh largest carrier, Cigna, lost 1.2% of its membership.  Five of the seven national carriers lost membership after the 2024 annual election period in the non-SNP, non-EGWP market, and six of the seven national carriers failed to grow at the same pace as that of the average large plan.  While in previous years many of these carriers experienced higher rates of growth, the current data demonstrates that this is not the case today.

22.     Our analysis focuses on the non-SNP, non-EGWP market because this is the most accurate way to assess comparative growth trends across carriers due to the fact that not all Medicare Advantage carriers participate in the SNP and/or EGWP markets, and that not all SNP and/or EGWP carriers participate in the non-SNP, non-EGWP market.

23.     Among somewhat smaller carriers with between 20,000 and 50,000 members, fifteen regional or state carriers experienced growth rates above the 3% average growth rate seen within their peer group.  When compared to the growth of the seven national carriers, all fifteen of these regional or state carriers experienced more growth than all the national carriers except CVS Aetna.

24.     Enrollment in some of the smallest carriers (those with between 5,000 and 20,000 members) increased 8% over the 2024 annual election period, with the average carrier in this peer group seeing 12% growth.  Several of these small carriers saw growth rates over 50%, with Samaritan growing by 82%, Commonwealth Care Alliance growing by 68%, and Banner growing by 52%.

25.     This data demonstrates that the contention that most national carriers experienced higher growth rates than regional carriers during the most recent annual election period is false. The majority of national carriers either failed to grow or experienced a decrease in membership in the non-SNP, non-EGWP market.

A26

**ENROLLMENT IS DRIVEN BY
QUALITY OF BENEFITS REGARDLESS OF DISTRIBUTION STRATEGY**

26.     The argument that FMOs are responsible for giving large national carriers an unfair competitive advantage over smaller regional carriers is also undermined by 2024 enrollment data. All three of the largest national carriers (United, Humana, and CVS Aetna) have partnerships with FMOs, but only one of those carriers experienced above-average growth in 2024.  If FMOs dictated enrollment in the non-EGWP, non-SNP space, one would expect to see above average growth rates for all carriers who partnered with FMOs.  But that has not been the case.

27.     CVS Aetna's outsized growth as compared to other large national carriers is better explained by the quality of benefits provided.  In 2024, CVS Aetna increased its investment in key benefits that matter to seniors.  On an average member-weighted basis, CVS Aetna decreased premiums, decreased drug deductibles, decreased out of pocket maximums, increased over the counter allowances, and maintained restorative dental services.  In contrast, United and Humana took the opposite approach, increasing overall cost sharing on an average member-weighted basis for seniors with regard to premium, drug deductibles, and out of pocket maximums while reducing overall over the counter allowances.

28.     In a marketplace where consumers have ample coverage options and access to important plan information through an independent agent or broker who can assist them in transitioning to a plan with better benefits, many consumers will choose to enroll in the plan that provides them with a better value.

29.     Differential growth rates are thus better understood by looking to the quality of benefits provided and the level of cost sharing imposed on beneficiaries.  While the picture may be more complex for regional carriers, for whom network or service area expansion also plays a large role in impacting rates of growth, regional carriers who elect to enrich their benefits also position themselves for growth and those who instead pull back on benefits also risk losing members.

30.     Viewed in this light, CVS Aetna's substantial growth this year supports the evidence that agents and brokers are helping consumers make informed choices to ensure that beneficiaries select the plan that provides them with the best value.

**GEOGRAPHY AND BRAND RECOGNITION IMPACT GROWTH RATES AND MEMBERSHIP TOTALS**

31.     National carriers compete in more states and counties than regional plans, which positions them for greater growth and membership potential.  A smaller, regional carrier that is owned by a single provider system operating in a limited number of counties cannot compete for growth in all the counties in the nation, but rather only in those select counties in which the provider system operates.  This reality dramatically reduces a hospital-owned carrier's ability to grow total membership compared to a national carrier, which can grow wherever it is able to establish sufficient networks.  Geography thus provides the national carrier with a distinct competitive advantage over the local carrier.

32.     Consumers who are aging into Medicare are reluctant to consider choosing a brand for Medicare with which they have not had recent experience, with only 8% of consumers aging

into Medicare being very or extremely likely to consider a Medicare brand if they have not been a member of that carrier in the past decade. Practically, this means that hospital-owned Medicare Advantage carriers that have small market shares in commercial group and Affordable Care Act coverage are hamstrung in their efforts to gain membership. In contrast, 58% of Age-Ins are willing to consider a carrier for Medicare if they are currently a member of that carrier commercially. With United, CVS Aetna, and Blue Cross Blue Shield affiliated plans owning approximately two thirds of the commercial group market, the majority of consumers aging into Medicare are not currently in a smaller, local plan, and thus are less likely to consider such a plan when coming into Medicare.

33.     There are a variety of factors that impact growth rates in the Medicare Advantage market that are entirely separate and apart from the influence of FMOs. Any argument that singularly blames FMOs for somehow hindering the growth of smaller regional carriers, or providing large national carriers with a competitive advantage, is incomplete and inaccurate.

*     *     *

34.     In light of the research explained above, it is clear that independent agents and brokers provide highly valued services to Medicare beneficiaries. Independent agents and brokers rely on the administrative support provided by FMOs to empower them to best serve beneficiaries. FMOs thus play an important role in ensuring that Medicare beneficiaries get the support they need during the enrollment process and beyond. Considering that the data outlined above draws into question the notion that FMOs are singularly to blame for some of the issues that appear to have motivated the final rule, I am concerned that the final rule will not solve the problems facing the Medicare Advantage program and will instead have unintended negative effects on the systems that serve beneficiaries.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of May, 2024.

By:     _George Dippel_
        _____
        George Dippel

6     A28

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE; | |
| SENIOR SECURITY BENEFITS, LLC | |
| *Plaintiffs*, | No. 4:24-cv-00439-O |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| CENTERS FOR MEDICARE & MEDICAID SERVICES, | **DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR A SECTION 705 STAY OF THE FINAL RULE OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION** |
| XAVIER BECERRA, *in his official capacity as Secretary of Health and Human Services*, | |
| CHIQUITA BROOKS-LASURE, *in her official capacity as CMS Administrator*, | |
| *Defendants*. | |

## DECLARATION OF EMILY TREVINO

I, Emily Trevino, declare as follows:

1.      I am a resident of Humble, TX.  I am over the age of eighteen, and I am competent to provide this declaration.

2.      I am the Senior Managing Partner of Wise Up Financial LLC, which is headquartered in Houston, TX.  I have held that position for 4 years.  As Senior Managing Partner, I am responsible for coordinating community outreach campaigns, develop educational content, oversee our Care Team, onboard and mentor insurance agents with Medicare and other related health insurance products, maintain relationship with carriers and community leaders, and oversee and implement regulatory compliance for our organization.

3.      I have worked in the healthcare insurance industry for 16 years.  I got my start as an independent broker, and then transitioned to a role as a carrier representative.  Approximately 10 years ago, I founded my own insurance agency—Seasons Consulting Group which then merged with my business partner Anh Kim Nguyen to form Wise Up Financial LLC dba Wise Insurance/Kim Anh Insurance.

4.     My extensive professional experience in the insurance industry, including my unique background working with both insurance carriers and Field Marketing Organizations ("FMO"), provides me with deep knowledge of how the insurance industry operates.

5.     The final rule issued by the Centers for Medicare & Medicaid Services ("CMS") on April 23, 2024 threatens to have a substantial negative impact on the ability of Wise Up Financial LLC to serve not only Medicare beneficiaries, but also the broader community.  I am passionate about the myriad ways Wise Up Financial LLC serves our community members in need. But the sweeping regulatory changes that the final rule will impose on the insurance industry would require Wise Up Financial LLC to make difficult decisions about which of the essential services we provide should be discontinued.  If we are forced to curtail certain services, it will almost certainly leave many community members in a lurch without access to resources on which they have come to rely.

## WISE UP FINANCIAL LLC

6.     Wise Up Financial LLC is a FMO offering our agency and agent partners access to the latest technology, business mentorship, marketing strategies, and opportunities.  Our partners are licensed in 34 states and more than 40 of our agents are fluent in a languages other than English.

7.     After noticing the lack of mentorship and partnership in the insurance industry, my business partner Anh Kim Nguyen merged and founded Wise Up Financial LLC a 4 years ago to fill that gap.

8.     Wise Up Financial LLC is proud to have built a network of agencies and agents with the language skills needed to serve the diverse communities in which we operate, with partners who provide education and services in Vietnamese, Spanish, Korean, and Chinese, to name a few.

9.     At Wise Up Financial LLC, we are committed to meeting the holistic needs of the communities we serve.  The services provided by our partner agents and agencies extend far beyond assisting beneficiaries with enrollment.  Our network of agencies and agents work with community leaders, physicians, service organization, and more to provide public education in a multitude of languages. Another essential service we provide involves helping beneficiaries access their benefits, both health-related and otherwise.  For example, our agents assist community members in applying for a variety of government benefits, such as Medicaid, food stamps, and more.

10.     Some examples of a few of the ways in which Wise Up Financial LLC and our agents serve their communities include:

- We often work with clients who must make a phone call to Social Security to obtain assistance, perhaps because they need to update their information or schedule an appointment to apply for Medicare, or because they need to reset their socialsecurity.gov password or experienced an issue with the website that prevented them from enrolling in Medicare.  In these circumstances, it is common for our clients to wait over an hour, sometimes even up to two hours, to speak with a representative.  For our clients who require

translation services, they then must wait even longer, and sometimes the call is disconnected before they can get the help they need. Our agents help their clients navigate this complicated and often frustrating process.

- Sometimes our clients receive medical bills that list a balance due that is higher than what is listed in the Summary of Benefits. This issue frequently arises because of claims processing issues. In these circumstances, our agents help their clients by coordinating calls with the client's insurance carrier and medical provider to identify and resolve any discrepancies. These issues generally take several months to resolve, and the process can be difficult for consumers to navigate by themselves. In these situations, having the assistance of an agent with a deep understanding of your Medicare plan can mean the difference between being forced to overpay for healthcare services and receiving the full value of the benefits to which you are entitled.

- Our clients often require assistance with switching providers, or finding new providers, so that they can access their benefits. For our clients who require translation services, they often do not want to call their carrier because when they do so they face long hold times waiting for a translator and then often have difficulty knowing the right questions to ask, an issue with which the translator cannot assist. Because our wide network of agents includes many individuals who are fluent in languages other than English, those agents can offer an alternative for their clients, providing in-office and in-language assistance to help consumers access their benefits and identify providers that can meet their needs.

- Unfortunately, in Houston it is not uncommon for unlicensed service-based businesses that charge $500 or more to help individuals enroll into Amerigroup or UHC MAPD plans on Medicare.gov to target non-English speaking communities. To combat this harmful behavior, Wise Up Financial LLC launched an educational campaign to inform the community that they can receive this help at no cost and from agents who are licensed and qualified to understand the benefits, networks, formularies, and nuances of the various plan options.

- Medicaid unwinding generated significant confusion and disruption in non-English speaking communities nationwide. Many community members were not aware that they had lost Medicaid coverage until they attempted to get care. Recognizing the serious harm that was occurring, Wise Up Financial LLC launched an educational campaign in Vietnamese to educate the public on this issue and conducted targeted outreach to our impacted clients. Because of these efforts, we were able to help many clients and community members avoid potentially dangerous disruptions in coverage and care.

- Many of our clients, particularly those for whom English is not their primary language, find it difficult to access their non-medical plan benefits, such as "flex" cards. While carriers provide their beneficiaries with general information on these benefits, it is often not sufficient. As mentioned earlier, many individuals avoid seeking help from their carriers due to long wait times and difficulty accessing translation services. To address this problem, our agents provide in-office, and in-language support, often helping clients understand and complete forms that are not provided in their native language and explaining to clients how they can use their "flex" cards.

11.     Many of the examples described above are services that the Medicare program does not offer in any capacity.  And even in areas where Medicare does offer assistance, beneficiaries often face multiple barriers in accessing that assistance.  The services our agents provide above and beyond assisting with the enrollment process help to ensure that beneficiaries get their needs met, their questions answered, and are able to access the full range of benefits to which they are entitled.

### THE FINAL RULE WILL UNDERMINE OUR ABILITY TO MEET THE NEEDS OF OUR COMMUNITIES

12.     The Medicare system is incredibly complex, and can be difficult to navigate for even the most sophisticated of consumers.  Agents and brokers play a critical role in helping beneficiaries understand their plan options so that they can make an informed decision as to which plan will best meet their individual needs.  Beyond the point of enrollment, agents and brokers can be a lifeline to consumers struggling to access their benefits, fielding questions that might otherwise go unanswered.

13.     To provide these essential services, agents and brokers rely on the administrative and support services provided by FMOs like Wise Up Financial LLC.

14.     The final rule will threaten the viability of this system if, in light of certain ambiguities in the final rule, it is interpreted to prohibit carriers from continuing to provide the administrative payments that reimburse FMOs for the wide range of administrative and support services they provide to agents and brokers.  Negatively impacting administrative payments from carriers to FMOs would cause ripple effects that would negatively impact not only FMOs like Wise Up Financial LLC, but also every agent and agency that we partner with, as well as the community members they serve.

15.     If the final rule is allowed to take effect and if administrative payments from carriers to FMOs are thus impacted, Wise Up Financial LLC will be forced to reduce and perhaps even eliminate the linguistically and culturally informed public education programs and social services it provides to the community.  Because these programs are well established in the communities we serve, I am concerned that community members will be harmed when the education and assistance they have come to rely on is no longer available.

*     *     *

16.     Based on my experience working in the industry for over a decade, I believe that if the final rule is allowed to take effect the agents and agencies who rely on the administrative and support services provided by Wise Up Financial LLC will no longer be able to provide expanded services to those in need.  Our community members have come to rely upon the support our agents provide to help them access the full range of benefits to which they are entitled.  If Wise Up Financial LLC is forced to scale back its public education and social service programs, I fear that it will be the most vulnerable community members who will suffer the most.

**A32**

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 17th day of May, 2024.

By: _____

Emily Trevino

5