IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, et al. | |
|     Plaintiff, | |
| v. | Civil Action No. 4:24-CV-439-O |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
|     Defendants. | |
| COUNCIL FOR MEDICARE CHOICE, et al. | |
|     Plaintiff, | |
| v. | Civil Action No. 4:24-CV-446-O |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | |
|     Defendants. | |

**DEFENDANTS' CONSOLIDATED RESPONSE TO PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION**

LEIGHA SIMONTON
UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:   214-659-8626
Facsimile:   214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

## Table of Contents

I.    Introduction ................................................................................................... 1

II.    Background .................................................................................................... 3

    A.    Medicare Advantage and Part D. ...................................................... 3

    B.    Marketing Medicare Advantage Plans and Prescription Drug Plans. ..................... 6

    C.    The Proposed Agent/Broker Compensation Rule. ............................. 11

    D.    The Final Agent/Broker Compensation Rule. .................................... 15

    E.    The lawsuit and Plaintiffs' motions. .................................................. 22

III.    Argument and Authorities ............................................................................ 22

    A.    Plaintiffs are unlikely to succeed on the merits. ............................... 22

        1.    CMS's authority to regulate the "use of compensation" includes prescribing administrative support costs. ............................ 23

        2.    The Final Rule is not arbitrary or capricious. ......................... 31

            a.    The Final Rule is supported by sufficient evidence and is rational. ............................................................... 31

            b.    The Final Rule is consistent with the purpose of the Medicare statute and HIPAA. ....................................... 37

            c.    The Final Rule's contract-term limits do not violate the Due Process Clause. ........................................... 39

            d.    The Final Rule's effective date is not arbitrary or capricious. ......................................................... 41

        3.    CMS complied with any applicable notice-and-comment requirements. ............................................................... 43

            a.    CMS disclosed all information required by the APA in the Proposed Rule. ...................................................... 43

            b.    The Final Rule is a logical outgrowth of the Proposed Rule. ....... 44

    B.    Plaintiffs fail to show irreparable harm or that the other public-interest factors support the extraordinary remedy of a preliminary injunction. ............... 45

C.    The Court should exercise its equitable discretion to deny relief or limit it to individual Plaintiffs.............................................................................................. 47

IV.    Conclusion ...................................................................................................................... 50

## Table of Authorities

Cases

*Air Prod. & Chems., Inc. v. GSA*,
 No. 2:23-CV-147-Z, 2023 WL 7272115 (N.D. Tex. Nov. 2, 2023)............................46, 47

*Air Transp. Ass'n of Am., Inc. v. Dep't of Agric.*,
 37 F.4th 667 (D.C. Cir. 2022)............................................................................43

*All. for Hippocratic Med. v. FDA*,
 78 F.4th 210 (5th Cir. 2023)..............................................................................22

*Am. Airlines, Inc. v. Dep't of Transp.*,
 202 F.3d 788 (5th Cir. 2000)..............................................................................40

*Am. Radio Relay League, Inc. v. FCC*,
 524 F.3d 227 (D.C. Cir. 2008)............................................................................43

*Anyadike v. Vernon Coll.*,
 No. 7:15-CV-157-O, 2015 WL 12964684 (N.D. Tex. Nov. 20, 2015)............................45

*Ass'n of Am. Physicians & Surgeons v. FDA*,
 13 F.4th 531 (6th Cir. 2021)..............................................................................49

*Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of the Treasury*,
 966 F.3d 782 (D.C. Cir. 2020)............................................................................38

*Associated Builders & Contractors of Tex., Inc. v. NLRB*,
 826 F.3d 215 (5th Cir. 2016)..............................................................................22

*Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*,
 894 F.3d 692 (5th Cir. 2018)..............................................................................45

*Bailey v. United States*,
 516 U.S. 137 (1995).........................................................................................25

*Barrett v. United States*,
 205 F. Supp. 307 (S.D. Miss. 1962)....................................................................29

*Batterton v. Francis*,
 432 U.S. 416 (1977).........................................................................................24

*Black Fire Fighters Ass'n v. City of Dallas*,
 905 F.2d 63 (5th Cir. 1990)...............................................................................22

*BNSF Ry. Co. v. United States*,
    775 F.3d 743 (5th Cir. 2015) ..................................................................................29

*Burkhart v. Univ. Interscholastic League*,
    No. 1:22-CV-1026-RP, 2023 WL 2940026 (W.D. Tex. Apr. 13, 2023) ..................39, 40

*Canal Auth. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ..................................................................................22

*Chamber of Com. of U.S. v. SEC*,
    85 F.4th 760 (5th Cir. 2023) ..................................................................................35

*Cmty. Care, LLC v. Leavitt*,
    537 F.3d 546 (5th Cir. 2008) ..................................................................................24

*CTS Corp. v. Waldburger*,
    573 U.S. 1 (2014) ..................................................................................................38

*DCOR, LLC v. U.S. Dep't of the Interior*,
    No. 3:21-CV-120-N, 2023 WL 4748197 (N.D. Tex. July 24, 2023) ..........................50

*Def. Distributed v. U.S. Dep't of State*,
    838 F.3d 451 (5th Cir. 2016) ..................................................................................45

*Dep't of Com. v. New York*,
    139 S. Ct. 2551 (2019) ..........................................................................................36

*Edwards' Lessee v. Darby*,
    25 U.S. 206 (1827) ................................................................................................24

*ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*,
    867 F.3d 564 (5th Cir. 2017) ..................................................................................40

*Flight Training Int'l, Inc. v. FAA*,
    58 F.4th 234 (5th Cir. 2023) ..................................................................................41

*FCC v. Fox Tele. Station, Inc.*,
    567 U.S. 239 (2012) ..............................................................................................39

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ..............................................................................................35

*GoNannies, Inc. v. GoAuPair.Com, Inc.*,
    464 F. Supp. 2d 603 (N.D. Tex. 2006) ....................................................................46

*Handley v. Chapman*,
    587 F.3d 273 (5th Cir. 2009) ..................................................................................43

iv

*Huawei Techs. USA, Inc. v. FCC*,
　　2 F.4th 421 (5th Cir. 2021) ...............................................................34, 40

*Hunt v. Wash. State Apple Advert. Comm'n*,
　　432 U.S. 333 (1977).  ......................................................................48

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
　　685 F.3d 353 (3d Cir. 2012)................................................................5, 37

*In re Riley*,
　　923 F.3d 433 (5th Cir. 2019) ...............................................................28

*J.H. Rutter Rex Mfg. Co. v. United States*,
　　706 F.2d 702 (5th Cir. 1983) ...............................................................28

*Knisley v. Network Assocs., Inc.*,
　　77 F. Supp. 2d 1111 (N.D. Cal. 1999) ...................................................29

*La. Indep. Pharms. Ass'n v. Express Scripts, Inc.*,
　　41 F.4th 473 (5th Cir. 2022) ...............................................................5, 37

*Liberty Mut. Fire Ins. Co. v. Clayton*,
　　33 F.4th 442 (7th Cir. 2022) ...............................................................28

*Madsen v. Women's Health Ctr., Inc.*,
　　512 U.S. 753 (1994)..........................................................................47

*Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*,
　　742 F.2d 442 (8th Cir. 1984) ...............................................................27

*Nuziard v. Minority Bus. Dev. Agency*,
　　No. 4:23-CV-278-P, 2024 WL 965299 (N.D. Tex. Mar. 5, 2024) ...................47

*O'Donnell v. Harris Cty.*,
　　892 F.3d 147 (5th Cir. 2018) ...............................................................47

*Rudisill v. McDonough*,
　　601 U.S. 294 (2024)..........................................................................28

*Sierra Club v. EPA*,
　　939 F.3d 649 (5th Cir. 2019) ...............................................................31

*Shah v. Azar*,
　　920 F.3d 987 (5th Cir. 2019) ...............................................................27

*Smith v. United States*,
　　508 U.S. 223 (1993).........................................................................25

*S. Union Co. v. Mo. Pub. Serv. Comm'n*,
    289 F.3d 503 (8th Cir. 2002) ........................................................................27

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
    989 F.3d 368 (5th Cir. 2021) ........................................................................50

*Tex. Clinical Labs, Inc. v. Sebelius*,
    612 F.3d 771 (5th Cir. 2010) ........................................................................23

*Tex. Health & Human Servs. Comm'n v. United States*,
    166 F. Supp. 3d 706 (N.D. Tex. 2016). ........................................................45

*Tex. Off. of Pub. Util. Couns. v. FCC*,
    265 F.3d 313 (5th Cir. 2001) ..............................................................41, 44

*Texas v. United States*,
    328 F. Supp. 3d 662 (S.D. Tex. 2018) .........................................................46

*Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*,
    No. 22-10414, 2023 WL 2573914 (5th Cir. Mar. 20, 2023).............................4

*Trump v. Int'l Refugee Assistance Project*,
    137 S. Ct. 2080 (2017) .................................................................................47

*United States v. Dubin*,
    27 F.4th 1021 (5th Cir. 2022) (en banc) ......................................................25

*United States v. Texas*,
    599 U.S. 670 (2023)......................................................................................47

*U.S. Anesthesia Partners of Tex., P.A. v. U.S. Dep't of Health & Hum. Servs.*,
    No. 2:23-CV-206-Z, 2024 WL 1257491 (N.D. Tex. Mar. 25, 2024)................31

*VanDerStok v. Garland*,
    633 F. Supp. 3d 847 (N.D. Tex. 2022) ........................................................49

*Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*,
    435 U.S. 519 (1978).....................................................................................43

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982).....................................................................................40

Statutes, Rules, and Other Authorities

5 U.S.C. § 553..............................................................................................43

5 U.S.C. § 553(b) ..................................................................................................43

5 U.S.C. § 553(d) ..................................................................................................41

5 U.S.C. § 705 ...........................................................................................22, 49, 50

5 U.S.C. § 706(2) ..................................................................................................23

42 C.F.R. § 417.532 (a)(1)(iii) ..............................................................................35

42 C.F.R. § 417.550 ..............................................................................................35

42 C.F.R. § 417.552 ..............................................................................................35

42 C.F.R. § 422.118 ..............................................................................................39

42 C.F.R. § 422.254 ..........................................................................................4, 46

42 C.F.R. § 422.256 ................................................................................................5

42 C.F.R. § 422.258(d) ...........................................................................................4

42 C.F.R. § 423.104 ...............................................................................................4

42 C.F.R. § 423.265 ..........................................................................................4, 46

42 C.F.R. § 423.272 ................................................................................................5

42 C.F.R. § 422.2274 ..............................................................................................9

42 C.F.R. § 423.2274(c)(13) ................................................................................14

42 C.F.R. § 422.2274(d)(1)(ii) .............................................................................42

42 C.F.R. § 422.2274(g) .......................................................................................21

42 C.F.R. § 422.2274(g)(4) ..................................................................................38

42 C.F.R. § 422.2274(a)(1)(iv) .............................................................................10

42 C.F.R. § 423.2274(a)(1)(iv) .............................................................................10

42 C.F.R. § 423.2274(c)(13) ................................................................................40

42 C.F.R. § 423.2274(g) .......................................................................................21

42 C.F.R. § 423.2274(g)(4) ..................................................................................38

42 U.S.C. § 1395w-21(h) ................................................................................6, 14

42 U.S.C. § 1395w-21(h)(4) ..........................................................................32, 38

42 U.S.C. § 1395w-21(h)(4)(C) ..........................................................................21

42 U.S.C. § 1395w-21(h)(4)(D) ..........................................................................23

42 U.S.C. § 1395w-21(j)(1)(A) ........................................................................8, 21

42 U.S.C. § 1395w-21(j)(2)(D) .......................1, 8, 14, 23, 24, 26, 32, 33, 37, 38, 40

42 U.S.C. § 1395w-22(a) .......................................................................................4

42 U.S.C. § 1395w-23(a)(1)(B) .............................................................................4

42 U.S.C. § 1395w-24(a)(1)(A) .............................................................................4

42 U.S.C. § 1395w-24(a)(6)(B) ..........................................................................5, 6

42 U.S.C. § 1395w-24(a)(6)(B)(iii) .......................................................................5

42 U.S.C. § 1395w-27(e)(4) ..................................................................................6

42 U.S.C. § 1395w-101 .........................................................................................4

42 U.S.C. § 1395w-101(b)(1)(B)(vi) ...................................................................6, 21

42 U.S.C. § 1395w-104(*l*)(1) ...........................................................................8, 21

42 U.S.C. § 1395w-104(*l*)(2) .................................................................................1

42 U.S.C. § 1395w-111(b)(1) .................................................................................4

42 U.S.C. § 1395w-111(d)(2) .............................................................................5, 6

42 U.S.C. § 1395w-111(e)(2) .............................................................................5, 6

42 U.S.C. § 1395w-111(*i*) .....................................................................................5

42 U.S.C. § 1395w-112(b)(3)(D) ...........................................................................6

42 U.S.C. § 1395w-115(a) .....................................................................................4

42 U.S.C. § 1395ww(d)(5)(D)(ii) .........................................................................29

42 U.S.C. § 1395x(v)(1)(A) .................................................................................35

65 Fed. Reg. 40,170 (June 29, 2000) ...................................................................39

69 Fed. Reg. 46,866 (2004) ........................................................................5, 37

73 Fed. Reg. 54,226 (Sept. 18, 2008) ...............................................8, 9, 10, 26, 27, 30

73 Fed. Reg. 67,406 (Nov. 14, 2008)..........................................8–9, 9, 10, 24, 26, 30

74 Fed. Reg. 1494, 1509 (2009) .......................................................................5

76 Fed. Reg. 54,600 (Sept. 1, 2011) ...........................................................10–11, 11

77 Fed. Reg. 22,072 (Apr. 12, 2012); ................................................................11

88 Fed. Reg. 78,476 (Nov. 15, 2023) (Proposed Rule) ......................11, 12, 13, 14, 15, 16, 42, 44

89 Fed. Reg. 30,448 (Apr. 23, 2024) (Final Rule)
      ...............................18, 19, 20, 21, 22, 23, 26, 30, 31, 32, 35, 36, 37, 39, 40, 41, 42, 44, 50

Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946) ...............49–50

Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 ...................................6

Black's Law Dictionary (11th ed. 2019) (*Compensation*)............................................29

Black's Law Dictionary (11th ed. 2019) (*Use*)....................................................24

Inflation Reduction Act, Pub. L. No. 117–169, 136 Stat. 1818 (Aug. 16, 2022) ..........................4

Kurt H. Decker & H. Thomas Felix II,
      *Drafting and Revising Employment Contracts* (1991) ......................................29

Medicare Improvements for Patients and Providers Act of 2008,
      Pub. L. No. 110-275, 122 Stat. 2494 ......................................................8

Medicare Prescription Drug, Improvement, and Modernization Act of 2003,
      Pub. L. No. 108-173, 117 Stat. 2066 ......................................................6

## I.    Introduction[1]

Over fifteen years ago, Congress directed the Centers for Medicare & Medicaid Services (CMS) to limit Medicare Advantage and Part D drug plans' "use of compensation" to sell their health coverage to Medicare beneficiaries.  42 U.S.C. § 1395w-21(j)(2)(D); *id.* § 1395w-104(*l*)(2).  Ever since, CMS has enforced specific dollar limits on how much those plans could pay their agents and brokers for enrolling new beneficiaries or renewing current enrollees.  And relying on the same statutory authority, CMS has likewise enforced a fair-market-value limit on payments to support related administrative activities like licensing and work travel.

For years, those limits have advanced the statutory goal of "ensur[ing] that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage [or Part D drug] plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(j)(2)(D); *id.* § 1395w-104(*l*)(2).  More recently, however, CMS received complaints that the Field Marketing Organizations (FMOs) that many agents and brokers use as go-betweens with plans were manipulating administrative payments to get around the compensation limits. After further investigation, CMS concluded that administrative payments were often structured as per-enrollee "overrides" and other add-ons, with the result that agents or brokers might walk away with double the compensation limit for each enrollment.  To make matters worse, the generosity of those administrative payments varied by plan in a way that created powerful incentives for agents and brokers to funnel beneficiaries into higher paying plans instead of the

---

[1] The plaintiffs in No. 4:24-CV-446-O are referred to as "ABC" with their brief and appendix cited as such, and "CMC" is used for the plaintiffs in No. 24-CV-446-O in the same manner.  Because of the expedited briefing schedule, CMS has not yet compiled the full administrative record (including things like audio files that cannot be submitted via ECF), but has included certified excerpts of that (forthcoming) administrative record in its appendix, which is cited as "App. __."  Quotations to authorities, unless otherwise noted, generally have internal quotation marks removed, and the citations dispense with sub-citations to internal sources unless particularly relevant.

plan that was best for the enrollee.  These conclusions added to CMS's existing concerns about both a recent spike in beneficiary complaints about plan marketing and about marketing calls where CMS had found that beneficiaries were pressured to enroll in plans they did not understand.

To stop FMOs, agents, and brokers from circumventing the compensation limits in this way and to realign their incentives with beneficiary health needs, CMS promulgated in April a Final Rule that consolidated administrative payments with the other categories of allowable compensation and added $100 per enrollment to the capped dollar limit to account for administrative costs.  (For reference, the national compensation limit without administrative costs is $611 for a Medicare Advantage plan in 2024.)

Plaintiffs filed suit and ask the Court to enjoin the Final Rule by July 10.  Not content just to challenge the incremental change made to the regulations in the Final Rule, Plaintiffs press a novel statutory theory that might, if accepted, eliminate CMS's authority to set *any* compensation limits, unraveling the past 15 years of beneficiary protections, all based on an unsupported reading of the term "use."  Their back-up effort to read the word "compensation" impliedly to exclude administrative costs also fails, as it is inconsistent with both the word's plain meaning (including as construed by the Fifth Circuit) and with CMS's 15-year practice of limiting administrative costs to fair-market value (thereby consistently regulating these payments as a form of statutory compensation).  And Plaintiffs' attacks on CMS's choice of a $100 increase to compensation ignores the agency's careful analysis of commenters' evidence that led CMS to triple the increase it initially proposed.  Additionally, as even the partial administrative record that CMS submits with this response shows, Plaintiffs are wrong to argue that CMS had an insufficient factual basis to identify and address the problems at issue in the Final Rule.

The Court should deny Plaintiffs' motions, but it also need not rush to judgment. Plaintiffs waited to file their motions until six weeks after the agency posted the new rule, and now say that a decision is needed by mid-July. That strategic choice poses a problem for Plaintiffs because the government does not make administrative payments directly to agents, brokers, and FMOs, and the mid-July timeline Plaintiffs invoke is not a relevant date. Rather, the government pays *plans* based on bids they submit by a June 3 statutory deadline, and plans use those funds to pay for things like administrative payments. It is the June 3 bids that set the plans' financial expectations for the entire year, including marketing parameters, so a July decision on Plaintiffs' motions will come too late to change the June 3 bids, and will not affect the amount of government funding that plans receive. To receive the administrative payments Plaintiffs seek, then, they must rely on plans' generosity to cut into other aspects of their bids—like their own profits—to fund more administrative costs than plans originally projected as of June 3. That kind of speculative chain of events and disruption to third parties not before the Court should, alone, be fatal to Plaintiffs' burden to obtain extraordinary preliminary relief. But as discussed herein, Plaintiffs' arguments also fail on the merits. The Court should deny Plaintiffs' motions and allow the case to proceed in the ordinary course on a complete record.

## II.    Background

### A.    Medicare Advantage and Part D.

Medicare is a federal health insurance program for the elderly and persons with certain disabilities, and authority to administer it has been delegated by the Secretary of Health and Human Services to CMS. Under Medicare Parts A and B—now colloquially known as traditional Medicare—the government pays eligible providers for a participating beneficiary's covered health costs. Under Part C, or Medicare Advantage, the government contracts with

private health insurers to provide beneficiaries the coverage they would otherwise have received through Parts A and B. *See* 42 U.S.C. § 1395w-22(a). And under Part D, the federal government contracts with private drug plan sponsors to provide drug benefits. *Id.* § 1395w-101.

The government kicks off the annual Medicare Advantage process by setting local per-enrollee benchmark rates based on the amount it expects it would pay for an average enrollee in traditional Medicare. *See* 42 C.F.R. § 422.258(d). (For an enrollee in Tarrant County in 2025, that amount is $1,148.68 per month. *See* CMS, 2025 MA Rate Book.[2]) For Part D, the government establishes the basic benefit with parameters like the deductible ($545 in 2025) and an out-of-pocket threshold ($2,000 in 2025). *See* 42 C.F.R. § 423.104. With that information, aspiring plans submit "bids" to the government by the first Monday in June, telling the government how much money the plan would need to provide each plan's hoped-for beneficiaries with the relevant services. *See* 42 U.S.C. §§ 1395w-24(a)(1)(A), 1395w-111(b)(1); 42 C.F.R. §§ 422.254, 423.265. For Medicare Advantage, if the bids fall beneath the benchmark rate—which CMS expects to be true for 98% percent of plans in 2025—the government pays for the entire Part A and Part B benefit covered by the plan (minus beneficiary premiums and cost sharing). 42 U.S.C. § 1395w-23(a)(1)(B). Thus, the government pays plans a fixed amount each month, and those plans "assume all financial risk for servicing those enrollees." *Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, No. 22-10414, 2023 WL 2573914, at *1 (5th Cir. Mar. 20, 2023). Part D was set up so that the government would subsidize approximately 75% of the cost of the plans.[3] *See* 42 U.S.C. § 1395w-115(a).

---

[2] https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/ratebooks-supporting-data/2025

[3] The picture is a bit more complicated after the Inflation Reduction Act, but not in any way directly relevant here. *See* Pub. L. No. 117–169, § 11201, 136 Stat. 1818, 1877 (Aug. 16, 2022).

The premise of both programs is that within the regulatory constraints, contracted plans "compete not only on price but on quality to attract beneficiaries' enrollment and to keep them enrolled over time." *See* 69 Fed. Reg. 46,866, 46,867 (2004); *see also In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 685 F.3d 353, 363 (3d Cir. 2012) ("Congress's goal in creating the Medicare Advantage program was to harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system."). To give plans space to compete, the statute prohibits government interference with plans' contracts with providers or pharmacies. *See* 42 U.S.C. §§ 1395w-24(a)(6)(B)(iii), 1395w-111(*i*); *see also La. Indep. Pharms. Ass'n v. Express Scripts, Inc.*, 41 F.4th 473, 476 (5th Cir. 2022) ("To promote competition, and therefore lower prices, Congress authorized plan sponsors to freely negotiate the terms of their relationships with pharmacies, including the terms of reimbursements, without governmental interference.").

But healthy competition does not happen in a vacuum, and Congress instructed CMS to closely monitor other aspects of Parts C and D to protect beneficiaries and the public fisc—as well as to ensure a level playing field to allow effective competition among plans. *See, e.g.*, 74 Fed. Reg. 1494, 1509 (2009) (explaining that "[i]t is also of paramount importance for CMS to ensure that there is a level playing field so that true competition can occur that benefits all parties—the taxpayer, beneficiaries, and plans"). Each year, for example, CMS must inspect the actuarial analyses plans submit to support their bids and ensure that the bids equitably reflect revenue requirements of benefits provided under the plan. *See* 42 U.S.C. §§ 1395w-24(a)(6)(B), 1395w-111(d)(2), (e)(2); *see also* 42 C.F.R. §§ 422.256, 423.272. That includes detailed guidance on profit margins, in part to prevent anti-competitive pricing. *See* Instructions

for Medicare Advantage Bid Pricing Tools for Contract Year 2025 at 25–27.[4]  And CMS

negotiates how much it pays in much the same way as the government negotiates how much it

pays for health plans for federal employees.  42 U.S.C. §§ 1395w-24(a)(6)(B), 1395w-111(d)(2),

(e)(2).  On the back end, CMS recoups money from plans that spend too little of their revenue on

patient care (as opposed to, for example, overhead or profit) as part of a minimum-medical-loss-

ratio requirement.  *See* 42 U.S.C. §§ 1395w-27(e)(4), 1395w-112(b)(3)(D).

**B.    Marketing Medicare Advantage Plans and Prescription Drug Plans.**

Another aspect of Parts C and D that Congress has long directed CMS to closely

supervise is plan marketing.  The law that added Part C to Medicare required contractors to

"conform to fair marketing standards" and directed CMS to review and approve all marketing

literature.  *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 285

(codified at 42 U.S.C. § 1395w-21(h)).  The same is true for Part D.  *See* Medicare Prescription

Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 101(a), 117 Stat.

2066, 2072–73 (codified at 42 U.S.C. § 1395w-101(b)(1)(B)(vi)) (instructing CMS to "use rules

similar to . . . the rules . . . relating to approval of marketing material and application forms").  In

other words, while Congress recognized that beneficiaries need to understand the differences

between plans so that they could choose the best one for their needs, it recognized that plans

might find it more lucrative to invest in their sales pitches instead of plan design.  Or that plans

might use aggressive tactics to steer beneficiaries to more profitable plans.  Those tactics would

be inconsistent with the goal of Parts C and D, which is to have plans compete on the substance

of plan quality and price, not marketing strategies.

---

[4] https://www.cms.gov/medicare/payment/medicare-advantage-rates-statistics/bid-forms-instructions/2025 (PDF file within link for ZIP download)

Based on Congress's directive, CMS in 2005 issued over 160 pages of guidance directly restricting marketing payments. Medicare Marketing Materials Guidelines at 138 (Rev. Nov. 1, 2005).[5] The guidelines required agreements with marketers in which "commission rate . . . should not vary based on the value of the business generated." *Id.* at 139. Plans were to "[p]rovide reasonable compensation in line with industry standards," fees had to "reasonably relate to the value of the services provided," and compensation could not be structured to provide "incentives to mislead beneficiaries, cherry pick certain beneficiaries, or churn beneficiaries between Plans" to win commissions. *Id.* at 138. Overall, CMS wanted to prevent payments that favored "the financial interests of the person performing marketing" rather than guiding beneficiaries to "select the Plan most appropriate to the beneficiary's needs." *Id.* at 137. And because perverse financial incentives could affect anyone involved with selling plans, the guidelines covered compensation to brokers, independent agents, and any "downstream contractor." *Id.* at 138.

The guidelines also addressed information sharing. Plans could not "[s]hare any member information, financial or otherwise, with any entity not directly involved in the outreach process." *Id.* at 90. Nor could they "[s]tore or use member financial information for any purpose other than the initial screening eligibility, the submission and follow-up of an application for benefits, for recertification purposes, and as required by law." *Id.* Those requirements added onto the privacy requirements in the recently-promulgated Health Insurance Portability and Accountability Act (HIPAA) regulations. *See, e.g.*, *id.* at 118.

Congress endorsed and expanded CMS's approach in 2008 in the Medicare

---

[5] https://www.cms.gov/medicare/prescription-drug-coverage/prescriptiondrugcovcontra/downloads/marketingguidelines_110105.pdf

Improvements for Patients and Providers Act.  In that law, Congress prohibited "[t]he use of compensation other than as provided under guidelines established by the Secretary."  *See* Pub. L. No. 110-275, § 103(b), 122 Stat. 2494, 2500 (codified at 42 U.S.C. § 1395w-21(j)(2)(D)). Congress did not require CMS to wait until it had identified specific bad practices to regulate compensation, but instead instructed CMS to focus on the risk of bad behavior: "Such guidelines shall ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." *Id.*  The statute also expanded CMS's longstanding prohibition on door-to-door solicitation to include "[a]ny unsolicited means of direct contact of a prospective enrollee," including telephone calls.  *Id.* § 103(a)(1)(A)(ii), 122 Stat. 2499 (codified at 42 U.S.C. § 1395w-21(j)(1)(A)).  The same rules also apply to Medicare prescription drug plans.  *Id.* § 103(a)(2), (b)(2), 122 Stat. 2499–500 (codified at 42 U.S.C. § 1395w-104(*l*)(1)).

Later in 2008, CMS published two rules implementing the statute.  The first—published in September 2008 and whose validity Plaintiffs do not contest—regulated compensation down to the months of the year for which agents and brokers could be paid.  *See* 73 Fed. Reg. 54,226, 54,250–51, 54,253 (Sept. 18, 2008).  Under the regulations, marketers were paid based on a six-year cycle, and CMS limited the relative amount they could be paid the first year in order to "encourage[] agents to establish longer term relationships with their clients, rather than short term relationships."  *Id.* at 54,238.  CMS expected "that plans will set compensation at levels that are reasonable and reflect fair market value for the services."  *Id.* at 54,239.

That expectation proved to be overly optimistic.  CMS "received reports of compensation structures that are inconsistent with the intent" of the September 2008 rule, including contractors offering "extremely generous compensation" above historic compensation levels.  *See* 73 Fed.

Reg. 67,406, 67,408, 67,409 (Nov. 14, 2008).  CMS quickly amended its regulations, in

November 2008, to cap agent and broker compensation beginning in 2009 based on either (i) the

amounts the plans paid in 2006, adjusted for inflation, or (ii) the "market rate" paid by plans in

the area in 2006 and 2007, also adjusted for inflation.  *Id.* at 67,413.  And "the compensation

amount paid for selling or servicing an enrollee" for renewal years of the six-year cycle was to

"be fair-market value for the work performed and no more, and no less, than 50 percent" of the

compensation in the initial year.  *Id.* at 67,408.  CMS then published in December 2008 a $400

national maximum for Medicare Advantage commissions and a $50 national maximum for Part

D commissions.  *See* CMS, 2009 Medicare Advantage and Prescription Drug Program Agent and

Broker Compensation Structures (Rev. Jan. 16, 2009).[6]

        The September 2008 rule focused on compensation "related to the volume of sales," and

so defined the specific "compensation" it addressed as "pecuniary or non-pecuniary

remuneration of any kind relating to the sale or renewal of the policy," and not other "salary or

other benefits related to employment" or "payment of fees to comply with State appointment

laws, training, certification, and testing costs; and reimbursement for mileage to and from

appointments with beneficiaries and reimbursement for actual costs associated with beneficiary

sales appointments such as venue rent, snacks."  73 Fed. Reg. at 54,250, 54,251.  Notably,

though, this definition of "compensation" was explained as being "[f]or purposes of this

section"—i.e., 42 C.F.R. § 422.2274—and CMS did not suggest that its rule had defined the

outer bound of the *statutory* term "compensation."  *See* 73 Fed. Reg. at 54,251.  Indeed, the

November 2008 rule separately addressed CMS's "concern[s]" about payments that fell outside

_____

[6] https://www.cms.gov/medicare/health-
plans/managedcaremarketing/downloads/compstructurerepmemo_011609.pdf

its regulatory definition of compensations, such as payments for "training, material development, customer service, direct mail, and agent recruitment."  73 Fed. Reg. at 67,409.  CMS was particularly worried about "amounts paid to FMOs" or other third-party marketing organizations that did not themselves sign up beneficiaries, but instead provided support for plans' marketing and enrollment efforts.  *Id.*  Those organizations, CMS warned, "could engage in a 'bidding war' with respect to payments they retain, agree to contract to recruit agents, or perform other services only for [plans] that are the 'highest bidders' for their services."  *Id.* at 67,410.  Because such bidding wars could occur based on any compensation paid to these entities, the 2008 rules capped other payments to such organizations at their fair-market value, by providing that if a plan uses "a third party entity such as a Field Marketing Organization or similar type of entity to sell its insurance products," then "the amount paid to the third party must be fair-market value and may not exceed an amount that is commensurate with the amounts paid by [the plan] to a third party for similar services in each of the prior two years."  *Id.* at 67,413, 67414 (codified at 42 C.F.R. §§ 422.2274(a)(1)(iv) (Part C), § 423.2274(a)(1)(iv) (Part D)).

Thus, by the end of 2008, CMS regulated all payments to agents, brokers, and third party marketing organizations based on fair-market value, regardless of whether they were payments for the sale or renewal of a policy or administrative payments.  Consistent with the statute, CMS also tightened its limitations on solicitations, explaining that the regulations' purpose was to protect beneficiaries from "inappropriate or fraudulent marketing activities such as high-pressure sales tactics or inappropriate use of beneficiary information."  73 Fed. Reg. at 54,214.

While concerns about third party marketing organizations—especially bidding wars— persisted, CMS continued to rely on its fair-market-value cap to control administrative costs, rather than setting a specific dollar cap, as it did for other compensation.  *See* 76 Fed. Reg.

54,600, 54,621 (Sept. 1, 2011) ("We are also concerned about amounts paid to [FMOs] or similar types of entities for their services that do not necessarily flow down to the agent or broker who deals with the beneficiary. Specifically, we are concerned that these FMOs or other similar entities could engage in a 'highest bidders' for their services."); *see also* App. 11286–90 (OIG discussion of concerns about FMO payments). CMS thus amended its regulations in 2011 to be absolutely clear that its "compensation rules would apply at all levels," including "payments made by plan sponsors to the FMOs, as well as the FMOs['] agents." 76 Fed. Reg. at 54,623. Over time, CMS changed the specific requirements for agent and broker compensation, but it consistently maintained its policy of calculating and publishing through guidance specific caps for sales and renewal payments and imposing a separate fair-market-value cap on administrative payments. *See, e.g.*, 77 Fed. Reg. 22,072, 22,168, 22,172 (Apr. 12, 2012); CMS, Contract Year 2024 Agent and Broker Compensation Rates, Referral/Finder's Fees, Submissions, and Training and Testing Requirements (June 21, 2023).[7]

## C.    The Proposed Agent/Broker Compensation Rule.

By 2023, the "bidding war" CMS had long warned about materialized, and CMS gave notice of a proposed rule covering the subjects that Plaintiffs now challenge. *See* Proposed Rule, 88 Fed. Reg. 78,476, 78,557 (Nov. 15, 2023). While CMS recognized the important role agents and brokers play in the industry, it was concerned that significant changes in the market could disrupt agent and broker incentives. *Id.* at 78,552. Many plans had merged into large national parent organizations, outpacing smaller regional or local rivals in enrollment and market share and freeing up money to spend on marketing. *Id.* FMOs, too, consolidated "from mostly small

---

[7] https://www.cms.gov/https/editcmsgov/research-statistics-data-and-systems/computer-data-and-systems/hpms/hpms-memos/hpms-memos-wk-4-june-19-23

regionally-based companies to a largely consolidated group of large national private equity-backed or publicly-traded companies." *Id.* at 78,553.

CMS believed that this industry consolidation gave plans "greater opportunity . . . to use financial incentives outside and potentially in violation of the compensation cap." *Id.* at 78,552. And it meant that "smaller, local or regional plans that are unable to pay exorbitant fees to FMOs risk losing enrollees to larger, national plans who can." *Id.* at 78,553. Administrative fees skyrocketed, including among third party marketers, which would in turn encourage additional consolidation and even more fees. *See id.* at 78,553–54. One community health plan explained to CMS in a meeting how payments to brokers could exceed $1,000 per enrollee, including $150 "override" payments to FMOs and other add-ons:

| | New member for Jan. 1 effective date | | |
|---|---|---|---|
| **Dollar Amount** | **Incentive Payment** | | **Description** |
| $601 | CMS commission maximum | | New Enrollee during AEP |
| $150 | HRA completion | | This is paid to every member who completes an HRA, regardless of plan type or agent involvement |
| $150 | FMO payment | | This is paid as a one-time field marketing payment for new enrollees for agents with this arrangement (larger brokers) |
| $100 | Referral payment | | This is paid as a one-time referral bonus. Reports of this being offered to incent agents to move members between carriers. |
| $301 | Annual renewal payment | | If the member had a November or December birthday, agents will receive renewal payment in addition on Jan. 1 |
| $1,302 | TOTAL payment for one member | | |

(App. 11379; *accord* App. 11381.)

Financial data CMS obtained from other plans revealed that the plan's $150 override estimate was conservative. It was true that smaller organizations (often referred to in plan documents as "General Agencies") with a smaller book of business (say, 50 beneficiaries) might receive just $110 per enrollee. (App. 11498, 11504.) But as the size of the marketing organization increased, so did the payments. FMOs with the largest business (say, 2,500 beneficiaries) might receive more than twice that of a General Agency. (App. 11498, 11504.) The largest plans might be able to pay less (App. 11584, 11586), but most plans paid FMOs large amounts nearly across the board, such as $200 (App. 11610), $250 (App. 11653, 11658), $275 (App. 11673), or even $385 (App. 11694). And the payments might vary by the particular

administrative services offered (App. 11699) or the particular plan sold—even if offered by the same company—meaning some sales lacked any commissions at all (App. 11701).

At one meeting with a large plan, the plan complained that the payments have "gotten out of control." (App. 11760.) Indeed, a plan that paid just $75 per enrollment in administrative fees to a particular FMO in 2014 paid $225 to the same FMO in 2023. (*Compare* App. 11730 *with* App. 11748.) One plan set up an airline-like rewards point system where agents earned points for completing tasks like enrollment milestones and climbed through different rewards tiers that awarded agents credits and other benefits like better marketing materials or discounts on certification fees. (App. 11752–54.) And on top of the administrative overrides, plans paid other administrative fees. One popular add-on was "health risk assessments" for prospective enrollees, the amount of which also varied by plan. (App. 11376, 11755–57.)

As all this money filtered through the system, marketing organizations began promising agents and brokers golf parties and trips if they worked with certain plans. 88 Fed. Reg. at 78,552. CMS observed, for example, the following ad promising a golf trip and cash door prizes (framed here as "Marketing Money" in an apparent attempt to get around CMS's rules):



(App. 11378.) "The result," CMS concluded, was that agents and brokers were "presented with a new suite of questionable financial incentives" that could influence their advice—"an environment[] not dissimilar to what prompted CMS to engage in the original agent and broker

compensation requirements in 2008." 88 Fed. Reg. at 78,552; *cf.* 73 Fed. Reg. at 67,509. And there was no end in sight. CMS explained that higher fees would create a vicious cycle where national FMOs insist on higher "administrative" fees that "smaller, local or regional" plans cannot afford. 88 Fed. Reg. at 78,553.

 CMS also linked these findings to its pre-existing concerns about recent trends in plan marketing. CMS noted its prior findings that consumer complaints more than doubled from 2019 to 2022, as did complaints from State partners, beneficiary advocacy organizations, and plans. *Id.* at 78,552.



(App. 11377.) Those complaints reflected a common scenario in which "a beneficiary was encouraged or pressured to join," a plan, but once enrolled, "the plan was not what the enrollee expected or what was explained to them" by the agent or broker. 88 Fed. Reg. at 78,552.

 To respond to these market realities, CMS proposed to modify its approach to agent and broker compensation, citing 42 U.S.C. § 1395w-21(j)(2)(D) and 42 U.S.C. § 1395w-21(h):

 First, CMS proposed to add 42 C.F.R. §§ 422.2274(c)(13) and 423.2274(c)(13), which would restrict unfair terms in plan agreements with agents, brokers, or third party marketing organizations. Tracking the statute, the regulations would prohibit any term that would have "the direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent's or broker's ability to objectively assess and recommend which plan best meets the health

care needs of a beneficiary."  88 Fed. Reg. at 78,554.  This proposal would balance plan flexibility with the statutory instruction to ensure that agents and brokers are incentivized to focus on beneficiary needs, rather than just their own pecuniary interest.

Second, CMS proposed to shift compensation restrictions for enrollment-based payments from a fair-market-value cap, under which contractors could set individual rates, to a uniform fair-market-value rate.  This would prevent contractors from incentivizing agents and brokers to "favor some [more lucrative] plans over others" instead of "enroll[ing] individuals in the . . . plan that is intended to best meet their health needs."  *Id.* at 78,555.  It would also "level the playing field" and "promote competition" that had been disrupted by the market changes discussed earlier*.  Id.*; *accord id.* at 78,553.

Third, CMS proposed to consolidate administrative payments into the enrollment-based payments described above, rather than treating them separately.  While administrative payments, like payments for enrollments and renewals, had long been subject to a fair-market value limitation, CMS explained that the policy would prevent contractors from using separate payments for administrative services "effectively [to] circumvent the [fair-market value] caps on agent and broker compensation."  *Id.* at 78,555.  For example, CMS cited a plan that would pay $125 for health risk assessments whose fair-market value was $12.50 per hour.  *Id.* (citing App. 11376).  CMS therefore proposed to increase the compensation rate by $31 to account for two administrative services: $12.50 per enrollee for training costs and $18.50 per enrollee for the costs of transcribing calls to them.  *Id.* at 78,597.  CMS based these numbers on the average training costs and time it would take to complete these administrative tasks.  *Id.*

## D.    The Final Agent/Broker Compensation Rule.

CMS received thousands of comments, and the information the commenters provided

confirmed the need for regulation.  Providers and beneficiary groups from across the industry

corroborated CMS's observation of a bidding war.  One physician's trade group observed that

"[t]he consolidation of plans in the markets has led to larger plans being able to accommodate

more substantial special broker incentives than smaller regional plans can afford."  (App. 4480;

*accord* App. 6210 (highlighting plan consolidation in rural areas); App. 10390 ("[W]e are

concerned about the market consolidation we already see that appears to be squeezing our

smaller and/or regional/local plans"); App. 11479 (January 2024 report finding that by 2023,

four plans controlled 72% of the Medicare Advantage market).)

An FMO confirmed that the industry was consolidating: "Over the last several years

[national marketing offices] and other FMO's have been 'buying' other entities," resulting in

"consolidation of power in the hands of a few select companies."  (App. 1841.)  Those large

companies continued their buying spree "by offering unlawful payments outside of" CMS's

regulations governing administrative payments, and "[i]ndividual agents and agencies are being

offered extra overrides disguised as 'marketing dollars'" (*id.*)—confirming CMS's independent

research, 88 Fed. Reg. at 78552.  As one commenter put it, "nationals are continuing to use

abusive payment practices to pay agency's money that smaller carriers cannot afford."  (App.

874; *see also* App. 11481, 11485 (report discussing FMO and agent/broker consolidation and

warning that it could inflate agent and broker payments while "push[ing] out smaller agencies

and insurers who cannot pay to compete").)

Plans and researchers similarly corroborated CMS's observation that administrative "add-

ons" caused plan payments to top $1,000 per enrollee.  (*See* App. 8911 (plan association stating

that "'add-ons,' ranging from marketing, administrative, technology, training and compliance to

bonuses, incentives for hitting enrollment targets or more," result in "some brokers . . . collecting

upwards of $1,300"); *id.* 7933 (researchers confirming "plans can offer additional fees which can increase broker payments to more than $1,000 per enrolled beneficiary").)  Commenters pointed to financial filings by major agencies in which they reported spending as much as $1,200 to acquire a single enrollee.  (*See* App. 8708–09 ("[A]ccording to publicly reported customer acquisition costs from publicly traded insurance agencies, agent and broker acquisition costs ranged from $888 per enrollee to over $1,200 enrollee."); *id.* 9954.)

Commenters also confirmed that payments to third party marketers varied by plan.  The National Association of Benefits & Insurance Professionals (NABIP, of which CMC Plaintiff "Fort Worth Association of Health Underwriters, Inc." is the Fort Worth Chapter) admitted in its comment that a plan's payment "varies based on geographic conditions and by carrier, with smaller, regional entities typically paying towards the higher end of the range."  (CMC App. 213–14.)  At least one large plan noted that it had observed "plans paying $500 or more in per-enrollment administrative payments to FMOs."  (App. 6236.)  And information from an employee of a regional carrier supported the notion that large carriers were pricing out smaller ones.  (App. 874.)  In sum, as one member of NABIP's Medicare Advisory Group put it, "there is not a level playing field for [health insurance] carriers when it comes to marketing funding and FMO/Agency override payments."  (App. 1305.)

Several health researchers supported CMS's common-sense conclusion that standardizing administrative payments would "reduce incentives for brokers to differentially steer beneficiaries to higher paying plans and instead encourage the broker to help the beneficiary make the best enrollment decision possible."  (App. 7933.)  But defining the standardized amount was trickier.  CMS received "many different figures and means of calculating an appropriate amount."  *See* Final Rule, 89 Fed. Reg. 30,448, 30,625 (Apr. 23, 2024).  Commenters, including some of the

Plaintiffs, listed pages of the "free" administrative support that agents, brokers, and FMOs said the administrative payments covered, ranging from training and client management software to estate planning coordination. *See id.* at 30,624; *see also* App. 5870 (estate planning attorneys organization acknowledging partnership with FMO); *cf.* CMC App. 42–44 (Plaintiffs' counsel list of 9 administrative costs); *id.* 211–13 (NABIP comment enumerating 11 costs); *id.* at 75 (categorizing 3 types of non-commission payments). None was easy to quantify. One agent observed that plans' health risk assessment payments ranged from $50 to $225. (App. 4984.) Another FMO insisted it needed to spend $40,000 in training alone for each agent. (App. 4899.)

The comments led CMS to conclude that "the true cost of most administrative expenses can vary greatly" and that analyzing those costs would require "data and contracts that CMS does not have access to." 89 Fed. Reg. at 30,625. Thus, CMS concluded, "a line-item calculation" of actual administrative costs was "not practicable." *Id.* Instead, CMS relied on setting top-line numbers that factored in input from commenters, including about current rates— which was a similar methodology to how CMS calculated the cap on commissions back in 2008. CMS explained that focusing on a single top line would "create parity among agents, regardless of which plan, plan type, or type of Medicare enrollment they effectuate on behalf of the beneficiary." *Id.* And this also fit in with the broader structure of Medicare Advantage by allowing "agents and brokers themselves [to] have the opportunity to decide which services are truly essential and how much those services are worth." *Id.*

Calculating the right number, however, required a judgment call. Taking stock of comments it had received, CMS agreed that the $31 it originally proposed was too low and would be insufficient to allow agents and brokers to continue adequately serving beneficiaries— a consequence CMS agreed it wanted to avoid. 89 Fed. Reg. at 30,625. Providers tended to

think that the rule should be finalized as proposed.  (*See, e.g.*, App. 3010–11; *id.* 4480; *id.* 9519.)

Smaller plans—and even the occasional agent—tended to suggest that $50 was enough.  (*See*

App. 945, 4703, 9613; *cf.* 1867 (suggesting $50–75 for smaller agencies).)  Larger plans or

FMOs, by contrast, suggested plans should pay between $200 or $250 (or even higher)—a third

of the commission limit in 2025.  (*See* App. 6238, 8114; *accord* CMC App. 215 (NABIP

asserting the market value of administrative payments was $250).)  This divide was striking

given the evidence above that smaller plans paid more than larger plans.  A member of NABIP's

Medicare Advisory Group suggested a sliding scale where smaller brokerages would receive $50

per enrollee, medium-sized brokerages would receive $100 per enrollee, and larger brokerages

would receive $200 per enrollee. (App. 1305.)  (The member did not explain why larger

brokerages needed *more* money per enrollee.)

　　　In the end, CMS concluded that the $200 recommendations were too high, because they

factored in "the full price of all technology and systems," regardless of whether they were used

for Part C and D or other products.  89 Fed. Reg. at 30,626.  For example, CMS noted that call

recording software mentioned by many commenters was used "when soliciting an enrollment for

a non-Medicare, private market plan."  *Id.* at 30,625.  To ensure Part C and D "funds are not

being used to subsidize other programs and industries," and to discount for the fact that current

administrative costs were overinflated, CMS settled on increasing the compensation rate by $100

to account for administrative payments.  *Id.*

　　　CMS also responded to questions that commenters raised about timing, and

acknowledged the "narrow timeline" between finalizing the rule and when agents and brokers

would need to start preparing to sell plans for 2025.  89 Fed. Reg. at 30,621.  But CMS explained

that it needed to implement payment guardrails "as soon as possible . . . to protect the interest

and health of Medicare beneficiaries." *Id.* at 30,623. Thus, CMS announced in the Final Rule that the regulations would apply beginning October 1, 2024, in time for the October 15 start date of open enrollment—the period beneficiaries can change their plan for 2025 or switch between traditional Medicare and Medicare Advantage. *Id.* at 30,621–25. CMS drew a clear line: the prior regulations govern through October 1, 2024, and CMS cannot take remedial action for arrangements that govern activities "before October 1, 2024." *Id.* at 30,621–22. But any arrangements governing activities after that date will be subject to remedial action under the new guidelines. *Id.* at 30,622. CMS acknowledged the potential "complexity" of this effective date, and that it could lead to "potential extra payment" before October 1, but found that the need to "enhance the beneficiary experience with agents and brokers" during annual enrollment offset those concerns. *Id.*; *id.* at 30,625.

Commenters also supported CMS's requirement that contract provisions not create a perverse incentive that might reasonably inhibit, directly or indirectly, agents and brokers from objectively assessing and recommending which plan best met a beneficiary's health care needs. *Id.* at 30,621. But they asked CMS to provide more information about what it wanted to prohibit. *Id.* at 30,620. CMS responded to those comments with additional examples of terms that CMS might find either permissible or impermissible. *Id.* at 30,620–21. Emphasizing the text of the regulation's incorporation of a reasonableness standard, CMS clarified that a plan need not only contract with agents who represent "all possible competitors in a market." *Id.* But it might be different if a plan provided a "contractual or financial incentive that would prevent the agent from choosing to . . . sell competitors' plans." *Id.* at 30,620–21. And CMS noted that volume-based payment incentives, for instance, might have the "indirect effect" of causing an agent to prioritize one plan over another based on how much business the agent did with them

rather than beneficiary needs, and so "would likely run afoul of the provision."  *Id.* at 30,621.
CMS emphasized "that it is impossible to anticipate every scenario," and these were just
"examples."  *Id.* at 30,620.

CMS also finalized a privacy proposal for which it had provided notice and an
opportunity to comment in an earlier proposed rule.  In particular, CMS explained that it had
learned about organizations selling and reselling beneficiary information without beneficiaries'
knowledge, and that by speaking to one representative, a beneficiary might end up receiving calls
from multiple other unrelated entities.  While these entities might use "a quickly read" or fine-
print disclaimer, CMS found that this was a "misleading marketing tactic[] because these entities
are using beneficiary contact information in a manner in which the beneficiary did not intend."
*Id.* at 30,599.

Relying on its authority to set fair marketing standards, 42 U.S.C. §§ 1395w-21(h)(4)(C)
and 1395w-101(b)(1)(B)(vi), and consistent with the statute's prohibition on unsolicited contact,
42 U.S.C. §§ 1395w-21(j)(1)(A) and 1395w-104(*l*)(1), CMS added 42 C.F.R. §§ 422.2274(g)
and 423.2274(g) to prohibit third party marketing organizations from distributing personal
beneficiary data without the beneficiary's consent.  89 Fed. Reg. at 30,599.  Specifically,
"[b]eginning October 1, 2024, personal beneficiary data collected by a [third party marketing
organization] for marketing or enrolling them into [a Medicare Advantage] plan" may only be
shared with another [organization] when prior express written consent is given by the
beneficiary."  89 Fed. Reg. at 30,829 (new text of 42 C.F.R. § 422.2274(g)(4) effective June 3,
2024); *see also* 89 Fed. Reg. 30,843 (new text of 42 C.F.R. § 423.2274(g)(4) with same rule for
prescription drug plans).  In promulgating the regulation, CMS acknowledged that other agencies
or laws regulate some aspects of data sharing, such as HIPAA, but that CMS's regulation was

intended to supplement those protections and allowed CMS to "take steps within its authority" to protect beneficiaries.  89 Fed. Reg. at 30,601.

### E.     The lawsuit and Plaintiffs' motions.

Approximately six weeks after the Final Rule was posted, ABC filed suit and then filed a motion to enjoin preliminarily the Final Rule.  CMC's suit and similar motion followed shortly thereafter.  The government now responds on an expedited basis to the motions in this consolidated brief.

### III.     Argument and Authorities

A preliminary injunction is an "extraordinary and drastic remedy."  *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).  As such, it is not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.  *Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990).  The movant must "clearly" carry its burden on all four of the well-known prerequisites (likelihood of success on the merits plus the public-interest factors).  *Canal Auth.*, 489 F.2d at 573.  The same standards apply to an APA stay, which may be entered only "to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705; *see also All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir.), *cert. granted*, 144 S. Ct. 537 (2023).  Because Plaintiffs have not met their burden on each factor, their motions should be denied.

### A.     Plaintiffs are unlikely to succeed on the merits.

Plaintiffs "bring a facial challenge" to the regulation, and so they "must establish that no set of circumstances exists under which the [Final Rule] would be valid."  *Associated Builders & Contractors of Tex., Inc. v. NLRB*, 826 F.3d 215, 220 (5th Cir. 2016).  They invoke the APA, which authorizes the court to set aside agency actions if "arbitrary, capricious, an abuse of

discretion" or otherwise "not in accordance with law, or unsupported by substantial evidence on the record taken as a whole."  *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010); *see also* 5 U.S.C. § 706(2).

### 1.  CMS's authority to regulate the "use of compensation" includes prescribing administrative support costs.

In promulgating the Final Rule, CMS acted under the authority of 42 U.S.C. § 1395w-21(j)(2)(D), which authorizes CMS to "establish limitations with respect to at least the following: . . . The use of compensation other than as provided under guidelines established by the Secretary," which in turn must at least "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  Likewise, 42 U.S.C. § 1395w-21(h)(4)(D) requires plans "and the agents, brokers, and other third parties representing such organization" to conform to "fair marketing standards" that include those compensation limits.[8]  As CMS explained, those provisions "direct the Secretary to set limits on compensation rates," and so authorized the Final Rule.  89 Fed. Reg. at 30,619.  Plaintiffs' arguments that the Final Rule is nonetheless unauthorized or invalid can generally be grouped into four challenges, but none are persuasive.

First, Plaintiffs argue that the statute authorizes CMS to regulate "how compensation may be used" rather than the "rate of compensation," and only applies to compensation paid directly to agents or brokers.  (ABC Br. at 11 (emphasis deleted); *accord* CMC Br. at 11–12.)  But the

---

[8] ABC incorrectly suggests that CMS relied on Executive Order 14036 as a source of legal authority for the Final Rule.  (ABC Br. at 12-13.)  In the Final Rule, the CMS relied on its statutory authority under 42 U.S.C. §§ 1395w-21(j)(2)(D) and § 1395w-21(h)(4)(D).  *See* 89 Fed. Reg. at 30,619 ("[S]ections 1851(j)(2)(D) and 1851(h)(4)(D) of the [Social Security] Act direct the Secretary to set limits on compensation rates . . . .").  CMS never contended that the Executive Order provides any independent legal authority to promulgate the Final Rule, and the sole statutory question is whether those two provisions together authorize CMS's regulation.  To the extent ABC means to argue that CMS relied on factors Congress did not intend CMS to consider, CMS addresses the argument below in Part III.A.2.

word "use" is not so cramped, nor does the statute contain any limitation based on the direct recipient of payments. Section 1395w-21(j)(2)(D), through its reference to "use," prohibits a plan from "avail[ing] [itself] of" or "employ[ing]" *any* compensation that does not comply with CMS's marketing guidelines. *Use*, Black's Law Dictionary (11th ed. 2019). At the time Congress passed the statute in 2008, CMS had already issued such guidelines, which capped marketing fees at market-value rates. *See* 2005 Medicare Marketing Materials Guidelines, *supra* n.5, at 138 ("Fees should reasonably relate to the value of the services provided" and "provide reasonable compensation in line with industry standards."). CMS then codified that interpretation into regulation just after the statute was passed—by continuing to regulate both marketing and related administrative fees. *See* 73 Fed. Reg. at 67,408, 67,410, 67,413–14 (capping both marketing and administrative compensation at fair-market rates). Courts have long given such a contemporaneous interpretation of a complex statute at least "very great respect"—and even deference. *See, e.g.*, *Edwards' Lessee v. Darby*, 25 U.S. 206, 210 (1827) ("In the construction of a doubtful and ambiguous law, the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect."); *Cmty. Care, LLC v. Leavitt*, 537 F.3d 546, 552 n.11 (5th Cir. 2008) (according deference to CMS's decision in a Medicare case, "given that we are dealing with a complex and highly technical regulatory program"). Such respect is at its apex when, as here, Congress "expressly delegated to the Secretary the power to prescribe standards" under the statute (and against the backdrop that Congress is presumed to be aware of, that CMS was *already* prescribing standards via guidance) in which case "Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term." *Batterton v. Francis*, 432 U.S. 416, 425 (1977).

This is all the more true when Congress employs a word like "use" that raises "interpretational difficulties because of the different meanings attributable to it." *Bailey v. United States*, 516 U.S. 137, 143 (1995). Because the word "use" is "inordinately sensitive to context," *Smith v. United States*, 508 U.S. 223, 245 (1993) (Scalia, J., dissenting), the Court should look to how the term fits into the rest of the provision. *See United States v. Dubin*, 27 F.4th 1021, 1038 (5th Cir. 2022) (en banc) (Elrod, J., dissenting) (warning against facile reliance on dictionary definitions "to interpret that chameleon-like word, 'use'"), *vacated and remanded*, 599 U.S. 110 (2023). By framing the statute in the negative—limiting the "use of compensation" except "under guidelines established by the Secretary"—the statute prohibits *any* compensation (regardless of who the direct recipient is) except compensation allowed by the guidelines. That comports with the common understanding of the phrase "use of" in this kind of negative construction. The Supreme Court's discussion of the word in *Bailey* is illuminative: "Consider the paradoxical statement: 'I *use* a gun to protect my house, but I've never had to *use* it.'" 516 U.S. at 143. Plaintiffs claim the only possible reading of "use" is one that carries with it a very limited qualitative purpose, similar to the latter notion in the house example of "using" a gun by, say, shooting or brandishing it at an intruder. But the term also has another broader meaning— captured by the sentiment that the gun is nonetheless being "used" to protect the house notwithstanding that it hasn't been fired or brandished. As discussed above, the context and the backdrop against which Congress legislated makes clear that the second, more expansive sense of "use" applies here.[9]

---

[9] Similarly, if an airline's drug policy prohibited the "use" of drugs by the airline's pilots other than as prescribed by a doctor, a doctor could doubtless prescribe a particular amount—she need not choose between unlimited access to drugs and none at all. And a company that confines the "use" of the company travel credit card to whatever is set forth in company policy may include in that policy a cap on the amount spent on lodging per night—the company need not choose between paying for no

This reading is reinforced by the only statutory requirement for the guidelines: to ensure that the "use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). There are many circumstances where the amount of payments could create perverse incentives for agents and brokers—for instance if (as CMS found here) payments differ based on which plan an individual enrolls in. 89 Fed. Reg. at 30,621. The guidelines in effect when the statute was passed reasoned that linking compensation to the value of marketing would help to reduce perverse incentives for agents and brokers. And the September 2008 rule (which Plaintiffs accept as valid) limited the relative amount agents could be paid in the first year of a six-year compensation cycle. *See* 73 Fed. Reg. at 54,238–39, 54,253.

The history of the compensation guidelines likewise supports this plain-reading interpretation. CMC attempts to make much of the fact that CMS declined to "set specific dollar values" on compensation in the September 2008 rule (CMC Br. at 11), but at the same time CMS still made clear that it expected plans to "set compensation at levels that are reasonable and reflect fair market value for the services." 73 Fed. Reg. at 54,239. When that expectation proved false, CMS immediately required plans to price marketing based on fair-market rates, and shortly thereafter translated that fair-market principle into a dollar amount. 73 Fed. Reg. at 67,410; CMS, 2009 Medicare Advantage and Prescription Drug Program Agent and Broker Compensation Structures, *supra* n.6. That is not a "flip flop" in the understanding of the statute, but a reasonable effort to consider regulatory alternatives. Indeed, that is exactly what happened

---

accommodations and paying for a room at a Ritz-Carlton. Like an airline's drug policy or a company's accommodation limits, CMS's marketing guidelines, too, can limit the amount of taxpayer funds plans use for marketing. CMS need not choose, for example, only between effectively paying for the most expensive customer relationship management software or none at all. *See* 89 Fed. Reg. at 30,622 (discussing estimated cost of customer relationship software).

here.  For years, CMS relied on a "fair-market" principle to regulate administrative payments, but warned that a "bidding war" might make it change tack.  Once CMS saw that bidding war break out, it moved to protect beneficiaries.

Second, CMC tries to characterize the new rule as an instance of ratemaking, by asserting a type of structural statutory interpretation argument that "'[r]ate regulation' is . . . controversial, difficult, and complex" and asking the Court to create a new clear-statement rule under which Congress must "confer[] ratemaking authority . . . unambiguously" and must "delineate[] factors the agency must consider."  (CMC Br. at 11–12.)  But the lone case on which CMC relies does not apply any such rule and is silent about the supposed controversy.  (*See* CMC Br. at 11 (citing *S. Union Co. v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 507 (8th Cir. 2002) (discussing state-set rates for natural gas, electricity, water, and sewer services)).  That case dealt with the separate sphere of public utilities, in which government ratemaking effects a taking of private property if it does not allow a reasonable rate of return on what is essentially a captive business (an electronic company is required to serve everyone within its territory and cannot, realistically, simply decide to no longer sell power if it doesn't like the rate set by a regulator).  This consideration, which is absent in in this case, renders "[c]ases concerning public utilities [] inapposite," where the relevant players have voluntarily decided to participate in a heavily-regulated government benefits program.  *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984) (making this point in the context of a Medicaid regulation); *cf. Shah v. Azar*, 920 F.3d 987, 998 (5th Cir. 2019) ("We agree with our four other sister circuits that have determined participation in the federal Medicare reimbursement program is not a property interest.").  CMC's attempt to import doctrine from the unique world of public-utility or common-carrier ratemaking into this case fails, particularly

given that the statute nowhere calls for such analysis. And there is no showing of the type of "long-settled judicial understandings of congressional practice" or background constitutional principle that might in some circumstances justify departing from the text. *See Rudisill v. McDonough*, 601 U.S. 294, 315 (2024) (Kavanaugh, J., concurring). Indeed, as Plaintiffs' examples themselves show, it is hardly controversial for the government to limit how its own contractors spend taxpayer funds. *See J.H. Rutter Rex Mfg. Co. v. United States*, 706 F.2d 702, 712 (5th Cir. 1983) ("Like private individuals and businesses, the Government enjoys the unrestricted power . . . to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases."). And CMC is also wrong to suggest that Congress always "delineate[s] factors the agency must consider" when regulating prices. *See Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944) (rejecting efforts to constrain an agency's authority to set "just and reasonable" rate when statute provided "no formula" by which to do so). The Court should reject Plaintiffs' invitation to place a policy-laden thumb on the scale to impose extra-textual ratemaking rules on CMS's regulation of Medicare Advantage compensation.

Third, Plaintiffs argue that the plain meaning of "compensation" excludes "reimbursement for costs incurred in rendering that service." (CMC Br. at 12; *accord* ABC Br. at 10.) But the Fifth Circuit disagrees: "[T]he plain meaning of 'compensation' is broad enough that it would generally be understood to include reimbursement." *In re Riley*, 923 F.3d 433, 442 (5th Cir. 2019) (statute authorizing "reasonable compensation" of bankruptcy attorney allowed for repayment of filing fees, credit counseling fees, and credit report fees); *accord Liberty Mut. Fire Ins. Co. v. Clayton*, 33 F.4th 442, 449 (7th Cir. 2022) (agreeing that "payment as reimbursement for expenses in a home day care constitutes compensation" in insurance

contract).  So does the dictionary on which Plaintiffs rely.  *See Compensation*, Black's Law

Dictionary (11th ed. 2019) (defining compensation to "include[] . . . expense reimbursement"

(quoting Kurt H. Decker & H. Thomas Felix II, *Drafting and Revising Employment*

*Contracts* § 3.17, at 68 (1991)).  Plaintiffs respond with a few statutes in which Congress

expressly distinguished between compensation for services and reimbursements for associated

costs, and one 60-year-old case that relied on a circular definition of "reimbursements."  (CMC

Br. at 12–13 (citing *Barrett v. United States*, 205 F. Supp. 307, 308 (S.D. Miss. 1962)

("reimbursements" are "reimbursements"), and 42 U.S.C. § 1395ww(d)(5)(D)(ii) (authorizing

Secretary to "compensate the hospital for the fixed costs it incurs" in certain circumstances).)

But these examples are irrelevant here, where Congress did not draw a similar line.  Plaintiffs

point to the term "remuneration" as if that proves their point, but that adds little to the discussion

when "'remuneration' includes reimbursement."  *Knisley v. Network Assocs., Inc.*, 77 F. Supp.

2d 1111, 1113 (N.D. Cal. 1999) (statute prohibiting brokers from accepting "remuneration"

included reimbursement of mailing costs).  At the very least, the term is capacious enough to

justify giving weight to the agency's consistent interpretation of the statute.  *See BNSF Ry. Co. v.*

*United States*, 775 F.3d 743, 755 (5th Cir. 2015) ("[W]e cannot conclude the Congress has

'spoken clearly' as to the meaning of 'money remuneration.'").

  Fourth and finally, without any real textual argument to rely on, Plaintiffs again

incorrectly accuse CMS of changing its position, this time about the meaning of the statutory

term "compensation."  (CMC Br. at 13; ABC Br. at 11.)  But the prior rules Plaintiffs point to do

not purport to construe that term as used in the statute.  They lack any discussion at all about the

text or context that one would expect when construing a statute.  Instead, they clarify the

"definition of compensation under our *rule*" and announce (again without purporting to construe

the statute) that those payments are "not *considered* compensation" for purposes of the then-extant regulations.  73 Fed. Reg. at 54,226 (emphasis added).  Plaintiffs also cannot explain why, if CMS believed the statute's concept of "compensation" did not extend to administrative payments, CMS nevertheless has consistently regulated those payments since the statute's passage in 2008.  *See* 73 Fed. Reg. at 67,413–14 (setting fair-market-value cap on administrative payments).  CMS's authority to do so, of course, was the statute's directive to limit "compensation"—even if CMS chose in its regulations to refer to the payments as administrative fees.  It is Plaintiffs' interpretation, not CMS's, that would be a departure from the agency's longstanding practice, and so Plaintiffs are wrong that this was a change that CMS needed to acknowledge or explain.  (*Cf.* ABC Br. at 13.)

The actual change in policy was that the agency no longer believed that its regulations should account for administrative payments separately from other compensation.  As discussed above, CMS acknowledged that change and explained why.  Plaintiffs are also incorrect to suggest that the agency ignored comments that the Final Rule would impact their members' business models.  (CMC Br. at 13.)  CMS acknowledged comments that "brokers rely on the payment of administrative fees . . . from an MA organization to their FMO" and that FMOs "would no longer provide agents and brokers with these extra services."  89 Fed. Reg. at 30,624.  In response, CMS explained that "agents and brokers themselves will have the opportunity to decide which services are truly essential and how much those services are worth."  *Id.*  And in response to arguments that "agents and brokers would no longer be able to serve the [Medicare Advantage] market" if CMS limited administrative payments to $31 per enrollee, CMS explained that it did not want "to make the . . . compensation rate so low that agents and brokers would be driven out of the industry," and more than tripled the initial proposed amount to $100.

*Id.* at 30,625.

### 2.    The Final Rule is not arbitrary or capricious.

Plaintiffs next argue that the Final Rule is arbitrary and capricious.  But agency action is arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. EPA*, 939 F.3d 649, 663–64 (5th Cir. 2019).  This standard is "narrow," and courts "must be mindful not to substitute [their] judgment for that of the agency." *Id.*  Rather, the courts' role is to simply "ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *U.S. Anesthesia Partners of Tex., P.A. v. U.S. Dep't of Health & Hum. Servs.*, No. 2:23-CV-206-Z, 2024 WL 1257491, at *5 (N.D. Tex. Mar. 25, 2024) (rejecting an arbitrary-and-capricious challenge in a Medicare case).  The Final Rule easily passes muster under these deferential standards.

### a.    The Final Rule is supported by sufficient evidence and is rational.

Plaintiffs' first argument is that CMS failed to substantiate its finding that administrative payments "are excessive" and "are rapidly increasing," or that "overall payments to agents and brokers" can vary from plan to plan.  (CMC Br. at 14; ABC Br. at 14–16.)  But these facts are well documented in the record.

The key problem CMS sought to address was the use of administrative payments to circumvent CMS's agent and broker compensation rules, leading to unfair marketing under 42 U.S.C. § 1395w-21(h)(4) and incentivizing agents and brokers to prioritize their own financial

well-being rather than beneficiary health needs, in violation of 42 U.S.C. § 1395w-21(j)(2)(D).

*See* 89 Fed. Reg. at 30,619, 30,622.  The record is full of evidence that payments to FMOs both

differ between plans and are high.  FMO contracts revealed administrative fees that varied from

$100 to nearly $400 per enrollee—up to two-thirds the commission for enrolling a new

beneficiary—and that contract evidence was reinforced by observations by market participants

(*see, e.g.*, App. 6236), and at least one Plaintiff (CMC App. 213–14 (NABIP's admission that

payments "var[y]")).  An OIG report supports that these numbers are well above levels a decade

ago, as do relevant plan documents.  (App. 11286; *Compare* App. 11730 *with* App. 11748.)

Even without accounting for add-ons, an administrative fee of $400 is nearly two-thirds the

national commission rate for enrolling a new enrollee.  CMS's conclusion that other add-on

payments inflated agent and broker compensation specifically is supported again by the

observations of market participants, as well as health care researchers and the amount given in

public filings—and by a Plaintiff in this lawsuit—as typical spending in acquiring new enrollees.

(App. 7933, 8708–09, 8911, 9954, 11379, 11381, CMC App. 230 ¶ 11.)  Even the representative

of a large plan admitted that the rates are "out of control."  (App. 11760.)  Similarly, CMS's

concern about market concentration is supported by analyzing publicly reported deals (App.

11479, 11481), as well as the experience of plans (App. 874), providers (App. 6210, 10390), and

at least one FMO (App. 1841.)  The fact that market concentration has distorted the market is

supported not only by the experience of market participants (App. 874), including NABIP

members (App. 1305), but also the fact that usual economies of scale have apparently broken

down: larger FMOs are paid more per enrollee, except maybe by the largest plans (App. 11584,

11586).

　　　　Plaintiffs then claim that there is nothing to link administrative payments to how agents

and brokers behave.  (ABC Br. at 14; CMC Br. at 15–16.)  In demanding empirical evidence of

this link, Plaintiffs misunderstand the statutory standard: the statute authorizes CMS to

promulgate compensation guidelines based on the "incentive" compensation structures create for

agents and brokers.  42 U.S.C. § 1395w-21(j)(2)(D).  In the Final Rule, CMS reasonably

concluded based on the record before it that it was likely that terms in contracts between FMOs

and plans "can trickle down to influence agents," including by using administrative payments to

"'reward[]' agents who enroll beneficiaries into a specific plan."  89 Fed. Reg. at 30,620.  And

CMS explained that because plans pay for administrative costs like travel expenses "on a 'per

enrollment' basis," whichever organization does so "at the highest rate would effectively be

offering a higher commission per enrollee," creating "a conflict of interest for the agent" without

violating existing regulations.  *Id.* at 30,619–20.  ABC's argument that additional enforcement

might solve the problem (ABC Br. at 14) misses the point.  This rule also addresses plans with

potentially *compliant* compensation structures that nevertheless create perverse incentives.

　　　　While CMS's stated rationale is all it needed under the statute, the record nevertheless

corroborates CMS's reasoning.  For example, as one plan explained: "[a]gency reactions to

companies who pay low overrides, or none at all, is often to steer agents away from selling those

plans at all."  (App. 873; *see also* App. 7933.)  So does the report of a focus group where agents

and brokers admitted they were recommending plans based on relative commission rate.  (*See*

App. 11314.).  In light of that evidence, CMS reasonably connected the increase in consumer

complaints it had previously observed to this incentive structure.  (*See* App. 11377.)

　　　　Ultimately, though, the statute requires CMS to base its compensation guidelines on its

analysis of incentives, not the other more "empirical" issues Plaintiffs raise in their briefs—but

nonetheless CMS did observe a trend in payment rates in FMO contracts.  (*E.g.*, ABC Br. at 17.)

Plaintiffs' effort, for example, to fault CMS for failing specifically to reply to comments about alleged deficiencies in the make-up of a focus group discussed in the Proposed Rule does not show any infirmity in the Final Rule. Comments "require [a] response, only if they raise points which, if true . . . and which, if adopted, would require a change in an agency's proposed rule." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021). The agency therefore did not need to respond to commenters who quibbled with the fact that the focus group CMS cited in its Proposed Rule was the size of a typical focus group and thus (by definition), was not a one-to-one representative match of every agent and broker in the market. (ABC Br. at 15; CMC Br. at 16–17.) Nor did CMS need to get into whether the complaints were caused mostly by COVID-19 or by aggressive marketing. (CMC Br. at 15–16.) While these are potentially interesting data points, they did not go to the ultimate issue CMS needed to answer under the statute: how do administrative payments affect agent and broker incentives? Indeed, for all of Plaintiffs' complaints about CMS's supposed failure to rely on hard data, Plaintiffs themselves rely on unsupported statements of their members. (*See* CMC Br. at 16 (citing CMC App. 33.).)

Plaintiffs are also wrong that CMS failed to explain and support why it priced administrative payments at $100. (CMC Br. at 16–18; ABC Br. at 18.) While commenters suggested various price points ranging from $50 to $500, 89 Fed. Reg. at 30,625, CMS concluded that requests for more than $100 were too high because they factored in "the full price of all technology and systems," regardless of whether they were used for Part C and D or other products. For example, CMS noted that call recording software mentioned by many commenters was used "when soliciting an enrollment for a non-Medicare, private market plan." To ensure Part C and D "funds are not being used to subsidize other programs and industries," and to discount for the fact that current administrative costs were overinflated, CMS settled on

increasing the compensation rate by $100 to account for administrative payments.  89 Fed. Reg. at 30,626.  This is not the "head count" Plaintiffs accuse CMS of conducting, but a reasonable judgment call taking into consideration public comments, and agency analysis accounting for a bedrock statutory principle of Medicare that Medicare funds should not subsidize non-Medicare coverage.  *See* 42 U.S.C. § 1395x(v)(1)(A); *see also* 42 C.F.R. §§ 417.532 (a)(1)(iii), 417.550, & 417.552.  And it is consistent with the premise of the Final Rule that a bidding war had caused administrative payments to bulldoze usual competitive forces and that current prices were overinflated.

Plaintiffs' contrary argument mostly boils down to a theory that CMS needed "to account for the cost" of each allegedly "vital service[]" commenters identified.  (CMC Br. at 17; *see also* ABC Br. at 18).  Indeed, CMC goes so far as to insist that hidden in the APA's text is a never-before-recognized requirement to use a particular formula: "the 'cost of providing services' plus 'a reasonable return on investment'" using "'elaborate economic models' and 'voluminous records.'"  (CMC at 17 ("[I]f CMS truly could not quantify these services' costs, it should have refrained from ratemaking altogether.").)  But "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021); *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 773 (5th Cir. 2023) ("[A]s a general matter, [an agency] is not required to undertake a quantitative analysis to determine a proposed rule's economic implications.").  And CMS's exercise of its statutory authority to limit the "use of compensation" in the Medicare Advantage space is not akin to the "ratemaking" exercises that agencies like the FCC or FERC carry out to set rates for "common carriers" like cable companies or utilities; Plaintiffs identify no authority showing that such consideration apply in the Medicare space to market participants that are, in

the end, electing to act as government contractors (or sub-contractors).

In any event, CMS explained why the comments it had received all pointing to different administrative costs convinced it that "the true cost of most administrative expenses can vary" and that analyzing those costs would require "data and contracts that CMS does not have access to," making "a line-item calculation" of actual administrative costs "not practicable." 89 Fed. Reg. at 30,625. CMS reasonably concluded that basing its payment on the administrative payments commenters reported would "create parity among agents, regardless of which plan, plan type, or type of Medicare enrollment they effectuate on behalf of the beneficiary." *Id.* It is not the role of the Court to determine whether CMS's decision "was 'the best one possible' or even whether it was 'better than the alternatives.'" *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019). The fact that CMS explained a reasonable approach to a complex problem, as directed by Congress, is enough.

Plaintiffs are also wrong to suggest that CMS ignored concerns that the Proposed Rule would "drive firms out of the industry or force them to sharply curtail services" (CMC Br. at 19; *see also* ABC Br. at 17). In fact, CMS acknowledged that feedback from commenters, expressly disavowed any desire to "drive[]" firms out of the industry, and explained that the feedback had convinced the agency that its original $31 proposal was "too low," leading it to triple the amount to $100. 89 Fed. Reg. at 30,625. And in response to comments that "FMOs would no longer provide agents and brokers with . . . extra services," CMS stated that its Final Rule would give agents and brokers "the opportunity to decide which services are truly essential and how much those services are worth." 89 Fed. Reg. at 30,624.

Finally, Plaintiffs contend that CMS wrongly considered what they call an "antitrust rationale." (ABC Br. at 18-19; *see also id.* at 12-13.) The Final Rule does not purport to enforce

the Sherman Act or any other similar law, nor does it impose antitrust liability on anyone.  The

notion, however, that CMS was somehow forbidden from considering the effect of competition

in the Medicare Advantage space in any fashion is meritless and unsupported.  Competition as a

general matter—as opposed to more specialized antitrust concerns—is baked into Medicare Parts

C and D at multiple levels.  Indeed, the very "purpose of Medicare Advantage is to harness the

power of private sector competition to stimulate experimentation and innovation that would

ultimately create a more efficient and less expensive Medicare system."  *See* 69 Fed. Reg. at

46,868; *see also In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 685 F.3d at 363; *La*

*Indep. Pharmacies Ass'n.*, 41 F.4th at 476.  More specifically, 42 U.S.C. § 1395w-21(j)(2)(D)

instructs CMS to analyze how compensation incentivizes agent and broker behavior, and market

structure is certainly relevant to understanding how those incentives play out.  That's why, since

it first implemented the statute, CMS has been so concerned about an FMO bidding war.

> **b.      The Final Rule is consistent with the purpose of the Medicare statute and HIPAA.**

Unable to make out any legal violation under the APA, ABC asks the Court to don a

policymaking hat and preliminary enjoin the rule because it is, in ABC's view, bad policy.  ABC

argues that agents "will now have an economic incentive to retain administrative fees for

themselves" and that the Final Rule will "force some FMOs to curtail some of the essential

services they provide to the community above and beyond assisting beneficiaries with

enrollment."  (ABC Br. at 19–20.)

In the Final Rule, CMS acknowledged that a side effect of limiting administrative

payments is that plans would likely start directly paying agents and brokers, rather than

funneling the payments through FMOs.  89 Fed. Reg. at 30,624.  And CMS explained that, if that

happened, "agents and brokers themselves will have the opportunity to decide which services are

truly essential and how much those services are worth." *Id.* Contrary to ABC's contention, that aligns perfectly with the statute's goal of incentivizing agents and brokers to prioritize beneficiary health. See 42 U.S.C. § 1395w-21(j)(2)(D). By changing the dynamic of FMO middlemen in the payment flow, along with the corresponding variation in plan payments depending on the different FMO contracts, the Final Rule lessens the incentive for agents and brokers to prioritize one over any other. And both that goal and the statutory fair marketing proviso, *see* 42 U.S.C. § 1395w-21(h)(4), are broad enough to encompass eliminating the bloat FMOs cause by providing services that agents and brokers may ultimately determine are not necessary to sell the best plans to beneficiaries. In the end, ABC's gripes are the type of policy considerations that the agency, not ABC, should make. *See Ass'n for Cmty. Affiliated Plans v. U.S. Dep't of the Treasury*, 966 F.3d 782, 794 (D.C. Cir. 2020) ("[S]o long as the Departments have acted within the bounds of their statutorily delegated authority, that policy judgment is theirs to make.").

Finally, ABC targets the Final Rule's consent requirement to share personal beneficiary data under 42 C.F.R. §§ 422.2274(g)(4) and 423.2274(g)(4), suggesting that the requirement is in tension with HIPAA's broader purpose of facilitating data sharing. (ABC Br. at 20.) But even if HIPAA might facilitate data sharing in some circumstances, that does not control whether CMS may limit certain harmful data-sharing practices under the Medicare statute. CMS expressly took steps to avoid any conflict with HIPAA, explaining that it was not "attempting to classify this information as [Personally Identifiable Information] or [Protected Health Information]," but that it would nevertheless "take steps within its authority" to protect beneficiaries. 89 Fed. Reg. at 30,604. After all, "no legislation pursues its purposes at all costs," *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014), and CMS has regulated the sharing of beneficiary information as far back

as 2005, just after HIPAA was passed. *See* Medicare Marketing Materials Guidelines in 2005 at 138 (prohibiting the "[s]tor[age] or use member financial information for any purpose other than the initial screening eligibility, the submission and follow-up of an application for benefits, for recertification purposes, and as required by law"). Indeed, Part C regulations have long required plans to establish procedures that safeguard the confidentiality and accuracy of enrollee records, independent of HIPAA. *See* 65 Fed Reg. 40,170, 40,218-19, 40,323 (June 29, 2000); 42 C.F.R. § 422.118. ABC does not dispute CMS's conclusion that third party marketers were sharing beneficiary information in ways that surprised the beneficiaries, nor that the statutes CMS identified in the Final Rule authorized CMS's consent requirement to stop this practice. Nothing more is needed.

### c.    The Final Rule's contract-term limits do not violate the Due Process Clause.

CMC also argues that contract-term limits violate due process because they are "impermissibly vague," relying on *FCC v. Fox Television Station, Inc.*, 567 U.S. 239, 253 (2012). (CMC Br. at 19-20.) But in *Fox*, the agency departed from its prior precedent to apply, in an administrative adjudication, a new legal precedent to punish a broadcaster for something that the broadcaster had no reason to know would be illegal. *Id.* Its application is—at best—an awkward fit here, in a facial challenge seeking preliminary relief to a regulation that is not penal in nature, applies only prospectively, and provides clear notice of what it covers. *See Burkhart v. Univ. Interscholastic League*, No. 1:22-CV-1026-RP, 2023 WL 2940026, at *6 (W.D. Tex. Apr. 13, 2023) ("Such challenges are normally reserved for penal statutes, rather than civil sporting codes."). Importing *Fox*'s adjudication-based rule to Plaintiffs' facial challenge to a rulemaking would also upset the black-letter principle of administrative law that "[a]gencies have discretion to choose between adjudication"—which was not used here—"and rulemaking"—which was—

"as a means of setting policy." *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000).

Even assuming the doctrine applies in this posture, the regulation here closely mirrors the statutory test, which CMC does not contend is vague. Both the statute and regulation focus on whether agents and brokers have an "incentive" to recommend plans based on a beneficiary's "health care need." *Compare* 42 U.S.C. § 1395w-21(j)(2)(D) *with* 42 C.F.R. § 423.2274(c)(13). In fact, the regulation is even more specific than the statute. It applies only when an objective person would "reasonably expect" a perverse incentive. 42 C.F.R. § 423.2274(c)(13); *accord* 89 Fed. Reg. at 30,620 (discussing "reasonableness standard")*.*

CMC gets the significance of the preamble text backwards (CMC Br. at 20): a regulation is only vague if a party cannot "identify with reasonable certainty" the meaning of a regulation after "reviewing the regulations *and other public statements issued by the agency*." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 578–79 (5th Cir. 2017) (emphasis added); *accord Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5, 498 (1982) (directing courts to "consider any limiting construction" an "agency has proffered" that may clarify a provision challenged as vague). Thus, by providing examples in preamble text to guide regulated parties, CMS gave regulated parties *more* notice of what is prohibited. *See Burkhart*, 2023 WL 2940026, at *6 (rule against "encouraging participation" by high schoolers in college activities not too vague, especially when university provided examples of impermissible activity). And providing a few additional examples to clarify the agency's intent without amending regulation text is a classic logical outgrowth of a proposed rule that does not require a new round of notice and comment. *See Huawei Techs.*, 2 F.4th at 448 ("[T]he final rule's adoption of changes responsive to Huawei's comments underlines that the rule logically emerged

from the rulemaking."); *Tex. Off. of Pub. Util. Couns. v. FCC*, 265 F.3d 313, 326 (5th Cir. 2001) (no logical outgrowth problem when final rule "retained the essential framework of the original proposal, but it added a few provisions to allay affordability concerns").  In any event, the examples simply "explain what an agency thinks a statute or regulation actually says" and so were interpretative rather than legislative, and thus not subject to notice-and-comment under the APA.  *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023).

To the extent CMC repeats its argument that CMS cannot take competition into account, that argument fails the same reasons discussed above.  *See* p. 37, *supra*.  And CMC's offhand comment that "one-size-fits-all contracts" are "the antithesis of competition," mistakes the relevant market.  (Br. at 19.)  Congress structured Medicare Parts C and D so that plans freely compete on plan features and quality, but marketing, by contrast, is highly regulated.  *See supra*, Part II.A.

> ### d.    The Final Rule's effective date is not arbitrary or capricious.

Finally, CMC argues that the APA prevents CMS from enforcing the Final Rule's October 1, 2024 effective date (which is 14 days before beneficiaries may begin enrolling in plans for 2025).  To begin, the only timing requirement the APA provides is a 30-day deadline, which the agency easily met given that the rule has been out since April and its effective date is not until June 3.  *See* 5 U.S.C. § 553(d); 89 Fed. Reg. at 30,448.  (Notably, the June 3 effective date coincides with the date that plan bids for the 2025 year must be submitted—a key date that Plaintiffs overlook by focusing instead on the purported need for relief by mid-July, at which point plan bids will have already been finalized and submitted.)

CMC complains instead about the "applicability date" CMS used to address concerns from agents, brokers, and FMOs about the agency's proposal to apply the revised agent and

broker compensation rules, insofar as the Proposed Rule referred to a time period "[b]eginning in 2025." 88 Fed. Reg. at 78,629. CMS explained in the Final Rule that its updates to "§ 422.2274 and § 423.2274 are applicable for all contract year 2025 marketing communications," which commence on October 1, 2024," 89 Fed. Reg. at 30,448, and correspondingly finalized the regulation text to apply in "contract year 2025," *see, e.g.*, 42 C.F.R. § 422.2274(d)(1)(ii).

CMC claims to find ambiguity in the rule, asking what will happen for the slice of marketing activities that might occur just before October 1, but for which payment is not completed until after October 1. (CMC Br. at 21.) The Final Rule is clear: plans and third party marketing organizations "will need to begin to comply with these updated standards beginning on October 1, 2024, when marketing activities for contract year 2025 begin." 89 Fed. Reg. at 30,622. But plans and third party marketing organizations "should continue to comply with CMS's existing agent and broker compensation policies until marketing activities for contract year 2025 begin on October 1, 2024." *Id.* That means that any marketing activities—including sales, renewals, and health risk assessments—done before October 1, 2024 are essentially part of contract year 2024, and so the prior regulations govern their payment, even if the payments are not actually made until after October 1. But any marketing activities done beginning October 1, 2024, for contract year 2025 are subject to the new regulations, including the provisions governing payment. CMC therefore is wrong that CMS did not account for commenters' timing concerns. And CMC's suggestion of any due process problem is illusory. The Final Rule is already published and (as of the date of filing this brief) legally effective, even if some rules do not kick in until October for activities related to the 2025 coverage year. There is no "after-the-fact" change or surprise deprivation of payments, as CMC alleges. (CMC Br. at 21.)

### 3.    CMS complied with any applicable notice-and-comment requirements.

Plaintiffs also critique the agency for allegedly not complying with procedural requirements in 5 U.S.C. § 553.  But CMS promulgated the Final Rule after notice and comment, and has complied with all applicable procedural requirements.

### a.    CMS disclosed all information required by the APA in the Proposed Rule.

Plaintiffs rely on out-of-circuit precedent to argue that the agency failed to disclose certain "critical factual material" for comment.  (*See* ABC Br. at 21 (quoting *Air Transp. Ass'n of Am., Inc. v. Dep't of Agric.*, 37 F.4th 667, 677 (D.C. Cir. 2022).)  In the Fifth Circuit, however, the relevant APA provision at 5 U.S.C. § 553 "establishes the maximum extent of procedural scrutiny a reviewing court may apply to agency rulemaking."  *Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009).  That provision requires an agency to disclose for comment only the "time, place, and nature of public rule making proceedings," the "legal authority under which the rule is proposed," the "terms or substance of the proposed rule or a description of the subjects and issues involved," and a plain-language summary of the proposal online.  *See* 5 U.S.C. § 553(b).  Because "[o]ne searches the text of APA § 553 in vain for a requirement that an agency disclose other agency information as part of the notice or later in the rulemaking process," any requirement to disclose specific factual material "cannot be squared with [its] text."  *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 246 (D.C. Cir. 2008) (Kavanaugh, J., concurring in judgment).  Plaintiffs do not contend that the Proposed Rule does not satisfy that standard, and the Court should decline Plaintiffs' invitation to graft additional procedural requirements onto § 553.  *See Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def. Council, Inc.*, 435 U.S. 519, 525 (1978) (reviewing courts must not "engraft[] their own notions of proper procedures upon agencies entrusted with substantive functions by Congress").

In any event, CMS disclosed sufficient materials for comment even under the D.C. Circuit's standard. As discussed, the heart of CMS's rule was its incentive analysis—which CMS included in the Proposed Rule. 88 Fed. Reg. at 78,553. And CMS also discussed other factors bearing on its analysis in the Proposed Rule, such as its complaints and the focus group. *See id.* at 78,554. While it did not make available to all members of the public—and all competing FMOs, plans, etc.—the highly confidential plan contract information, it did disclose that it was relying on "information gleaned from plan oversight activity." *Id.* at 78,556. Plaintiffs cite no case suggesting that an agency must choose between using sensitive data obtained through oversight and disclosing that sensitive data to the world—which would risk significant harm to regulated entities. "[T]he public 'need not have an opportunity to comment on every bit of information influencing an agency's decision.'" *Tex. Off. of Pub. Util. Couns.*, 265 F.3d at 326 (affirming agency's reliance on *ex parte* communications).

### b.    The Final Rule is a logical outgrowth of the Proposed Rule.

ABC also argues that CMS violated the logical outgrowth requirement by stating for the first time in the Final Rule's preamble that "'the full payments shall be made 'directly to the agents and brokers,' thereby 'prohibit[ing] separate administrative payments." (ABC Br. at 22 (quoting 89 Fed. Reg. at 30,624, 30,622).) That is not what the Final Rule states. The Final Rule simply predicts that "removing the category of 'administrative payments' (i.e., overrides), would change the current flow of payments from an MA organization to agents and brokers for an enrollment." 89 Fed. Reg. 30,624. That statement does not impose any legal requirements, and so does not make the Final Rule vary in any way from the proposal. And even if in that statement is a binding statement about payment flow, plenty of commenters understood CMS's regulations to affect FMO payments—including another Plaintiff in this lawsuit. (CMC App.

110 (noting rule "does not impact an MAO's payments to an FMO for services" only for payments "outside of administrative payments"); *id.* 210 (NABIP comment noting "the proposed rule would eliminate the separate regulatory provision for administrative payments" to FMOs). In light of the fact that so many other commenters knew to comment on payments to FMOs, ABC cannot now claim surprise.

**B.    Plaintiffs fail to show irreparable harm or that the other public-interest factors support the extraordinary remedy of a preliminary injunction.**

"[T]o establish irreparable injury, Plaintiffs 'must demonstrate that the harm is 'real, imminent, and significant—not merely speculative or potential—with admissible evidence and a clear likelihood of success.'" *Tex. Health & Human Servs. Comm'n v. United States*, 166 F. Supp. 3d 706, 710 (N.D. Tex. 2016).  "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *Anyadike v. Vernon Coll.*, No. 7:15-CV-157-O, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015).  And contrary to ABC's contention that the Court should relax its scrutiny of the equitable factors if it agrees with Plaintiffs on the merits, the Fifth Circuit has "long held that satisfying one requirement does not necessarily affect the analysis of the other requirements." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 457 (5th Cir. 2016); *see also Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 n.1 (5th Cir. 2018) (noting debate over whether cases suggesting a sliding scale approach survives more recent Supreme Court precedent).

Regardless of the test, Plaintiffs do not meet their burden.  To the extent they complain about doing business under the Final Rule's regulatory scheme, that is strictly financial harm, and "a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial." *Air Prod. & Chems., Inc. v. GSA*, No. 2:23-CV-147-Z, 2023 WL 7272115, at *13 (N.D. Tex. Nov. 2, 2023).  Plaintiffs' claim that "there will be no meaningful opportunity

to change their contracts" after July 10 also does not support relief.  (ABC Br. at 23 (citing ABC

App. 6 ¶ 27).)  NABIP itself admitted that "contracts between plans and agents and brokers are

those of adhesion, and individual servicing agents have no ability to change the terms with the

carriers in their service."  (CMC App. 209.)  Because the plans have ultimate control of what

compensation flows to Plaintiffs, the notion that Plaintiffs will be able to re-negotiate contracts

terms beginning in mid-July if this Court grants relief is speculative, at best.

Indeed, in this regard it is particularly relevant that Plaintiffs waited almost six weeks

following the April 4th posting of the rule on the Federal Register website to seek relief in Court.

Plaintiffs' needless delay is itself disqualifying.  "The law is well-established that[] [d]elay in

seeking a remedy is an important factor bearing on the need for a preliminary injunction."

*GoNannies, Inc. v. GoAuPair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (internal

quotation marks and citation omitted); *see also Texas v. United States*, 328 F. Supp. 3d 662,

738–39 (S.D. Tex. 2018) (collecting cases).  More crucially, Plaintiffs' delay pushed the briefing

schedule—and any eventual decision from this Court—well past the plans' June 3 deadline to

submit their bids.  *See* 42 C.F.R. §§ 422.254, 423.265.  Those bids determine the financial

expectations of the plans for the next year—including their marketing budget and plan.  *See*

Instructions for Medicare Advantage Bid Pricing, *supra* n.4, at 31 (requiring plans to submit

"non-benefit expenses" including "Sales & Marketing" expenses like "commissions," as well as

direct and indirect administrative costs); *id.* at 92 (requiring plans submit a "product narrative

that offers relevant information about plan design—including . . . marketing approach").  Thus,

even if the Court granted Plaintiffs relief by July 10, plans presumably have already set their

overall marketing budgets for next year.  Because it would be impossible for CMS to allow plans

to resubmit the thousands of bids in response to an order issued by this Court after June 3 in time

for open enrollment to begin in October, plans cannot change those budgets without dipping into

their bottom line or some other source of funds (which Plaintiffs cannot show is likely to

happen).  Indeed, interfering in the rules surrounding the bid process now would disrupt plans'

2025 offerings, potentially distort the competitive landscape, and compromise the quality of the

bids—which is an independent reason not to grant preliminary relief.  *See Air Prod. &*

*Chemicals, Inc.*, 2023 WL 7272115, at *15 ("[W]hen the sale and conveyance of something is at

issue, there is a strong public interest in avoiding disruptions in procurement, and for

withholding judicial interjection").

## C.    The Court should exercise its equitable discretion to deny relief or limit it to individual Plaintiffs.

Should the Court nevertheless award Plaintiffs some relief, that relief should extend only

to any policies the Court finds likely unlawful and reach no more broadly than necessary to

remedy any demonstrated harms.  "Crafting a preliminary injunction is an exercise of discretion

and judgment, often dependent as much on the equities of a given case as the substance of the

legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087

(2017).  Moreover, "injunctive relief should be no more burdensome to the defendant than

necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512

U.S. 753, 765 (1994).  "A district court abuses its discretion if it does not narrowly tailor an

injunction to remedy the specific action which gives rise to the order." *O'Donnell v. Harris Cty.*,

892 F.3d 147, 163 (5th Cir. 2018).  And, the Court should decline to enter any universal relief.

*See United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch, J., concurring) ("[A] district

court should 'think twice—and perhaps twice again—before granting' such sweeping relief" as

universal vacatur."); *Nuziard v. Minority Bus. Dev. Agency*, No. 4:23-CV-278-P, 2024 WL

965299, at *42 (N.D. Tex. Mar. 5, 2024) (declining to grant vacatur and "exercis[ing] [the

court's] equitable discretion to decline a remedy with nebulous authority in favor of remedies with clear authority").

Nor should relief extend beyond the two individual Plaintiffs to the three association Plaintiffs.  To sue on behalf of its members, an association must, among other things, show that "the interests it seeks to protect are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  But the associational Plaintiffs CMC and Fort Worth Association of Health Underwriters, Inc. submit no declarations at all to support their standing.[10]  While they cite their comments to the Proposed Rule, neither disclose an organizational purpose.  (*See* CMC App. 2 (stating only that "[t]he Council is a nonprofit corporation representing many of the largest unaffiliated insurance agency, brokerage, and field-marketing organizations"); *id.* at 207 (stating only that NABIP is an "association representing over 100,000 licensed health insurance agents, brokers, general agents, consultants and employee benefits specialists").  For its part, ABC states only that it "was formed to bring together beneficiaries, agents and brokers, and FMOs," to "protect[] the best interests of beneficiaries of Medicare and other health insurance plans," and to lobby "for sensible, forward-thinking policies that improve health insurance knowledge and education, lower healthcare costs, and maximize coverage choices for consumers."[11]  (ABC App. A11.)

---

[10] CMC describes itself as an Austin-based non-profit whose members include agencies, brokerages, telemarketers, and FMOs.  (CMC Compl. ¶¶ 14, 30.)  And Fort Worth Association of Health Underwriters, Inc. is the Fort Worth Chapter of NABIP, which is comprised of similar members.  (*Id.* ¶¶ 15, 30.)

[11] ABC registered with the Texas Secretary of State five days before filing suit and appears to be a coalition run by a lobbying firm in Washington, D.C., with registered headquarters at the address of the country's largest insurance distributer to seniors. whose Managing Partner is Senior Security Benefits, LLC's CEO.  (App. 11761–75.)

That vague language fails to link the associations' purposes to its members' alleged financial harm. *See VanDerStok v. Garland*, 633 F. Supp. 3d 847, 859–60 (N.D. Tex. 2022) (organization failed to show how organization's "educational and political advocacy purposes" were "germane to the protection of [its member's] financial interests"); *see also Tenth Street Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020) ("Associational standing requires that the individual members of the group each have standing[.]"). Indeed, to the extent ABC (or CMC) was formed specifically to fight against this the Final Rule (as appears to have been the case), that sort of maneuver would allow individual plaintiffs to extend any relief received to an unlimited number of others through the simple expedient of filing incorporation papers just before the lawsuit. That would transform associational standing doctrine into a vehicle to obtain opt-in class relief without complying with the rules governing class actions in the Federal Rules of Civil Procedure. The Court should reject such an ahistorical interpretation of Article III and not exercise its equitable powers so broadly. *Cf. Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 538–41 (6th Cir. 2021).

The APA, in 5 U.S.C. § 705, does not change the inadvisability of a universal remedy. That section provides: "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. In limiting such relief "to the extent necessary to prevent irreparable injury," the statute directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Relief under § 705 should "normally, if not always, be limited to the parties complainant." Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess.

277 (1946).  Moreover, the Final Rule's "effective date" is the day this brief is being submitted (June 3), 89 Fed. Reg. at 30,448, so it is too late universally to "postpone," 5 U.S.C. § 705.

Finally, if the Court find for Plaintiffs only on arbitrary and capricious or procedural grounds, the most likely outcome is remand to the agency further explanation.  *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) ("[O]nly in rare circumstances is remand for agency reconsideration not the appropriate solution"); *DCOR, LLC v. U.S. Dep't of the Interior*, No. 3:21-CV-120-N, 2023 WL 4748197, at *9 (N.D. Tex. July 24, 2023) ("Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so."), *amended in part*, 2023 WL 8628322 (N.D. Tex. Dec. 13, 2023).  The Court should take any likely remedy into account in crafting any preliminary relief.

## IV.    Conclusion

Plaintiffs' motion for preliminary injunction or a § 705 stay should be denied.

<div style="margin-left:50%">

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

</div>

**Defendants' Consolidated Response to Plaintiffs' Motions for Preliminary Injunction – Page 50**

<u>Certificate of Service</u>

On June 3, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<u>/s/ Brian W. Stoltz</u>
Brian W. Stoltz
Assistant United States Attorney