# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> *Defendants*. | No. 4:24-cv-439-O |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR A SECTION 705 STAY OF THE FINAL RULE OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION

David Keltner
Texas Bar No. 11249500
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 878-3560
david.keltner@kellyhart.com

Stephanie A. Webster
D.C. Bar No. 479524, *pro hac vice*
Christopher M. Nienhaus
D.C. Bar No. 90008585, *pro hac vice*
Ropes & Gray LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 508-4859
stephanie.webster@ropesgray.com
christopher.nienhaus@ropesgray.com

Casey Kyung-Se Lee
Ropes & Gray LLP
New York Bar No. 4885927, *pro hac vice*
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 596-9000
casey.lee@ropesgray.com

Michael P. Lynn
Texas Bar No. 12738500
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3801
mlynn@lynnllp.com

Michael B. Kimberly
D.C. Bar No. 991549, *pro hac vice*
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C. 20001
Phone: (202) 756-8901
mkimberly@mwe.com

Ashley C. Parrish
D.C. Bar No. 464683, *pro hac vice*
Adam C. Solander
D.C. Bar No. 1002511, *pro hac vice*
King & Spalding LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Phone: (202) 626-2627
aparrish@kslaw.com
asolander@kslaw.com

## TABLE OF CONTENTS

Table of Authorities .................................................................................................. ii

Introduction ............................................................................................................. 1

I.    Plaintiffs are likely to prevail on the merits .................................................. 2

      A.    The Rule exceeds CMS's statutory authority ........................................ 2

            1.    A holistic analysis of the entire statutory provision reveals a narrow
                  grant of rulemaking power ......................................................... 3

            2.    The agency's prior regulations support plaintiffs .......................... 5

            3.    The agency's reliance on antitrust principles exceeded its authority ...... 7

      B.    The Rule lacks evidentiary support and was promulgated without
            observance of the ground rules for notice and comment ........................ 8

II.   The Rule disrupts an entire market and will inflict irreversible, industry-wide
      harms absent a temporary stay ...................................................................... 13

III.  A stay of the Rule, not a party-specific injunction, is most appropriate ........... 15

i

# TABLE OF AUTHORITIES

## Cases

*Air Products & Chemicals, Inc. v. FERC*,
  650 F.2d 687 (5th Cir. 1981) ................................................................. 9

*Air Transport Association of America v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999) .................................................................. 9

*Burbridge v. CitiMortgage*,
  37 F.4th 1049 (5th Cir. 2022) .............................................................. 4

*Career Colleges and Schools of Texas v. U.S. Department of Education*,
  98 F.4th 220 (5th Cir. 2024) .......................................................... 13, 15

*Chamber of Commerce v. CFPB*,
  2023 WL 5835951 (E.D. Tex. Sept. 8, 2023) ................................... 15

*Checkosky v. SEC*,
  23 F.3d 452 (D.C. Cir. 1994) .............................................................. 15

*Chemical Manufacturers Association v. EPA*,
  870 F.2d 177 (5th Cir. 1989) ............................................................... 9

*In re E.P.A.*,
  803 F.3d 804 (6th Cir. 2015) .............................................................. 15

*Matter of GFS Industries*,
  99 F.4th 223 (5th Cir. 2024) .............................................................. 13

*Learmonth v. Sears, Roebuck & Co.*,
  631 F.3d 724 (5th Cir. 2011) .............................................................. 14

*Liberty Mutual v. Clayton*,
  33 F.4th 442 (7th Cir. 2022) ................................................................. 3

*Marbury v. Madison*,
  5 U.S. 137 (1803) ................................................................................. 6

*Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance*,
  463 U.S. 29 (1983) ..................................................................... 2, 8, 9

*NAM v. DHHS*,
  491 F. Supp. 3d 549 (N.D. Cal. 2020) ............................................... 15

*Portland Cement Association v. Ruckelshaus*,
  486 F.2d 375 (D.C. Cir. 1973) ............................................................. 9

*In re Riley*,
  923 F.3d 433 (5th Cir. 2019) ................................................................. 3

**Cases—continued**

*Sorenson Communications Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014) ...................................................................10

*Texas v. Becerra*,
    575 F. Supp. 3d 701 (N.D. Tex. 2021) .....................................................8, 10

*Texas v. EPA*,
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ..........................................................9

*United States v. Palomares*,
    52 F.4th 640 (5th Cir. 2022) ........................................................................2

*United States v. White*,
    869 F.2d 822 (5th Cir. 1989) ........................................................................4

*United Technicians v. U.S. Department of Defense*,
    601 F.3d 557 (D.C. Cir. 2010) ......................................................................8

*Wages & White Lion Investments, LLC v. FDA*,
    90 F.4th 357 (5th Cir. 2024) (en banc) .....................................................8, 10

*Watkins v. Scott Paper*,
    530 F.2d 1159 (5th Cir. 1976) ......................................................................4

*Window Covering Manufacturers Association v. Consumer
    Product Safety Commission*,
    82 F.4th 1273 (D.C. Cir. 2023) ...................................................................10

**Statutes and regulations**

42 U.S.C.
    § 1395w-21(j)(1) .........................................................................................3
    § 1395w-21(j)(2) .........................................................................................3
    § 1395w-21(j)(2)(D) ....................................................................1, 4, 5, 6, 7, 8
    § 1395ww(a)(1)(A)(i) ...................................................................................4
    § 1395ww(k)(1) ...........................................................................................5

46 U.S.C. § 53910(f)(2) ....................................................................................3

42 C.F.R.
    § 422.2274 (2008) .....................................................................................7, 11
    § 422.2274(b)(1)(iv)(B) (2008) ....................................................................6
    § 422.2274(e) (2023) .................................................................................7, 11
    § 422.2274(e)(1) (2023) ...............................................................................6
    § 160.102(b) ...............................................................................................12
    § 164.105(b) ...............................................................................................12

**Statutes and regulations—continued**

*Changes to the Medicare Advantage and the Medicare Prescription Drug
    Benefit Program for Contract Year 2024*, 89 Fed. Reg. 30448 (April 23, 2024)...............7, 12

*Contract Year 2022 Policy and Technical Changes to the Medicare Advantage
    Program*, 86 Fed. Reg. 5864 (Jan. 19, 2021).....................................................................6, 10

*Revisions to the Medicare Advantage and Prescription Drug Benefit Programs:
    Clarification of Compensation Plans*, 73 Fed. Reg. 67406 (Nov. 14, 2008) .....................5, 11

## INTRODUCTION

We demonstrated in the opening brief that all of the elements necessary for a stay or pre-liminary injunction are satisfied: Plaintiffs are likely to succeed on the merits; there is a substantial threat of irreparable harm absent a stay; and the balance of harms and public interest favor an injunction. With little to say about the clear-cut irreparable harms and damage to the public interest at issue here, the government focuses predominantly on the merits. Its arguments on that score are stunning, both in their near-limitless assertion of the agency's authority and in their disregard for the text, purpose, and structure of the statute and the basics of APA rulemaking.

The statutory language does not permit CMS's extreme position. Congress directed the agency merely to set "guidelines" for the "use of compensation," and then only to ensure that "agents and brokers" are incented "to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). In CMS's view (at 24-25), this narrow grant of power flat-out "prohibits *any* compensation" related in any way to MA plan marketing unless it satisfies CMS's rigid and fine-grained rules concerning who may pay whom, how much, and under what circumstances. This command-economy interpretation of the statutory text stretches its meaning well beyond the breaking point. And while it might be at home in the context of government-run traditional Medicare, it turns Congress's free-market vision for the Medicare Advantage program upside down, destroying rather than fostering the conditions necessary for beneficiaries to find the best plans for their needs.

The government also invites the Court to read the Administrative Procedure Act virtually out of existence. It relies (at 12-14, 32) in substantial respects on all-new reasoning advanced for this first time by its counsel, propped up by cherry-picked evidence the agency did not cite in its rulemaking and the public has never seen before. No problem, the agency insists (at 33, 44), be-cause it has no obligation under the APA to support its reasoning with "empirical evidence" any-way, let alone to make any such evidence available to the public during the comment period.

1

That is not how rulemakings are supposed to work. It is fundamental under the APA that "the agency must examine the relevant data" and draw "a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Association v. State Farm Mutual Auto Insurance*, 463 U.S. 29, 43 (1983). The agency also must respond to serious objections and provide adequate notice so the public can meaningfully comment. Before this Court, it must defend its position based on the agency's own justifications articulated in the rulemaking documents, not based on the post hoc rationalizations of its lawyers. CMS did none of those things.

Without an immediate stay, the Rule will inflict irreparable harm not just on Senior Security Benefits, ABC's members, and other FMOs, agents, and brokers, but also on the tens of millions of MA beneficiaries they all serve. The government brushes this off as remediable financial harm, but that can't be taken seriously. The fundamental realignment of an entire industry will inflict permanent damage on stakeholders throughout the marketplace. To prevent that harm, and to ensure that the Court has a meaningful opportunity to conduct judicial review, a grant of temporary relief by mid-July is imperative.

## I.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.     The Rule exceeds CMS's statutory authority

The statutory text authorizes CMS to "establish guidelines" for the "use of compensation" to encourage agents and brokers to act in the best interest of beneficiaries and not their own financial interests. That language is incompatible with CMS's position that any and all payments related to MA marketing are prohibited unless they are made pursuant to the agency's rigid rules.

In an effort to justify a boundless view of its own regulatory power, CMS proceeds by addressing the statute's terms one at a time, in isolation. But statutory interpretation requires more than stitching together the rote definitions of individual words, each taken alone. In construing a statute, courts must "consider the text holistically," minding the structure, context, and purpose of the provision as a whole. *United States v. Palomares*, 52 F.4th 640, 642-643 (5th Cir. 2022).

CMS begins (at 23-25) with "use." But its analysis, which turns to a discussion of firearms and drug use by airline pilots, is candidly hard to follow. CMS insists (*id.*) that "use" must be given an "expansive" meaning and not a "cramped" one. Its only justification seems to be that an expansive meaning would give it more regulatory authority, and a cramped one would give it less.

The agency then considers (at 28-29) "compensation," again in isolation. It points to *In re Riley*, 923 F.3d 433 (5th Cir. 2019), for the proposition that compensation can include reimbursement for hard costs. But *Riley* is a bankruptcy case, and the court's analysis in that opinion was expressly limited to the statutory context at issue. *See id.* at 441-443. Indeed, *Riley* confirms that although the word compensation "*can* permit the reimbursement of some expenses," its definition does not "compel" that conclusion in all cases. *Id.* at 442 (emphasis added). Were it otherwise, Congress never would need to specify when the term "compensation" includes costs, which often it does. *See, e.g.*, 46 U.S.C. § 53910(f)(2) ("compensation may include an allowance for expenses reasonably incurred"). Much the same goes for *Liberty Mutual v. Clayton*, 33 F.4th 442 (7th Cir. 2022), which concerned an idiosyncratic state insurance law. Both cases support our point that the question of statutory interpretation before the Court cannot be answered by mechanical, seriatim application of dictionary definitions. It instead requires attention to context, purpose, and practice—all of which work in favor of plaintiffs and against CMS.

> 1. *A holistic analysis of the entire statutory provision reveals a narrow grant of rulemaking power*

**a.** Consider first the statutory structure and context within which the provision appears. As a starting point, § 1395w-21(j)(2) is just one half of a broader subsection. The first half of that subsection, § 1395w-21(j)(1), describes certain "prohibited activities." That stands in contrast with (j)(2), which describes only "limitations with respect to" certain other activities—activities that necessarily are *not* prohibited. When (j)(2)(D) says that CMS shall establish guidelines for the "use of compensation," it cannot be taken to mean, as CMS insists, that "the statute *prohibits* any compensation (regardless of who the direct recipient is) except compensation allowed by" CMS. CMS

Br. 25 (emphasis altered). If Congress had intended for (j)(2)(D) categorically to prohibit all non-authorized compensation, it would have placed paragraph (D) under (j)(1), which provides for "prohibited activities." That Congress codified it instead under (j)(2) is a clear indication that it meant only for CMS generally to provide guardrails for the "use of compensation" and not to "prohibit" activities described in the paragraph.

That conclusion is confirmed by the word "guidelines," which provides important context for interpreting "use" and "compensation." According to ordinary usage, a "guideline" is a general standard or parameter (literally, a line that guides), leaving room for judgment in application. The Fifth Circuit often has noted that "guidelines" are not "rigid mandates" (*Burbridge v. CitiMortgage*, 37 F.4th 1049, 1052 (5th Cir. 2022)) or "mechanical requirements" (*United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989)). *Accord Watkins v. Scott Paper*, 530 F.2d 1159, 1184 (5th Cir. 1976) ("guidelines are intended as just that, guidelines rather than rigid rules"). If CMS promulgated a standard that "administrative payments must not exceed fair market value," it would establish a guideline. A provision like that sets a general parameter, allowing for judgment in application. But if it instead specified that "all administrative payments shall be $100," that would not be a guide-line—it would be a hardline rule and affirmative mandate.

Here, the words "compensation" and "use" must be read with attention to the word "guide-line." Even if it were possible, in the abstract, to interpret CMS's authority to set limitations on the "use of compensation" as the power to set *rates* of compensation, here the word "guideline" fore-closes that approach. Again, a rate-setting rule is not a guideline commonly understood.

**b.** CMS insists that § 1395w-21(j)(2)(D) gives it authority to set rates for compensation of any kind related to MA marketing. But other provisions of the Medicare statute show that when Congress means to empower CMS with such authority, it says so expressly. Take, for example, § 1395ww(a)(1)(A)(i), which authorizes CMS to "determine[e] the amount of the payments that may be made under" traditional Medicare to hospitals for (in this case) inpatient services. Congress

instructed CMS to promulgate rules that "specify the amounts, form, and manner in which such payments will be made." *Id*. § 1395ww(k)(1). These provisions demonstrate that when Congress means to grant rate-setting authority, it gives the power clearly and expressly, rather than speaking vaguely in terms of "guidelines" to "ensure" the achievement of general goals.

   **c.**   As we explained in the opening brief (at 10-11), the Court also must consider the express statutory objective that Congress directed CMS to pursue: incentivizing "agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). In light of that narrow aim, CMS cannot be correct that Congress empowered the agency to set rates for any and all payments with any relation to MA plan marketing. *See* CMS Br. 24-25. Section 1395w-21(j)(2)(D) empowers CMS to regulate only compensation that, if left unregulated, has the potential to lead agents and brokers to act in their own interests rather than beneficiaries' interests. That means compensation directly to independent agents and brokers, whose behavior is not affected by payments between MAOs and FMOs.

   Against this background, CMS's bid for unlimited regulatory authority over all payments with any relation to MA plan marketing cannot succeed. Its position might make sense if Congress had drafted a different statute—if it had empowered CMS "to specify by rule the amounts, form, and flow of compensation paid by MAOs to all third parties," akin to its express rate-setting power under traditional Medicare. But that is not what the statute says. Using clear language, Congress directed the agency only to set general parameters to guide the use of compensation to ensure that agents and brokers will act in the best interest of beneficiaries.

### 2.   *The agency's prior regulations support plaintiffs*

   **a.**   CMS invokes (at 29-30) its past policy and practice as support for its contrary reading of the text, but that gets matters backwards. CMS is correct (Br. 30) that it "has consistently regulated . . . payments" for administrative services "since the statute's passage in 2008." *See* 73 Fed. Reg. 67406, 67410 (Nov. 14, 2008). It is wrong, however, to conclude that the agency thus has

always treated such payments as "compensation" within the ambit of § 1395w-21(j)(2)(D).

Prior to the final Rule, CMS had adopted a fair-market-value (FMV) rule for administrative payments according to which "[t]he amount paid to the third party for services other than selling insurance products, if any, must be fair-market value." 42 C.F.R. § 422.2274(b)(1)(iv)(B) (2008). The agency varied the language of the FMV rule over time, but the standard remained substantively unchanged for 16 years. *See* 42 C.F.R. § 422.2274(e)(1) (2023) (administrative payments "must not exceed the value of those services in the marketplace").

Although it affected payments to FMOs, the FMV rule is in fact a regulation of compensation to agents and brokers: By limiting payments to FMOs to fair market value, CMS ensured that MAOs could not funnel additional compensation to agents and brokers through FMOs. *See* 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021). Understood in that way, there is no inconsistency between the FMV rule and CMS's express exclusion of administrative payments from "compensation" subject to § 1395w-21(j)(2)(D). The idea is simply that any payment to an FMO above the fair-market value of the administrative services rendered is not in fact a payment for administrative services at all—it is a payment for something else. And because chances are good that it is a payment "to circumvent the limits on compensation to agents and brokers," it is properly regulated as touching the "use of compensation" under § 1395w-21(j)(2)(D). CMS is thus wrong to say (at 30) that plaintiffs "cannot explain why, if CMS believed the statute's concept of 'compensation' did not extend to administrative payments, CMS nevertheless has consistently regulated those payments since the statute's passage in 2008." The explanation (the same as above) appears on pages 6-7 of the opening brief. CMS simply ignores the argument.

**b.**   For similar reasons CMS's request (at 25) for deference to its "contemporaneous interpretation" of § 1395w-21(j)(2)(D) is entirely unhelpful to its position. Even assuming it were proper for the Court to pass off the authority "to say what the law is" (*Marbury v. Madison*, 5 U.S. 137, 177 (1803)) to CMS in this circumstance, the agency could not have been any clearer at the

6

time of § 1395w-21(j)(2)(D)'s enactment that "'[c]ompensation' does not include the payment of fees" related to administrative costs and services. 42 C.F.R. § 422.2274 (2008). In more recent iterations, it had stated that "administrative payments" are "[p]ayments other than compensation." 42 C.F.R. § 422.2274(e) (2023). Thus, if the Court were going to defer to anything, it would have to be CMS's longstanding position that administrative payments to FMOs are *not* "compensation" subject to regulation under § 1395w-21(j)(2)(D).

CMS asserts (at 29-30) that its prior regulations offered a "definition of compensation" only for purposes of the regulations themselves and did "not purport to construe that term as used in the statute." That is nonsense. CMS's request for deference depends on the idea that § 422.2274 codified the agency's interpretation *of the statute*. And it would be self-defeating for CMS to assert that it invested common terms in both the statute and regulation with different meanings. Nor does CMS explain why it would have taken such a bizarre approach to implementing § 1395w-21(j)(2)(D). At the very least, if an agency were to use a statutory term in an implementing regulation but imbue it with regulation-specific meaning that differed from the statutory meaning, one would expect it to do so openly, with good justification. Not so here.

### 3. *The agency's reliance on antitrust principles exceeded its authority*

As we noted in the opening brief (at 12-13), CMS improperly justified its new rate-setting rule for administrative services by reference to concern for anticompetitive behaviors in the market. CMS asserts (at 36-37) that it did not, in the final Rule, "purport to enforce the Sherman Act or any other similar law." The Rule says otherwise, explaining that the agency adopted its new fixed rates expressly to "deter anti-competitive practices" and to prevent what it believed would be "anti-competitive results." 89 Fed. Reg. 30448, 30618-30619 (April 23, 2024). True, CMS did not cite the antitrust laws, but it openly relied on the principles and objectives of those laws—principles and objectives that are notably absent from § 1395w-21(j)(2)(D).

CMS turns (at 5) to other elements of the Medicare Advantage scheme, divining from their

interstices a general regulatory mandate "to ensure a level playing field to allow effective competition among plans." *See also* CMS Br. 37 (asserting that agency supervision of "[c]ompetition as a general matter" is "baked into" the regulatory scheme). But even supposing Congress intended the agency to foster "effective competition" (that is a stretch), it did so only by directing CMS to undertake particular, discrete tasks, such as audits and recoupments. *See* CMS Br. 5-6. Nowhere did Congress authorize a roving regulatory patrol of MA markets. Meanwhile, Congress left no doubt as to the limited objective it intended CMS to pursue with § 1395w-21(j)(2)(D)—it was *not* to "ensure a level playing field" for MAOs, but instead to ensure that agents and brokers are encouraged to act in the interests of beneficiaries and not their own financial interests. Inasmuch as CMS justified the Rule as necessary to promote competition among MAOs, it "relied on factors which Congress has not intended it to consider" and thereby exceeded "the scope of the authority delegated to the agency by the statute." *State Farm*, 463 U.S. at 43.

### B. The Rule lacks evidentiary support and was promulgated without observance of the ground rules for notice and comment

**1.** The Rule is substantively arbitrary and procedurally unlawful. *See* Opening Br. 13-21. The ground rules warrant repeating. First, the agency must support its reasoning with evidence, meaning that a reviewing court "does not 'defer to the agency's conclusory or unsupported suppositions.'" *Texas v. Becerra*, 575 F. Supp. 3d 701, 720 (N.D. Tex. 2021) (quoting *United Technicians v. U.S. Department of Defense*, 601 F.3d 557, 562 (D.C. Cir. 2010)). Second, an "agency is not free to defend its decision by supplying new, post hoc rationalizations for it when sued." *Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357, 371 (5th Cir. 2024) (en banc). In other words, "[i]n reviewing an agency's action, the Court considers only reasoning 'articulated by the agency itself at the time of the agency action and cannot consider *post hoc* rationalizations.'" *Texas*, 575 F. Supp. 3d at 720 (quoting *State Farm*, 463 U.S. at 43). Reasoning cooked up by government lawyers in briefs, not previously articulated by the agency, doesn't count. *Id.*

CMS takes a different view. It asserts (at 43) that, in the Fifth Circuit, there is no "requirement to disclose specific factual material" in a rulemaking, even when that factual material is the lynchpin of the rule. And in this case, it says (at 33) that had no obligation to ground its decision on "empirical evidence" at all. It was enough, according to CMS (*id.*), to throw out an abstract "analysis of incentives" without regard for real-world facts.

That is wrong. "Although the APA does not specifically require notice and comment on the technical data that an agency considers, [the Fifth Circuit] has recognized that fairness requires that the agency afford interested parties an opportunity to challenge the underlying factual data relied on by the agency." *Chemical Manufacturers Association v. EPA*, 870 F.2d 177, 200 (5th Cir. 1989). "It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of data that, in critical degree, is known only to the agency." *Air Products & Chemicals, Inc. v. FERC*, 650 F.2d 687, 699 n.17 (5th Cir. 1981) (cleaned up) (quoting *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973)). Thus, "[t]he most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (quoting *Air Transport Association of America v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999)).

Moreover, CMS is wrong that it had no duty to ground the Rule on facts and evidence. Few standards are better settled in administrative law than that an agency "must examine the relevant data and articulate a satisfactory explanation for its action," including at minimum "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. It should go without saying that, for an agency to find facts, it must have evidence *of* those facts.

CMS's own brief makes this clear—it describes (at 34) the "ultimate issue" in the rulemaking as whether "administrative payments affect agent and broker incentives." That is an empirical question, not one answered with ineluctable logic. There are some circumstances in which the answer could be yes—such as when administrative payments exceed FMV and there is evidence

they are being used by MAOs to funnel additional compensation to agents and brokers. *See* 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021). But there are other cases in which the answer would be no—such as when the payments do not exceed FMV and there is no evidence that agents and brokers are personally gaining from per-enrollment, market-rate payments to FMOs (the case here).

CMS's brief all but concedes that it did not disclose any evidence concerning the "ultimate issue" in the rulemaking. All it offered was "conclusory [and] unsupported suppositions." *Texas*, 575 F. Supp. 3d at 720; *see* Opening Br. 14-17. That is fatal, because, again, agencies must base rulemakings on "logic and evidence, not sheer speculation." *Sorenson Communications Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).

**2.**   Notwithstanding its eschewing of "empirical evidence," the agency devotes a substantial portion of its brief attempting to backfill the evidentiary holes that it left in the Federal Register. On pages 12-13, for example, it recites various "financial data" concerning FMO payments. It then asserts on page 32 that "observations of market participants" suggest that certain "add-on [administrative] payments inflated agent and broker compensation." It cites (*id*.) to analyses of "publicly reported deals" to support its extra-statutory "concern about market concentration."

In all of that, there is an especially glaring omission—any citation to a single page in the Federal Register. The agency cannot overcome a failure to support the Rule during the comment period by "provid[ing]" the supposed evidence "to a single party during a post hoc judicial proceeding." *Window Covering Manufacturers Association v. Consumer Product Safety Commission*, 82 F.4th 1273, 1284 (D.C. Cir. 2023). To do so is to "supply[] new, post hoc rationalizations" for the Rule in court, violating the basic ground rules for administrative actions like this. *See Wages & White*, 90 F.4th at 371.

Even on its own terms, CMS's new evidence and explanation fall short. It has now adorned its reasoning with new citations to (selectively curated pieces of) the administrative record, but its position still boils down to speculation and surmise. For example, on page 12, CMS merely

speculates what large FMOs "might receive" compared with what small FMOs "might receive." It speculates further that "payments might vary" depending on the services offered. That surmise, weak as it is, adds only to anecdotal reports, such as what took place at "one meeting with a large plan," and how "one plan['s] . . . rewards point system" works. CMS Br. 13.

None of this comes close to the well-supported analysis that would be necessary to justify and implement a rule that sets rates across an entire market. The opening brief (at 14-17) laid out in great detail the many leaps of fact and logic contained throughout the Rule's preamble, but CMS ignores virtually all of it. Its new but equally flawed reasoning cannot save the Rule.

**3.** CMS did not adequately explain its sudden rejection of its longstanding definition of "compensation," in particular with respect to the reliance interests that had built up around its prior reading. *See* Opening Br. 17-18. CMS responds with doublespeak, insisting (at 30) that it is *our* "interpretation, not CMS's, that would be a departure from the agency's longstanding practice." That ignores reality. CMS expressly excluded administrative fees from "compensation" under its implementing regulations for 16 years. *See* 42 C.F.R. § 422.2274 (2008); 42 C.F.R. § 422.2274(e) (2023). Under the Rule, "its regulations [no longer] account for administrative payments separately from other compensation." CMS Br. 30. That is a change, period.

CMS appears to acknowledge in the next paragraph that this is a "change in policy" after all, but it insists that it "acknowledged [the] change and explained why." No it didn't. CMS did not once acknowledge in the Federal Register its prior policy—certainly, it does not cite any such occasion in its brief. The agency's only apparent explanation for its change in policy appears to be its concern that FMOs "could engage in a bidding war" and thus allow their agents and brokers to sell plans only for "[MAOs] that are the highest bidders" for administrative services. CMS Br. 10. That is no explanation at all—CMS articulated the same worry back in 2008 but did not believe it warranted direct regulation of administrative fees as "compensation." *See* 73 Fed. Reg. 67406, 67410 (Nov. 14, 2008). The Federal Register is devoid of a single word illustrating why the

11

concern was insufficient then but is sufficient now—let alone an acknowledgement of, or effort to grapple with, how its change would affect the industry's substantial reliance interests.

4.  The Rule's $100 one-time increase to the fee cap for administrative costs and services also lacks factual support or a reasoned basis. In its brief before the Court, CMS says (at 34) that it "concluded that requests for more than $100 were too high because they factored in the full price of all technology and systems," and that a rate of $100 or less was thus necessary to ensure that "funds are not being used to subsidize other programs and industries." It also explains (in its brief at 34, but the not in the Federal Register) that a "discount" on administrative fees was necessary to account "for the fact that current administrative costs were overinflated."

That would be all well and good, if only there were an iota of evidence to support it. But in fact, CMS expressly disclaimed an ability accurately to estimate the cost of providing necessary administrative services. 89 Fed. Reg. at 30625-26. That being so, it is wholly unclear how the agency could have concluded that "current administrative costs were overinflated" and by how much; or at what point payments for such services might begin to subsidize other programs. As we said, and CMS does not directly deny, it picked the number from thin air.

5.  The opening brief explained (at 19-21) that the HIPAA regulatory framework permits and encourages necessary sharing of protected health information among certain entities under common control or ownership and that the Rule directly interferes with and disrupts that parallel regulatory scheme. CMS does not deny the conflict; it says (at 38) only that the DHHS regulations implementing HIPAA "[do] not control whether CMS may limit certain harmful data-sharing practices under the Medicare statute." That is incorrect.

The HIPAA regulations by their terms apply to FMOs who are covered entities under the statute. *E.g.*, 45 C.F.R. §§ 160.102(b), 164.105(b). HIPAA itself and the rules implementing it are carefully reticulated, specifying in great detail the terms upon which protected health information, including "personal beneficiary data" under the Rule, may and may not be shared within and across

12

covered entities. Given that the Rule conflicts with those standards, the HIPAA regulations must prevail. "[T]o the extent that one might find tension between the two [code] sections, the more specific provision should govern over the more general." *Matter of GFS Industries*, 99 F.4th 223, 229 (5th Cir. 2024). Here, the Rule is an exercise only of CMS's general "authority to set fair marketing standards" (CMS Br. 21) while the HIPAA regulations are an exercise of Congress's more specific direction to the Secretary to issue reticulated privacy regulations. The Rule's limitation on information sharing among covered entities therefore cannot stand.[1]

## II.   THE RULE DISRUPTS AN ENTIRE MARKET AND WILL INFLICT IRRE-VERSIBLE, INDUSTRY-WIDE HARMS ABSENT A TEMPORARY STAY

We demonstrated (Opening Br. 23-24) that if the Rule is not temporarily stayed, plaintiffs will suffer irreparable harm and the Court's ability to conduct meaningful judicial review will be undermined. CMS asserts (at 45) that the harms cited are "strictly financial harm," but that is plainly mistaken. The declarations show that compliance with the Rule over the coming months with inflict harms occasioned by "necessary alterations in operating procedures," which is textbook irreparable harm. *Career Colleges and Schools of Texas v. U.S. Department of Education*, 98 F.4th 220, 235 (5th Cir. 2024).

CMS next suggests (at 46) that an injunction cannot remedy the harm because "plans have ultimate control of what compensation flows to [FMOs]," and the possibility that contracts will change in response to a court order "is speculative." But that ignores the crux of this case, which is that plans and FMOs have arranged their affairs one way under the status quo ante, and they are being forced by regulation to change the way they arrange their affairs moving forward. It is hardly "speculation" to assume that the status quo would persist if the coercive hand of government were not telling private market participants whom to pay and how much.

---

[1]   We argued (Opening Br. 22-23) that the preamble's apparent dictation that MAOs must pay administrative fees to agents and brokers and not to FMOs was unlawful. CMS has disclaimed any such requirement. *See* CMS Br. 44 ("That is not what the Final Rule states," and the preamble "does not impose any legal requirements"). The Court should hold CMS to that representation.

13

Without citing evidence and again relying on surmise, CMS implies (at 46) that MAOs' "June 3 deadline to submit their bids" to CMS was the real deadline by which relief would have been required because, after that point, "plans presumably have already set their overall marketing budgets for next year." Incorrect. Actual "agreements between Medicare Advantage plans and CMS must be executed by August 31, 2024 for Cost Year 2025." A8 ⁋ 38. Now is thus the time during which "agents and brokers are being forced to renegotiate their relationships with FMOs, and FMOs are being forced to renegotiate their relationships with MAOs." A13-14 ⁋ 23. For instance, because "$100 flat fee and $100 one-time increase in the compensation cap would not cover the monthly expenses that are covered by my FMO's services," agents and brokers will have to negotiate with FMOs "to personally cover the cost of the services that they previously received" under the freely negotiated contracts between MAOs and FMOs. A19 ⁋⁋ 20-21. Some will pay out-of-pocket to maintain service, others will not. On that score, the thousands of relevant contracts will be negotiated and "finalized in July and August 2024." A6 ⁋ 27. *See also* A8 ⁋ 38; A11 ⁋ 8; A21-22 ⁋⁋ 27, 31-32. By mid-July, sufficient contracts will have been consummated as to make reversal of the momentum impossible.

As for the public interest, CMS says that "interfering in the rules surrounding the bid process now would disrupt plans' 2025 offerings." But there is no reason for thinking so, and CMS cites no evidence for it. *Cf. Learmonth v. Sears, Roebuck & Co.*, 631 F.3d 724, 733 (5th Cir. 2011) ("lawyers' arguments are not evidence"). To countenance that position would invite CMS to promulgate any regulation it likes, no matter how unlawful, as long as it is near the deadline for plan bids, in which case it would avoid the possibility of an injunction. In all events, CMS has it backward—it is the Rule itself that is disrupting and interfering with long settled arrangements. And "[t]he breakdown in the system threatened by the final rule will not only impact the industry, it will also harm beneficiaries." A13 ⁋ 24; *see also, e.g.* A32 ⁋ 16.

14

### III. A STAY OF THE RULE, NOT A PARTY-SPECIFIC INJUNCTION, IS MOST APPROPRIATE

CMS does not dispute that a stay of the Rule is the more modest form of intervention, because it does not require the Court to enter an order that runs against an Executive Branch official. It nonetheless argues (at 48) that the Court should enter a preliminary injunction rather than a stay and that "relief [should not] extend beyond the two individual Plaintiffs," not even to the association plaintiffs and their members. That proposal breaks from settled practice and ignores the extraordinary complexities of the Medicare Advantage program, which would make implementation of a party-specific injunction nearly impossible as a practical matter.

Regardless, courts routinely grant preliminary injunctive relief to trade associations and their members. *See, e.g.*, *Career Colleges*, 98 F.4th at 233 (initially granting "a temporary administrative injunction limited to CCST and its members"); *Chamber of Commerce v. CFPB*, 2023 WL 5835951, at *11 (E.D. Tex. Sept. 8, 2023) (extending injunctive relief "to plaintiffs' members"); *NAM v. DHHS*, 491 F. Supp. 3d 549, 571 (N.D. Cal. 2020) (granting PI "with respect to Plaintiffs and, with respect to the association Plaintiffs, their members").

And beyond that, "the scope of preliminary relief" should "align[] with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colleges*, 98 F.4d at 255. True, the effective date here has passed, and CMS labels October 1 an "applicability date." But courts may stay agency rules at any time if equity requires it. *See, e.g.*, *In re E.P.A.*, 803 F.3d 804, 808 (6th Cir. 2015) (granting a stay of a regulation where the effective date had passed, "to restore the status quo as it existed before the Rule went into effect"). Nor is there any merit in the preview (at 49-50) of the government's argument that it will seek a remand without vacatur. "In the face of § 706(2)'s command that the reviewing court 'shall' 'set aside' arbitrary and capricious agency action, [a court has] no choice but to vacate." *Checkosky v. SEC*, 23 F.3d 452, 493 (D.C. Cir. 1994) (opinion of Randolph, J.). That is especially so here, given the Rule's industry-wide disruption.

Dated: June 7, 2024

/s/ *Michael P. Lynn*

David Keltner
Texas Bar No. 11249500
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 878-3560
Fax: (512) 495-6401
david.keltner@kellyhart.com

Michael P. Lynn
Texas Bar No. 12738500
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3801
Fax: (214) 981-3839
mlynn@lynnllp.com

Stephanie A. Webster
D.C. Bar No. 479524, *pro hac vice*
Christopher M. Nienhaus
D.C. Bar No. 90008585, *pro hac vice*
Ropes & Gray LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 508-4859
Fax: (202) 508-4650
stephanie.webster@ropesgray.com
christopher.nienhaus@ropesgray.com

Michael B. Kimberly
D.C. Bar No. 991549, *pro hac vice*
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C. 20001
Phone: (202) 756-8901
Fax: (202) 756-8087
mkimberly@mwe.com

Casey Kyung-Se Lee
New York Bar No. 4885927, *pro hac vice*
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 596-9000
Fax: (212) 596-9090
casey.lee@ropesgray.com

Ashley C. Parrish
D.C. Bar No. 464683, *pro hac vice*
Adam C. Solander
D.C. Bar No. 1002511, *pro hac vice*
King & Spalding LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Phone: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com
asolander@kslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 7, 2024, I caused the foregoing document to be filed with the Clerk for the U.S. District Court for the Northern District of Texas through the ECF system. Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

Dated: June 7, 2024

*/s/ Michael P. Lynn*

Michael P. Lynn
Texas Bar No. 12738500
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3801
Fax: (214) 981-3839
mlynn@lynnllp.com