**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, *et al.*,<br><br>            *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>            *Defendants*. | Civil Action No. 4:24-cv-439-O |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Introduction ...............................................................................................................................1

Background ...............................................................................................................................3

    A.   The Medicare Advantage program and the FMO-facilitated model of
         independent brokers and agents ...............................................................................3

    B.   Prior regulation of compensation in the MA marketing industry .................................6

    C.   The final Rule ..........................................................................................................9

Standard of Decision ...............................................................................................................11

Argument ................................................................................................................................12

I.    The challenged elements of the Rule exceed the agency's statutory authority ....................12

    A.   The Medicare Advantage statute does not authorize CMS to set the rate
         of third-party fees for administrative and other support services ..............................12

         1.   "Compensation" does not include payments to FMOs for
               reimbursements of hard costs and administrative support ...............................13

         2.   The statutory structure and surrounding words confirm that the Rule
               exceeds CMS's authority under § 1395w-21(j)(2)(D) ...................................15

    B.   Congress has not given CMS roving enforcement authority to promote
         competition in the Medicare Advantage marketing industry ....................................18

II.   The Rule is arbitrary and capricious ...............................................................................20

    A.   CMS cited no evidence that agents and brokers are circumventing
         compensation rule using excessive administrative fees paid to FMOs .....................22

    B.   CMS ignored the significant reliance interests that have built up around
         the longstanding prior regulatory regime .................................................................28

    C.   CMS did not satisfactorily explain how it settled on a compensation
         cap of $100 per enrollee to account for administrative fees .......................................32

    D.   CMS's concerns about anti-competitive practices were similarly
         speculative ...............................................................................................................34

    E.   CMS did not satisfactorily justify the Rule's new restrictions on the
         sharing of personal beneficiary data .........................................................................35

III.  The Rule was promulgated without observance of procedure required by law ...................37

    A.   CMS failed to disclose critical factual material underlying its proposal ....................37

    B.   The Rule was not a logical outgrowth of CMS's initial proposal ..............................39

IV.  The Court should enter an order vacating the rule ............................................................40

Conclusion ..............................................................................................................................42

ii

# TABLE OF AUTHORITIES

**Cases**

*10 Ring Precision, Inc. v. Jones,*
    722 F.3d 711 (5th Cir. 2013) .......................................................................................21, 30

*Air Products & Chemicals, Inc. v. FERC,*
    650 F.2d 687 (5th Cir. 1981) .......................................................................................26

*Air Transport Association of America v. FAA,*
    169 F.3d 1 (D.C. Cir. 1999) .......................................................................................26, 39

*Air Transportation Association of America, Inc. v. Department of Agriculture,*
    37 F.4th 667 (D.C. Cir. 2022) .......................................................................................38

*American Express Co. v. Italian Colors Restaurant,*
    570 U.S. 228 (2013) .......................................................................................34

*American Library Association v. FCC,*
    406 F.3d 689 (D.C. Cir. 2005) .......................................................................................19

*American Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008) .......................................................................................37

*Americans for Beneficiary Choice v. HHS,*
    2024 WL 3297527 (N.D. Tex. July 3, 2024) ................................................................. *passim*

*Amin v. Mayorkas,*
    24 F.4th 383 (5th Cir. 2022) .......................................................................................1, 12, 20, 33

*Association of Data Processing Service Organizations, Inc. v. Board of*
    *Governors of the Federal Reserve System,*
    745 F.2d 677 (D.C. Cir. 1984) .......................................................................................38

*Bailey v. United States,*
    516 U.S. 137 (1995) .......................................................................................17

*Burbridge v. CitiMortgage,*
    37 F.4th 1049 (5th Cir. 2022) .......................................................................................16

*Chamber of Commerce v. SEC,*
    443 F.3d 890 (D.C. Cir. 2006) .......................................................................................38

*Chamber of Commerce v. U.S. Department of Labor,*
    885 F.3d 360 (5th Cir. 2018) .......................................................................................18, 19, 41

*Checkosky v. SEC,*
    23 F.3d 452 (D.C. Cir. 1994) .......................................................................................40

**Cases—continued**

*Chemical Manufacturers Association v. EPA*,
   870 F.2d 177 (5th Cir. 1989) ....................................................26

*Data Marketing Partnership LP v. Department of Labor*,
   45 F.4th 846 (5th Cir. 2022) ....................................................41

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016).........................................................28, 32

*ExxonMobil Pipeline Company v. U.S. Department of Transportation*,
   867 F.3d 564 (5th Cir. 2017) ....................................................21

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).........................................................21, 29

*Fort Bend Cnty. v. United States Army Corps of Eng'rs*,
   59 F.4th 180 (5th Cir. 2023) ....................................................37

*Franciscan Alliance, Inc. v. Azar*,
   414 F. Supp. 3d 928 (N.D. Tex. 2019) .......................................40, 41

*Matter of GFS Industries*,
   99 F.4th 223 (5th Cir. 2024) ....................................................37

*Holloway v. United States*,
   526 U.S. 1 (1999)...............................................................17

*Huawei Technologies USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) .............................................21, 23, 37

*Janvey v. Alguire*,
   847 F.3d 231 (5th Cir. 2017) ....................................................34

*Kelly v. Robinson*,
   479 U.S. 36 (1986)..............................................................17

*Kovac v. Wray*,
   660 F. Supp. 3d 555 (N.D. Tex. 2023) ..........................................18

*Laffey v. Northwest Airlines, Inc.*,
   746 F.2d 4 (D.C. Cir. 1984)..................................................32, 33

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007)..............................................................39

*Loper Bright Enterprises v. Raimondo*,
   144 S. Ct. 2244 (2024)....................................................1, 12, 20

**Cases—continued**

*Louisiana v. U.S. Department of Energy,*
    90 F.4th 461 (5th Cir. 2024) ..........................................................................21, 30

*Luminant Generation Co. v. EPA,*
    675 F.3d 917 (5th Cir. 2012) ....................................................................................21

*MCR Oil Tools, LLC v. U.S. Department of Transportation,*
    110 F.4th 677 (5th Cir. 2024) ...................................................................................19

*Medicaid & Medicare Advantage Products Association of Puerto Rico, Inc. v.*
    *Emanuelli-Hernández,*
    58 F.4th 5 (1st Cir. 2023)............................................................................................3

*Michigan v. EPA,*
    576 U.S. 743 (2015)...................................................................................................20

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) .......................................................................................1

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile*
    *Insurance Co.,*
    463 U.S. 29 (1983)................................................................................1, 20, 26, 33

*National Mining Association v. U.S. Army Corps of Engineers,*
    145 F.3d 1399 (D.C. Cir. 1998).................................................................................41

*Offshore Logistics, Inc. v. Tallentire,*
    477 U.S. 207 (1986)...................................................................................................17

*Owner-Operator Independent Drivers Association v. Federal Motor Carrier*
    *Safety Administration,*
    494 F.3d 188 (D.C. Cir. 2007)...................................................................................38

*Portland Cement Association v. Ruckelshaus,*
    486 F.2d 375 (D.C. Cir. 1973)...................................................................................26

*R.J. Reynolds Vapor Company v. FDA,*
    65 F.4th 182 (5th Cir. 2023) .....................................................................................28

*In re Riley,*
    923 F.3d 433 (5th Cir. 2019) ..............................................................................13, 14

*NPR Investments, LLC ex rel. Roach v. United States,*
    740 F.3d 998 (5th Cir. 2014) ....................................................................................13

**Cases—continued**

*Sid Peterson Memorial Hospital v. Thompson,*
    274 F.3d 301 (5th Cir. 2001) ..................................................................3

*Sierra Club v. FERC,*
    38 F.4th 220 (D.C. Cir. 2022).............................................................32

*Sorenson Communications Inc. v. FCC,*
    755 F.3d 702 (D.C. Cir. 2014).........................................20, 24, 25, 27

*Southwest Electric Power v. EPA,*
    920 F.3d 999 (5th Cir. 2019) ........................................................40, 41

*Spirit Airlines, Inc. v. DOT,*
    997 F.3d 1247 (D.C. Cir. 2021).............................................................33

*Taniguchi v. Kan Pacific Saipan, Ltd.,*
    566 U.S. 560 (2012)..............................................................................13

*Texas Association of Manufacturers v. CPSC,*
    989 F.3d 368 (5th Cir. 2021) ...............................................................39

*Texas v. Becerra,*
    575 F. Supp. 3d 701 (N.D. Tex. 2021) .............................20, 23, 27

*Texas v. EPA,*
    389 F. Supp. 3d 497 (S.D. Tex. 2019) .....................26, 37, 38, 39

*Texas v. United States,*
    497 F.3d 491 (5th Cir. 2007) ...............................................................20

*United States v. Palomares,*
    52 F.4th 640 (5th Cir. 2022) ...............................................................15

*United States v. White,*
    869 F.2d 822 (5th Cir. 1989) ...............................................................16

*United Steel v. Mine Safety & Health Administration,*
    925 F.3d 1279 (D.C. Cir. 2019) ...........................................................41

*United Technicians v. U.S. Department of Defense,*
    601 F.3d 557 (D.C. Cir. 2010) ......................................................20, 34

*UnitedHealthcare Insurance Co. v. Becerra,*
    16 F.4th 867 (D.C. Cir. 2021)................................................................4

*Wages & White Lion Investments, LLC v. FDA,*
    90 F.4th 357 (5th Cir. 2024) (en banc) ............................21, 27, 29

**Cases—continued**

*Watkins v. Scott Paper,*
    530 F.2d 1159 (5th Cir. 1976) .......................................................................16

*Window Covering Manufacturers Association v. Consumer Product Safety*
    *Commission,*
    82 F.4th 1273 (D.C. Cir. 2023) ....................................................................27

**Statutes and regulations**

5 U.S.C.
    § 704 .............................................................................................................11
    § 706(2) .........................................................................................................11
    § 706(2)(A) ....................................................................................................20
    § 706(2)(D) ....................................................................................................37

11 U.S.C.
    § 330(a)(1) .....................................................................................................14
    § 330(a)(4)(B) ................................................................................................14

42 U.S.C.
    § 1395w-21(j)(2)(D) ................................................................................. *passim*
    § 1395w-22(a) ..................................................................................................4
    § 1395w-23(a) ..................................................................................................4
    § 1395ww(a)(1)(A)(i) ...................................................................................16
    § 1395ww(k)(1) .............................................................................................16

46 U.S.C. § 53910(f)(2) ......................................................................................14

42 C.F.R.
    § 422.2274(a) ..........................................................................................10, 13
    § 422.2274(a)(1) (2008) ............................................................................7, 30
    § 422.2274(a)(1)(iv) (2008) ..........................................................................31
    § 422.2274(a)(1)(iv)(B) (2011) .....................................................................31
    § 422.2274(c)(13) ..........................................................................................10
    § 422.2274(e) (2023) .......................................................................................8
    § 422.2274(e)(1) (2023) ...................................................................10, 16, 31
    § 422.2274(e)(2) (2023) ...............................................................................8, 9
    § 422.2274(g)(4) ............................................................................................35
    § 423.2274(g)(4) ......................................................................................11, 35

45 C.F.R.
    § 160.103 ..................................................................................................11, 35
    § 164.105(a)(2)(iii) ........................................................................................36
    § 164.105(b) ...................................................................................................36
    § 164.314 ........................................................................................................36

**Other authorities**

*American Heritage Dictionary of the English Language* (4th ed. 2000)......................................13

Barbara J. Evans, *The HIPAA Privacy Rule at Age 25*, 50 Fla. St. U. L. Rev. 741
(2023)....................................................................................................................................35

*Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit
Program for Contract Year 2024*, 89 Fed. Reg. 30448 (Apr. 23, 2024) ........................ *passim*

*Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit
Programs*, 77 Fed. Reg. 22,072, 22,168 (Apr. 12, 2012) ........................................................8

The Commonwealth Fund, *The Challenges of Choosing Medicare Coverage:
Views from Insurance Brokers and Agents* (Feb. 28, 2023), https://perma.cc/-
67WG-7NDF..........................................................................................................................22

Compensation, *Black's Law Dictionary* (8th ed. 2004)................................................................13

Compensation, *Webster's New Third International Dictionary* (2002) .........................................13

*Contract Year 2022 Policy and Technical Changes to the Medicare Advantage
Program*, 86 Fed. Reg. 5864, 5994, 6114 (Jan. 19, 2021)...................................................8, 26

*Contract Year 2025 Policy and Technical Changes to the Medicare Advantage
Program*, 88 Fed. Reg. 78476 (Nov. 15, 2023) ................................................................ *passim*

CY2018 Medicare Marketing Guidelines, Section 120.4.4 (July 20, 2017)................................31

Executive Order 14036 .................................................................................................................19

*Medicare Advantage and Prescription Drug Benefit Programs*, 76 Fed. Reg.
54,600, 54,634 (Sept. 1, 2011)..................................................................................................8

*Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed.
Reg. 4,588, 4,589 (Jan. 28, 2005) .............................................................................................3

Nancy Ochieng, et al., *Medicare Advantage in 2023: Enrollment Update and Key
Trends* (Aug. 9, 2023), https://perma.cc/EYE2-4UHR.............................................................4

*Revisions to the Medicare Advantage and Prescription Drug Benefit Programs*,
73 Fed. Reg. 54226 (Sept. 18, 2008) ........................................................................................7

*Revisions to the Medicare Advantage and Prescription Drug Benefit Programs:
Clarification of Compensation Plans*, 73 Fed. Reg. 67406, 67410 (Nov. 14,
2008) ..............................................................................................................................7, 29, 30

Set Aside, *Black's Law Dictionary* (11th ed. 2019) ....................................................................40

*Standards for Privacy of Individually Identifiable Health Information*, 54 Fed.
Reg. 82462 (Dec. 28, 2000)....................................................................................................35

## INTRODUCTION

The "role of the reviewing court under the APA" is to "independently identify and respect" Congress's delegation of authority to the agency whose action is under review, and to "police the outer statutory boundaries" of the delegation. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2263, 2268 (2024). It is also to ensure that an agency issuing a new regulation acts reasonably, including by "articulat[ing] a satisfactory explanation for its action including a rational connection between the facts found and the choice made" (*Amin v. Mayorkas*, 24 F.4th 383, 393 (5th Cir. 2022) (quoting *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co*., 463 U.S. 29, 43 (1983))) and abiding by the APA's "procedural requirements" to "provid[e] the public with a meaningful opportunity to comment on the proposed rule" (*Mock v. Garland*, 75 F.4th 563, 583 (5th Cir. 2023)).

That dual role leads to two conclusions in this case: First, the Centers for Medicare and Medicaid Services (CMS) well exceeded Congress's grant of rulemaking power by regulating the minutiae of compensation terms across the entire marketing industry for Medicare Advantage. Second, it did so without checking any of the boxes that the APA would require even if the statute authorized that action: The agency barely acknowledged that it was breaking from nearly two decades of settled practice, it did not ground its factual assumptions in verifiable evidence, and it failed to undertake the kind of rigorous analysis or provide the kind of reasoned explanation that a rule of this magnitude would require. Rare is the case that presents so many clearcut violations of the APA's basic requirements for agency decisionmaking.

As relevant here, Congress directed CMS to "establish limitations with respect to . . . [t]he use of compensation" to agents and brokers who market Medicare Advantage plans, but only by establishing "guidelines" that "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). For longer than 16 years, CMS interpreted that

1

language to authorize regulation of compensation paid *to agents and brokers*, and not to third parties like the field-marketing organizations (FMOs) that provide agents and brokers with administrative-support and regulatory-compliance services. But earlier this year, the agency suddenly shifted course, reading § 1395w-21(j)(2)(D) for the first time to grant the agency broad, open-ended authority to bar all compensation to any third party with any role in the Medicare Advantage industry. It thus flat-out prohibited all payments touching on Medicare Advantage marketing and enrollment unless the terms of payment comply with comprehensive and prescriptive regulatory requirements, including hard fee caps for administrative services used by agents and brokers. The regulation far exceeds the proper scope of CMS's statutory authority. It also risks interfering with FMOs' provision of the patient-focused services that—in line with the express purpose of § 1395w-21(j)(2)(D)—facilitate patients' ability to access the Medicare Advantage plans that best meet their health care needs.

One would have expected such a marked and consequential shift in an agency's policy to follow the identification of a serious problem in need of a drastic solution. But that is not what occurred here. The agency's factual and analytical explanation for its new assertion of extra-statutory authority can only be described as guesswork—the agency repeatedly stated what it believes *may* be happening in the marketing industry around Medicare Advantage, identifying a radical new regulatory approach (rate setting throughout the marketplace) as a solution that it merely *hopes* will solve what problems it *believes* may be present. In any other context, this kind of freewheeling, speculation-based rulemaking would be troubling; but in the context of a rate-setting endeavor for a multibillion-dollar industry, it is astonishing regulatory malpractice.

In all events, the APA demands more. The agency was required to issue a rule within the limits granted by Congress. That means the promulgation of *guidelines* (not rigid rules) for the use of compensation *to agents and brokers* (not to third-party FMOs whose compensation does not risk creating incentives for agents and brokers to act in their own interests rather than those of MA

enrollees). The agency was also required to support its Rule with evidence and rationally explained connections between that problem identified and the solution adopted. There was none of that here. The Rule accordingly must be vacated.

In granting a Section 705 stay earlier in this case, the Court determined it was likely that "the Final Rule is arbitrary and capricious." *Americans for Beneficiary Choice v. HHS*, 2024 WL 3297527, at *4 (N.D. Tex. July 3, 2024). The Court should now confirm that the Rule is unlawful and set it aside in a final judgment, as required by the APA.

## BACKGROUND

### A.    The Medicare Advantage program and the FMO-facilitated model of independent brokers and agents

Medicare is a federally funded health insurance program for elderly and disabled Americans. *See Sid Peterson Memorial Hospital v. Thompson*, 274 F.3d 301, 303 (5th Cir. 2001). Medicare comprises four parts: Parts A, B, C, and D.

Medicare Part A is a federally funded, federally administered insurance program covering inpatient hospital treatment, while Medicare Part B is an insurance program covering outpatient services. Together, Parts A and B are known as traditional Medicare. *See Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4,588, 4,589 (Jan. 28, 2005). Under traditional Medicare, the federal government itself acts as the insurer, paying provider costs for a "limited array of specified services" using a fee-for-service schedule—a one-size-fits all public health benefit program. See *Medicaid & Medicare Advantage Products Association of Puerto Rico, Inc. v. Emanuelli-Hernández*, 58 F.4th 5, 8 (1st Cir. 2023).

Part C—which Congress substantially revised in 2003 and is now known as the Medicare Advantage (MA) program—is different. It harnesses free market competition to encourage the development of innovative insurance options that expand benefit choices available to enrollees. It thus enables enrollees to select options that are better tailored to their particular needs. Compl. ¶ 27; 70 Fed. Reg. at 4,589.

Under Medicare Advantage, CMS contracts with private companies, called Medicare Advantage Organizations (MAOs), to sponsor health insurance plans, called MA plans, which must cover at least the same services as beneficiaries would receive through traditional Medicare. *See* 42 U.S.C. § 1395w-22(a); *UnitedHealthcare Insurance Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021). Instead of fee-for-service reimbursements, MAOs receive risk-adjusted, per-person monthly allowances to provide coverage for all Medicare-covered benefits to the Medicare beneficiaries enrolled in their plans. 42 U.S.C. § 1395w-23(a). MAOs are therefore incentivized to manage their MA plans efficiently, using the cost savings to attract subscribers by offering supplemental benefits, such as dental and vision coverage, and to reduce enrollees' out-of-pocket payments. Compl. ¶ 28; *UnitedHealthcare*, 16 F.4th at 872.

Since its adoption under the Bush administration in 2003, the Medicare Advantage program has proved an overwhelming success. Compl. ¶ 29. By 2023, the proportion of the Medicare-eligible population enrolled in the Medicare Advantage program surpassed for the first time the number of enrollees in traditional Medicare. *Id.* (citing Nancy Ochieng, et al., *Medicare Advantage in 2023: Enrollment Update and Key Trends* (Aug. 9, 2023), https://perma.cc/EYE2-4UHR).

The success of the MA program has meant not only an enriched range of choices available to would-be enrollees, but also an increase in decisionmaking complexity. Compl. ¶ 31. Despite the significance and complexity of enrollees' MA plan choice, however, CMS provides beneficiaries with little in the way of education or guidance in selecting an MA plan. For example, CMS does not offer any user-friendly online tools for comparing different MA plans. *Id.*

Congress envisioned that agents and brokers would fill this gap by helping Medicare beneficiaries choose the plan that best suits their health care needs. *See* 42 U.S.C. § 1395w-21(j)(2)(D). These agents and brokers "help[] millions of Medicare beneficiaries to learn about and enroll in" MA plans "by providing expert guidance on plan options in their local area, while

assisting with everything from comparing costs and coverage to applying for financial assistance." 89 Fed. Reg. at 30617; *see also* A32 ¶ 12; A3 ¶ 17; A5 ¶ 22; A25-A26 ¶¶ 14-19.

The work that insurance agents and brokers do in facilitating choice among, and enrollment in, MA plans has historically been organized around two models. The older model was a "captive agent" model, under which MAOs and their predecessor entities originally managed proprietary networks of dedicated insurance agents who were devoted to selling only the MA plans sponsored by the MAOs that employed them. Compl. ¶ 33; A3 ¶ 15; A20 ¶ 22. But this approach was a poor fit for the Medicare Advantage program, because it limited choices presented to beneficiaries while saddling MAOs with the enormous costs of maintaining parallel networks of exclusive brokers. Compl. ¶ 33; A20 ¶ 22. In other words, agents and brokers could not offer beneficiaries potentially better-suited plans offered by other MAOs, and each MAO had to carry the burden of maintaining its own overlapping network of agents and brokers.

The captive agent model thus gave way to a second model that utilizes independent agents and brokers. A3 ¶¶ 15-16. Under this model, which is now prevalent across the Medicare Advantage program, agents and brokers are unaffiliated with particular MAOs. A3 ¶ 16. MAOs pay commissions to independent agents and brokers, and they separately pay administrative fees to FMOs, who recruit and support networks of independent agents and brokers. A13 ¶ 21. FMOs thus work to facilitate better outcomes by serving both sides of the market: They contract with MAOs, bringing the MAOs' plans and marketing information and materials to independent agents and brokers; and they contract with agents and brokers, bringing a wide network MAOs and supplying agents and brokers with essential administrative and operational support. A3-A4 ¶¶ 19-20. FMOs are responsible for a broad range of support services and technologies, including: oversight and agent management for regulatory compliance and indemnification of carriers for agent non-compliance; facilitating agent access to MA plans; customer relationship management software; back-office support; data privacy and security technology and software; coverage of the

costs of training, certifications, and licensure; reimbursement for mileage to and from events; and coverage of marketing overhead expenses. A12 ¶¶ 18-19; A3 ¶ 19.

The prevailing FMO-facilitated model of independent agents and brokers better suits everyone. It better suits agents, who are not beholden to a single MAO and who, by working with FMOs, are able to offer and educate enrollees on a diverse array of MA plans, helping them ascertain which options best meets their needs. *E.g.*, A20 ¶¶ 22-23. It better suits enrollees, who receive superior services from independent agents and brokers and who report higher satisfaction when working with them. A25 ¶ 14-17. It better suits MAOs, which are freed from the strategic pressures and enormous costs of developing proprietary agent networks, allowing them to compete instead on the quality of the MA plans they create. Compl. ¶ 33. And it better suits the government, because the model more often results in beneficiaries obtaining higher quality, higher satisfaction MA plans, in alignment with Congress's express policy goals. *See* 42 U.S.C. § 1395w-21(j)(2)(D).

**B.     Prior regulation of compensation in the MA marketing industry**

Congress understood that independent agents and brokers may not make recommendations to prospective plan enrollees based on the enrollees' best interests if the agents and brokers were receiving more generous commissions from MAOs to sell certain plans over others. Congress accordingly authorized CMS to establish guidelines for agent-broker compensation in the Medicare Improvements for Patients and Providers Act of 2008. Pub. L. 110-275, 122 Stat. 2494; *see* Compl. ¶ 41. This new statutory provision did not grant CMS broad ratemaking powers or authorize the agency to assume regulatory control of the entire market. Rather, it granted CMS carefully cabined regulatory authority to limit "[t]he use of compensation other than as provided under guidelines established by" the agency. 42 U.S.C. § 1395w-21(j)(2)(D). In establishing such guidelines, Congress directed CMS to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." *Id*. § 1395w-21(j)(2)(D).

Soon after the statute's enactment, CMS published an interim final rule that imposed caps on compensation to "independent brokers [and] agents" selling MA products through FMOs. *See Revisions to the Medicare Advantage and Prescription Drug Benefit Programs*, 73 Fed. Reg. 54226, 54238-54239 (Sept. 18, 2008). The interim final rule defined "compensation" to include "remuneration of any kind relating to the sale or renewal of a policy including but not limited to commissions, bonuses, gifts, prizes, awards and finders' fees." *Id*. at 54251. CMS excluded from its definition of "compensation" payments or reimbursements for the cost of non-marketing activities provided by FMOs, including "training, certification, and testing costs," travel "to and from appointments with beneficiaries," and "costs associated with beneficiary sales appointments such as venue rent, snacks, and materials." *Id*. at 54238, 54251; 42 C.F.R. § 422.2274(a)(1) (2008). CMS left unregulated the administrative "fees paid to FMOs" by MAOs to cover the costs associated with "provid[ing] additional services beyond selling insurance products." Compl. ¶ 45; *see* 73 Fed. Reg. at 54238. The result was to regulate the fees paid to agents and brokers while leaving unregulated the administrative fees that MAOs or agents and brokers paid to FMOs, creating a Medicare Advantage marketing industry geared to Congress's goal of helping beneficiaries select MA plans best suited to their particular needs.

In later finalizing its interim rule, CMS determined that it should limit the amount paid to FMOs to the "fair-market value" of the services provided. *Revisions to the Medicare Advantage and Prescription Drug Benefit Programs: Clarification of Compensation Plans*, 73 Fed. Reg. 67406, 67410 (Nov. 14, 2008). Still, CMS did not define regulated "compensation" to include administrative fees paid by MAOs or agents and brokers to FMOs. *See id*. at 67413. Instead, this measure was framed a prophylactic against the possibility that excessive fees paid to FMOs could be passed along by the FMO to agents and brokers as surreptitious commissions or bonuses, circumventing the compensation guidelines for agents and brokers. *See id*. at 67409-67410.

7

Over the next 16 years, CMS regulations continued to distinguish between "compensation" paid to agents and brokers for selling MA plans to beneficiaries, and administrative fees paid to FMOs for services that supported marketing efforts. *See, e.g., Medicare Advantage and Prescription Drug Benefit Programs*, 76 Fed. Reg. 54,600, 54,634 (Sept. 1, 2011); *Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs*, 77 Fed. Reg. 22,072, 22,168 (Apr. 12, 2012). Taking this approach, CMS ensured that the incentives facing independent agents and brokers were properly aligned while maintaining FMOs' key role in helping beneficiaries choose plans tailored to their needs. CMS's Medicare Marketing Guidelines continued to identify non-enrollment services like training, customer service, and agent recruitment as "administrative" services, and corresponding payments to FMOs as "administrative fees." CY2018 Medicare Marketing Guidelines, Section 120.4.4 (July 20, 2017). The section under which this provision appears was titled "Payments *other than* Compensation." *Id.* (emphasis added).

As recently as 2021, CMS promulgated a regulatory update characterizing "administrative payments" to FMOs for "services other than enrollment of beneficiaries" as "[p]ayments other than compensation" under § 1395w-21(j)(2)(D), expanding its illustrative examples of such services to include "assistance with completion of health risk assessments" and "training, customer service, agent recruitment, [or] operational overhead." *Contract Year 2022 Policy and Technical Changes to the Medicare Advantage Program*, 86 Fed. Reg. 5864, 5994, 6114 (Jan. 19, 2021); 42 C.F.R. § 422.2274(e) (2023). This reaffirmed CMS's longstanding approach of requiring that payments for administrative services "not exceed the value of those services in the marketplace," while clarifying that "[a]dministrative payments can be based on enrollment provided payments are at or below the value of those services in the marketplace." *Id.* at 6114; 42 C.F.R. § 422.2274(e)(2) (2023). Consistent with its past position on the matter, CMS explained that this standard was "intended to ensure that [MAOs] do not use these administrative payments as a means to circumvent the limits on compensation to agents and brokers." 86 Fed. Reg. at 5994.

8

The prior regulatory scheme—which defined "compensation" under § 1395w-21(j)(2)(D) to include payments to agents and brokers for their marketing services and expressly excluded payments to FMOs for administrative-support and regulatory-compliance services—prevailed effectively undisturbed between 2008 and 2024. During that time, ABC's members, including Senior Security Benefits, invested substantial resources building out a robust business model that depended on MAOs paying FMOs fair market value for a myriad of services and technologies that FMOs provide to independent agents and brokers. A2 ¶ 12.

C.    **The final Rule**

CMS published a notice of proposed rulemaking (NPRM) in late 2023, proposing to reverse the longstanding regulatory regime governing compensation for independent agents and brokers and the payment of fees to FMOs to cover administrative costs and services. *See Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program*, 88 Fed. Reg. 78476 (Nov. 15, 2023). Thousands of stakeholders, including ABC and many of its members, submitted comments. Barely five months after the original NPRM—lightning fast for notice-and-comment rulemaking—CMS issued the final Rule, which implemented the bulk of the proposed rule. *See Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Program for Contract Year 2024*, 89 Fed. Reg. 30448 (Apr. 23, 2024). As finalized, the Rule accomplishes four notable changes.

*First*, CMS takes the position, for the first time in 16 years, that "administrative payments are included in the calculation of enrollment-based compensation" and that they are therefore subject to regulation as "compensation," eliminating separate treatment under § 1395w-21(j)(2)(D) of administrative payments. 42 C.F.R. § 422.2274(e)(2) (as amended). Now, according to the agency, "compensation" under § 1395w-21(j)(2)(D) encompasses not just payments to independent agents and brokers for their services selling MA plans (as the term in context is naturally understood), but also "any other payments" that are in any way "tied to" or "related to"

9

a Medicare Advantage enrollment, or that are provided "for services conducted as a part of the relationship associated with" a Medicare Advantage enrollment. *Id*. § 422.2274(a).

*Second*, in place of the existing standard merely requiring that payment for administrative services "not exceed the value of those services in the marketplace" (*id*. § 422.2274(e)(1)), the final Rule engages in government rate setting. For contract year 2025, the permitted rate is expressed as a one-time increase of a flat $100 per enrollee "to account for administrative payments" that will now be "included under the compensation rate." *Id*. For future contract years, the $100 increase will be rolled into a "base compensation rate that will be updated annually." 89 Fed. Reg. at 30626.

In its initial proposal, CMS had contemplated that this per-enrollee flat fee for administrative services (initially proposed as $31) would be paid from MAOs to FMOs. *See* 88 Fed. Reg. at 78555. But the Rule's preamble purported to require "chang[ing] the current flow of payments," such that MAOs will "mak[e] the full payments," including the amount to account for administrative services, "directly to the agents and brokers," so that "agents and brokers themselves will have the opportunity to decide which services are truly essential and how much those services are worth." 89 Fed. Reg. at 30624. In briefing on the motion for a Section 705 stay, however, CMS abandoned that position, acknowledging that "that is not what the Final Rule states," and the preamble's purported alteration of the Rule "does not impose any legal requirements." CMS Stay Br. 44. Thus, the final Rule does not prohibit payment of FMO fees directly from MAOs to FMOs.

*Third*, CMS adopted a vague and open-ended general prohibition on contract terms between MAOs, on the one hand, and agents, brokers, and FMOs, on the other hand. The prohibition bars any and all terms that may have "a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." 42 C.F.R.

§ 422.2274(c)(13) (as amended). CMS provided no further guidance concerning the meaning or application of this provision, leaving uncertain when CMS might further intrude into any economic arrangements having a connection to Medicare Advantage.

*Fourth*, in parallel with the changes to compensation, the Rule adds a new paragraph (4) to §§ 422.2274(g) and 423.2274(g), prohibiting third-party marketing organizations, including FMOs, from "distributing any personal beneficiary data that they collect" to any other third-party marketing organizations, including FMOs, unless "prior express written consent is given by the beneficiary." *See* 89 Fed. Reg. at 30599-30600; 42 C.F.R. §§ 422.2274(g)(4), 423.2274(g)(4). This prohibition covers a beneficiary's "name, address, and phone number," as well as "any other information given by the beneficiary for the purpose of finding an appropriate MA or Part D plan." *Id*. at 30604. This same data qualifies as "protected health information" (PHI) for purposes of the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule. *See* 45 C.F.R. § 160.103 (defining "protected health information" as, with specified exceptions, "individually identifiable health information" that is "[t]ransmitted or maintained" in any "form or medium"). HIPAA broadly governs the handling of private health information and seeks not only to protect patient privacy, but also to facilitate the exchange of data to support efficient care coordination, including with respect to benefit plans and coverage. The HIPAA Privacy Rule permits and promotes the sharing of PHI among authorized entities, sometimes including FMOs and other third-party marketing organizations.

## STANDARD OF DECISION

The APA makes final agency action subject to judicial review (5 U.S.C. § 704), directing reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or done "without observance of procedure required by law." *Id*. § 706(2). "APA cases are often resolved at summary judgment because whether an agency's decision is

11

arbitrary and capricious is a legal question that the court can usually resolve on the agency record." *Amin*, 24 F.4th at 391.

## ARGUMENT

### I.    THE CHALLENGED ELEMENTS OF THE RULE EXCEED THE AGENCY'S STATUTORY AUTHORITY

Congress has delegated authority to CMS to limit "[t]he use of compensation," by establishing "guidelines" to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). That language is incompatible with CMS's position that any and all payments related to MA marketing are prohibited unless they are made pursuant to the agency's inflexible rules, including rate setting.

When a statute authorizes an agency to act, the first "role of the reviewing court under the APA" is to "independently identify" Congress's delegation of authority, and to "police the outer statutory boundaries" of the delegation. *Loper Bright*, 144 S. Ct. at 2263, 2268. To determine the boundaries of an agency's delegated authority, a reviewing court discerns the "best reading of the statute" by searching for the interpretation that, upon "applying all relevant interpretive tools," the court "concludes is best." *Id*. at 2266. Because the Rule veers well beyond the outer boundaries of CMS's delegated authority according to § 1395w-21(j)(2)(D)'s plain text, it must be vacated.

#### A.    The Medicare Advantage statute does not authorize CMS to set the rate of third-party fees for administrative and other support services

CMS has asserted authority to set rates for all fees related to MA marketing, including the fees that may be paid to third-party FMOs for the cost of administrative services provided to agents and brokers. That position is incompatible with the best reading of § 1395w-21(j)(2)(D) in light of its language, context, and purpose.

### 1.    *"Compensation" does not include payments to FMOs for reimbursements of hard costs and administrative support*

The central statutory term, "compensation," is not naturally read to include payments to third parties for overhead support.

Since the term "compensation" is undefined in the statute, it takes its ordinary meaning. *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The starting point is the dictionary definition. *NPR Investments, LLC ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014) ("In determining the ordinary meaning of terms, dictionaries are often a principal source."). Contemporaneous dictionaries broadly agree that "compensation" means payment or remuneration for a service. *See, e.g., Black's Law Dictionary* (8th ed. 2004) (defining compensation as "[r]emuneration and other benefits received in return for services rendered"); *Webster's New Third International Dictionary* 463 (2002) (defining compensation as "payment for value received or service rendered"); *American Heritage Dictionary of the English Language* 376-377 (4th ed. 2000) (defining compensation as "[s]omething, such as money, given or received as payment or reparation, as for a service or loss").

That ordinary meaning is a problem for CMS, because the administrative fees paid to FMOs are best understood as reimbursements for overhead and other hard costs incurred by independent agents and brokers. The Rule's plain text makes this clear—it treats as "compensation" repayments for, among other things, "mileage," licensing fees, costs of obtaining certifications, and all other reimbursable "actual costs associated with beneficiary sales." 42 C.F.R. § 422.2274(a) (as amended). Yet repayment of costs generally is *not* remuneration for a service.

In its opposition to the motion for a Section 705 stay, CMS disagreed, pointing to *In re Riley*, 923 F.3d 433 (5th Cir. 2019). That case, CMS says, stands for the proposition that compensation necessarily includes reimbursement for any hard costs associated with the service provided. But *Riley* is a bankruptcy case, and the court's analysis in that opinion was expressly limited to that statutory context. *See id*. at 441-443. The court there held that "compensation" for

"representing the interests of the debtor" could include reimbursement of court filing fees because "advancing the cost of a filing fee" is a part of the representational service itself—the lawyer pays the fee on the client's behalf and for his benefit. *Id.* at 443 (quoting 11 U.S.C. § 330(a)(4)(B)).

That reasoning is inapposite here. Agents and brokers do not pay FMOs on behalf of carriers for services provided by the FMOs to the carriers; indeed, MAOs do not "reimburse" agents and brokers at all. Rather, MAOs pay FMOs for the separate and distinct service of establishing and administratively supporting networks of independent agents and brokers. MAOs then separately pay commissions to agents and brokers for the sales services they provide. To be sure, the services are related—but this is wholly unlike a lawyer's payment of filing fee, which is itself part of the service provided to the client.

*Riley* thus supports our position and not CMS's—it confirms that although the word compensation in some circumstances "*can* permit the reimbursement of some expenses," it ordinarily does not. 923 F.3d at 442 (emphasis added). Whether it does in any given case turns on context, and in particular whether or not reimbursement is for a hard cost the advancement of which is itself an element of the service. Here, that is not the case; payment of hard costs by FMOs is not part of the service that agents and brokers provide the MAOs.

Other statutory provisions bear out this understanding of the word "compensation." If CMS's position were correct—if the word "compensation" always includes cost reimbursements regardless of context—Congress never would need to specify when the term "compensation" includes reimbursement and when it is separate. But it often does. *See, e.g.*, 11 U.S.C. § 330(a)(1) (providing separately for "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses"); 46 U.S.C. § 53910(f)(2) (specifying that "compensation may include an allowance for expenses reasonably incurred"). The upshot is that § 1395w-21(j)(2)(D) does not authorize CMS to regulate payments to FMOs *at all* inasmuch as those payments are reimbursement for costs incurred.

### 2. The statutory structure and surrounding words confirm that the Rule exceeds CMS's authority under § 1395w-21(j)(2)(D)

**a.** Even if administrative fees paid to FMOs could be considered "compensation" as an academic matter, the broader statutory context forecloses CMS's view that § 1395w-21(j)(2)(D) gives it rate-setting authority over those payments. *See United States v. Palomares*, 52 F.4th 640, 642-643 (5th Cir. 2022) (cleaned up) (calling for a "holistic" analysis of statutory text).

Congress directed CMS to set "guidelines" for the "use of compensation," and then only to ensure that "agents and brokers" are incented "to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). In CMS's view, this narrow grant of power flat-out "prohibits any compensation" related in any way to MA plan marketing unless it satisfies CMS's detailed and inflexible rules concerning who may pay whom, how much, and under what circumstances. This command-economy interpretation of the statutory text stretches its meaning well beyond the breaking point.

Consider first the statutory structure and context within which paragraph (j)(2)(D) appears. Paragraph (j)(2) is just one half of a broader subsection. The first half of that subsection, (j)(1), describes certain "prohibited activities." That stands in contrast with (j)(2), which describes only "limitations" on certain other activities—activities that by necessary implication are *not* prohibited. Thus, when (j)(2)(D) says that CMS shall establish guidelines for the "use of compensation," it cannot be taken to mean, as CMS insists, that "the statute *prohibits* any compensation (regardless of who the direct recipient is) except compensation allowed by" CMS. CMS PI Br. 25 (emphasis altered). If Congress had intended for (j)(2)(D) categorically to prohibit all non-authorized compensation, it would have placed paragraph (D) under (j)(1), which provides for "prohibited activities." That Congress codified it instead under (j)(2) is a clear indication that it meant only for CMS generally to provide guardrails for the "use of compensation" and not to "prohibit" activities described in the paragraph.

Consider next the word "guidelines." The statute contemplates that CMS will establish "*guidelines*" for the "use of compensation." 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added). Guidelines are general standards that allow for some flexibility and judgment in application, distinct from "rigid mandates" (*Burbridge v. CitiMortgage*, 37 F.4th 1049, 1052 (5th Cir. 2022)) or "mechanical requirements" (*United States v. White*, 869 F.2d 822, 829 (5th Cir. 1989)); *accord Watkins v. Scott Paper*, 530 F.2d 1159, 1184 (5th Cir. 1976) ("guidelines are intended as just that, guidelines rather than rigid rules").

CMS's prior approach of requiring that administrative payments "not exceed the value of those services in the marketplace" (42 C.F.R. § 422.2274(e)(1) (2023)), would establish a guideline. That regulatory approach set a general parameter, allowing for judgment in application. But no one would call a fixed quantitative cap on payments for administrative services at $100 per enrollee a guideline. A specific payment cap is a rigid rule and affirmative mandate, leaving no room for judgment or discretion.

Here, the words "compensation" and "use" must be read with attention to the word "guideline." Even supposing that CMS's authority to set limitations on the "use of compensation" could be interpreted as the power to set *rates* of compensation (it cannot), here the word "guideline" forecloses that approach. Again, a specific rate-setting rule is not a guideline as that term is commonly understood.

**b.**  Consulting other provisions of the Medicare statute confirms that Congress did not grant CMS rate-setting authority over payments to FMOs. Where Congress means to empower CMS with such authority elsewhere in the Medicare statute, it says so expressly. Take, for example, 42 U.S.C. § 1395ww(a)(1)(A)(i), which authorizes CMS to "determine[e] the amount of the payments that may be made under" traditional Medicare to hospitals for (in that case) inpatient services. Congress instructed CMS to promulgate rules that "specify the amounts, form, and manner in which such payments will be made." *Id*. § 1395ww(k)(1). These provisions demonstrate

that when Congress means to grant granular rate-setting authority, it gives the power clearly and expressly, rather than speaking vaguely in terms of "guidelines" to "ensure" the achievement of general goals.

In fixing the boundaries of authority that § 1395w-21(j)(2)(D) delegates to CMS, the Court must "'consider not only the bare meaning' of the critical word[s] or phrase[s] 'but also its placement and purpose in the statutory scheme.'" *Holloway v. United States*, 526 U.S. 1, 6 (1999) (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)). While dictionary definitions are of course a matter of central importance, the Court "must not be guided by a single sentence or member of a sentence" studied in the academic abstract; it must instead "look to the provisions of the whole law, and to its object and policy." *Kelly v. Robinson*, 479 U.S. 36, 43 (1986) (quoting *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 221 (1986)).

Here, the purpose of the scheme is spelled out expressly: Congress adopted § 1395w-21(j)(2)(D) to ensure that incentives are aligned for "agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." That narrow aim suggests that § 1395w-21(j)(2)(D) grants CMS authority to regulate compensation that, if left unregulated, has the potential to lead agents and brokers to act in their own interests rather than beneficiaries' interests. That includes compensation paid directly by MAOs to independent agents and brokers. It may also include amounts paid to FMOs in excess of fair market value for the administrative services provided, given the theoretical possibility that FMOs could be used by MAOs to route additional "compensation" to agents and brokers (a possibility of which there is no actual evidence). But by purporting to dictate rates for MAO-to-FMO payments beyond a simple fair-market-value guideline, the Rule oversteps CMS's authority under § 1395w-21(j)(2)(D).

Against this background, CMS's bid for unlimited regulatory authority over all payments with any relation to MA plan marketing cannot succeed. Its position might make sense if Congress had drafted a different statute—if it had empowered CMS "to specify by rule the amounts, form,

and flow of compensation paid by MAOs to all third parties," like its rate-setting power under traditional Medicare. But that is not what the statute says. Using clear language, Congress directed the agency only to set general parameters to guide the use of compensation to ensure that agents and brokers will act in the best interest of beneficiaries. The Rule far exceeds that limited direction.

### B.     Congress has not given CMS roving enforcement authority to promote competition in the Medicare Advantage marketing industry

CMS offered a second explanation for its extra-statutory focus on payments by MAOs to third-party FMOs, but that rationale is equally untethered to any statutory text.

According to the preamble to the final Rule, CMS adopted its new regulation of administrative fees, newly designated as "compensation," in an effort to advance "the Administration's policy goals to promote a fair, open, competitive marketplace." *See* 89 Fed. Reg. at 30618-30619. In particular, CMS set out to "deter anti-competitive practices" on the part of MAOs, agents, brokers, and third parties like FMOs. CMS asserted without evidence that the MA marketplace "has become increasingly consolidated." *Id*. at 30617. It speculated that growing administrative fees paid by MAOs to FMOs might "create a situation where there is an unlevel playing field among plans," because larger MA plans are able to pay FMOs richer fees than can than smaller, more locally based MA plans. *Id*. at 30618. "If left unaddressed," the agency baldly surmised, this situation would produce "anticompetitive results," as smaller plans that are less able to pay large fees to FMOs lose enrollees to larger, national plans who can. *Id*. at 30619.

Even supposing there were evidence to support that position—there is not—it touches on a field of regulation in which Congress has given CMS no authority to act. "Congress enacts laws that define and, equally important, circumscribe the power of the Executive to control the lives of the citizens." *Chamber of Commerce v. U.S. Department of Labor*, 885 F.3d 360, 387 (5th Cir. 2018). "Sometimes, however, agencies 'defy Congressional limits' and aggrandize powers to themselves that Congress never granted." *Kovac v. Wray*, 660 F. Supp. 3d 555, 563-564 (N.D. Tex. 2023). When they do so, they act beyond their authority and in violation of the APA. *Id*.

18

Just so here. Again, § 1395w-21(j)(2)(D) directs CMS to establish "guidelines" for the "use of compensation" to help ensure that "agents and brokers" are incentivized "to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." No more. There is not even a hint in that language that Congress intended to appoint CMS as an antitrust regulator for markets peripheral to the MA program, setting rate caps for third-party services to "level the playing field" and "promote[] competition." 89 Fed. Reg. at 30621.

Given the complete absence of authority under § 1395w-21(j)(2)(D) for CMS to enforce antitrust principles in the Medicare Advantage marketing industry, CMS unsurprisingly did not cite § 1395w-21(j)(2)(D) to justify its regulatory effort to "deter anti-competitive practices engaged in by Medicare Advantage organizations, agents, brokers, and [FMO]s." *Id.* at 30619. Instead, CMS cited its supposed authority under Executive Order No. 14036, 86 Fed. Reg. 36987 (July 14, 2021) (Executive Order 14036).

There are two clear problems with that approach. First, "[i]t is axiomatic that administrative agencies may issue regulations only pursuant to authority delegated to them by *Congress*." *MCR Oil Tools, LLC v. U.S. Department of Transportation*, 110 F.4th 677, 687 (5th Cir. 2024) (quoting *American Library Association v. FCC*, 406 F.3d 689, 691 (D.C. Cir. 2005)) (emphasis added). That an agency's authority must come from a *congressional* delegation is a "fundamental principle[] deriving from the Constitution's separation of powers." *Chamber*, 885 F.3d at 387. But Congress does not issue executive orders, the President does. Second, Executive Order 14036 does not purport to confer any authority on CMS in any event. The Order cites as its own statutory basis "[t]he antitrust laws, including the Sherman Act, the Clayton Act, and the Federal Trade Commission Act." *See* 86 Fed. Reg. at 36989. None of those laws, however, empowers CMS to do anything.

In its stay briefing, CMS resorted to yet a different purported source of statutory authority for its regulatory effort to "level the playing field" and "promote[] competition." 89 Fed. Reg. at

19

30621. Stitching together piecemeal delegations of power to regulate various aspects of Medicare Advantage and Part D in specific ways, CMS divined a general congressional mandate "to ensure a level playing field to allow effective competition among plans." CMS Stay Br. 5. But even supposing Congress silently intended the agency to foster "effective competition" (which is an implausible stretch), it did so only by directing CMS to undertake particular, discrete tasks, such as auditing MAOs and recouping overpayments. *See* CMS Stay Br. 5-6. And "when Congress has made" such "explicit delegation[s] of authority to an agency," it "stands to reason" that "Congress did not intend to delegate additional authority *sub silentio*," especially not sweeping authority like that asserted here. *Texas v. United States*, 497 F.3d 491, 503 (5th Cir. 2007).

At bottom, Congress has not delegated CMS any rulemaking authority to police competition policy. Inasmuch as the agency adopted the Rule as a tool to "deter anti-competitive practices" (89 Fed. Reg. at 30617), it exceeds the agency's statutory authority.

## II.    THE RULE IS ARBITRARY AND CAPRICIOUS

In addition to asserting sweeping regulatory authority that Congress has never delegated to CMS, the Rule does not reflect "reasoned decisionmaking" by the agency, thus falling afoul of the APA's prohibition on arbitrary and capricious agency action. *Loper Bright*, 144 S. Ct. at 2263 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)); *see* 5 U.S.C. § 706(2)(A).

"To survive an arbitrary and capricious challenge, the agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Amin*, 24 F.4th at 393 (quoting *State Farm*, 463 U.S. at 43). Agencies must base their rulemaking decisions on "logic and evidence, not sheer speculation." *Sorenson Communications Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014). A reviewing court "does not 'defer to the agency's conclusory or unsupported suppositions.'" *Texas v. Becerra*, 575 F. Supp. 3d 701, 720 (N.D. Tex. 2021) (quoting *United Technicians v. U.S. Department of Defense*, 601 F.3d 557, 562 (D.C. Cir. 2010)).

Moreover, in assessing whether an agency has adequately explained its decisions, a reviewing court "must disregard any *post hoc* rationalizations of the [agency's] action and evaluate it solely on the basis of the agency's stated rationale at the time of its decision." *ExxonMobil Pipeline Company v. U.S. Department of Transportation*, 867 F.3d 564, 571 (5th Cir. 2017) (quoting *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012)). An "agency is not free to defend its decision by supplying new, post hoc rationalizations for it when sued." *Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357, 371 (5th Cir. 2024) (en banc).

In its explaining its decisions, an agency furthermore must "consider and explain its rejection of . . . significant, viable and obvious alternatives" (*10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 724 (5th Cir. 2013) (cleaned up)), including "alternatives that are within the ambit of existing policy" (*Louisiana v. U.S. Department of Energy*, 90 F.4th 461, 476 (5th Cir. 2024) (cleaned up)). An "agency violates the arbitrary-and-capricious standard if it fails to respond to significant points and consider all relevant factors raised by the public comments." *Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (cleaned up).

Finally, when an agency's "prior policy has engendered serious reliance interests," it "*must* provide a 'detailed justification' for its change." *Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357, 381 (5th Cir. 2024) (en banc) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

The Rule here is arbitrary and capricious for any one and all of those reasons. CMS's diagnosis of supposed problems in the Medicare Advantage marketing industry, and the solutions it adopted to address these perceived problems—setting a prescribed cap on compensation for FMO-provided services of $100 per enrollee, and imposing new restrictions on the sharing of personal beneficiary data—are founded on unsupported speculation and pervasively defective and incomplete reasoning.

### A.    CMS cited no evidence that agents and brokers are circumventing compensation rule using excessive administrative fees paid to FMOs

**1. Lack of evidence of any problem requiring agency action.** CMS justified the final Rule's regulatory overhaul as a response to a rise in improper Medicare Advantage marketing practices. Pursuant to these undefined, unelaborated practices, Medicare beneficiaries are supposedly being pressured by independent agents and brokers to enroll in MA plans that do not fit best with their health care needs. Speculating about the source of this purported trend, CMS asserted without supporting evidence that fees paid for administrative and other support services were "rapidly increasing," surmising as a result that excess fees are being used to "effectively circumvent" caps on agent and broker compensation by paying illegal bonuses that create "questionable financial incentives" for agents and brokers to "prioritize enrollment in some plans over others" irrespective of fit with beneficiaries' health care needs. 89 Fed. Reg. at 30617-30619, 30622; *see also id*. at 30449.

The factual premises of these apparent problems are entirely imaginary. Take CMS's assertion that administrative payments have ballooned beyond their market value. In the notice of proposed rulemaking, CMS stated that it "*believe[s]* payments categorized by MA organizations as 'administrative expenses,' paid by MA organizations to agents and brokers, have significantly outpaced the market rates for similar services provided in non-MA markets." 88 Fed. Reg. at 78554 (emphasis added). As support for this "belief"—an odd characterization for what should be an objectively verifiable fact—CMS alluded to (but did not provide) "information shared by insurance associations and focus groups and published in research articles." *Id*. The only concrete source CMS cited to substantiate its "belief" was a single study by a private entity, which itself relied on personal anecdotes from just 29 agents and brokers. *See* The Commonwealth Fund, *The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents* (Feb. 28, 2023), https://perma.cc/-67WG-7NDF (cited in 88 Fed. Reg. at 78554 nn.136-137).

22

Commenters highlighted the evidentiary inadequacy of the Commonwealth Fund's report. *See* Council for Medicare Choice Comment Letter AR 6311-6314 (CMC Comment Letter), https://perma.cc/DN2F-7TE5; Greenberg Traurig Comment Letter AR 9940, https://perma.cc/7FQ5-XEGH. Among other things, commenters showed that 29 anecdotal accounts concerning payment arrangements in a complex market cannot possibly constitute a statistically significant analysis of the approximately 100,000 health insurance agents and brokers serving 30 million MA beneficiaries throughout the United States. CMC Comment Letter AR 6311-6312.

But although the Commonwealth Fund report constituted "CMS's central evidence" for its assertion that administrative payments have significantly outpaced market rates, CMS "failed to sufficiently respond" to these public comments pointing out the deficiencies in the report, as this Court already recognized. *See Americans for Beneficiary Choice*, 2024 WL 3297527, at *5. The preamble to the final Rule simply restates verbatim the same "belief" concerning increased administrative expenses, continuing to rely solely on the Commonwealth Fund report. *See* 89 Fed. Reg. at 30619 nn. 154, 155. And as to that lone citation, the agency made no effort to explain in the preamble to the final Rule why, in the face of significant critical comments, it was reasonable to continue to rely on a study drawing conclusions about industry-wide payment arrangements from a mere sample of 29 anecdotal accounts.

CMS thus wholly failed in its related obligations to respond meaningfully to substantial comments received (*see Huawei*, 2 F.4th at 449) and, in turn, to furnish adequate evidence rather than "conclusory or unsupported suppositions" (*Texas*, 575 F. Supp. 3d at 720).

**2. Lack of evidence linking FMO fees with agent/broker behavior.** As for CMS's contention that rising administrative payments are being used to fund improper bonuses for agents and brokers that create misaligned financial incentives, this too rested on nothing more than a series of conjectures.

23

CMS expressed concern that "rapidly increasing" payments to FMOs for administrative fees "*may*" be being used to "influence or obscure the activities of agent and brokers." 89 Fed. Reg. at 30618 (emphasis added). It explained only that it, again, "*believe[s]* these financial incentives are contributing to" abusive marketing behaviors. *Id*. In turn, it suspected that unidentified abusive practices "are driving an increase in Medicare Advantage marketing complaints received by CMS in recent years" based on a bare correlation: "these types of complaints have escalated at a pace that mirrors the growth of administrative or add-on payments." *Id*. (emphasis added).

CMS guessed that this asserted (but undocumented) rise in MA marketing complaints "*suggests* that agents and brokers are being influenced to engage in high pressure tactics." *Id*. at 30617-30618 (emphases added). The agency thus "*contend[ed]*" that administrative payments "are being misused" by some MA plans "to pay agents and brokers over and above the CMS-set compensation limits" in order to "encourage agents and brokers to enroll individuals in their plan over a competitor's plan." *Id*. (emphases added). These conjectures are consistent with the agency's presumptions in the notice of proposed rulemaking, where it likewise expressed vague and unexplained worry that independent agents and brokers are facing "questionable financial incentives" from FMOs, which "are *likely* to influence which MA plan an agent encourages a beneficiary to select during enrollment." 88 Fed. Reg. at 78552 (emphasis added).

CMS's failure to support its theory that FMOs are using excess administrative fees improperly to influence independent agents and brokers is fatal under the APA. Agencies, including CMS, bear an obligation to base decisionmaking on "logic and evidence, not sheer speculation." *Sorenson*, 755 F.3d at 708. This evidentiary failure compounds a further departure from the APA's expectation of reasoned decisionmaking: that CMS's hypothesized dynamic is, on its face, illogical. The whole point of the current market structure is that neither FMOs, nor the independent agents and brokers they work with, are beholden to MAOs. By design, both are paid uniformly

24

regardless of the particular plan an enrollee selects among a particular MAO's offerings. It is therefore unclear what incentive FMOs would have to concoct a scheme to entice agents and brokers to favor some plans over others.

**3. Failure to substantiate or verify allegations in complaints.** Supposedly driving CMS's concern about improper incentives was an asserted rise in beneficiary complaints about agents and brokers. While these marketing complaints formed the factual lynchpin for the subsequent guesswork that the agency relied on to link excess administrative payments with high-pressure marketing tactics in selling MA plans, CMS furnished no evidence—*none*—to support their existence or veracity. The agency merely stated that it had "received complaints from a host of different organizations," to the effect that independent "agents and brokers are being paid, typically through various purported administrative and other add-on payments, amounts that cumulatively exceed the maximum compensation allowed under the current regulations." *Id*.; 89 Fed. Reg. at 30617.

The rulemaking record is devoid of any indication that the agency tested the veracity of these complaints or attempted in any way to analyze or extrapolate from them. This matters because no system is perfect—there always will be bad apples whose actions warrant a complaint. But one complaint, taken alone, does not necessarily portend a pattern or a system-wide problem. Determining whether there is such a problem requires real, data-driven analysis. The evidence here leaves no indication that the agency actually undertook such an analysis. Like the Commonwealth Fund report, the evidentiary value of the alluded-to-but-never-identified complaints did not rise above the purely anecdotal.

**4. CMS's denial of any obligation to produce or rely on evidence.** In response to all of this, CMS took the astonishing position in its stay brief (at 43) that, in the Fifth Circuit, there is no "requirement to disclose specific factual material" in a rulemaking, even when that factual material is the lynchpin of the rule. It also said (at 33) that it had no obligation to ground its decision on

"empirical evidence" at all. It was enough, according to CMS (*id.*), to throw out an abstract "analysis of incentives" without regard for real-world facts.

That is wrong. The Fifth Circuit has recognized that, in the rulemaking context, "fairness requires that the agency afford interested parties an opportunity to challenge the underlying factual data relied on by the agency." *Chemical Manufacturers Association v. EPA*, 870 F.2d 177, 200 (5th Cir. 1989). "It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of data that, in critical degree, is known only to the agency." *Air Products & Chemicals, Inc. v. FERC*, 650 F.2d 687, 699 n.17 (5th Cir. 1981) (cleaned up) (quoting *Portland Cement Association v. Ruckelshaus*, 486 F.2d 375, 393 (D.C. Cir. 1973)). Thus, "[t]he most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (quoting *Air Transport Association of America v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999)).

And CMS is assuredly wrong that it had no duty to ground the Rule on facts and evidence. Few standards are better settled in administrative law than that an agency "must examine the relevant data and articulate a satisfactory explanation for its action," including at minimum "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. It should go without saying that, for an agency to find facts, it must have evidence *of* those facts.

CMS's stay brief made this clear—it described (at 34) the "ultimate issue" in the rulemaking as whether "administrative payments affect agent and broker incentives." That is an empirical question, not one answered with ineluctable logic. There are some circumstances in which the answer could be yes—such as when administrative payments exceed fair market value and there is evidence they are being used by MAOs to funnel additional compensation to agents and brokers. *See* 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021). But there are other cases in which the answer would be no—such as when the payments do not exceed market rates and there is no evidence that agents and brokers are personally gaining from per-enrollment, market-rate pay-

ments to FMOs (the case here). That position all but concedes that it did not disclose any evidence concerning the "ultimate issue" in the rulemaking. All it offered was "conclusory [and] unsupported suppositions." *Texas*, 575 F. Supp. 3d at 720; *see* Opening Br. 14-17. That is fatal, because, again, agencies must base rulemakings on "logic and evidence, not sheer speculation." *Sorenson*, 755 F.3d at 708.

**5. CMS provides post-hoc rationalizations.** Notwithstanding its denial of any obligation to produce "empirical evidence," CMS has tried to backfill the evidentiary holes that it left in the Federal Register. On pages 12-13 of its stay brief, for example, the agency recited various "financial data" concerning FMO payments. It then asserted on page 32 that "observations of market participants" suggest that certain "add-on [administrative] payments inflated agent and broker compensation." It then cited (*id.*) to analyses of "publicly reported deals" to support its extra-statutory "concern about market concentration." But none of that appeared in the Federal Register. The agency cannot overcome a failure to support the Rule during the comment period by "provid[ing]" the supposed evidence "to a single party during a post hoc judicial proceeding." *Window Covering Manufacturers Association v. Consumer Product Safety Commission*, 82 F.4th 1273, 1284 (D.C. Cir. 2023). To do so is to "supply[] new, post hoc rationalizations" for the Rule in court, violating the basic ground rules for administrative actions like this. *See Wages & White Lion*, 90 F.4th at 371.

Even on their own terms, CMS's new evidence and explanation fall short. It adorned its reasoning with new citations to (selectively curated pieces of) the administrative record, but its position still boils down to speculation and surmise. For example, in its stay briefing, CMS merely speculated what large FMOs "might receive" compared with what small FMOs "might receive." CMS Stay Br. 12. It speculated further that "payments might vary" depending on the services offered. That surmise, weak as it is, adds only to anecdotal reports, such as what took place at "one meeting with a large plan," and how "one plan['s] . . . rewards point system" works. *Id.* at 13.

None of this comes close to the well-supported analysis that would be necessary to justify and implement a rule that sets rates across an entire market. Commenters objected to the many leaps of fact and logic contained throughout the Rule's preamble, but CMS ignored virtually all of those objections. Its equally flawed reasoning in the stay briefing cannot save the Rule.

**B.    CMS ignored the significant reliance interests that have built up around the longstanding prior regulatory regime**

**1.**    There is no question that CMS abandoned a 16-year-old status quo when it suddenly defined administrative fees paid to FMOs as part of the regulated "compensation" under the statute, now subject to a $100 hard cap. Between 2008 and 2024, CMS consistently excluded administrative fees from "compensation" under 42 U.S.C. § 1395w-21(j)(2)(D) and regulated such payments for administrative services separately. By defining "compensation" to encompass payments to cover any administrative costs and subsuming such payments under the fixed cap on compensation, the Rule abruptly abandoned the agency's longstanding interpretation of "compensation" and repudiated the regulatory approach that had governed the Medicare Advantage marketing industry for 16 years.

While "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). An "unexplained inconsistency in agency policy is a reason for holding an [action] to be an arbitrary and capricious change from agency practice." *R.J. Reynolds Vapor Company v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Encino Motorcars*, 579 U.S. at 222). When an agency changes its existing position, it must, "[a]t a bare minimum, . . . display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* (cleaned up). The APA's demand that an agency explain its change in position is especially insistent when the agency's "prior policy has engendered serious reliance interests that must be taken into account"; in that

28

case, it "*must* provide a 'detailed justification' for its change." *Wages & White Lion*, 90 F.4th at 381 (quoting *Fox Television*, 556 U.S. at 515).

As this Court already observed, CMS failed to meet even the bare minimum requirements to explain its reversal of its longstanding position. *See Americans for Beneficiary Choice*, 2024 WL 3297527, at *4. At no point in the rulemaking did CMS acknowledge that it was upending a 16-year-old status quo, characterizing the far-reaching changes the Rule imposes on the Medicare Advantage marketing industry merely as "further updates" to the regulatory landscape. 89 Fed. Reg. at 30617. And the agency's only apparent explanation for its change in policy appears to be its concern that the "growth of administrative or add-on payments" is sparking an escalating "bidding war" among MAOs and FMOs. 88 Fed. Reg. at 78552-78553. But that is no explanation at all—CMS articulated the same worry back in 2008 but did not then believe it warranted direct regulation of administrative fees as "compensation." *See* 73 Fed. Reg. at 67410.

Moreover, the agency ignored the concerns raised by several commenters about the impact that the Rule's regulatory upheaval would have on their very serious reliance interests on the status quo. *See, e.g.*, CMC Comment Letter, at AR 6304; IMG Comment Letter (AR 3257-5260); SelectQuote Comment Letter (AR 714-715). Where CMS did acknowledge comments calling attention to reliance interests, the agency offered no meaningful response. For instance, CMS noted concern among numerous commenters that, "because many agents and brokers rely on the payment of administrative fees" from MAOs to FMOs to fund essential services that support their work, CMS's new policy would disable FMOs from providing agents and brokers with these services, without which they could not "effectively accomplish their enrollment work." 89 Fed. Reg. at 30624. But far from offering a "detailed justification" for its new policy that addressed these concerns, CMS blithely stated only a "belie[f]" that agents and brokers could use the higher compensation payments they received "to decide which [FMO] services are truly essential and how much those services are worth"—without undertaking even a basic economic analysis to

predict the impacts of the Rule's regulatory upheaval on the Medicare Advantage marketing industry. *Id*. Here, again, CMS fell well short of the bare minimum required by the APA for reasoned decisionmaking.

    **2.**  These omissions are especially stark because CMS offered no explanation why it chose to break from 16 years of settled practice rather than simply enforcing rules and guidelines that were already on the books. On this front, it offered only the limp aspiration that it "*expected*" rate-setting for administrative fees to "eliminate a significant method which some plans *may* have used to circumvent the regulatory limits on enrollment compensation," which would "*hopefully*" free independent agents and brokers "from undue influence" by MAOs and FMOs. *Id*. at 30622-30623 (emphases added).

    Yet while CMS was supposedly concerned that agents and brokers were being "offered bonuses and perks . . . framed as allowable administrative add-ons in exchange for enrollments" (*id*. at 30617), the agency neglected to acknowledge that its existing regulations already defined "[b]onuses," "[g]ifts," and "[p]rizes or awards" as "compensation" subject to the limits on agent and broker compensation. *See* 42 C.F.R. § 422.2274(a)(i) (2023). By failing to explain why it rejected the obvious alternative of stepping up enforcement of existing rules and guidelines, CMS fell far short of its obligations to offer reasoned explanations for its sharp break from settled practice. *See 10 Ring Precision*, 722 F.3d at 724; *Louisiana*, 90 F.4th at 476.

    **3.**  In its stay briefing, CMS invoked (at 29-30) its past policy and practice as *support* for its new approach to § 1395w-21(j)(2)(D). But that attempt to suggest continuity fails. To be sure, CMS is correct (*id*. at 30) that it "has consistently regulated . . . payments" for administrative services "since the statute's passage in 2008." *See* 73 Fed. Reg. 67406, 67410 (Nov. 14, 2008). It is wrong, however, to conclude that the agency thus has always treated such payments as "compensation" within the ambit of § 1395w-21(j)(2)(D).

Before its final Rule, CMS had adopted a fair-market-value (FMV) rule for administrative payments according to which "the amount paid to [a] third party" such as an FMO to "perform services" other than selling insurance products "must be fair-market value." 42 C.F.R. § 422.2274(a)(1)(iv) (2008). The agency varied the language of the FMV rule over time, but the standard remained substantively unchanged for 16 years. *See* 42 C.F.R. § 422.2274(a)(1)(iv)(B) (2011) ("The amount paid to the third party for services other than selling insurance products, if any, must be fair-market value."); 42 C.F.R. § 422.2274(e)(1) (2023) (administrative payments "for services other than enrollment of beneficiaries . . . must not exceed the value of those services in the marketplace").

Although it affected payments to FMOs, the FMV rule is in fact a regulation of compensation to agents and brokers: By limiting payments to FMOs to fair market value, CMS ensured that MAOs could not funnel additional compensation to agents and brokers through FMOs. *See* 86 Fed. Reg. 5864, 5994 (Jan. 19, 2021). Understood in that way, there is no inconsistency between the FMV rule and CMS's express exclusion of administrative payments from "compensation" subject to § 1395w-21(j)(2)(D). The idea is simply that any payment to an FMO above the fair-market value of the administrative services rendered is not in fact a payment for administrative services at all—it is a payment for something else. And because there is a possibility that it is a payment "to circumvent the limits on compensation to agents and brokers," it is properly regulated as touching the "use of compensation" under § 1395w-21(j)(2)(D). 86 Fed. Reg. at 5994.

But at the same time, fair-market-value payments to FMOs are (and prior to the Rule, always had been) properly classed as "[p]ayments *other than* Compensation." CY2018 Medicare Marketing Guidelines, Section 120.4.4 (July 20, 2017) (emphasis added); *accord* 86 Fed. Reg. at 5994, 6114 (characterizing "administrative payments" to FMOs for "services other than enrollment of beneficiaries" as "[p]ayments other than compensation"). Expressly treating payments from MAOs to FMOs as "compensation" to agents and brokers, and subjecting those

31

payments to a hard price cap, is thus manifestly a break from 16 years of past practice. CMS was required by settled law to acknowledge the change in position and explain it. *Encino Motorcars*, 579 U.S. at 221. It did not do so, and the Rule must therefore be vacated.

### C.   CMS did not satisfactorily explain how it settled on a compensation cap of $100 per enrollee to account for administrative fees

Congress rarely grants agencies rate-setting authority, and we already have shown that it did not do so here. But even supposing this was one of those rare circumstances in which Congress did mean to grant such power, CMS did not exercise it rationally.

In most such cases, agencies will set rates based on the "cost of providing services" plus "a reasonable return on investment." *Sierra Club v. FERC*, 38 F.4th 220, 228-29 (D.C. Cir. 2022). Otherwise, a regulation will run into Takings Clause problems and will drive private participants from the market. (Here, that would mean an exodus of agents and brokers from the MA marketing industry, depriving beneficiaries of assistance they need to select a plan that suits their needs and defeating the point of § 1395w-21(j)(2)(D).) But these calculations are not made from whole cloth; similar to the economic analyses needed for rationally supported competition regulations, any rate-setting endeavor requires "elaborate economic models" and "voluminous" data. *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 21 (D.C. Cir. 1984), *overruled on other grounds*, 857 F.2d 1516 (D.C. Cir. 1988).

CMS did nothing like that here. As the Court has already noted, CMS "never substantiated" its decision to cap compensation for FMO services to a fixed $100 per enrollee. *Americans for Beneficiary Choice*, 2024 WL 3297527, at *4. In its original notice, CMS had proposed $31 as the per-enrollment cap for administrative fees. 88 Fed. Reg. at 78556. Commenters objected that this amount was too low adequately to capture the costs of providing the full range of administrative services that FMOs provide. In response, CMS acknowledged—without a word of empirical explanation—that its proposed payment cap did not "adequately account[] for the array" of

administrative services. 89 Fed. Reg. at 30625. But then, instead of attempting to quantify an amount that *would* adequately account for the cost of providing administrative services—an attempt that rightly would have required "elaborate economic models" and "voluminous" data (*Laffey*, 746 F.2d at 21)—CMS more than tripled its initial proposal (showing just how untethered from reality it was) and selected $100 instead, without offering any opportunity for the public to comment on the $100 rate. Its only attempt at explanation was to observe that "[s]everal commenters suggested that an increase of $100 would be an appropriate starting point." *Id*. at 30626.

That is no reason at all, and the agency gave no other explanation why it agreed with the commenters proposing $100. Indeed, it did not even identify *who* the commentators were or why *they* suggested $100—a notable omission, given that other commenters "suggested an increase of $200 or more." *Id*. CMS's response was simply to shrug its shoulders, complain that "it would be extremely difficult for [it] to accurately" estimate the cost of necessary administrative services, and pick a number apparently at random. *Id*. at 30625, 30626.

That is not sufficient under the APA. When selecting among commenters' "competing proposals," an agency must engage in its own, independent efforts to "rationally analyze the various issues" and select a position based on evidence and reasoning. *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1256 (D.C. Cir. 2021) (vacating agency decision "embracing a 'middle-of-the-road approach'" without reasoned explanation). And it cannot escape its obligation to adequately explain its decision "merely insisting that administrative costs are unquantifiable." *Americans for Beneficiary Choice*, 2024 WL 3297527, at *4. To engage in guesswork because it would be too difficult to accurately quantify the full range of administrative costs is ground for issuing no rule at all, and not for refusing "a satisfactory explanation for [the agency's] action including a rational connection between the facts found and the choice made." *Amin*, 24 F.4th at 393 (quoting *State Farm*, 463 U.S. at 43).

33

### D.    CMS's concerns about anti-competitive practices were similarly speculative

CMS's asserted detection of anti-competitive practices in the Medicare Advantage market-
ing industry is likewise unsupported by reliable evidence. Discerning problems of market con-
centration and supra-competitive pricing requires a complex and data-driven approach, involving
"an economic analysis defining the relevant markets, establishing . . . monopoly power, [and]
showing anticompetitive effects." *Janvey v. Alguire*, 847 F.3d 231, 250 n.33 (5th Cir. 2017)
(Higginbotham, J., concurring) (quoting *American Express Co. v. Italian Colors Restaurant*, 570
U.S. 228, 245 (2013)). Without anything close to that kind of rigorous analysis, CMS simply
announced an "observ[ation]" that "the MA marketplace, nationwide, has become increasingly
consolidated among a few large national parent organizations." 89 Fed. Reg. at 30617.

From this unsupported assertion, CMS offered the speculative concern that larger MA
plans in the supposedly consolidated Medicare Advantage marketplace "*presumably* have greater
capital to expend on sales, marketing, and other incentives and bonus payments to agents and
brokers than smaller market MA plans." *Id*. (emphasis added). The agency then piled conjecture
on top of speculation, suggesting—without evidence—that because "[l]arger, national MA plans
are *likely* able to more easily shoulder" the cost of administrative payments to FMOs, increases in
administrative fees paid to FMOs have "resulted in a 'bidding war' among MA plans to secure
anti-competitive contract terms with FMOs." *Id*. at 30618-30619 (emphasis added). CMS further
predicted that this purported bidding war "will continue to escalate with anti-competitive results."
*Id*. at 30619. The agency cited no market studies or economic analyses to support any of this,
offering only surmise.

Of course, we already have shown that CMS has no authority to adopt rules to promote
competition. But either way, such "conclusory or unsupported suppositions" do not satisfy the
reasoned decisionmaking mandated by the APA. *United Technicians*, 601 F.3d at 562.

### E.    CMS did not satisfactorily justify the Rule's new restrictions on the sharing of personal beneficiary data

The Rule's new limitation on sharing or distributing "personal beneficiary data," requiring a beneficiary's "prior express written consent" before such data collected by an FMO may be shared with another FMO, also is arbitrary and capricious and should be vacated.

This new restriction will greatly undermine the ability of FMOs to support independent agents and brokers. *See* 42 C.F.R. §§ 422.2274(g)(4), 423.2274(g)(4) (as amended). As commenters pointed out during the rulemaking, beneficiary "data distribution is already governed by other statutes that conflict with" this restriction on the sharing of personal beneficiary data. 89 Fed. Reg. at 30603. In particular, the HIPAA regulatory framework governs the use and disclosure of PHI, defined broadly as "individually identifiable health information" that is "[t]ransmitted or maintained" in any "form or medium." 45 C.F.R. § 160.103. PHI therefore overlaps substantially with the "personal beneficiary data" that the Rule seeks to regulate, as CMS itself recognized when it warned FMOs that "the HIPAA Privacy Rule must be followed" and reminded them of their responsibility to determine their overlapping obligations under the HIPAA Privacy Rule and then Rule's new restrictions on sharing "personal beneficiary data." 89 Fed. Reg. at 30604.

The HIPAA Privacy Rule establishes a complex regulatory framework that does not seek singly to maximize the individual interest in maintaining the confidentiality of their PHI. Rather, it balances that interest with a countervailing interest in promoting responsible obtaining, using, or disclosing PHI—an interest which the regulations sometimes prioritize over the individual's interest in privacy. *See Standards for Privacy of Individually Identifiable Health Information*, 54 Fed. Reg. 82462, 82464 (Dec. 28, 2000) ("The rule seeks to balance the needs of the individual with the needs of the society."); *id.* at 82472 ("The need to balance [the] competing interests . . . of protecting privacy and the public interest in using identifiable health information for vital public and private purposes . . . causes much of the complexity in the rule."); *see also* Barbara J. Evans, *The HIPAA Privacy Rule at Age 25*, 50 Fla. St. U. L. Rev. 741, 748 (2023) (noting that the Privacy

Rule includes 25 legal pathways for "moving patients' health data into a wide variety of secondary uses without individual authorization").

In particular, the HIPAA Privacy Rule permits and encourages necessary sharing of PHI, including "personal beneficiary data" under the Rule, between entities under common control or ownership. *See* 45 C.F.R. § 164.105(b). It likewise permits and promotes necessary sharing of PHI encompassing "personal beneficiary data" under the Rule between third party marketing organizations that act as "business associates" of covered entities. *See* 45 C.F.R. §§ 164.105(a)(2)(iii), 164.314. Yet the final Rule here prohibits sharing "personal beneficiary data" under both circumstances, despite that HIPAA authorizes—and by purpose and design, encourages—such sharing. And such sharing is an essential part of the service that FMOs provide to independent agents and brokers, providing them with the leads they need to do their jobs effectively. A7-A8 ¶ 37. This element of the Rule will leave many elderly would-be enrollees to fend for themselves, without the essential help of independent agents and brokers to direct them toward to most appropriate MA plans. *Id.*

Commenters pointed out the conflict between the Rule's added restrictions on the sharing of personal beneficiary data and the HIPAA Privacy Rule's provisions facilitating the sharing of PHI where this serves societal interests. CMS's response was a non-sequitur: It asserted that the HIPAA Privacy Rule "contains very specific disclosure and authorization rules that are *more stringent*" than the restrictions on sharing "personal beneficiary data" that CMS was finalizing. 89 Fed. Reg. at 30604 (emphasis added). The agency thus explained that FMOs must comply both with the Rule and with any overlapping requirements imposed by HIPAA or other applicable regulatory regimes. *Id.* But CMS failed to address the concern that the Rule is in significant respects *more* limiting than what HIPAA regulations require, and therefore that compliance will undermine the carefully reticulated HIPAA scheme that finely balances privacy interests with societal interests in the sharing of health information. For instance, the new data-sharing limitation

prohibits data sharing even between and among agents who are call-center employees and who should, under HIPAA regulations, be free to share PHI with fellow employees.

CMS was required to address these comments meaningfully, rather than giving a brush-off. "[T]o the extent that one might find tension between the two [code] sections, the more specific provision should govern over the more general." *Matter of GFS Industries*, 99 F.4th 223, 229 (5th Cir. 2024). Here, the Rule is an exercise only of CMS's general "authority to set fair marketing standards" (CMS Stay 21) while the HIPAA regulations are an exercise of Congress's more specific direction to the Secretary to issue reticulated privacy regulations. The Rule's limitation on information sharing among covered entities therefore should not prevail absent a clear, rational explanation. In dodging this point entirely, the agency failed to "respond to significant points and consider all relevant factors raised by the public comments" (*Huawei*, 2 F.4th at 449) or to consider every "important aspect of the problem" (*Fort Bend Cnty. v. United States Army Corps of Eng'rs*, 59 F.4th 180, 194 (5th Cir. 2023)). The Rule accordingly does not meet the APA's requirements of reasoned decisionmaking.

## III.    THE RULE WAS PROMULGATED WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW

Because, in at least two respects, CMS failed to comply with the procedures the APA prescribes for notice-and-comment rulemaking, the Court must "hold unlawful and set aside" the Rule as promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

### A.    CMS failed to disclose critical factual material underlying its proposal

Courts have long interpreted the APA to require that, "in order to afford interested persons meaningful notice and an opportunity for comment," the "studies upon which an agency relies in promulgating a rule must be made available during the rulemaking." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (quoting *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008)). For that reason, an agency "commits serious procedural error" if it "fails to

reveal . . . the technical basis for a proposed rule in time to allow for meaningful commentary." *Id.* (quoting *Owner-Operator Independent Drivers Association v. Federal Motor Carrier Safety Administration*, 494 F.3d 188, 199 (D.C. Cir. 2007)). At the very least, "the most critical factual material that is used to support the agency's position" must be made "public" during the rule-making process. *Air Transportation Association of America, Inc. v. Department of Agriculture*, 37 F.4th 667, 677 (D.C. Cir. 2022) (quoting *Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System*, 745 F.2d 677, 684 (D.C. Cir. 1984)).

CMS repeatedly failed to disclose the particular data and analyses it relied on in the rulemaking—the "recent studies," "information shared by insurance associations and focus groups," data "published in research articles," "complaints," "reports," "market surveys," "information gleaned from oversight activities," and other supposed data underlying the final Rule. *See* 89 Fed. Reg. at 30617-30622. The agency relied on all of those vaguely described sources to justify its many suppositions about how the market for agent-and-broker services operates, but it provided no detail at all concerning these purported supporting studies, publications, and data—and it declined to make any of this critical factual material available for public review and comment. Outside of government reports, the sole research article or study that CMS disclosed was the Commonwealth Fund report.

If CMS had given plaintiffs and their members access to the mass of undisclosed studies and reports on which the agency relied, they and other commenters unquestionably would have had something "useful to say about" them. *Air Transportation*, 37 F.4th at 677 (quoting *Chamber of Commerce v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006)). Again, commenters identified serious flaws in the Commonwealth Fund report, which CMS did disclose. Given a chance, plaintiffs also would have refuted the assertions appearing in the undisclosed studies and reports (assuming they exist) with objective data and examples from their own experience and expertise in the market. *See* A24-A28 ¶¶ 12-33. Only by shielding the critical factual material on which it relied from

38

public knowledge did CMS save that material from being "exposed to refutation." *Texas*, 389 F. Supp. 3d at 505 (quoting *Air Transportation Association of America v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999)). This "serious procedural error" dooms the Rule. *Id*.

**B.      The Rule was not a logical outgrowth of CMS's initial proposal**

The procedures prescribed by the APA for notice-and-comment rulemaking require agencies to publish a notice of proposed rulemaking that gives the public "fair notice" of the actions the agency is considering. *Texas Association of Manufacturers v. CPSC*, 989 F.3d 368, 381 (5th Cir. 2021). It follows that an agency may promulgate a rule that differs from a proposed rule only if it is a "'logical outgrowth' of the proposed rule." *Id.* (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007)). A final rule that departs from the proposed rule is a logical outgrowth "[i]f interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Id*. at 381 (cleaned up).

In this case, the agency's initial proposal contemplated that administrative fees, even if regulated as "compensation" to agents and brokers, could be paid by MAOs to FMOs. 88 Fed. Reg. at 78555. The notice gave no indication that CMS was considering limiting who could pay and receive administrative fees. But in the preamble to the final Rule, CMS announced that the new regulatory regime "would change the current flow of payments," with "the full payments" being made "directly to the agents and brokers," thereby "prohibit[ing] separate administrative payments" to FMOs. 89 Fed. Reg. at 30624, 30622. This previously unheralded restriction on MAO-to-FMO payments—a disruptive change to contractual arrangements common across a multibillion-dollar industry—could not have been anticipated based on the notice of proposed rulemaking. Plaintiffs and their members thus had no opportunity to comment on it.

Because this element of the final Rule is not a logical outgrowth of the original proposal, it must be set aside as procedurally defective under the APA. To be sure, as we noted in the

statement (*supra* at 10), CMS appears to have abandoned its position in the preamble that the $100 payment must be made by MAOs directly to agents and brokers, and not the FMOs. The agency acknowledged that the final Rule imposes no such payment-flow requirement, and it took the position that the preamble's purported alteration of the Rule "does not impose any legal requirements." CMS Stay Br. 44. Thus, the final Rule appears not to prohibit payment of FMO fees directly from MAOs to FMOs. But if the Court decided for any reason not to credit CMS's retraction of the preamble, or if CMS were to change its position after the conclusion of this litigation, it bears emphasizing that a payment-flow requirement would be unlawful because, like the $100 fee cap, it exceeds CMS's statutory authority; and separately because the public had no opportunity to comment on it.

## IV.    THE COURT SHOULD ENTER AN ORDER VACATING THE RULE

We have shown that the challenged portions of the Rule—its regulation of rates paid by MAOs to FMOs and its limitation on FMOs' ability to share enrollee information across corporate affiliates consistent with HIPAA—are unlawful several times over. Among other things, they exceed the agency's authority and were promulgated without adequate evidentiary support or reasoning. If the Court agrees, then it must settle on an appropriate remedy.

"Under Section 706 of the APA, when a reviewing court finds that an agency rule violates the APA, it *shall*—not *may*—hold unlawful and set aside the agency action." *Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928, 944 (N.D. Tex. 2019) (O'Connor, J.) (cleaned up, emphasis added) (quoting *Southwest Electric Power v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019) (in turn citing *Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994))).

"Set[ting] aside" an agency action is generally understood to mean its vacatur. *See* Set Aside, *Black's Law Dictionary* (11th ed. 2019) (defining "set aside" as "to annul or vacate"). Thus, "[w]hen a court holds unlawful and sets aside agency rules that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the ordinary result is that the rules are

40

vacated—not that their application to the individual petitioners is proscribed." *Franciscan Alliance*, 414 F. Supp. 3d at 944 (cleaned up) (quoting *National Mining Association v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998)); *accord Data Marketing Partnership LP v. Department of Labor*, 45 F.4th 846, 860-861 (5th Cir. 2022) ("The ordinary practice is to vacate unlawful agency action.") (quoting *United Steel v. Mine Safety & Health Administration*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)); *Data Marketing Partnership, LP v. U.S. Department of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (reiterating that the Fifth Circuit's "ordinary practice is to vacate unlawful agency action").

An agency action held unlawful under the APA may be vacated "in whole [or] in part." *Franciscan Alliance*, 414 F. Supp. 3d at 944 (citing *Chamber of Commerce v. Department of Labor*, 885 F.3d 360, 379, 388 (5th Cir. 2018) (vacatur "in toto"), and *Southwest Electric Power*, 920 F.3d at 102 (vacatur in part)). Here, we have shown that the challenged portions of the Rule should be vacated. But beyond that, plaintiffs seek no more. That is to say, plaintiffs do not request a court order vacating of the Rule *in toto*, because the elements of the rule that have not been challenged operate independently of the challenged portions. A partial vacatur would therefore grant complete relief. It also would be consistent with the Court's approach to the section 705 stay entered earlier in this litigation.

**CONCLUSION**

The Court should grant plaintiffs' motion for summary judgment, entering an order that vacates the challenged elements of the final Rule.

Dated: September 27, 2024

/s/ *Michael P. Lynn*

David Keltner
Texas Bar No. 11249500
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 878-3560
Fax: (512) 495-6401
david.keltner@kellyhart.com

Stephanie A. Webster
D.C. Bar No. 479524, *pro hac vice*
Christopher M. Nienhaus
D.C. Bar No. 90008585, *pro hac vice*
Ropes & Gray LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 508-4859
Fax: (202) 508-4650
stephanie.webster@ropesgray.com
christopher.nienhaus@ropesgray.com

Casey Kyung-Se Lee
New York Bar No. 4885927, *pro hac vice*
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 596-9000
Fax: (212) 596-9090
casey.lee@ropesgray.com

Michael P. Lynn
Texas Bar No. 12738500
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3801
Fax: (214) 981-3839
mlynn@lynnllp.com

Michael B. Kimberly
D.C. Bar No. 991549, *pro hac vice*
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C. 20001
Phone: (202) 756-8901
Fax: (202) 756-8087
mkimberly@mwe.com

Ashley C. Parrish
D.C. Bar No. 464683, *pro hac vice*
Adam C. Solander
D.C. Bar No. 1002511, *pro hac vice*
King & Spalding LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Phone: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com
asolander@kslaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of this document was served via CM/ECF on all counsel of record pursuant to the Federal Rules of Civil Procedure on September 27, 2024.

/s/ *Michael P. Lynn*
Counsel for Plaintiffs