**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, *et al.*, <br><br>     *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br>     *Defendants*. | No. 4:24-cv-439-O |

**CONSOLIDATED RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction..................................................................................................................1

Argument ....................................................................................................................1

I.  CMS lacks authority to set rates for fees paid to third parties for administrative
    services to agents and brokers ........................................................................1

    A.  CMS's authority under § 1395w-21(h)(4)(D) is a red herring .....................2

    B.  The language and context of § 1395w-21(j)(2)(D) confirm that it does not
        empower CMS to set rates for administrative services ................................3

        1.  Section 1395w-21(j)(2) grants limited rulemaking power..................3

        2.  By regulating cost reimbursements, the Rule reaches more than
            "compensation"..............................................................................6

        3.  A rigid, fixed rate is not a "guideline" ............................................8

    C.  Section 1395w-21(j)(2)(D) does not authorize CMS to "level the playing field"........9

II.  The Rule is arbitrary and capricious ................................................................11

    A.  CMS cited no evidence that administrative payments are being used to
        circumvent limits on agent and broker compensation ...............................11

        1.  The rulemaking record lacks evidence that administrative payments
            are rising above market rates or vary substantially from plan to plan...............12

        2.  There is no evidence that administrative payments are being used to
            backchannel improper bonuses to agents and brokers.....................13

        3.  CMS did not respond to comments pointing out methodological flaws
            in the "central evidence" supporting the Rule ...............................14

    B.  CMS did not satisfactorily explain why a $100 increase in the compensation
        cap appropriately accounts for administrative payments............................16

    C.  CMS upended the longstanding regulatory regime surrounding agent and
        broker compensation with no attention to reliance interests .....................18

    D.  CMS failed to consider the Rule's impact on the HIPAA Privacy Rule's
        encouragement of socially beneficial data sharing....................................20

III.  The rulemaking was procedurally defective ......................................................21

IV.  Partial vacatur of the Rule is the appropriate relief ..........................................24

Conclusion ...............................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Alliance Houston v. EPA*,
906 F.3d 1049 (D.C. Cir. 2018)................................................................3

*Air Transport Association of America v. FAA*,
169 F.3d 1 (D.C. Cir. 1999).....................................................................22

*American Clinical Laboratory Association v. Azar*,
931 F.3d 1195 (D.C. Cir. 2019)...............................................................25

*American Radio Relay League, Inc. v. FCC*,
524 F.3d 227 (D.C. Cir. 2008).................................................................13

*Americans for Beneficiary Choice v. HHS*,
2024 WL 3297527 (N.D. Tex. July 3, 2024)............................................ *passim*

*Association of American Physicians & Surgeons v. Texas Medical Board*,
627 F.3d 547 (5th Cir. 2010)...................................................................26

*Burbridge v. CitiMortgage, Inc.*,
37 F.4th 1049 (5th Cir. 2022) ...................................................................8

*Cargill v. Garland*,
57 F.4th 447 (5th Cir. 2023) ...................................................................24

*Carlson v. Postal Regulatory Commission*,
938 F.3d 337 (D.C. Cir. 2019).................................................................15

*Cascabel Cattle Co., LLC v. United States*,
955 F.3d 445 (5th Cir. 2020) .....................................................................6

*Central Forwarding, Inc. v. ICC*,
698 F.2d 1266 (5th Cir. 1983) ...............................................................3, 6

*Chamber of Commerce of United States v. SEC*,
85 F.4th 760 (5th Cir. 2023) ...............................................................15, 22

*Chemical Manufacturers Association v. EPA*,
870 F.2d 177 (5th Cir. 1989)...................................................................23

*Comcast Corp.* v. *NAAAOM*,
589 U.S. 327 (2020).................................................................................3

*DHS v. Regents of the University of California*,
140 S. Ct. 1891 (2020)............................................................................18

*DiNapoli v. Northeast Regional Parole Commission*,
764 F.2d 143 (2d Cir. 1985).....................................................................8

*Dolan* v. *Postal Service*,
546 U.S. 481 (2006).................................................................................4

**Cases–continued**

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016)..................................................................................18

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021)..........................................................................16, 17

*FDA v. Alliance for Hippocratic Medicine,*
    602 U.S. 367 (2024)..................................................................................26

*Federation of Americans for Consumer Choice, Inc. v. U.S. Department of Labor,*
    2023 WL 5682411 (N.D. Tex. June 30, 2023) ........................................26

*Flowers v. Southern Regional Physician Services Inc.,*
    247 F.3d 229 (5th Cir. 2001) ....................................................................8

*Graham County Soil & Water Conservation District v. U.S. ex rel. Wilson,*
    559 U.S. 280 (2010)....................................................................................4

*Hancock County Board of Supervisors v. Ruhr,*
    487 F. App'x 189 (5th Cir. 2012) ...........................................................25

*Hancock v. Chicago Title Insurance Co.,*
    263 F.R.D. 383 (N.D. Tex. 2009) ..............................................................9

*Handley v. Chapman,*
    587 F.3d 273 (5th Cir. 2009) ..................................................................22

*Huawei Technologies USA, Inc. v. FCC,*
    2 F.4th 421 (5th Cir. 2021) ....................................................................18

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244 (2024) .........................................................................9, 11

*Louisiana v. U.S. Department of Energy,*
    90 F.4th 461 (5th Cir. 2024) ..................................................................14

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)..................................................................................25

*McBoyle v. United States,*
    283 U.S. 25 (1931) (Holmes, J.) ...............................................................3

*Mercy Hospital of Laredo v. Heckler,*
    777 F.2d 1028 (5th Cir. 1985) ..................................................................9

*Michael v. Ghee,*
    498 F.3d 372 (6th Cir. 2007) ....................................................................8

*Michigan v. EPA,*
    576 U.S. 743, 752 (2015)....................................................................15, 18

*Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm
    Mutual Automobile Insurance Co.,*
    463 U.S. 29 (1983)............................................................................15, 21

**Cases–continued**

*National Association of Manufacturers v. SEC*,
  105 F.4th 802 (5th Cir. 2024) ........................................................24

*National Infusion Center Association v. Becerra*,
  116 F.4th 488 (5th Cir. 2024) ........................................................26

*NFIB v. Sebelius*,
  567 U.S. 519 (2012).........................................................................3

*Ohio v. EPA*,
  144 S. Ct. 2040 (2024)...............................................................15, 21

*Owner-Operator Independent Drivers Association v. Federal Motor Carrier
  Safety Administration*,
  494 F.3d 188 (D.C. Cir. 2007) ......................................................22

*R.J. Reynolds Vapor Co. v. FDA*,
  65 F.4th 182 (5th Cir. 2023) .....................................................18, 20

*In re Ramba, Inc.*,
  416 F.3d 394 (5th Cir. 2005) ..........................................................9

*In re Riley*,
  923 F.3d 433 (5th Cir. 2019) .......................................................6, 7

*Sackett v. EPA*,
  598 U.S. 651 (2023).........................................................................5

*Sierra Club v. EPA*,
  939 F.3d 649 (5th Cir. 2019) ........................................................11

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
  143 S. Ct. 2141 (2023)...................................................................24

*Texas Democratic Party v. Benkiser*,
  459 F.3d 582 (5th Cir. 2006) ........................................................25

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .............................13, 21, 22, 23

*Texas v. Nuclear Regulatory Commission*,
  78 F.4th 827 (5th Cir. 2023), *cert. granted on unrelated questions*, No. 23-
  1300, 2024 WL 4394124 (U.S. Oct. 4, 2024)................................25

*Texas v. U.S. Department of Transportation*,
  726 F. Supp. 3d 695 (N.D. Tex. 2024) ..........................................10

*Tice-Harouff v. Johnson*,
  2022 WL 3350375 (E.D. Tex. Aug. 12, 2022) ...............................23

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)........................................................................26

*United States v. Hernandez*,
  104 F.4th 755 (10th Cir. 2024) ........................................................8

**Cases–continued**

*United States v. Palomares*,
 52 F.4th 640 (5th Cir. 2022) ................................................................3

*United States v. Sharp*,
 62 F.4th 951 (5th Cir. 2023) ............................................................4, 5

*VanDerStok v. Garland*,
 86 F.4th 179 (5th Cir. 2023) ..............................................................10

*Wages & White Lion Investments, LLC v. FDA*,
 90 F.4th 357 (5th Cir. 2024) (en banc) .........................................18, 20

*Warth v. Seldin*,
 422 U.S. 490 (1975) ............................................................................25

*Whitman v. American Trucking Associations*,
 531 U.S. 457 (2001) ..............................................................................5

**Statutes, Rules, and Regulations**

42 C.F.R.
 § 422.2274(a) ......................................................................................16
 § 422.2274(g)(4) .................................................................................20
 § 423.2274(g)(4) .................................................................................20

88 Fed. Reg. 78476 (Nov. 15, 2023) .............................................. *passim*

89 Fed. Reg. 30448 (Apr. 23, 2024) ............................................... *passim*

5 U.S.C.
 § 553 ...................................................................................................22
 § 706(2) ..............................................................................................24

11 U.S.C.
 § 330(a)(1) ............................................................................................7
 § 330(a)(4)(B) .......................................................................................7

42 U.S.C.
 § 1395w-21(j)(2)(D) .........................................................................4, 5
 § 1395ww(a)(1)(A)(i) ............................................................................4
 § 1395ww(k)(1) .....................................................................................4
 § 53910(f)(2) .........................................................................................7

Fed. R. Civ. P. 56(e) ...........................................................................25

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
 Texts* (2012) .....................................................................................4, 5

Commonwealth Fund, *The Challenges of Choosing Medicare Coverage: Views
 from Insurance Brokers and Agents* (Feb. 28, 2023)............................12

Compensation, *American Heritage Dictionary of the English Language* (4th ed.
 2000) ....................................................................................................6

**Other Authorities–continued**

Compensation, *Webster's New Third International Dictionary* (2002) ..........................................6

Daniel R. Levinson, *Beneficiaries Remain Vulnerable to Sales Agents' Marketing of Medicare Advantage Plans* (Mar. 2010)..............................................................................13

**INTRODUCTION**

As our opening brief demonstrated, the Centers for Medicare and Medicaid Services (CMS) exceeded Congress's specific delegation to establish flexible "guidelines" to regulate "compensation" paid to agents and brokers for their services by setting a rigid rate for administrative payments to third parties. CMS also defied its obligation under the Administrative Procedure Act (APA) to engage in reasoned decision making: It promulgated the Rule without citing any reliable evidence of the apparent problems the new regulatory regime was purportedly responding to, failing to consider the serious reliance interests that have grown up around CMS's longstanding prior policies, settling on the $100 figure without explanation, and ignoring the conflict between the Rule's data sharing restrictions and the HIPAA Privacy Rule. Because CMS failed to disclose the critical factual material underlying its proposed rule during the rulemaking process, the Rule is also procedurally defective.

CMS's rejoinders are not persuasive. For the most part, the agency repeats its strategy from the stay briefing, which was not to deny that it fell short of the duties that the Medicare Advantage (MA) statute and the APA impose, but instead to deny that it has any such duties to begin with. CMS thus insists that it has boundless rulemaking power over the MA marketing industry, while it denies any obligation to demonstrate with evidence that the problems it is purporting to solve actually exist, or to disclose during the notice-and-comment process the evidence and data on which its rulemaking is based. Each of those arguments is wrong and must be rejected.

**ARGUMENT**

**I.    CMS LACKS AUTHORITY TO SET RATES FOR FEES PAID TO THIRD PARTIES FOR ADMINISTRATIVE SERVICES TO AGENTS AND BROKERS**

CMS claims near limitless authority under 42 U.S.C. § 1395w-21(h)(4) to establish "fair marketing standards" across all spheres of the MA marketing industry, including the authority to engage in the rate-setting for administrative payments that the Rule asserts. But that contradicts the statute's plain text. Congress established a thoughtfully limited framework for the regulation

1

of MA marketing that includes a circumscribed delegation in § 1395w-21(j)(2)(D) to set general parameters to ensure that use of compensation does not create improper incentives for agents and brokers. In setting a fixed rate for all administrative payments, and in seeking to police not only agent and broker incentives but also the structure of the entire MA marketing industry itself, CMS has far exceeded the outer limits of Congress's delegation to the agency.

A.    **CMS's authority under § 1395w-21(h)(4)(D) is a red herring**

CMS claims (at 20) broad authority under 42 U.S.C. § 1395w-21(h)(4) to regulate "fair marketing standards" throughout the MA industry. The agency says (*id*.) that this is the kind of open-ended delegation of "discretionary authority to an agency" that allows for executive lawmaking to which courts supposedly must defer. That is wrong.

To start, neither the notice of proposed rulemaking (NPRM) nor the preamble to the final Rule cites CMS's supposed power to regulate "fair marketing standards" as the source of its rate-setting authority. Instead, the agency asserted only that § 1395w-21(h)(4)(D), together with § 1395w-21(j)(2)(D), authorized the rate-setting element of the Rule. *Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Program for Contract Year 2024*, 89 Fed. Reg. 30448, 30619 (Apr. 23, 2024). That is a critical distinction, because (h)(4)(D) does not speak to "fair marketing standards" generally. It instead codifies one particular subset of "fair marketing standards" to which MA organizations (MAOs) must conform: those requiring MAOs to "conduct the activities described in subsection (j)(2) in accordance with the limitations established under such subsection." That is nothing but an incorporation by reference of the guidelines that CMS is to establish under (j)(2), which must stand on their own. In other words, (h)(4)(D) cannot be read to authorize any regulation of compensation that is not already authorized by (j)(2).

Even if that were wrong, § 1395w-21(h)(4)(D) applies only to an MAO and "the agents, brokers, and other third parties representing such organization." A field marketing organization (FMO) does not represent an MAO and is not its agent; rather, it provides administrative and related support services to *independent* agents and brokers. So even on its own terms, § 1395w-

2

21(h)(4)(D) cannot be interpreted to authorize CMS establish caps for fees paid to FMOs.

Finally and more, it is fundamental that a "general grant of rulemaking power . . . [cannot] trump the specific provisions of the [statute]." *Air Alliance Houston v. EPA*, 906 F.3d 1049, 1061 (D.C. Cir. 2018); *accord Central Forwarding, Inc. v. ICC*, 698 F.2d 1266, 1277 (5th Cir. 1983). Section 1395w-21(j)(2)(D) empowers CMS to establish guidelines in a more specific way than any grant of power to address "fair marketing standards" generally under § 1395w-21(h)(4). The statute makes this clear by specifying in (h)(4)(D) that the guidelines established under (j)(2)(D) qualify as one, specific standard.

Against this background, CMS's citation to § 1395w-21(h)(4)(D) is a red herring. The only question concerning CMS's authority to act is whether § 1395w-21(j)(2)(D) empowers the agency to engage in rate-setting for compensation to third-party FMOs. As we have shown, it does not.

### B. The language and context of § 1395w-21(j)(2)(D) confirm that it does not empower CMS to set rates for administrative services

#### 1. Section 1395w-21(j)(2) grants limited rulemaking power

**a.** In a further effort to justify a boundless view of its own regulatory power, CMS proceeds by addressing the statute's terms one at a time and in isolation: "use," "guideline," "compensation," and so on. But statutory interpretation requires more than stringing together the rote definitions of individual words, each considered in a vacuum. In construing a statute, courts must "consider the text holistically." *United States v. Palomares*, 52 F.4th 640, 642-643 (5th Cir. 2022). Textualism is a commitment to the principle that "the best evidence of Congress's intent is the statutory text" (*NFIB* v. *Sebelius*, 567 U.S. 519, 544 (2012)) read through the eyes of "an ordinary speaker of English" (*Comcast Corp.* v. *NAAAOM*, 589 U.S. 327, 333 (2020)). It does not ask whether "etymologically it is possible" to read a statute in a particular way according to an expert grammarian dissecting sentence structures and dictionary definitions; it asks only what the statutes means in "everyday speech" given the background, context, purpose, and "phraseology of the statute." *McBoyle* v. *United States*, 283 U.S. 25, 27 (1931) (Holmes, J.).

3

To put it more simply, "language has meaning only in context." *Graham County Soil & Water Conservation District* v. *U.S. ex rel. Wilson*, 559 U.S. 280, 289 (2010). "Interpretation of a word or phrase depends upon" not just dictionary definitions, but "the whole statutory text, considering the purpose and context of the statute." *Dolan* v. *Postal Service*, 546 U.S. 481, 486 (2006); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012) (explaining that "words are given meaning by their context").

We showed in the opening brief (at 15) that the phraseology of § 1395w-21(j)(2)(D) and the statutory context within which it is situated indicate a narrow grant of power. Congress directed CMS to set "*guidelines*" for the "*use of* compensation" to ensure that "agents and brokers" are incented "to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added). To an ordinary English speaker, that language suggests flexible, goal-oriented standards for agent and broker compensation, not the power to set rigid rate caps for every ancillary service by every third-party participant in the broader MA marketing industry.

The statutory structure confirms this. Congress enumerated in § 1395w-21(j)(1) a series of *prohibited* activities, and in (j)(2) a series of mere *limitations*. As we noted (Opening Br. 15), if Congress had intended for (j)(2)(D) categorically to prohibit all nonauthorized compensation, it would have placed paragraph (D) under (j)(1), with the other statutory prohibitions. It notably did not do so. Moreover, other provisions of the Medicare statute demonstrate that when Congress means to empower CMS with rate-setting authority, it says so expressly. In 42 U.S.C. § 1395ww-(a)(1)(A)(i), for example, Congress authorized CMS to "determine[] the amount of the payments that may be made under" traditional Medicare to hospitals for inpatient services. It thus directed CMS to promulgate rules that "specify the amounts, form, and manner in which such payments will be made." *Id*. § 1395ww(k)(1). There is nothing like that here.

Finally, "[t]he provision's general purpose" confirms our argument. *United States v. Sharp*, 62 F.4th 951, 953 (5th Cir. 2023). "[W]ords are given meaning by their context, and context

includes the purpose of the text" when the purposes is spelled out "concretely" by the text itself. *Id.* (quoting *Reading Law*, *supra*, at 56-57). That is the case here. As we explained in the opening brief (at 17), the express statutory objective that Congress directed CMS to pursue is clear: It is to develop guidelines that incentivize "agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). In light of that narrow aim, CMS cannot be correct that Congress empowered the agency to set rates for any and all payments with any relation to MA plan marketing. Section 1395w-21(j)(2)(D) empowers CMS to regulate only compensation that, if left unregulated, has the potential to lead agents and brokers to act in their own interests rather than beneficiaries' interests. That means compensation directly to independent agents and brokers, whose behavior is not affected by payments between MAOs and FMOs.

**b.** CMS does not address these arguments. Simply talking past our contentions, it takes the precise opposite view, insisting (at 23) that § 1395w-21(j)(2)(D) sets no "outer bound" to the CMS's authority "at all," granting the agency essentially limitless authority to establish any rules for MA marketing that it likes. In support of this remarkable position, the agency asserts (at 30-31) that because § 1395w-21(j)(2) instructs CMS to "at least" establish five enumerated limitations, including the limitation on the "use of compensation" inconsistent with "guidelines" to be developed by the agency, the list of enumerated limitations is not exhaustive, setting a "statutory floor" not a "statutory ceiling."

Whatever the words "at least" may suggest, they cannot be taken as an open-ended grant of otherwise unlimited regulatory power over the MA market. "Congress does not hide elephants in mouseholes by altering the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Sackett v. EPA*, 598 U.S. 651, 677 (2023) (cleaned up) (quoting *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001)). And where Congress has specified the way in which the agency is to wield its rulemaking authority with respect to a particular sphere of MA marketing activity (as it has in (j)(2)(D) with respect to MA marketing compensation),

CMS may not promulgate regulations that "run far afield from the specific substantive provisions." *Central Forwarding*, 698 F.2d at 1277. Congress's careful delineation in § 1395w-21(j)(2)(D) of CMS's authority to "establish limitations with respect to . . . [t]he use of compensation," stipulating that the agency must develop "guidelines" for the specific purpose of "ensur[ing] that the use of compensation creates incentives for agents and brokers to enroll individuals in the [MA] plan that is intended to best meet their health care needs," necessarily displaced whatever broad discretion CMS might think it has.

### 2.    By regulating cost reimbursements, the Rule reaches more than "compensation"

CMS's arguments concerning the statute's isolated words are unpersuasive even on their own terms. Take first the term "compensation." As we explained in the opening brief (at 13-14), to read the statutory term "compensation" to include reimbursements for overhead support and other hard costs stretches the term beyond its ordinary meaning. *See Cascabel Cattle Co., LLC v. United States*, 955 F.3d 445, 451 (5th Cir. 2020) ("[W]ords in statutes are [typically] construed according to their ordinary, contemporary, common meaning[s].").

The ordinary meaning of "compensation," as multiple dictionaries attest, encompasses payment or other benefits received in return for services rendered, not reimbursements of hard costs. *See, e.g.,* Compensation, *Webster's New Third International Dictionary* 463 (2002) (defining compensation as "payment for value received or service rendered"); Compensation, *American Heritage Dictionary of the English Language* 376-377 (4th ed. 2000) (defining compensation as "[s]omething, such as money, given or received as payment or reparation, as for a service or loss").

CMS disagrees, insisting (at 23-24) that the Fifth Circuit has held that the ordinary meaning of "compensation" is so broad that it presumptively encompasses the reimbursement of expenses. *See In re Riley*, 923 F.3d 433, 442 (5th Cir. 2019). But *Riley* did not hold that "compensation" presumptively encompasses the reimbursement of expenses in all contexts. Instead, *Riley* more

cautiously acknowledged that the "plain meaning" of "compensation" "*can*" encompass the reimbursement of "*some*" expenses, depending on the context. *Riley*, 923 F.3d at 442 (emphasis added). While "compensation" could potentially include expense reimbursements, that still "leaves the question" of whether any particular form of expense reimbursement counts as compensation. *Id*. Addressing the question whether "reasonable compensation to the debtor's attorney for representing the interests of the debtor" under a provision of the bankruptcy statute (11 U.S.C. § 330(a)(4)(B)) includes reimbursements for advancing the costs of filing fees, credit counseling fees, and credit report fees, the court reasoned that a debtor's attorney's advancing of the three fees serve the "interests of the debtor" and hence are included within "reasonable compensation" for purposes of § 330(a)(4)(B). *Riley*, 923 F.3d at 442-443.

Riley is therefore a highly context-specific case that has little relevance to the meaning of "compensation" in the completely different MA marketing context. To the extent that any more general principle can be drawn from *Riley*, it is that reimbursement for hard costs can count as "compensation" when the initial payment of the costs was itself part of the service that is being compensated. That principle would not support including expense reimbursements as "compensation" in the MA marketing context, since payment of hard costs by FMOs is in no sense a part of the service that agents and brokers provide.

CMS again relies (at 23-24) on *Riley* to dismiss the relevance of other statutes in which Congress has treated compensation and reimbursement of expenses as distinct and specified when the former may include the latter. *See, e.g.*, 11 U.S.C. § 330(a)(1) (providing separately for "reasonable compensation for actual, necessary services rendered" and "reimbursement for actual, necessary expenses"); 46 U.S.C. § 53910(f)(2) (specifying that "compensation may include an allowance for expenses reasonably incurred"). As CMS would have it, *Riley* held that the ordinary meaning of the word "compensation" so clearly includes reimbursement for expenses that even if Congress has expressly distinguished compensation and reimbursement in certain other statutes, that would not be enough to overcome to presumption that "compensation" includes reimburse-

ment of expenses. CMS Br. 24.

But *Riley* in no way repudiates the settled canon that "in determining the meaning of a particular statutory provision, it is helpful to consider the interpretation of other statutory provisions that employ the same or similar language." *Flowers v. Southern Regional Physician Services Inc*., 247 F.3d 229, 233 n.4 (5th Cir. 2001). Indeed, at no point does *Riley* ever address the relevance of similar language in other statutes in interpreting a statutory term. Our argument (Opening Br. 13-14) thus holds: because the administrative fees paid to FMOs are best understood as reimbursements for overhead and other hard costs incurred by independent agents and brokers, they do not constitute "compensation" under § 1395w-21(j)(2)(D).

### 3.      A rigid, fixed rate is not a "guideline"

As the opening brief demonstrated (at 16), while the statute directs CMS to establish "guidelines" to regulate the "use of compensation," the Rule imposes a fixed numerical cap on payments for administrative services, setting that cap at $100 per enrollee. This affirmative mandate of a rigid payment cap is not a "guideline," because guidelines involve flexibility and room for discretion. Courts within and outside of the Fifth Circuit have repeatedly analyzed the term "guidelines"—in a variety of contexts—as implying flexibility, contrasting guidelines with rigid rules and fixed standards. Thus, the Fifth Circuit has distinguished contractual deadlines that operate as "flexible guidelines" from those that operate as "rigid mandates." *Burbridge v. CitiMortgage, Inc.*, 37 F.4th 1049, 1052 (5th Cir. 2022). Other courts of appeals have similarly observed that guidelines "provide flexible recommendations, not strict requirements," (*United States v. Hernandez*, 104 F.4th 755, 761 (10th Cir. 2024)), or that guidelines are "not fixed and rigid, but . . . flexible." *Michael v. Ghee*, 498 F.3d 372, 381 (6th Cir. 2007); *accord DiNapoli v. Northeast Regional Parole Commission*, 764 F.2d 143, 146 (2d Cir. 1985).

Against this array of authority that a "guideline" is flexible in application and preserves space for judgment and discretion, CMS insists (at 27-28) that a guideline *can* impose a rigid numerical requirement for two reasons. First, CMS points to cases in which the meaning of the

statutory term "guidelines" was not at issue or otherwise addressed by the court. In *Mercy Hospital of Laredo v. Heckler*, 777 F.2d 1028 (5th Cir. 1985), for instance, hospitals dissatisfied with CMS's disallowance of their reimbursement claims under the agency's reasonable cost guidelines challenged the guidelines as arbitrary and capricious. While the hospitals objected that "these guidelines were administered as absolute, rigidly fixed substantive limitations upon reimbursable costs" (*id*. at 1032), the court did not reach that issue and disposed of the appeal on administrative exhaustion grounds. And *Hancock v. Chicago Title Insurance Co*., 263 F.R.D. 383 (N.D. Tex. 2009), which CMS also cites, addressed a motion for class certification and a motion to implead a third-party defendant. At no point did the court decide, or even consider in dicta, the meaning of the term "guidelines." These cases thus shed no meaningful light on the issue.

CMS also argues (at 28) that the Provider Reimbursement Manual and the Medicare Marketing Guidelines contain dense volumes of detailed directives that the agency refers to as "guidelines," including directives that set specific dollar limits.[1] But the fact that CMS chooses to use the term "guidelines" inaptly in the nomenclature of agency-issued guidance documents has no bearing on *Congress's* intended meaning of the term "guidelines" in the MA statute. When the reading that an agency assigns to a statutory term departs from the "best meaning" of the term, the "best meaning" controls. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).

## C.    Section 1395w-21(j)(2)(D) does not authorize CMS to "level the playing field"

In the preamble to the Rule, CMS did not assert authority to set rates for administrative payments to agents and brokers on § 1395w-21(j)(2)(D) alone. As a central justification for the Rule, CMS also expressed a concern over purported "bidding wars" among MA plans to "secure

---

[1] CMS further claims (at 28) that the Medicare Marketing Guidelines "likely informed the statute's choice of the word 'guidelines.'" In the first place, CMS does not cite to the legislative history to provide any substantiation for this claim. Even if CMS were to provide some evidence to support its claim, it would be of no relevance, since "[i]nferences drawn from a statute's legislative history . . . cannot justify an interpretation that departs from the plain language of the statute itself." *In re Ramba, Inc*., 416 F.3d 394, 401 (5th Cir. 2005).

anticompetitive contract terms" with FMOs. *See* 89 Fed. Reg. at 30619. CMS considered these supposed bidding wars troubling because (it assumed) they threatened to bring about "anticompetitive results," as smaller plans that are unable to pay higher administrative fees to FMOs "risk losing enrollees to larger, national plans who can." *Id*; *see also id*. at 30618 (describing the risk of an "unlevel playing field among plans" because larger MA plans are likely able to more easily shoulder the added costs paid to FMOs, compared to smaller MA plans). To "deter anticompetitive practices" by MAOs, agents, brokers, and FMOs that "limit competition in the Medicare plan marketplace" (*id*. at 30619), CMS determined to regulate administrative payments as compensation and set a fixed cap on such payments, in order to "help level the playing field for all plans represented by an agent or broker and promote[] competition." *Id*. at 30621.

As explained in the opening brief (at 18-20), Congress has not delegated authority to CMS to act as an antitrust regulator in the MA marketing industry. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated [to it] by Congress." *Texas v. U.S. Department of Transportation*, 726 F. Supp. 3d 695, 708 (N.D. Tex. 2024) (quoting *VanDerStok v. Garland*, 86 F.4th 179, 187 (5th Cir. 2023)). To the extent that CMS invokes the antitrust rationale as basis to regulate administrative payment, the agency therefore exceeds its statutory authority.

As it did in the stay briefing, CMS asserts (at 41) that it did not, in the final Rule, "purport to enforce the Sherman Act or any other similar law." The Rule says otherwise, explaining that the agency adopted its new fixed rates expressly to "deter anti-competitive practices" and to prevent what it believed would be "anti-competitive results." 89 Fed. Reg. at 30618-30619. True, CMS did not cite the antitrust laws, but it openly relied on the principles and objectives of those laws, which are principles and objectives that are notably absent from § 1395w-21(j)(2)(D).

The agency does not improve its position by repeating (at 41-42) its contention from the stay briefing that supervision of "[c]ompetition as a general matter" is "baked into" the regulatory scheme. Even supposing Congress intended the agency to foster "effective competition," it would

have done so only by directing CMS to undertake particular, discrete tasks, such as audits and recoupments. Nowhere did Congress authorize a roving regulatory patrol of MA markets.

CMS responds (at 42) that § 1395w-21(j)(2)(D) authorizes the agency to consider "market structure" in the MA marketing industry, since that is "relevant" to analyzing the impact of compensation on incentives for agents and brokers. That is a straw man. Plaintiffs do not deny that CMS may, under § 1395w-21(j)(2)(D), consider how stakeholders interact within the MA marketing industry, inasmuch as it is relevant to determining the effects of market structure on agents' and brokers' compensation. But CMS's assertion of authority for the Rule goes beyond merely analyzing and correcting market conditions to ensure the proper alignment of agent and broker incentives. As CMS's own statements in the regulatory preamble make clear, the agency was concerned to prevent "anti-competitive results" between different MA plans and to "level the playing field" *between plans* (89 Fed. Reg. at 30619, 30621), quite apart from any downstream impact on misalignment of incentives *for agents and brokers* in their efforts to sell MA plans to enrollees. And CMS does not deny that the U.S. Code nowhere directs it to police the MA marketing industry for anti-competitive conduct.

## II.    THE RULE IS ARBITRARY AND CAPRICIOUS

The Rule is unlawful not only because it vastly oversteps the "outer statutory boundaries" of CMS's delegated authority, but also—and independently—because the agency did not exercise its purported authority "consistent[ly] with the APA." *Loper Bright*, 144 S. Ct. at 2268. CMS did not base the Rule on "the evidence before the agency," and it failed to "articulate a satisfactory explanation for its action" by drawing a "rational connection between the facts found and the choice made." *Sierra Club v. EPA*, 939 F.3d 649, 663-664 (5th Cir. 2019) (cleaned up).

### A.    CMS cited no evidence that administrative payments are being used to circumvent limits on agent and broker compensation

CMS summarizes (at 36-37) the essential steps of its stated justification for the Rule's sweeping new regulations on administrative payments: that administrative payments are balloon-

ing out of control, that the amount of these payments vary wildly from plan to plan, and that these supposed features of the MA marketing industry indicate that MAOs are using administrative payments to FMOs to pay unlawful bonuses to agents and brokers, circumventing existing limits on agent and broker compensation designed to ensure that improper incentives do not arise. Neither the premises nor the conclusion drawn from them is supported by adequate evidence.

### 1. The rulemaking record lacks evidence that administrative payments are rising above market rates or vary substantially from plan to plan

CMS asserted in the NPRM that "overall payments to agents and brokers can vary significantly" across plans, and that administrative payments for agents and brokers selling "some" MA plans seem to "significantly outpace" payments for similar activities made by other MA plans and outpace parallel payments to insurance agents and brokers in other industries. *See Contract Year 2025 Policy and Technical Changes to the Medicare Advantage Program*, 88 Fed. Reg. 78476, 78555 (Nov. 15, 2023). The evidence CMS cited to support these assertions, however, were nebulous references to "information shared by insurance associations and focus groups," "research articles," and "information gleaned from oversight activities." 88 Fed. Reg. at 78554, 78555. The only specific evidence CMS pointed to during the rulemaking was a single study based on anecdotal focus-group findings. *See* The Commonwealth Fund, *The Challenges of Choosing Medicare Coverage: Views from Insurance Brokers and Agents* (Feb. 28, 2023), https://perma.cc/-67WG-7NDF (cited in 88 Fed. Reg. at 78554 nn.136-137).

This Court has aptly described the Commonwealth Fund study as "CMS's central evidence" for its assertion that administrative payments have risen above market rates. *See Americans for Beneficiary Choice v. HHS*, 2024 WL 3297527, at *5 (N.D. Tex. July 3, 2024). But as we explained in the opening brief and the stay briefing, the study offers meager support for CMS's key justification for the Rule, given its severe methodological flaws: anecdotal accounts gathered in focus groups cannot produce statistically reliable inferences about the MA marketing industry as a whole, which encompasses approximately 100,000 health insurance agents and

12

brokers serving 30 million MA beneficiaries.

CMS does not defend the substance of the Commonwealth Fund study. The agency instead points (at 38) to another document CMS cited in the rulemaking: an OIG report from 2010. *See* 89 Fed. Reg. at 30618 (citing Daniel R. Levinson, *Beneficiaries Remain Vulnerable to Sales Agents' Marketing of Medicare Advantage Plans* (Mar. 2010)). But far from offering substantive evidence to support CMS's assertions about trends in the MA marketing industry, this report merely speculated in the most general terms that payments from plan sponsors to FMOs "may have" created improper financial incentives. AR 11295. In any event, the agency repeatedly avowed that the Rule responds to "recent" developments (*see, e.g.*, 89 Fed. Reg. at 30619). A report published 14 years ago can hardly be evidence of such developments.

CMS attempts to strengthen this lack of evidence with citations to comments submitted during the rulemaking. *See* AR 6236, 7933, 8708-8709, 8911, 9954, 10238, 11381, 10238-10239. But it is self-defeating for an agency to rely almost exclusively on comments submitted in response to a notice of proposed rulemaking as evidence for the market developments that, supposedly, prompted the agency to draw up the proposal in the first place. If observations offered by commenters indeed formed the basis for CMS's belief that administrative payments are rising faster than market rates and that such payments vary significantly between plans, the Rule would be unlawful for the separate reason that CMS did not, as required in notice-and-comment rulemaking, make available to the public during the rulemaking the "studies upon which [it] relie[d] . . . in order to afford interested persons meaningful notice and an opportunity for comment." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (quoting *American Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008)).

### 2. There is no evidence that administrative payments are being used to backchannel improper bonuses to agents and brokers

To justify ending separate treatment of payment for administrative services and setting a fixed rate for administrative payments, CMS relied primarily on its "belie[f]" that this regulatory

13

change is needed to ensure that MAOs cannot "circumvent" existing caps on agent and broker compensation to pay unlawful per-enrollment bonuses that are "likely to influence which MA plan an agent encourages a beneficiary to select during enrollment." 88 Fed. Reg. at 78555, 78552. But CMS again offered no evidence that agents and brokers are actually being influenced by administrative payments to push beneficiaries toward certain plans regardless of their suitability for individual enrollees. The agency instead simply made the bald assertion that the "result" of supposedly "rapidly increasing" administrative fees is that agents and brokers are presented with "questionable financial incentives" that are "likely to influence" them to encourage enrollment in some plans over others. which MA plan an agent encourages a beneficiary to select during enrollment. 89 Fed. Reg. at 30618.

CMS suggests (at 38) that this purely theoretical hypothesis was enough to satisfy CMS's obligation to engage in reasoned decision making. But courts have made clear, to the contrary, that "conclusory statements . . . do not constitute adequate" explanation for agency decisions. *Louisiana v. U.S. Department of Energy*, 90 F.4th 461 (5th Cir. 2024) (cleaned up). Under the APA, the Rule cannot validly rest on a *hypothesized* connection between supposed increases in the administrative payments offered by some plans and shifts in agent and broker behavior toward encouraging beneficiaries to select plans associated with higher administrative fees. CMS must produce some *evidence* of this link. But the only such evidence in the rulemaking record that CMS manages to identify is the same flawed Commonwealth Fund study that formed the basis for the agency's assertion that administrative payments have recently ballooned. CMS MSJ Br. 38.

### 3. CMS did not respond to comments pointing out methodological flaws in the "central evidence" supporting the Rule

"CMS's central evidence" for the purported need to overhaul its regulation of administrative payments for MA marketing was the Commonwealth Fund report. *Americans for Beneficiary Choice*, 2024 WL 3297527, at *5. But despite multiple commenters pointing out the serious methodological flaws in the report (*see, e.g.,* AR 6311-6314, 9940), CMS "failed to

sufficiently respond to" these comments (*Americans for Beneficiary Choice*, 2024 WL 3297527, at *5)*. Indeed, the preamble to the final Rule is devoid of any attempt to defend the report's reliability in the face of commenters' methodological criticisms. Even now, CMS has not attempted to explain how the report is reliable.

CMS does not—and cannot—deny that it failed to respond to the comments raising methodological criticisms of the Commonwealth Fund report. Instead, it contends (at 39) that the agency was not required to respond to the comments in question because they were not comments that, if true, would require the agency to change direction. That is plainly wrong. If the key evidence supporting an agency's proposed rule is in fact unreliable because of serious methodological flaws, then there would be no "rational connection" between the rule and the "facts found." *Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). An agency engaged in "reasoned decision making" would have to rethink the rule. *Michigan v. EPA*, 576 U.S. 743, 752 (2015).

That is why, as the Fifth Circuit has made clear, an agency must respond to comments that "can be thought to challenge a fundamental premise underlying the proposed agency decision." *Chamber of Commerce of United States v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023) (quoting *Carlson v. Postal Regulatory Commission*, 938 F.3d 337, 344 (D.C. Cir. 2019)). The comments that objected to the methodology behind CMS's "central evidence" that administrative payments have outstripped market rates and are being used to circumvent compensation caps in ways that are distorting agent and broker incentives are surely challenges to a "fundamental premise" underlying the Rule. Because CMS "offered no reasoned response" to these critical comments, the "agency failed to supply a satisfactory explanation for" the Rule, and instead "ignored an important aspect of the problem before it." *Ohio v. EPA*, 144 S. Ct. 2040, 2054 (2024) (cleaned up).

15

**B.    CMS did not satisfactorily explain why a $100 increase in the compensation cap appropriately accounts for administrative payments**

The Rule eliminated separate payment to agents and brokers for administrative services and sweeps administrative payments into "compensation" subject to the cap set by CMS. "[T]o account for administrative payments included under the compensation rate," the Rule increases the cap by $100 per enrollee. 42 C.F.R. § 422.2274(a).

As the Court recognized when granting a stay, CMS "never substantiated" its decision to set at $100 the increase intended to account for administrative payments. *Americans for Beneficiary Choice*, 2024 WL 3297527, at *4. CMS originally proposed only a $31 increase, "based on the estimated costs for training, testing, and call recording." 88 Fed. Reg. at 78556. Faced with a barrage of comments observing that $31 failed to account for other administrative costs that agents and brokers must expend to effectively serve beneficiaries, CMS acknowledged that its original proposal was too low but insisted that a "line-item calculation" of the market value of the "full array" of administrative costs is "not practicable." 89 Fed. Reg. at 30625. Instead of attempting any kind of reasoned estimation of the market rate for the administrative payments the Rule subsumes under the compensation cap, CMS settled on a $100 increase without "reasonably explain[ing]" its choice. *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

CMS argues (at 40-41) that because CMS determined that a "bottom-up analysis," based on a line-item calculation, of the market value of various administrative costs was not feasible since such an analysis would require "data and contracts CMS does not have access to," CMS proceeded reasonably by focusing on "a single top line." That echoes its acknowledgement that it adopted the $100 figure as "an appropriate starting point" based on the suggestions of "[s]everal commenters." 89 Fed. Reg. at 30626. CMS reasonably rejected higher amounts that other commenters recommended, the agency insists (*id.*), because the agency "believe[d]" that such higher-dollar recommendations did not appropriately discount the cost of technology that agents

16

and brokers use to solicit enrollment in private, non-Medicare plans, and "may" incorporate the cost of improper bonuses payments.

The alternative method to line-item calculation that CMS used to derive the $100 number was, however, no method at all—it was simply a shot in the dark. *See* Opening Br. 32-33. The agency provided no indication of how it was measuring the appropriate discount to avoid subsidizing non-Medicare sales. And it relied on sheer speculation in asserting that recommended amounts higher than $100 "appear[]" to be inflated by improper bonus payments. *Id.* Indeed, given that CMS declared that a line-item calculation was impracticable, it is mysterious how the agency could have a reasoned basis to distinguish between amounts reflecting fair market value and improperly inflated amounts. And the fact that the agency lacks the "data and contracts" necessary to make a reasoned decision is ground for concluding that it simply may not set rates—it surely is not license of it to do so willy nilly, without evidence or rational analysis.

CMS further argues (at 40-41) that a line-item calculation was not required because the APA does not require agencies to "conduct or commission their own empirical or statistical studies." *Prometheus*, 141 S. Ct. at 1160. It's not at all clear that is correct in this context; if an agency is going to jump into the rate-setting game (not at issue in *Prometheus*), it better be prepared to engage in serious econometric analyses to justify the rate that it sets. But even if CMS is right that it need not do the hard work of gathering evidence and crunching numbers, it (again) assuredly must do more than throw a dart at the dartboard. It must demonstrate at least that it "reasonably considered the relevant issues and reasonably explained [its] decision. *Id.* at 1158. Plaintiffs' objection, at bottom, is that CMS gave *no* rational explanation to support its choice of a flat $100 increase in the compensation cap. And whatever *Prometheus* may have said about statistical studies, it in no way abolished or rolled back an agency's obligation under the APA to supply a reasoned basis for their choices.

The facts of *Prometheus* make it inapposite in any event. The agency in *Prometheus* had "repeatedly asked commenters to submit empirical or statistical studies," but no commenter had

produced this "additional data." *Id*. In that context, the Court held that it was reasonable for the agency to proceed "on the evidence it had," rather than to "conduct or commission [its] own studies. *Id*. Here, by contrast, "[c]ommenters suggested many different figures and means of calculating an appropriate amount" 89 Fed. Reg. at 30625. Instead of working from this evidence to discern an appropriate level of increase to the compensation rate, CMS plucked the $100 figure from among the many proposed rates based on surmise and logical leaps. Because the "process by which [an agency] reaches" a particular result "must be logical and rational" (*Huawei Technologies USA, Inc. v. FCC*, 2 F.4th 421, 434 (5th Cir. 2021) (quoting *Michigan*, 576 U.S. at 750)), the $100 increase is arbitrary and capricious, as this Court has already recognized. *See Americans for Beneficiary Choice*, 2024 WL 3297527, at *3.

C.    **CMS upended the longstanding regulatory regime surrounding agent and broker compensation with no attention to reliance interests**

By including administrative fees paid to FMOs within the "compensation" subject to a fixed cap, the Rule marked an abrupt shift from CMS's consistent policy over the past 16 years, eliminating the longstanding prior regime of separate treatment of administrative payments. An agency pursuing such an upheaval of its "longstanding policies" must be "cognizant" of the "serious reliance interests" that the prior regulatory regime may have generated. *DHS v. Regents of the University of California*, 140 S. Ct. 1891, 1913 (2020). The "bare minimum" required is for the agency to "display awareness that it is changing position and show that there are good reasons for the new policy." *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 189 (5th Cir. 2023) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016)). If indeed significant reliance interests attach to the regulatory environment that the agency seeks to revolutionize, the agency must offer a "detailed justification for its change." *Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357, 381 (5th Cir. 2024) (en banc).

As this Court has provisionally held, CMS "insufficiently addressed reliance interests" in promulgating the Rule. 2024 WL 3297527, at *4. The agency did not even acknowledge that it

was departing from its own longstanding policy of treating administrative payments as separate from "compensation," let alone consider the harm to the "long standing business models" that have grown up around its prior policy. *Id*. CMS claims that its prior regulations offered a "definition of compensation" only for purposes of the regulations themselves and did "not purport to construe that term as used in the statute." That makes no sense. CMS's request for deference (at 20-21) depends on the idea that § 422.2274 codified the agency's interpretation of the statute. And it would be self-defeating for CMS to assert that it invested common terms in both the statute and regulation with different meanings. Nor does CMS explain why it would have taken such a bizarre approach to implementing § 1395w-21(j)(2)(D). At the very least, if an agency were to use a statutory term in an implementing regulation but imbue it with regulation-specific meaning that differed from the statutory meaning, one would expect it to do so openly, with good justification. But CMS has never taken this position before this suit.

CMS now points (at 41) to what it characterizes as instances where it considered how the regulatory sea-change it was implementing might disrupt or harm substantial reliance interests throughout the industry. For example, CMS notes CMS's disavowal of any intention to depress administrative payments to the point where "agents and brokers would be driven out of the industry" (89 Fed. Reg. at 30625), and the agency's related decision to set the rate for administrative payments at $100 rather than the initially proposed $31. CMS also highlights its response to commenters who explained that they "rely on the payment of administrative fees . . . from an MA organization to their FMO" to enable them to access various services they need to assist Medicare beneficiaries. *Id*. at 30624. CMS reassured these commenters that its regulatory overhaul would simply give "agents and brokers . . . the opportunity to decide which services are truly essential." 89 Fed. Reg. at 30624.

CMS cannot fulfill its obligation to consider reliance interests simply by scattering a few boilerplate remarks in the regulatory preamble. In the first place, none of these remarks meets the "bare minimum" requirement for CMS to show awareness that it was upending a longstanding

regulatory regime. *R.J. Reynolds*, 65 F.4th at 189. Despite its declared intention not to drive agents and brokers out of the industry by upending the business model they depend on, CMS did not attempt to estimate how replacing separate regulation of administrative payments under a fair market standard with a fixed $100 cap would affect recruitment and retention of agents and brokers. Nor did the agency balance the risks of disruption to the MA marketing industry—and, by extension, to the MA program itself—against the purported benefits of the new regulatory regime. And, despite predicting that its new policies would "change the current flow of payments," CMS did nothing to analyze the impact of this change, other than to rest on a blithe statement that it "believed" the change would empower agents and brokers to choose which services to pay for. 89 Fed. Reg. at 30624. None of this comes close to the "detailed justification" required when an agency upends a 16-year-old regulatory regime. *Wages & White Lion*, 90 F.4th at 381.

### D. CMS failed to consider the Rule's impact on the HIPAA Privacy Rule's encouragement of socially beneficial data sharing

The Rule puts up new barriers to data sharing by barring FMOs and other third-party marketing organizations from sharing "personal beneficiary data" unless the beneficiary gives "prior express written consent." 42 C.F.R. §§ 422.2274(g)(4), 423.2274(g)(4). Although CMS insists that the Rule does not impose an "outright prohibition of sharing personal beneficiary data," the Rule's requirement of "prior express written consent, one-to-one from person to seller, through a clear and conspicuous disclosure to share personal beneficiary data" creates a heavy burden for beneficiaries who wish to allow data sharing by FMOs. 89 Fed. Reg. at 30602. The Rule's one-to-one consent structure places particular burdens on beneficiaries working with independent agents and brokers supported by FMOs, since even when beneficiaries have consented to their data being shared with an FMO, they would have to separately provide express written consent to having their data shared with, and being contacted by, a specific affiliated agent or broker. By contrast, once beneficiaries have consented to their data being shared with a call center, that call center may freely share data among and across all the agents it employs.

As commenters pointed out during the rulemaking, the Rule's burdensome new restrictions on beneficiary data distribution is in "conflict with" the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule's goal of facilitating the socially beneficial sharing of "protected health information" (PHI) among authorized entities, including FMOs, noting that the new restrictions on sharing "personal beneficiary data" would effectively restrict the right for beneficiaries to consent to share their data. 89 Fed. Reg. at 30603; *see, e.g.* AR 10357. CMS did not respond to this concern, insisting only that FMOs must comply with the "more stringent" disclosure and authorization requirements under the HIPAA Privacy Rule—without addressing the respect in which the Rule is *more* restrictive than HIPAA. 89 Fed. Reg. at 30604. In failing to meaningfully respond to these comments and explain how it had accounted for the conflict between the Rule's new restrictions on sharing "personal beneficiary data" and the HIPAA Privacy Rule's purpose of facilitating the beneficial sharing of PHI, CMS "ignored 'an important aspect of the problem' before it." *Ohio*, 144 S. Ct. at 2054 (quoting *State Farm*, 463 U.S. at 43).

CMS's response (at 42-43) that CMS took steps to avoid any conflict between the Rule's new restriction on data sharing and the requirements of the HIPAA Privacy Rule misses the point. Plaintiffs do not contend that the requirement for FMOs to obtain beneficiaries' prior written express consent before sharing "personal beneficiary data" violates any specific provision or legal command of the HIPAA Privacy Rule. Plaintiffs' argument is that CMS failed to adequately consider how the Rule's restriction on the sharing of personal beneficiary data could and would stymie socially valuable data sharing authorized and encouraged by HIPAA, despite commenters' drawing attention to the ways in which CMS's restrictive new requirement effectively negates existing rights to consent to data sharing under HIPAA and other statutes.

## III. THE RULEMAKING WAS PROCEDURALLY DEFECTIVE

Courts in the Fifth Circuit have recognized that notice-and-comment rulemaking requires at least the "most critical factual material" supporting the agency's position to "have been made public" during the comment period and thereby "exposed to refutation." *Texas*, 389 F. Supp. 3d at

505 (quoting *Air Transport Association of America v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999)). Failure to disclose the technical and empirical basis for a proposed rule during the rulemaking deprives the public of an opportunity to scrutinize the evidence underlying the agency's decisions and thus precludes "meaningful commentary"—a "serious procedural error." *Id.* (quoting *Owner-Operator Independent Drivers Association v. Federal Motor Carrier Safety Administration*, 494 F.3d 188, 199 (D.C. Cir. 2007)). CMS committed precisely this "serious procedural error" by frequently gesturing in the NPRM at such generic descriptors as "recent market surveys," "information gleaned from oversight activities," and "information shared by insurance associations and focus groups and published in research articles" without providing any way for commenters to access and thereby assess the specific underlying data. 88 Fed. Reg. at 78554, 78555.

CMS argues, first, that there is no procedural obligation under Fifth Circuit precedent for agencies to disclose the factual and technical basis for a proposal rule. CMS MSJ Br. 45. In support of this surprising contention, CMS cites the observation in *Handley v. Chapman* that, "[g]enerally speaking," 5 U.S.C. § 553 "establishes the maximum extent of procedural scrutiny a reviewing court may apply to agency rulemaking." 587 F.3d 273, 281 (5th Cir. 2009).

CMS reads too much into stray language in *Handley*. The requirements enumerated by 5 U.S.C. § 553 are spare. To be sure, there is no express mention of an obligation to disclose critical data during the rulemaking. But § 553 likewise does not explicitly require agencies to respond to significant comments. Yet it is settled administrative law that an agency must "consider all relevant factors raised by the public comments and provide a response to significant points within." *Chamber of Commerce*, 85 F.4th at 774. The suggestion that agencies' procedural obligations are exhausted by the express requirements detailed in 5 U.S.C. § 553 therefore proves too much.

In all events, the proposition that agencies must expose to public comment at least the key factual material a proposed rule relies on is not a "novel rule" in the Fifth Circuit, as CMS suggests. CMS MSJ Br. 46. To the contrary, the Fifth Circuit has long held that "fairness requires that the agency afford interested parties an opportunity to challenge the underlying factual data relied on

22

by the agency." *Chemical Manufacturers Association v. EPA*, 870 F.2d 177, 200 (5th Cir. 1989). District courts within the Circuit routinely endorse and apply this rule. *See, e.g., Tice-Harouff v. Johnson*, 2022 WL 3350375, at *9 (E.D. Tex. Aug. 12, 2022) ("[T]he most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation"); *Texas*, 389 F. Supp. 3d at 505 (holding that the challenged agency rule "violated the APA by preventing interested parties from commenting on the studies that served as the technical basis for the rule").

CMS also argues that CMS did in fact disclose the empirical basis for the proposed rule, pointing to what it characterizes as the "incentive analysis" offered in the NPRM. CMS MSJ Br. 46. True, CMS mentioned "some recent studies" showing that MA plans were offering "additional or alternative incentives," including "through third parties such as FMOs," to influence agents and brokers to "prioritize enrollment into some plans over others." 88 Fed. Reg. at 78553-78554. But the sole such study that the NPRM actually disclosed was the Commonwealth Fund study.

Attempting to justify the paucity of the factual basis for the proposed rule that CMS made available, CMS maintains that CMS reasonably declined to reveal any specifics about the "information gleaned from oversight activities," because this data includes sensitive information raising privacy and trade-secret concerns. 88 Fed. Reg. at 78555. Even supposing CMS reasonably determined that data drawn from its oversight activities should not be disclosed, there is no plausible case that the other factual material that the agency relied on but only refers to in generic terms—such as market surveys and research articles—were also too sensitive to be shared.[2]

---

[2] CMS also argues (at 47) that the Rule did not introduce a prohibition on administrative payments that flow from MAOs to FMOs that was absent from the NPRM, and hence did not violate the "logical outgrowth" requirement. The preamble's suggestion that the Rule would "would change the current flow of payments," CMS insists, was simply prediction of the practical effects of the Rule. 89 Fed. Reg. at 30624. CMS thus appears to agree with the argument set forth in our opening brief (at 40): If—but *only* if—the Rule does not introduce a separate legal prohibition on payments from MAOs to FMOs, then CMS did not run afoul of the "logical outgrowth" requirement.

## IV.    PARTIAL VACATUR OF THE RULE IS THE APPROPRIATE RELIEF

Having demonstrated that the challenged parts of the Rule are unlawful, plaintiffs sought summary judgment in their favor and vacatur of the Rule's unlawful provisions. CMS urges (at 48) that any relief the Court grants should not extend beyond the plaintiffs because "party-specific relief is the default judicial remedy." Whatever the merit of that sweeping proposition in other contexts, it does not apply in APA cases. Rather, "vacatur of an [unlawful] agency action is the default rule." *National Association of Manufacturers v. SEC*, 105 F.4th 802 (5th Cir. 2024) (quoting *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023)). That universal vacatur is the proper relief when a court determines that an agency action is unlawful follows from the text of the APA itself. "Under section 706 of the APA, when a court holds that an agency rule violates the APA, it 'shall'—not may—'hold unlawful and set aside' the agency action." *Id*. at 815 (cleaned up); *see* 5 U.S.C. § 706(2).

CMS identifies no reason for the Court to depart from the default APA remedy here. Indeed, there is a particular reason to grant universal relief because, as the Court has already observed when entering a Section 705 stay, "limiting relief to only the parties before the court would likely distort the market." *Americans for Beneficiary Choice*, 2024 WL 3297527, at *7.

CMS contends that the Court must blind itself to this reality because Americans for Beneficiary Choice (ABC) lacks standing at the summary judgment stage. It is not clear why that would be so, but in all events, ABC has standing.

CMS's attack focuses on two of the elements needed for an organization to establish the associational standing—namely that the organization's "members would otherwise have standing to sue in their own right" and that "the interests it seeks to protect are germane to [its] purpose." CMS MSJ Br. 49; *see Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141, 2157 (2023). At the summary-judgment stage, a plaintiff organization must support each element required for associational standing by "'set[ting] forth' by affidavit or

other evidence 'specific facts.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quoting Fed. R. Civ. P. 56(e)).

CMS asserts (at 49) that ABC has supposedly not met its burden to establish standing, because it did not submit the required evidence with its summary-judgment brief. That is a meaningless technicality. ABC and Senior Security Benefits (a member of ABC), plus multiple individual ABC members, submitted affidavits in an appendix to the stay motion. Dkt. 9. Those declarations demonstrate that ABC, Senior Security Benefits, and other ABC members all have standing to sue. *See* A6-A8. It does not make a difference that the declarations were attached as exhibits to the stay motion rather than the summary-judgment motion; the declarations are in the record.

CMS maintains (at 49) that the declarations are insufficient because, in its view, *every* member of an organization must have an injury to support associational standing. That is flat wrong. To establish standing, an "association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975) (emphasis added); *accord, e.g.*, *American Clinical Laboratory Association v. Azar*, 931 F.3d 1195, 1203 (D.C. Cir. 2019) (to establish associational standing, and association plaintiff must demonstrate a redressable injury to "at least one of its members"). CMS brushes *Warth* aside as dictum, but that is not how the Fifth Circuit has seen it. *See, e.g.*, *Hancock County Board of Supervisors v. Ruhr*, 487 F. App'x 189, 195-196 (5th Cir. 2012) ("The first prong of the associational standing test requires that *at least one* member of the association satisfy the Article III elements and have standing to sue in his or her own right.") (emphasis added) (citing *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587-588 (5th Cir. 2006); *Warth*, 422 U.S. at 511). Indeed, the Fifth Circuit has recently confirmed that an association establishes standing so long as just "some of its members have an injury" (*Texas v. Nuclear Regulatory Commission*, 78 F.4th 827, 836 (5th Cir. 2023), *cert. granted on unrelated questions*, No. 23-1300, 2024 WL 4394124

(U.S. Oct. 4, 2024)), and that, "[t]o invoke associational standing," an organization must "identify at least one member that has suffered or will suffer harm" (*National Infusion Center Association v. Becerra*, 116 F.4th 488, 497 (5th Cir. 2024)).

CMS is also wrong that *Warth* has been "overtaken" by more recent cases. The Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), confirms only that "[e]very class member must have Article III standing in order to recover individual damages" in a class action. *Id*. at 431. This case is not a class action, and no one is seeking damages, so that truism has no application here. And in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), the Cour held that the individual doctors in the case lacked standing because their injuries were "too speculative," and the association plaintiff could not assert standing in the absence of any member with standing. *Id*. at 390, 393-396. That holding also has no application here, as it is undeniable that Senior Security Benefits, an ABC member, has standing.

CMS also challenges the germaneness prong of the associational standing test. That prong is "undemanding," calling for "mere pertinence between the litigation at issue and the organization's purpose." *Federation of Americans for Consumer Choice, Inc. v. U.S. Department of Labor*, 2023 WL 5682411, at *12 (N.D. Tex. June 30, 2023) (quoting *Association of American Physicians & Surgeons v. Texas Medical Board*, 627 F.3d 547, 550 n.2 (5th Cir. 2010)). The declaration of Greg Johnson, Executive Director of ABC—indicating that ABC was formed to "bring together beneficiaries, agents and brokers, and FMOs," "[u]nited by the common objective of protecting the best interests of beneficiaries of Medicare and other health insurance plans," and explaining how the Rule would seriously harm Medicare beneficiaries—easily meets this "undemanding" standard. A11-A14. ABC thus has standing. And in all events, a universal vacatur is warranted.

## CONCLUSION

The Court should grant plaintiffs' motion for summary judgment and deny defendants' cross-motion for summary judgment. It should thus vacate the Rule.

Dated: December 20, 2024

/s/ *Michael P. Lynn*

David Keltner
Texas Bar No. 11249500
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 878-3560
Fax: (512) 495-6401
david.keltner@kellyhart.com

Stephanie A. Webster
D.C. Bar No. 479524, *pro hac vice*
Christopher M. Nienhaus
D.C. Bar No. 90008585, *pro hac vice*
Ropes & Gray LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Phone: (202) 508-4859
Fax: (202) 508-4650
stephanie.webster@ropesgray.com
christopher.nienhaus@ropesgray.com

Casey Kyung-Se Lee
New York Bar No. 4885927, *pro hac vice*
Ropes & Gray LLP
1211 Avenue of the Americas
New York, New York 10036
Phone: (212) 596-9000
Fax: (212) 596-9090
casey.lee@ropesgray.com

Michael P. Lynn
Texas Bar No. 12738500
Lynn Pinker Hurst & Schwegmann, LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Phone: (214) 981-3801
Fax: (214) 981-3839
mlynn@lynnllp.com

Michael B. Kimberly
D.C. Bar No. 991549, *pro hac vice*
McDermott Will & Emery LLP
500 North Capitol Street NW
Washington, D.C. 20001
Phone: (202) 756-8901
Fax: (202) 756-8087
mkimberly@mwe.com

Ashley C. Parrish
D.C. Bar No. 464683, *pro hac vice*
Adam C. Solander
D.C. Bar No. 1002511, *pro hac vice*
King & Spalding LLP
1700 Pennsylvania Avenue NW, Suite 900
Washington, D.C. 20006
Phone: (202) 626-2627
Fax: (202) 626-3737
aparrish@kslaw.com
asolander@kslaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of this document was served via CM/ECF on all counsel of record pursuant to the Federal Rules of Civil Procedure on December 20, 2024.

*/s/ Michael P. Lynn*
Michael P. Lynn

Counsel for Plaintiffs