IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICANS FOR BENEFICIARY CHOICE, et al. | | |
| Plaintiffs, | | |
| v. | | Civil Action No. 4:24-CV-439-O |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | | |
| Defendants. | | |
| COUNCIL FOR MEDICARE CHOICE, et al. | | |
| Plaintiffs, | | |
| v. | | Civil Action No. 4:24-CV-446-O |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | | |
| Defendants. | | |

**REPLY IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

CHAD E. MEACHAM
ACTING UNITED STATES ATTORNEY

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:    214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

**Table of Contents**

I.    Introduction ................................................................................................................. 1

II.   Argument and Authorities .......................................................................................... 2

    A.    The statute grants the agency express authority to regulate how the
Medicare Advantage plans it funds are marketed. ................................................. 2

        1.    The statute grants CMS authority to limit administrative payments
as part of its "fair marketing standards." ...................................................... 2

        2.    The statute grants CMS authority to limit administrative payments
under its authority to limit the "use of compensation." ............................. 8

        3.    The statute grants CMS authority to regulate contract terms. ................. 17

    B.    The Final Rule is not arbitrary and capricious. ................................................... 18

        1.    The Final Rule is supported by sufficient evidence, is rational,
and accounted for reliance interests. ........................................................... 18

        2.    The Final Rule is consistent with HIPAA ................................................. 22

        3.    The Final Rule is consistent with the Due Process Clause. ..................... 22

    C.    CMS complied with any applicable notice-and-comment requirements. ............. 24

    D.    Plaintiffs' requested relief is overbroad. ............................................................. 25

III.  Conclusion ................................................................................................................. 25

## Table of Authorities

### Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935)...................................................................................................5

*Almendarez-Torres v. United States*,
    523 U.S. 224 (1998)...................................................................................................5

*as Relay League, Inc. v. FCC*,
    524 F.3d 227 (D.C. Cir. 2008)................................................................................24

*Asgrow Seed Co. v. Winterboer*,
    513 U.S. 179 (1995)...................................................................................................4

*Bank of Am., N.A. v. F.D.I.C.*,
    244 F.3d 1309 (11th Cir. 2001) ................................................................................8

*Bhd. of R. R. Trainmen v. Baltimore & O.R. Co.*,
    331 U.S. 519 (1947)...................................................................................................4

*Big Time Vapes, Inc. v. FDA*,
    963 F.3d 436 (5th Cir. 2020) ....................................................................................5

*Bradford v. U.S. Dep't of Lab.*,
    101 F.4th 707 (10th Cir. 2024) ...............................................................................15

*Bus. Roundtable v. SEC*,
    905 F.2d 406 (D.C. Cir. 1990)..................................................................................8

*Conn. Dep't of Pub. Util. Control v. FERC*,
    484 F.3d 558 (D.C. Cir. 2007)..................................................................................8

*DHS v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020).....................................................................................................21

*Echo Powerline, L.L.C. v. Occupational Safety & Health Rev. Comm'n*,
    968 F.3d 471 (5th Cir. 2020) ..................................................................................23

*FCC v. Fox Tel. Stations, Inc.*,
    556 U.S. 502 (2009)................................................................................................12

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)................................................................................................16

*FPC v. Hope Nat. Gas Co.*,
    320 U.S. 591 (1944) ............................................................................................5, 14

*Garcia v. United States*,
    469 U.S. 70 (1984) .................................................................................................17

*HUD v. Rucker*,
    535 U.S. 125 (2002) ................................................................................................5

*In re Riley*,
    923 F.3d 433 (5th Cir. 2019) ..................................................................................9

*Loper Bright Entrs. v. Raimondo*,
    603 U.S. 369 (2024) ................................................................................................8

*Mayfield v. U.S. Dep't of Lab.*,
    117 F.4th 611 (5th Cir. 2024) ................................................................................16

*MCI Telecomms. Corp. v. AT&T*,
    512 U.S. 218 (1994) ...............................................................................................16

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ..................................................................................23

*Nebraska v. Su*,
    121 F.4th 1 (9th Cir. 2024) ....................................................................................16

*Perkins v. Lukens Steel Co.*,
    310 U.S. 113 (1949) ...........................................................................................6, 15

*Sierra Club v. EPA*,
    939 F.3d 649 (5th Cir. 2019) .................................................................................21

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ...............................................................................................16

*Whitman v. Am. Trucking Ass'ns.*,
    531 U.S. 457 (2001) .................................................................................................5

*Willis v. Cleo Corp.*,
    749 F.3d 314 (5th Cir. 2014) ...................................................................................7

*Tenth Street Residential Ass'n v. City of Dallas, Tex.*,
    968 F.3d 492 (5th Cir. 2020) .................................................................................25

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
    992 F.3d 350 (5th Cir. 2021) ...................................................................................8

*Zummer v. Sallet*,
    37 F.4th 996 (5th Cir. 2022) ...................................................................................5

## Statutes, Rules, and Other Authorities

5 U.S.C. § 553 ...............................................................................................................24

5 U.S.C. § 553(b) ..........................................................................................................24

5 U.S.C. § 553(c) ..........................................................................................................24

11 U.S.C. § 330(a)(4)(B) ..............................................................................................9

42 C.F.R. § 422.504(a)(16) ........................................................................................4, 6

42 C.F.R. § 422.2274(a)(1) ...........................................................................................17

42 U.S.C. § 1395w-21(h)(4)(D) ...................................................................................2, 6

42 U.S.C. § 1395w-21(h)(7) .......................................................................................4, 25

42 U.S.C. § 1395w-21(j)(2)(D) ...............................................................................2, 17, 19

42 U.S.C. § 1395w-21(d)(2)(D) ....................................................................................16

73 Fed. Reg. 54,226 (2008) .........................................................................11–12, 13, 17

73 Fed. Reg. 67,406 (2008) ..................................................................................7, 12, 13

88 Fed. Reg. 78,476 (2023) (Proposed Rule) ...............................................................24

89 Fed. Reg. 30,448 (2024) (Final Rule) ...............4, 6–7, 7, 10, 13, 16, 17, 18, 19, 20, 22, 23, 25

*Compensation*, Merriam-Webster ..................................................................................9

*Marketing*, Black's Law Dictionary (12th ed. 2024) ....................................................4

## I.    Introduction

Defendants' opening brief detailed how Congress has long delegated authority to the Centers for Medicare & Medicaid Services (CMS) to limit how Medicare Advantage organizations use Medicare trust fund dollars to market government-funded Medicare Advantage health plans to Medicare beneficiaries.  In their responses, Plaintiffs try to carve out from that broad authority the Final Rule's specific limit on the administrative fees that agents, brokers, and other third-party marketing organizations like Field Marketing Organizations (FMOs) charge. But Plaintiffs cannot evade the broad terms of the statute Congress wrote, which has been understood for over fifteen years to authorize CMS's dollar limits on how much Medicare Advantage organizations—who voluntarily engage in a government health care program—pay their subcontractors for marketing.  Perhaps because of this fact, Plaintiffs ask for a new clear statement rule that would prevent Congress from authorizing the Executive Branch to regulate contractor spending in line with statutory goals unless Congress specifies a payment formula. But Plaintiffs fail to show any legal basis for this rule, nor is there any tradition or usage of the type that Plaintiffs would like to impose to prevent the Executive Branch from supervising how government contractors spend taxpayer money.  To the contrary, the plain text, structure, and history of the statute affirm the agency's decades-long contrary practice here.

Plaintiffs get no further with their argument that the Final Rule is arbitrary and capricious or that CMS violated other APA procedural requirements.  CMS acknowledged and explained both why it was reducing, to a particular dollar value, its earlier fair-market-value limit on administrative fees, as well as why $100 is the relevant fair-market value.

Put plainly, the Medicare statute does not leave the government—not to mention Medicare beneficiaries and taxpayers—helpless to only watch as agents, brokers, and other

marketers siphon limited government health care dollars into administrative fees without regard to the impact on the information agents and brokers provide to Medicare beneficiaries.  The statute instead authorizes—and, indeed, requires—the agency to take action to prevent this.  This Court should therefore reject Plaintiffs' efforts to rewrite the law, and should grant summary judgment to the agency.

## II.     Argument and Authorities

**A.     The statute grants the agency express authority to regulate how the Medicare Advantage plans it funds are marketed.**

CMS explained in its opening brief that the Medicare statute expressly delegates broad authority to the agency to promulgate "fair marketing standards," which must "at least" regulate the "use of compensation" so that it incentivizes "agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  42 U.S.C. § 1395w-21(h)(4)(D), (j)(2)(D).  (Gov't Br. at 20–22.)  Plaintiffs cannot show that the Final Rule's $100 limit on administrative payments exceeds that delegated authority.

**1.     The statute grants CMS authority to limit administrative payments as part of its "fair marketing standards."**

Section 1395w-21(h)(4)(D) authorizes CMS to promulgate "limitations" on Medicare Advantage organizations and their agents, brokers, and third-party representatives as part of the agency's "fair marketing standards."  That is an express delegation that authorizes the agency to regulate administrative payments, and Plaintiffs' contrary arguments fail.

<u>Regulatory Authority</u>.  The plain text of § 1395w-21(h)(4)(D) empowers CMS to promulgate "fair marketing standards."  Plaintiff CMC disagrees, insisting that the statute only "directs [Medicare Advantage] plans to comply with lawful regulations established pursuant to" other statutes—particularly paragraph (j)(2) and § 1395w-26.  (CMC Reply at 14.)  And Plaintiff

ABC, for its part, argues that any regulatory authority § 1395w-21(h)(4)(D) grants does not extend to compensation, because subparagraph (j)(2)(D) requires CMS to regulate the "use of compensation," which more specifically addresses the topic.  (ABC Reply at 3.)

Plaintiffs overlook the first two words of subparagraph (h)(4)(D), which instruct the agency to prescribe its limitations under paragraph (j)(2) as part of "such standards," i.e., the agency's "fair marketing standards."  The statute therefore provides that the agency's fair marketing standards include the limitations authorized in paragraph (j)(2).  (*See* Gov't Br. at 21.) If those limitations covered only the specific topics enumerated in subparagraphs (j)(2)(A) through (E), or restricted the agency's compensation rules to the minimum compensation guidelines the statute requires in subparagraph (j)(2)(D), then the statute would not say in paragraph (j)(2) that the agency's limitations must "at least" cover those topics.  By using the phrase "at least," Congress set a statutory floor mandating what CMS *must* regulate, not a statutory ceiling on what CMS *can* regulate.  (*See* Gov't Br. at 30–31.)  ABC cannot explain why "at least" does not mean "at least" (ABC Reply at 5–6), and even if CMC is correct that the phrase only "preserves" the agency's authority under other statutory provisions (CMC Reply at 14), that includes the authority to promulgate fair marketing standards as referenced in subparagraph (h)(4)(D).

"Fair marketing standards."  As CMS explained, the fair marketing standards authorized by paragraph (h)(4) have always uncontroversially authorized CMS's compensation rules.  (*See* Gov't Br. at 5–6 (quoting 2005 Marketing Guidelines at 139).)  CMC argues that CMS has been wrong to do so all along, because "marketing practices are *what* someone is paid to do, not *how much* someone is paid."  (CMC Reply at 15 (emphasis in original).)  But the plain meaning of "marketing" is broader than CMC posits:  "Marketing ordinarily refers to the act of holding forth

property for sale, together with the activities preparatory thereto," including "pricing." *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995) (growing seeds to bring to market encompassed within marketing). Even CMC's preferred dictionary definition encompasses the entire "process" of "promoting and selling . . . products or services." *See Marketing*, Black's Law Dictionary (12th ed. 2024)) (cited by CMC Reply at 15). Using agents, brokers, and FMOs—i.e., field *marketing* organizations—to sell plans to beneficiaries is one part of the "activities preparatory" to bringing plans to the market or the "process of promoting and selling" the plans. *See* 89 Fed. Reg. 30,448, 30,617 (2024) (recognizing importance of agents and brokers to Medicare Advantage); *see also* 42 C.F.R. § 422.504(a)(16) (requiring Medicare Advantage organizations to "maintain administrative and management capabilities sufficient . . . to organize, implement, and control the . . . marketing . . . activities related to the delivery of Part C services").

Nor can CMC limit the plain meaning of "marketing" because the heading to subdivision (h) uses the phrase "marketing materials." (CMC Reply at 15.) While some parts of subsection (h) discuss marketing materials, the heading does not trump the operative language in paragraph (h)(4) authorizing CMS to prescribe "fair marketing standards." *See Bhd. of R. R. Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528–29 (1947) (because "matters in the text . . . are frequently unreflected in the headings and titles" of a statute, the "title of a statute and the heading of a section cannot limit the plain meaning of the text"). Thus, just like other parts of subsection (h), paragraph (h)(4) sweeps more broadly than mere materials. *See* 42 U.S.C. § 1395w-21(h)(7) (imposing qualification and reporting requirements for agents and brokers).

<u>Constitutional Avoidance</u>. Unable to support its position with statutory text, CMC tries to supplant that text with an implied limitation based on constitutional avoidance, arguing that

because (in CMC's view) Congress somehow lacks the power to delegate CMS authority to promulgate fair marketing standards in Medicare Advantage, the Court should assume that Congress did not do so. But that argument fails at the outset because the constitutional avoidance canon "has no application in the absence of statutory ambiguity." *HUD v. Rucker*, 535 U.S. 125, 134 (2002) (internal quotation marks and citation omitted). And the statute's delegation to prescribe fair marketing standards, while broad, is not ambiguous.

But even if the statute were ambiguous, "[t]here's no need for avoidance 'where a constitutional question, while lacking an obvious answer, does not lead [a court] gravely to doubt that [a] statute is constitutional.'" *Zummer v. Sallet*, 37 F.4th 996, 1009 (5th Cir. 2022) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 239 (1998)). CMC is wrong that CMS's reading gives the agency unrestrained authority to promulgate any "limitations" it wants, because those "limitations" must be part of the agency's "fair marketing standards." This case is thus nothing like the sole non-delegation case CMC cites—*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 531, 539 (1935)—where private individuals could "regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 474 (2001) (analyzing *Schechter*). By contrast, here Congress delegated authority to the agency responsible for Medicare to prescribe standards over a "narrow and defined category," *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 445 (5th Cir. 2020) (internal quotation marks and citation omitted), i.e., marketing a particular type of publicly funded health plan to seniors. And at least when legislating in such narrow and defined categories, "the [Supreme] Court has also approved of delegations that spoke in terms of fairness and equity." *Id.* at 443 n18 (collecting cases); *see also FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944) (upholding delegation to Federal Power

**Reply in Support of Defendants' Cross-Motion for Summary Judgment – Page 5**

Commission to determine just and reasonable rates).  Moreover, the marketing standards here govern how contractors administer a government-benefit program using federal funds.  *See, e.g.*, AR11613–14, 11667, 11719 (FMOs' acknowledging payments are federal funds).  Just as the government "can supply its needs by . . . purchas[ing]" supplies instead of manufacturing them, the government can run benefit programs by purchasing services from contractors instead of using its own employees, and in so doing, Congress may permissibly delegate to agencies the "executive responsibility" of determining, as part of running the government's "internal affairs," how much in federal funds its contractors spend subcontracting out their responsibilities.  *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 127, 129, 130 (1949) (Congress could authorize agency to set minimum wage that government contractors must pay employees).  This Court therefore should reject CMC's theory that non-delegation doctrine prevents Congress from instructing the agency to protect the Medicare trust fund and issue rules to ensure that Medicare Advantage organizations and their agents, brokers, and representatives use those funds to provide information about Medicare plans to Medicare beneficiaries in a reasonable manner.

"Agents, Brokers, and Other Third Parties."  The Final Rule's limit on administrative payments is also consistent with CMS's authority to apply its fair marketing standards to "Medicare Advantage organization[s] (and the agents, brokers, and other third parties representing such organization[s])."  42 U.S.C. § 1395w-21(h)(4)(D).  Medicare Advantage organizations must "organize, implement, and control the . . . marketing . . . activities" of their Medicare Advantage plans.  *See* 42 C.F.R. § 422.504(a)(16).  As part of that responsibility, Medicare Advantage organizations appoint certain FMOs to enroll beneficiaries in the Medicare Advantage organization's particular plans and otherwise provide administrative support to the agents and brokers that Medicare Advantage organizations use.  *See, e.g.*, 89 Fed. Reg. at

30,618; *see also* AR11514 (appointing FMO and its employees "to represent" the Medicare Advantage organization, including to "sell, solicit, and negotiate" Medicare Advantage plans). Those same Medicare Advantage organizations pay FMOs based on how many beneficiaries they enroll in that organization's plans. (*See* AR11501 (requiring FMO to maintain minimum a number of Medicare Advantage contracts).) Unsurprisingly, FMO contracts with Medicare Advantage plans often refer to FMOs as agents or brokers. (AR11558, 11686, 11750.) Payments to FMOs have thus always been at the heart of the "agents, brokers, and third parties representing" Medicare Advantage organizations that Congress included in (h)(4)(D). *See* 73 Fed. Reg. 67,406, 67,409 (2008) (noting FMOs "perform . . . services for [Medicare Advantage] organizations"). ABC resists this conclusion, but cites no factual support, which alone is fatal to its claim. *See Willis v. Cleo Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) ("The party opposing summary judgment is required to identify specific evidence in the record, and to articulate the precise manner in which that evidence supports their claim." (cleaned up)).

*Chenery*. Without any convincing substantive arguments, Plaintiffs argue that the Court should refuse to consider § 1395w-21(h)(4)(D) altogether because the agency did not reference the phrases "fair marketing standards" or "at least" in the Final Rule. (CMC Reply at 13–14; ABC Reply at 2.) But the agency cited § 1395w-21(h)(4)(D) as a basis for its rule, *see* 89 Fed. Reg. at 30,619, and explained that § 1395w-21(j)(2)(D) provides an "obligation" to regulate, consistent with the government's position in this Court that the provision is a statutory floor, not a ceiling, *id.* at 30,617 (noting provision provides an "obligation" to regulate in certain circumstances). Thus, CMS is not relying on a statutory basis that "appears nowhere in" the rule. *Conn. Dep't of Pub. Util. Control v. FERC*, 484 F.3d 558, 560 (D.C. Cir. 2007) (cited by CMC Reply at 13–14); *see also Bus. Roundtable v. SEC*, 905 F.2d 406, 417 & n.10 (D.C. Cir.

1990) (same).

Even if Plaintiffs were correct that CMS's § 1395w-21(h)(4)(D) argument is somehow a *post hoc* rationalization (which it is not), courts consider arguments not pressed by the agency in its proceedings when the argument is not "a determination of policy or judgment which the agency alone is authorized to make." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 358 n.14 (5th Cir. 2021) (considering sovereign immunity argument not pressed by agency below) (cleaned up). "[T]he *Chenery* principle," therefore, has never applied to "agency post-hoc rationalizations involving . . . pure questions of statutory analysis" like when a court "undertake[s] an independent analysis of [a] statute." *Bank of Am., N.A. v. F.D.I.C.*, 244 F.3d 1309, 1319, 20 (11th Cir. 2001) (collecting cases). As Plaintiffs acknowledge, the Supreme Court recently held that it is courts' obligation to "independently identify and respect" statutory "delegations of authority." *Loper Bright Entrs. v. Raimondo*, 603 U.S. 369, 404 (2024). Whether the Final Rule exceeds that delegation is thus a pure statutory question that is not within the agency's sole authority and so does not implicate *Chenery*.

### 2.    The statute grants CMS authority to limit administrative payments under its authority to limit the "use of compensation."

Plaintiffs do not dispute that § 1395w-21(j)(2)(D) expressly delegates authority to CMS, under the *Loper Bright* framework, to promulgate "guidelines" that regulate the "use of compensation." Thus, even if the Court analyzes the Final Rule based only on the agency's authority under 42 U.S.C. § 1395w-21(j)(2)(D), Plaintiffs must show that the $100 limit on administrative payments exceeds that authority. And they cannot.

"Compensation" (challenge to 42 C.F.R. § 422.2274(a) and (e)). "Compensation" is a capacious term that generally includes payments like the administrative payments regulated in the Final Rule, and Plaintiffs' efforts to narrow the word's plain meaning fails. (Gov't Br. at 23–

27.)  Plaintiffs insist that the Final Rule oversteps the statute to the extent it limits

"reimbursement" for "hard costs."  (CMC Reply at 9–11; ABC Reply at 6–8.)  But neither

Plaintiff group has a convincing response to the fact that the Fifth Circuit already held in *In re*

*Riley*, 923 F.3d 433, 442 (5th Cir. 2019), that the "plain meaning of 'compensation' is broad

enough that it would generally be understood to include reimbursement."  (*See* Gov't Br. at 23.)

Drawing on the question noted in *Riley* of whether compensation to bankruptcy attorneys

serves the "the interests of the debtor," ABC argues that *Riley* should be understood to mean that

compensation includes hard costs only when those costs are "part of the service that is being

compensated."  (ABC Reply at 7.)  But *Riley* did not consider why the hard costs discussed

therein were incurred, or read an interest-of-the-debtor standard into "compensation," because of

some definitional aspect of that term.  Rather, *Riley* considered this only because the bankruptcy

statute there separately required the court to do so:  "§ 330(a)(4)(B) says courts may allow

compensation '*for representing the interests of the debtor* in connection with the bankruptcy

case[.]'"  923 F.3d at 443 (quoting 11 U.S.C. § 330(a)(4)(B)) (emphasis added).  That additional

statutory language is why ABC is also wrong when it selectively quotes *Riley* as holding only

that "the 'plain meaning' of 'compensation' '*can*' encompass the reimbursement of '*some*'

expenses, depending on the context."  (ABC Br. at 6–7 (quoting *Riley*, 923 F.3d at 442

(emphasis ABC's)).  The qualifications ABC quotes derive from the *Riley* court's analysis of the

interest-of-the-debtor statutory language, not any analysis of "compensation."  *Riley*, 923 F.3d at

442–43.

ABC relies on additional dictionary definitions (ABC Reply at 6), but those do nothing to

rebut *Riley*'s holding.  The online version of one of ABC's new dictionaries acknowledges that

compensation broadly encompasses "payment" or "remuneration."  *See Compensation*, Merriam-

Webster.[1]  And the definition ABC quotes from the American Heritage Dictionary suggests that compensation includes something given in "reparation" for a "loss"—which is broad enough to encompass money expended or lost on hard costs acquiring new enrollees.  (ABC Reply at 6 (quoting the American Heritage Dictionary).)

CMC focuses on the second sentence of § 1395w-21(j)(2)(D), which requires the agency's compensation guidelines to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs."  CMC interprets that sentence to mean the agency can only promulgate guidelines covering "compensation to enroll individuals," not reimbursing hard costs.  (CMC Reply at 10–11.)  But the language CMC cites modifies the phrase "incentives for agents and brokers," not the phrase "use of compensation."  (Gov't Br. at 24–25.)  The statute therefore simply requires CMS to analyze how the compensation it permits in its guidelines affects the incentives of agents and brokers to enroll individuals in particular plans.  It does not somehow restrict CMS's general authorization (in the statute's first sentence) to promulgate "limitations" on the "use of compensation other than as provided under" its "guidelines."  By focusing on the effect of the compensation, the statute suggests that Congress enabled CMS to prohibit *any* remuneration that in fact provides the prohibited incentives, whether or not the compensation itself is for enrollment.  (*See* Gov't Br. at 25.)  CMS cited in its Final Rule several ways those reimbursements could impact an agent or broker's incentives, including when administrative payments for some types of plans are greater than for others, 89 Fed. Reg. at 30,619, when more is paid for administrative services for Medicare Advantage enrollments than

---

[1] https://www.merriam-webster.com/dictionary/compensation (accessed January 31, 2025).

for the same administrative services for other types of enrollments, *id.* at 30,622, and when hard

costs like "travel and operational overhead" and paid "on a 'per enrollment' basis," *id.* at 30,622.

Plaintiffs also cite to a smattering of statutes and agency rules that treat reimbursement

differently than other forms of compensation.  (CMC Reply at 11; ABC Reply at 7.)  But they

never address the fact that *Riley* rejected a similar argument.  (*See* Gov't Br. at 24 (citing 923

F.3d at 441–42).)  CMC strains (CMC Reply at 11) to distinguish *Riley* by arguing that rules it

cites deal with employment compensation, which CMC argues is more analogous to § 1395w-

21(j)(2)(D) than the statute at issue in *Riley*.  But that is no distinction at all because the statute in

*Riley* also dealt with employment compensation (for bankruptcy attorneys).  Indeed, FMOs

themselves call their administrative payments "compensation," suggesting this particular

industry views administrative payments as part of overall compensation.  (*See* AR11501, 11598,

11730, 11748.)

Finally, CMC falls back on its argument that because CMS has previously excluded

administrative payments from its regulatory definition of compensation, the Court should graft

that (prior) regulatory definition onto the statute.  (CMC Reply. at 9–10.)  But as CMS explained

(Gov't Br. at 25–26), CMS has always regulated administrative payments, albeit differently from

other compensation.  And CMS never purported definitively to construe the statutory term.  (*Id.*)

CMC asks the Court to reject CMS's interpretation of its own regulations based on a few

preamble statements and because § 1395w-21(j)(2)(D) states that CMS "shall establish

limitations" on "the use of compensation other than as provided under guidelines."  (CMC Reply

at 10.)  The cited preamble statements are of little help to CMC.  CMS explained in them that

administrative payments are "not considered" compensation "under the rule" implementing the

statute—not that they could never be regulated as compensation under the statute itself.  73 Fed.

Reg. 54,226, 54,239 (2008). CMC finds no more traction in its argument that CMS was required to regulate every form of "compensation" the statute authorizes. (CMC Reply at 10.) CMC is wrong on the law, because the statute requires CMS only to regulate compensation that provides a perverse incentive to agents and brokers. (*See* Gov't Br. at 30–31). And CMC is wrong on the facts, because CMS has regulated administrative payments since the first year the statute was in effect. (*Id.* at 8 (citing 73 Fed. Reg. at 67,413, 67,414).) CMC has no response to the fact that "[n]othing prohibits federal agencies from moving in an incremental manner." *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 522 (2009). CMS has accordingly recognized that different types of compensation might have different effects, and when it observed behavior that suggested that its prior treatment of administrative payments no longer sufficed, it added to them.

  <u>"Guidelines" and "Use" (challenge to 42 C.F.R. § 422.2274(d) and (e))</u>. The Final Rule's $100 limit on administrative payments is also a "guideline" on the "use" of compensation. (Gov't Br. at 27–30.) Neither Plaintiff group disputes that insurance guidelines often include specific dollar limits (*id.* at 28), or that CMS's marketing guidelines in particular imposed dollar-limits on compensation since the first year § 1395w-21(j)(2)(D) was effective (*id.* at 30). Plaintiffs nevertheless insist that the words "guidelines" (ABC Reply at 8–9) and "use" (CMC Reply at 6-7) have always prohibited any specific dollar limits on compensation.

  ABC barely defends its argument that the term "guidelines" excludes dollar limits, reasserting that guidelines "involved flexibility and room for discretion," even when admitting that Medicare guidelines are often more precise. (ABC Reply at 8–9.) But as CMS explained (Gov't Br. at 27–28), ABC cites only irrelevant dicta in support of its theory.

  CMC, too, fails to support its argument that the word "use" prohibits dollar limits on compensation. Congress did not use a flexible term like "use" implicitly to disapprove of the

agency's detailed limits on compensation amounts that were in effect when Congress passed § 1395w-21(d)(2)(D), nor does the phrase "use of compensation" introduce surplusage when the amount an Medicare Administrative organization pays agents, brokers, and FMOs falls well within how the organization "use[s]" compensation. (Gov't Br. at 28–31.)

CMC's main justification for upsetting the long-settled understanding of the statute is to cite the agency's September 2008 rulemaking in which the agency initially adopted a rule that did not include dollar-limits on compensation before changing tacks and instituting dollar limits before the September 2008 rule ever went into effect. (CMC Reply at 8–9.) But a regulatory approach CMS tried for a month-and-a-half, that never went into effect, and that never purported to regulate to the outer limit of the agency's authority, is not more controlling than the actual compensation regulations that have been in effect for over 15 years. (Gov't Br. at 30.) And CMC essentially concedes the statutory argument when it endorses the part of the agency's September 2008 rulemaking where CMS explained that it intended to change the "compensation structure" its guidelines previously authorized. (CMC Reply at 6 (quoting the 2008 rule).) CMS explained that the "compensation structure" it had proposed but not finalized "focus[ed]" on "specific dollar values," meaning "compensation structure" includes any dollar-limits contained within those structures. 73 Fed. Reg. at 54,239; *see id.* at 67,409 (reinstating compensation dollar-level limits based on the "excessive compensation structure" the industry sought to implement in the wake of the earlier 2008 rule). By conceding CMS could regulate "compensation structure," CMC thus concedes that the agency can regulate the "specific dollar values" within that structure. *See also* 89 Fed. Reg. at 30,619 ("[W]e are focusing on current payment structures, including the *use* of administrative payments . . . .") (emphasis added).

CMC again concedes its case by admitting that CMS could continue regulating specific

compensation rates if it bases those rates on fair-market value, as it did in its 2005 Marketing Guidelines.  (CMC Reply at 8.)  CMC overlooks that the Final Rule it challenges regulates administrative payments based on fair-market value; CMS simply reduced that fair-market value to a particular dollar amount.  *See* 89 Fed. Reg. at 30,624 (explaining CMS was setting administrative rates based on its "fair market value analysis").  In any event, CMC cannot overcome the fact that Congress wrote a statute where it is "the result reached not the method employed which is controlling."  *Hope*, 320 U.S. at 602.  Thus, if dollar-limits on compensation prevents perverse incentives for agents and brokers, then the plain text of the statute certainly allows—and arguably requires—them.

CMC next analogizes to compensation rules from an entirely different industry:  private securities brokers.  (CMC Reply at 6–7.)  But CMC's own example undermines its own point. The first sentence of the cited Financial Industry Regulatory Authority (FINRA) website limits gifts to $100, directly contradicting CMC's argument that regulating the *amount* of compensation is divorced from its use.  *See* FINRA, *Gifts, Gratuities and Non-Cash Compensation*  (2025)[2] ("FINRA Rule 3220 . . . prohibits any member or person associated with a member, directly or indirectly, from giving anything of value in excess of $100 per year to any person where such payment is in relation to the business of the recipient's employer.").  And even if those rules said something different, CMC cites nothing—no statutory text, judicial decision, regulation, subregulatory guidance, or even legislative history—to suggest that Congress had regulations governing private securities markets in mind when directing a federal agency to supervise government subcontractors selling Medicare Advantage plans to

---

[2] https://www.finra.org/rules-guidance/key-topics/gifts-gratuities-and-non-cash-compensation (accessed Jan. 31, 2025)

beneficiaries.

Finally, CMC asks the Court to infer that Congress never intended CMS to promulgate dollar-limits on compensation despite the statute's broad text and the past two decades of uncontroverted agency practice based on a novel statement rule under which agencies can only impose dollar-level limits on government contractors if Congress prescribes a statutory formula for the agency to use to calculate that limit.  (CMC Reply at 4–6.)  CMC barely tries meet its burden to prove any longstanding Congressional practice against authorizing the executive branch to regulate how government contractors use government funds, relying on largely the same examples CMS previously explained were not instructive.  (*See* Gov't Br. at 32–34.)  CMC's response to the contracting cases CMS cited is that the Medicare Advantage plans CMC's members market are not sold to the government.  (CMC Reply at 6.)  But that fact is immaterial because CMC's members still use government funds to market government-funded Medicare Advantage plans.  They thus sell their marketing services to the government, even if indirectly.  *See supra* at 5–6.  So just as Congress can delegate to an agency the authority to set minimum compensation that government contractors need to pay their employees as part of the government's "own internal affairs" without exercising "regulatory power over private business or employment," *Lukens*, 310 U.S. at 127, 128, Congress can delegate to an agency the authority to set the compensation government contractors may pay their marketing subcontractors.

Unable to meet its burden to create a brand-new clear statement rule, CMC tries to recast its argument as a species of the major questions doctrine.  (*See* CMC Reply at 4–5.)  But regulating administrative payments to agents, brokers, and FMOs is not the "extraordinary case[]" in which the history and the breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before

concluding that Congress meant to confer that authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (internal quotation marks and citation omitted). Contrary to CMC's suggestion, courts have repeatedly rejected the major questions doctrine's applicability to agency rules regulating contractors and even private parties based on specific dollar amounts. *See Mayfield v. U.S. Dep't of Lab.*, 117 F.4th 611, 616–17 (5th Cir. 2024) (agency's conditioning of certain FLSA exemptions on specific salary amounts did not trigger major questions doctrine); *Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 725 (10th Cir. 2024) (setting a minimum wage for government contractors did not implicate major questions doctrine); *Nebraska v. Su*, 121 F.4th 1, 14 (9th Cir. 2024) (same). And the agency has long regulated compensation amounts, (Gov't Br. at 5–6, 29–30), which Congress endorsed by singling out "compensation" as an appropriate topic for regulation, 42 U.S.C. § 1395w-21(d)(2)(D). Thus, CMS is not now asserting authority that it had "repeatedly and consistently assert[ed] that it lacks," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156 (2000), nor has it read some transformative expansion of regulatory authority into "subtle devices," *MCI Telecomms. Corp. v. AT&T*, 512 U.S. 218, 231 (1994). CMC does not argue that the regulation's marginal economic effect, *see* 89 Fed. Reg. at 30,802 (provision "transfers funds" from "administrative" payments to "compensation" so "scored this impact as having no cost"), on "tens of thousands" of FMO employees or agents and brokers (CMC App. 210, 217) satisfies the demanding standard to invoke the doctrine on economic terms. *See Mayfield*, 117 F.4th at 616–17 (regulation impacting $472 million of payments per year and affecting 1.2 million workers insufficient to do so). Nor can CMC argue that prescribing compensation levels has political significance when the agency has done so for years, uncontroversially. (Gov't Br. at 30.)

  <u>Combination Argument</u>. As a last resort, ABC argues (ABC Reply at 3–4) that even if it

cannot identify any particular statutory language that prohibits limiting administrative payments, the *gestalt* of those words, taken together, metamorphize the text so that CMS can set only "flexible, goal-oriented standards." But courts "are not willing to narrow the plain meaning" of a statute "on the basis of a gestalt judgment of what Congress probably intended." *Garcia v. United States*, 469 U.S. 70, 78 (1984). And ABC does not explain how words that, standing alone, authorize the Final Rule, somehow mean the opposite when strung together.

### 3. The statute grants CMS authority to regulate contract terms.

Finally, 42 U.S.C. § 1395w-21(j)(2)(D)'s directive to regulate the use of compensation under guidelines that prevent perverse incentives for agents and brokers authorizes the Final Rule's limitations on contract terms that inhibit agents' or brokers' ability to objectively assess and recommend which health plan best meets beneficiary needs. (Gov't Br. at 34–35.) CMC is not correct that the regulation "exceeds CMS's authority because it regulates contract terms that have nothing to do with money." (CMC Reply at 30.) In compensation rules CMC does not challenge, CMS regulates "non-monetary remuneration," which alone defeats this argument. *See* 42 C.F.R. § 422.2274(a) (defining compensation to include "monetary or non-monetary remuneration"); 73 Fed. Reg. at 54,238 (CMC's preferred September 2008 rulemaking covering "non-pecuniary remuneration"). And while CMS argued that compensation *includes* payments and reimbursements, it has never suggested compensation is *limited* to those categories. (Compare CMC Reply at 31 *with* Gov't Br. at 23). Whether the remuneration is contract renewals, leads, or other non-pecuniary compensation, 89 Fed. Reg. at 30,622, the statute not only authorizes, but requires, the agency to prohibit compensation that misaligns agent/broker incentives with beneficiaries. And CMC's insistence that CMS cannot regulate administrative payments at all (CMC Reply at 30) fails for the reasons discussed above.

**B.**    **The Final Rule is not arbitrary and capricious.**

CMS explained in its opening brief (at 35–42) why the Final Rule was reasonable, reasonably explained, and supported by substantial evidence. For those reasons, and those described below, plaintiffs cannot show that the Final Rule is arbitrary and capricious.

**1.    The Final Rule is supported by sufficient evidence, is rational, and accounted for reliance interests.**

In the Final Rule, CMS supported its finding that current administrative payments are adversely influencing agent and broker incentives. Plaintiffs attempt to cast doubt on CMS's evidence largely by mischaracterizing the Final Rule as relying solely on a single focus group study. (ABC Reply at 22–23; CMC Reply at 19.) But Plaintiffs overlook that CMS relied on numerous evidence-backed observations (Gov't Br. at 35–38), including: (1) "the value of administrative payments offered to agents and brokers . . . that CMS has observed in recent years," 89 Fed. Reg. at 30,618; (2) a concomitant rise of complaints about Medicare Advantage marketing and pressure by agents and brokers to enroll beneficiaries in plans the beneficiary did not understand, *id*; (3) "complaints from a host of different organizations . . . . that agents and brokers are being paid, typically through various purported administrative and other add-on payments, amounts that cumulatively exceed the maximum compensation allowed under the current regulations," *id.* at 30,617; and (4) the fact that the Medicare Advantage market "has become increasingly consolidated among a few large national parent organizations," *id.* And as CMS also explained in its opening brief (at 35–38), each of those observations was backed up with record evidence, including "information gleaned from oversight activities," a review of marketing complaints including "listening to call recordings" between beneficiaries and agents and brokers, an OIG report, *id.*, along with the focus group that Plaintiffs emphasize, 89 Fed. Reg. at 30,618–22. Plaintiffs are therefore wrong to say that the problem CMS set out to solve is

illusory (ABC Reply at 12–13), or unsupported (CMC Br. at 24–25)

Plaintiffs repeat their arguments that these findings are not enough to support the agency's conclusion that administrative payments needed more clear regulation.  (ABC Br. at 24; *accord* CMC Br. at 13–14.)  But CMS found that administrative payments varied from plan to plan and circumvented CMS's compensation rules, 89 Fed. Reg. at 30,618, and it is neither a logical leap nor conclusory to deduce that agents, brokers, and FMOs have an incentive to favor plans that pay them more, *see* 89 Fed. Reg. at 30,621—particularly when industry participants admitted as much (*see* Gov't Br. at 38).  Nor do Plaintiffs have any meaningful response to the fact that the statute requires the agency's compensation guidelines to regulate proactively based on agent and broker "incentive[s]."  (*See* Gov't Br. at 38 (citing 42 U.S.C. § 1395w-21(j)(2)(D).)  The statute does not require CMS to wait until there is incontrovertible "evidence that agents and brokers are actually being influenced by administrative payments."  (ABC Reply at 14.)  By then the harm would be done and CMS would have failed to "ensure" that agents and brokers lack the incentive to lead beneficiaries astray.  42 U.S.C. § 1395w-21(j)(2)(D).  For similar reasons, Plaintiffs' reiteration of comments that did not undermine that rationale did not require a response.  (*See* Gov't Br. at 38-39.)

CMC theorizes that individual agents are "unaware" of administrative payments and so CMS's conclusion that they can influence agents and broker behavior is "speculative."  (CMC Reply at 25.)  But agents and brokers are, by definition, aware of administrative payments they receive directly, including "bonuses and perks (such as golf parties, trips, and extra cash)," 89 Fed. Reg. at 30,617, "travel and operational overhead" that can influence enrollment behavior when it is paid "on a 'per enrollment' basis," *id.* at 30,619, and other add-on payments like "health risk assessments," *id.* at 30,622.  And CMS explained that FMOs can influence agents

and brokers indirectly by rewarding with leads those agents and brokers who enroll beneficiaries in plans that are more lucrative for FMOs.  *Id.* at 30,620.

In the Final Rule, CMS explained and supported why it priced administrative payments at $100, and Plaintiffs are wrong to suggest otherwise.  (CMC Reply at 26–29; ABC Reply at 16-18.)  CMS explained how it properly considered commenters' feedback to its original $31 proposal, including why it shifted away from adjudicating a proper price for every conceivable administrative fee to a market-drive analysis of actual administrative payments.  (Gov't Br. at 39–41 (citing 89 Fed. Reg. at 30,625–26)).  CMC wrongly accuses CMS of relying on "fictitious evidence" because CMC found only one commenter who suggested that $100 was sufficient for administrative payments rather than the "[s]everal" CMS cited.  (*See* CMC Reply at 27 (citing AR01291 (recommending CMS "[l]imit administrative overrides to no more than $100 per year").)  CMC overlooks the NABIP Medicare Advisory Group member CMS cited in its opening brief who agreed that medium-sized brokerages should receive $100 per enrollee.  (Gov't Br. at 16 (citing AR1305–06 (recommending "Override = $100 per application" for certain agencies).)  Other commenters made similar recommendations.  *See* AR1456 (recommending "very small reasonable override for FMO organizations" of "maybe $75-100 per Med Adv policy"); AR1867 (suggesting an "[o]verride [of] $100-$125 per application" for certain agencies).  In any event, as CMS has explained (Gov't Br. at 39–40), the agency's broader point is that there was a "wide variation" in the recommended administrative payments, 89 Fed. Reg. at 30,625.  CMS's decision did not turn on how many commenters recommended any particular amount, but rather a conclusion that the commenters recommending more than $100 were trying to cross-subsidize the costs of other, non-Medicare health plans.  *Id*. at 30,626.

Plaintiffs are also wrong that CMS failed to acknowledge a change in position and

account for reliance interests in its prior position. (ABC Reply at 18–20; CMC Reply at 17–19.) Plaintiffs do not dispute that CMS acknowledged that it was altering its regulatory approach (Gov't Br. at 26–27), instead insisting that CMS had a statutory interpretation unbeknownst to the agency this whole time—a position CMS has explained is wrong. *See supra* at 11. Plaintiffs acknowledged that CMS disavowed any desire to drive firms out of the industry and raised the proposed administrative payment amount from $31 in the Proposed Rule to $100 in the Final Rule. (ABC Reply at 18–19.) They demand still more, asserting that the $100 is a "still-too-low fee" and so does not account for reliance interests *enough*. (CMC Reply at 18.) But the "difficult decision" of weighing reliance interests against others is "the agency's job," not Plaintiffs'. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32 (2020). Nor does the existence of some reliance interests jettison the usual rule that a court does not "substitute [its] judgment for that of the agency." *Sierra Club v. EPA*, 939 F.3d 649, 664 (5th Cir. 2019) (internal quotation marks and citation omitted).

Finally, plaintiffs are wrong to fault CMS for considering market structure in its rule. (Gov't Br. at 41–42.) Not only is considering the market in which an agency regulates routine, but it is necessary to consider that context where, as here, Congress instructed CMS to consider what "incentives" particular uses of compensation might have on agents and brokers operating in that market. And CMC is wrong that the agency's economic rationales are "inconsistent" because they limited the amount of administrative payments while also relying on competition more broadly. (CMC Reply at 24.) CMS explained that the statute envisions Medicare Advantage organizations competing on "'price'" and "'quality'" on a "level playing field." (Gov't Br. at 4.) The fact that Congress has instructed CMS to regulate both the use compensation and to prescribe fair marketing standards, (Gov't Br. at 21–22), demonstrates that

Congress never intended to allow unbridled competition on every aspect of Medicare Advantage, especially when perverse incentives could harm beneficiaries.

### 2.    The Final Rule is consistent with HIPAA.

CMS explained in its opening brief why the Court was correct to find that ABC was not likely to succeed on the merits of its challenge to the Final Rule's consent requirement to share personal beneficiary data under 42 C.F.R. §§ 422.2274(g)(4) and 423.2274(g)(4).  (Stay Order at 12.)  ABC does not dispute that the Final Rule acknowledged that it imposed standards that might be more stringent than HIPAA, and that the rule explained why it was possible and desirable for marketers to comply with both rules.  (Gov't Br. at 42–43).  And to the extent ABC now argues that CMS failed to respond to comments that would decrease potentially beneficial marketer contacts with beneficiaries (ABC Reply at 20), CMS acknowledged "the important role TPMOs can play," 89 Fed. Reg. at 30,605, and specifically addressed that concern by allowing data-sharing with beneficiary consent, instead of prohibiting *all* data sharing between marketers, as CMS had originally proposed.  *See id.*; *id.* at 30,601–02 (explaining change).  This, CMS explained, would "balance[e] beneficiary protections with beneficiary choice" by allowing "beneficiaries to control who is contacting them" so they could choose which marketers would best help them select the right health plan.  *Id.* at 30,605.  ABC's argument thus boils down to the idea that its members know better than beneficiaries who should contact them—something ABC cannot defend.

### 3.    The Final Rule is consistent with the Due Process Clause.

While CMC spends most of its brief bemoaning how prescriptive the agency's administrative payment regulations are, it claims the Due Process Clause prevents the agency from writing a contract-term regulation that grants TPMOs more flexibility.  The agency runs

afoul of the Constitution, the argument goes, by requiring that Plaintiffs' member's contracts adhere to the bare statutory minimum and avoid incentivizing agents and brokers to enroll individuals in the Medicare Advantage plan that is not intended to best meet their health care needs. *Cf.* 89 Fed. Reg. at 30,620 (explaining in Proposed Rule that agency sought to regulate "without being overly prescriptive as to how the plans should structure" their contracts). Contrary to CMC's claim, neither the APA nor the Constitution prefers lists of illegal contract terms over rules that focus on (and aim to prevent) adverse outcomes. *See Echo Powerline, L.L.C. v. Occupational Safety & Health Rev. Comm'n*, 968 F.3d 471, 475, 477 (5th Cir. 2020) (no Due Process problem when regulation required entities to "minimize the possibility that conductors and cables the employees are installing or removing will contact energized power lines or equipment"). CMC still points to no agency precedent CMS abrogated despite CMC's members' reliance, rendering *FCC v. Fox* (cited by CMC at 32) irrelevant. (*See* Gov't Br. at 43.) And *Mock v. Garland*, 75 F.4th 563, 585 (5th Cir. 2023) (cited by CMC at 32–33) was a logical outgrowth case that had nothing to do with the Due Process clause.

Indeed, taking *Mock* on its own terms, there is no logical outgrowth problem here. Unlike in *Mock*, where the agency discarded, without notice, the worksheet on which its prior regulation was based in favor of multi-factor standard that extended the regulatory framework to cover 99% of the market, 75 F.4th at 583–84, CMS both proposed and finalized the same test: whether a contract "has the direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent's or broker's ability to objectively assess and recommend which plan best meets the health care needs of a beneficiary." *Compare* 88 Fed. Reg. at 78,554 *with* 89 Fed. Reg. at 30,621. CMC's remaining arguments fault the agency for providing additional examples of conduct that might, "depending on the facts and

circumstances," 89 Fed. Reg. at 30,621, violate that standard. (CMC Reply at 33.) But the legal

test remains the same, and additional examples are not a change in course. Nor do CMC's

arbitrary and capricious arguments (CMC Reply at 34)—which parrot arguments raised against

the agency's $100 limit on administrative payments—find any more traction here.

## C.    CMS complied with any applicable notice-and-comment requirements.

Plaintiffs also critique the agency for allegedly not complying with procedural

requirements in 5 U.S.C. § 553, but as CMS explained (Gov't Br. at 45–47), these arguments

fail. Plaintiffs ask this Court to decide which specific factual materials the agency should have

disclosed in its Proposed Rule. But the APA does not require the agency to disclose any

particular factual materials, meaning Plaintiffs' argument "cannot be squared with [the APA's]

text." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 246 (D.C. Cir. 2008) (Kavanaugh, J.,

concurring). Plaintiffs rely on two cases from the 1980s that, as CMS already explained (Gov't

Br. at 45–46), applied a provision of the APA irrelevant here or never found a violation of the

doctrine that CMC touts. (*See* CMC Reply at 20–21; ABC Reply at 22–23.) ABC admits that

this theory has no textual basis (ABC Reply at 22), and CMC's belated effort to ground its theory

in § 553(c)'s provision allowing parties to comment on proposed rules falls short. All that

provision requires is the opportunity to comment "[a]fter notice required by this section." 5

U.S.C. § 553(c). The requirements for that "notice" are set forth in § 553(b), which requires the

agency to disclose "either the terms or substance of the proposed rule or a description of the

subjects and issues involved." *Id.* § 553(b). CMC does not contend that the Proposed Rule

failed to disclose all that was required by § 553(b), and so it cannot overcome the plain text.

In any event, while Plaintiffs cite a bevy of factual material they would have liked to see

(ABC Reply at 22; CMC Reply at 20), neither responds meaningfully to CMS's argument that

the agency disclosed the heart of CMS's proposed rule and discussed the factors bearing on its analysis (Gov't Br. at 46). CMC insists that the agency should have released confidential plan contracts after redacting confidential information. (CMC Reply at 20). But the most relevant information in those contracts were the specific rates that could not have been disclosed without raising serious confidentiality concerns. *See* 89 Fed. Reg. at 30,618 (relying on "the value of administrative payments offered to agents and brokers").

### D.     Plaintiffs' requested relief is overbroad.

If the Court enters relief, that relief should only extend to the parties with standing and to the specific parts of the Final Rule found unlawful. Plaintiffs double down on their incorrect assertion that a court *may never* grant party-specific relief (CMC Reply at 36–37), despite the fact that the Fifth Circuit has said the opposite (Gov't Br. at 47–48.) Nor do the uniformity concerns that controlled CMC's case law apply when agents and brokers are already subject to specific state-law requirements that prevent such uniformity. *See* 42 U.S.C. § 1395w-21(h)(7).

Plaintiffs are wrong to dismiss Article III as "a distraction." (CMC Reply at 37.) Plaintiffs fail to grapple with the Fifth Circuit precedent CMS cites requiring that each member of an association have standing. *Tenth Street Residential Ass'n v. City of Dallas, Tex.*, 968 F.3d 492, 500 (5th Cir. 2020). And they also cannot account for subsequent Supreme Court caselaw supporting the rationale of that holding. (Gov't Br. at 48-50.) Nor do they give no reason why Article III would treat associations differently from classes (ABC Reply at 26), or individuals (CMC Reply at 37), and so their efforts to cast aside Article III fail.

### III.     Conclusion

The Court should grant the agency's cross-motion for summary judgment and deny Plaintiffs' motions.

Respectfully submitted,

CHAD E. MEACHAM
ACTING UNITED STATES ATTORNEY

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:    214-659-8626
Facsimile:     214-659-8807
brian.stoltz@usdoj.gov

Attorneys for Defendants

Certificate of Service

On January 31, 2025, I electronically submitted the foregoing document with the clerk of

court for the U.S. District Court, Northern District of Texas, using the electronic case filing

system of the court.  I hereby certify that I have served all parties electronically or by another

manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Brian W. Stoltz
Brian W. Stoltz
Assistant United States Attorney