# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **AMERICANS FOR BENEFICIARY CHOICE, et al.,** | § § § | |
| **Plaintiffs** | § § | |
| **v.** | § § | **Civil Action No. 4:24-cv-00439-O** |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; et al.,** | § § § § | |
| **Defendants.** | § § | |

| | | |
|---|---|---|
| **COUNCIL FOR MEDICARE CHOICE, et al.,** | § § | |
| **Plaintiffs** | § § | |
| **v.** | § § | |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; et al.,** | § § § § | **Civil Action No. 4:24-cv-00446-O** |
| **Defendants.** | § § | |

## MEMORANDUM OPINION & ORDER

Before the Court are Americans for Beneficiary Choice ("ABC") and Council for Medicare

Choice's ("CMC") (collectively, "Plaintiffs") Motions for Summary Judgment (ECF No. 50 (Case

4:24-CV-439); ECF No. 50 (Case 4:24-CV-446)) and accompanying briefs (ECF No. 51 (Case

4:24-CV-439); ECF No. 51 (Case 4:24-CV-446)); Defendants' Motions for Summary Judgment

(ECF No. 52 (Case 4:24-CV-439); ECF No. 53 (Case 4:24-CV-446)) and accompanying briefs

(ECF No. 54 (Case 4:24-CV-439); ECF No. 55 (Case 4:24-CV-446)); Plaintiffs' respective

Responses and Replies (ECF No. 55 (Case 4:24-CV-439); ECF Nos. 56, 57 (Case 4:24-CV-446));

1

and Defendants' respective Responses and Replies (ECF Nos. 53, 58 (Case 4:24-CV-439); ECF Nos. 54, 60 (Case 4:24-CV-446)). For the reasons stated herein, Plaintiffs' Motions for Summary Judgment are **GRANTED in part** and **DENIED in part**. And as explained below, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND

### A.  The Final Rule

Medicare is a federal health-insurance program for the elderly and persons with certain disabilities. Medicare Advantage ("MA") is a private alternative to traditional Medicare in which the government contracts with private health insurers to provide beneficiaries with the coverage they would otherwise receive under traditional Medicare. 42 U.S.C. § 1395w-22(a). Under Medicare Part D, the federal government contracts with private drug-plan sponsors to provide drug benefits. *Id.* § 1395w-101. About fifteen years ago, Congress in the Social Security Act authorized the Centers for Medicare and Medicaid Services ("CMS") to set "guidelines" to "ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." *Id.* § 1395w-21(j)(2)(D); *see also id.* § 1395w-104(l)(2) (applying same to Part D).

Under this scheme, CMS regulates compensation that MA and Medicare Part D plans pay to independent agents and brokers who help beneficiaries select and enroll in private plans. In doing so, CMS places price caps on "compensation" paid to agents and brokers for enrollments. 42 C.F.R. § 422.2274(d)(2)–(3). The current price cap for new enrollments is $611. Changes to MA for Contract Year 2024, 89 Fed. Reg. 30448, 30621 (Apr. 23, 2024) (to be codified at 42 C.F.R. pts. 417, 422, 423, 460).

In addition to payments made to agents and brokers, insurance carriers, i.e., Medicare Advantage Organizations, also reimburse third-party firms like field-marketing organizations ("FMOs") for administrative services provided to agents and brokers as part of the MA enrollment process. These services include fielding and recording beneficiaries' calls; developing technology such as plan-comparison tools that agents deploy in the field; assisting agents and brokers with obtaining necessary licenses, certifications, and trainings; and launching marketing campaigns.

Until recently, CMS did not cap payments for administrative services because it did not classify payment for those services as "compensation." 42 U.S.C. § 1395w-21(j)(2)(D); *see* Medicare Program Revisions, 73 Fed. Reg. 54226, 54239 (Sept. 18, 2008) (to be codified at 42 C.F.R. pts. 417, 422, 423); Medicare and Medicaid Programs, Contract Year 2022 Changes, 86 Fed. Reg. 5864, 5993 (Jan. 19, 2021) (to be codified at 42 C.F.R. pts. 405, 417, 422, 423, 455, 460). Instead, CMS only required that administrative payments not exceed "the value of those services in the marketplace." 42 C.F.R. § 422.2274(e)(1)–(2).

CMS shifted course and set fixed rates for a wide range of administrative payments that were previously uncapped and unregulated as compensation. To that end, CMS promulgated a new rule (the "Final Rule"). Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30448. Key provisions of the Final Rule seek to regulate administrative payments as "compensation" and limit the total payments that carriers can make for administrative services to $100 (the "Fixed Fee"). *Id.* at 30621 (42 C.F.R § 422.2274(a), (e) and § 423.2274(a), (e)). The Final Rule also introduces new prohibitions on contract terms that health-plan carriers may offer third-party firms or agents and brokers (the "Contract-Terms Restriction"). *Id.* at 30620 (42 C.F.R. § 422.2274(c)(13) and § 423.2274(c)(13)). Under the Contract-Terms Restriction, health-plan carriers must

> ensure that no provision of a contract with an agent, broker, or other [third-party marketing organization] has a direct or indirect effect of creating an incentive that

would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary.

*Id.* at 30829. CMS provided examples of prohibited terms, which focus on schemes to circumvent existing compensation caps, such as volume-based bonuses. *Id.* at 30621.

In conjunction with the Fixed Fee and Contract-Terms Restriction, the Final Rule also prohibits third-party firms from "distributing any personal beneficiary data that they collect" to any other third-party marketing organizations without consent (the "Consent Requirement"). *Id.* at 30599. This prohibition covers a beneficiary's "name, address, and phone number," as well as "any other information given by the beneficiary for the purpose of finding an appropriate MA or Part D plan." *Id.* at 30604. Notably, this same data qualifies as "protected health information" for purposes of the Health Insurance Portability and Accountability Act ("HIPAA"). 45 C.F.R. § 164.105(c).

### B.  Relevant Procedural History

Plaintiffs filed two separate cases[1] seeking vacatur of the Final Rule along with declaratory and injunctive relief.[2] Plaintiffs later moved for a stay of the Final Rule under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction enjoining enforcement of the Fixed Fee, Contract-Terms Restriction, and Consent Requirement.[3] On July 3, 2024, this Court granted in part and denied in part Plaintiffs' Motions for a Stay. *See Ams. for Beneficiary Choice v. HHS*, No. 4:24-CV-00439-O, 2024 WL 3297527, at *7 (N.D. Tex. July 3, 2024). Specifically, the Court held the Fixed Fee and Contract-Terms Restriction were arbitrary and capricious under Section 706 of the

---

[1] *Ams. for Beneficiary Choice v. HHS*, No. 4:24-cv-00439-O and *Council for Medicare Choice v. HHS*, No. 4:24-cv-446-O. For clarity, citations to ABC's summary judgment briefing and Complaint reference Case No. 4:24-cv-00439-O, while citations to CMC's summary judgment briefing and Complaint and Defendants' summary judgment briefing correspond to Case No. 4:24-cv-446-O.

[2] ABC Compl. 31, ECF No. 1; CMC Compl. 45, ECF No. 1.

[3] *See* ABC Mot. Prelim. Inj, ECF No. 7; CMC Mot. Prelim. Inj., ECF No. 19. Only ABC challenged the sharing of personal data prohibitions. 42 C.F.R. §§ 422.2274(g), 423.2274(g). ABC Br. 9, ECF No. 8.

4

Administrative Procedure Act ("APA"). So, the Court stayed the effective date of the Final Rule's amendments to 42 C.F.R. §§ 422.2274(a), (c), (d), (e) and §§ 423.2274(a), (c), (d), (e) for the pendency of this suit and any appeal. *Id.* at *3–5. The Court, though, held that ABC failed to demonstrate a substantial likelihood of success on its challenge to the Consent Requirement, and denied ABC's Motion for a Stay insofar as it sought a stay for the Final Rule's amendments to 42 C.F.R. § 422.2274(g) and 42 C.F.R. § 423.2274(g). *Id.* at *6.

Given the similarity of issues raised by the Plaintiffs in the two cases, the parties agreed to a joint scheduling order regarding their Cross-Motions for Summary Judgment. Plaintiffs filed separate Motions, Responses, and Replies,[4] while Defendants addressed both cases in their consolidated Cross-Motion for Summary Judgment, Response, and Reply.[5] The parties' Cross-Motions for Summary Judgment are ripe for the Court's review.

### C. The Parties

Plaintiffs are ABC, Senior Security Benefits, LLC ("Senior Security"); CMC; Fort Worth Association of Health Underwriters, Inc. ("NABIP–Fort Worth");[6] and Vogue Insurance Agency LLC ("Vogue"). Senior Security and Vogue are Individual Plaintiffs whose businesses are impacted by the Final Rule. ABC is a trade association who represents health-industry stakeholders in litigation.[7] Individual Plaintiff Senior Security is a member of ABC.[8] CMC represents "independent, third-party firms that contract with multiple MA and [Medicare] Part D health plan carriers and either employ individual agents directly or provide administrative services to a

---

[4] ABC Mot. Summ. J., ECF No. 50; ABC. Resp. and Reply, ECF No. 55; CMC Mot. Summ. J., ECF No. 50; CMC Resp., ECF No. 56; CMC Reply, ECF No. 57.
[5] CMS Mot. Summ. J., ECF No. 53; CMS Resp., ECF No. 54; CMS Reply, ECF No. 60.
[6] CMC and NABIP–Fort Worth will be referred to collectively as "CMC."
[7] ABC Compl. 6, ECF No. 1; CMC Compl. 7, ECF No. 1.
[8] ABC Compl. 7, ECF No. 1.

network of independent-contractor agents or brokers."[9] NABIP–Fort Worth represents firms that provide administrative services to agents and brokers.[10] Individual Plaintiff Vogue is a member of NABIP–Fort Worth.[11]

Defendants in these suits are the United States Department of Health and Human Services ("HHS"); CMS; Robert F. Kennedy, Jr. in his official capacity; and Mehmet Oz in his official capacity.[12] The Court collectively refers to Defendants as "CMS" throughout this Order.

## II.    LEGAL STANDARD

The APA "authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (alteration in original) (quoting 5 U.S.C. § 702). Upon review of agency action, a district court is required to "hold unlawful and set aside agency action" that the court finds is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and] (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)–(D).

Disputes arising under the APA are commonly resolved on summary judgment, where district courts sit as an appellate tribunal to decide legal questions on the basis of the administrative record. *Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022). In APA cases challenging agency action, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA

---

[9] CMC Compl. 4, ECF No. 1.
[10] *Id.*
[11] *Id.*
[12] *Id.* at 8–9. Pursuant to Federal Rule of Civil Procedure 25(d), Robert F. Kennedy, Jr. and Mehmet Oz were substituted for their predecessors as Secretary of HHS and Administrator of CMS, respectively.

standard of review." *Gadhave v. Thompson*, No. 3:21-CV-2938-D, 2023 WL 6931334, at *1 (N.D. Tex. Oct. 19, 2023) (citations omitted). The agency "resolve[s] factual issues to arrive at a decision . . . supported by the administrative record," and the district court applies the APA standards of review to determine whether, as a matter of law, "the evidence in the administrative record permitted the agency's decision." *Yogi Metals Grp. Inc. v. Garland*, 567 F. Supp. 3d 793, 797–98 (S.D. Tex. 2021), *aff'd*, 38 F.4th 455 (5th Cir. 2022) (internal quotation marks and citation omitted).

## III.    ANALYSIS

Plaintiffs challenge the Final Rule on two primary grounds. First, Plaintiffs argue that CMS exceeded its statutory authority.[13] Second, Plaintiffs contend the Final Rule is arbitrary and capricious.[14] The Court addresses each argument in turn.

### A.  Excess of Authority

Plaintiffs argue the Fixed Fee and Contract-Terms Restriction exceed CMS's statutory authority.[15] As explained below, the Court agrees.

#### 1.  The Fixed Fee

The Court begins with the Fixed Fee. Congress enabled CMS to set "guidelines" to "ensure that the *use of compensation* creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added). ABC argues this statutory "language is incompatible with CMS's

---

[13] CMC Br. Supp. Mot. Summ. J. 16–21, 35, ECF No. 51; ABC Br. Supp. Mot. Summ. J. 12–19, ECF No. 51.

[14] CMC Br. Supp. Mot. Summ. J. 22–35, 38–40, ECF No. 51; ABC Br. Supp. Mot. Summ. J. 20–37, ECF No. 51.

[15] CMC Br. Supp. Mot. Summ. J. 16–21 (arguing the Fixed Fee exceeds authority), 35 (arguing the Contract-Terms Restriction exceeds authority), ECF No. 51; ABC Br. Supp. Mot. Summ. J. 12–19 (arguing the Fixed Fee exceeds authority), ECF No. 51.

position that any and all payments related to MA marketing are prohibited unless they are made pursuant to the agency's inflexible rules, including rate setting."[16] Similarly, CMC contends the Fixed Fee exceeds CMS's "statutory authority in two ways: (1) CMS has no authority to regulate the amount of compensation provided, much less to fix that compensation at a single, artificially depressed rate; and (2) CMS has no authority to regulate administrative payments as 'compensation.'"[17]

"The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). And "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.* at 412. "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." *Id.* at 413.

Statutory interpretation starts with the text. "[S]tatutory terms are generally interpreted in accordance with their ordinary meaning." *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013) (citation omitted). The traditional approach for courts is to "interpret the words consistent with their ordinary meaning . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (alteration in original) (internal quotation marks and citation omitted). Moreover, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted).

---

[16] ABC Br. Supp. Mot. Summ. J. 12, ECF No. 51.
[17] CMC Br. Supp. Mot. Summ. J. 16, ECF No. 51.

Here, the statutory language states that CMS's "guidelines shall ensure that the use of compensation creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). As promulgated, the Fixed Fee regulates administrative payments as "compensation" and places a $100 fixed fee on the total payments for administrative services. Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30621.

The Court first addresses whether CMS had the statutory authority under 42 U.S.C. § 1395w-21(j)(2)(D) to fix payment for administrative services at $100 and then turns to whether § 1395w-21(j)(2)(D) authorized CMS to regulate administrative payments as compensation.

### i.    $100 Payment Limit

CMC posits that "CMS's Fixed Fee hinges on an asserted power to engage in ratemaking for plans, firms, agents, and brokers in the industry. But Congress gave CMS no such power."[18] The Court agrees. The statutory text delegates to CMS the authority to set "*guidelines*" to "ensure that the *use of compensation* creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added). As shown below, CMS may only regulate how compensation is *used*, not engage in ratemaking.

The Court first consults the plain meaning of § 1395w-21(j)(2)(D), which indicates Congress did not authorize CMS to establish price controls. *See NPR Invs., L.L.C. ex rel. Roach v. United States*, 740 F.3d 998, 1007 (5th Cir. 2014) ("We follow the plain and unambiguous meaning of the statutory language, interpreting undefined terms according to their ordinary and natural meaning and the overall policies and objectives of the statute." (internal quotation marks and

---

[18] *Id.*

9

citations omitted)). "Dictionaries are a principal source for ascertaining the ordinary meaning of statutory language." *Thompson v. Goetzmann*, 337 F.3d 489, 497 n.20 (5th Cir. 2003).

Beginning with the term "use," its plain meaning is "application or employment." *Use*, BLACK'S LAW DICTIONARY (8th ed. 2004).[19] So, CMS may establish "guidelines" to "ensure that the *use of compensation*," i.e., the "*application* or *employment*" of compensation, "creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added); *Use*, BLACK'S LAW DICTIONARY (8th ed. 2004) (emphasis added). The "application or employment" of "compensation"—read collectively with the term "guidelines"—allows CMS to regulate "*how* agents and brokers put compensation into action,"[20] not the specific *rate* of compensation.

Further, as CMC explains, this language starkly contrasts with other statutes in which Congress has given agencies the authority to engage in ratemaking.[21] For instance, Congress in the Social Security Act, which includes § 1395w-21(j)(2)(D), expressly authorized HHS and CMS to set payments to physicians "based on the lesser of . . . the actual charge for the service, or . . . under the *fee schedule*." 42 U.S.C. § 1395w-4(a)(1)(A)–(B) (emphasis added). The Act also gave these agencies authority to "establish separate *rates of payment* to a Medicare+Choice organization." *Id.* § 1395w-23(a)(1)(H) (emphasis added).

Other statutes likewise demonstrate Congress's ability to give agencies the power to regulate set or fixed amounts of compensation. For instance, Congress has enabled the Department of Transportation to "prescribe guidelines" that "shall be used to determine the reasonable *amount*

---

[19] The Court considers the 2004 edition of Black's Law Dictionary as it was the current edition when 42 U.S.C. § 1395w-21(j)(2)(D) was enacted.
[20] CMC Br. Supp. Mot. Summ. J. 18, ECF No. 51.
[21] *Id.* at 17–18.

of compensation required to ensure the continuation of air service or air transportation." 49 U.S.C. § 41737(a) (emphasis added).

The statutory language at issue here contains no such language expressly delegating ratemaking authority. Rather, CMS is allowed to set "guidelines" to "ensure that the *use of compensation* creates incentives for agents and brokers to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D) (emphasis added). Thus, after consulting the statutory text's plain meaning and other statutory schemes, the Court interprets the "use of compensation" not to encompass the $100 payment limit.

CMS counters that "the word 'use' is much more flexible than what CMC posits."[22] Specifically, CMS argues that "[b]y using a capacious word like 'use,' Congress made sure to capture the existing limits on both the amount of compensation paid and the practical effects of particular compensation schemes."[23] But the Court declines to assume Congress imparted such a specific power to CMS as ratemaking or setting price controls without any explicit delegation or by implication. The foregoing examples of other statutory schemes confirm "that when Congress meant to set a limit on fees, it knew how to do so." *Crawford Fitting Co. v. J. T. Gibbons, Inc.*, 482 U.S. 437, 442 (1987). And CMS has not provided the Court any statutory schemes demonstrating otherwise.

In sum, based on the statutory text's plain meaning and other statutory schemes, the Court concludes CMS lacked the authority to establish the $100 payment limit.

---

[22] CMS Br. Supp. Mot. Summ. J. 28, ECF No. 55.
[23] *Id.* at 29.

11

### ii. Administrative Payments as Compensation

Having decided that CMS exceeded its authority to establish the $100 payment limit, the Court now turns to whether CMS has the authority to regulate administrative payments as compensation. Plaintiffs argue the plain meaning of "compensation" and CMS's historical interpretations of compensation demonstrate that the Final Rule's inclusion of administrative payments as compensation exceeds CMS's statutory authority.[24] Again, the Court agrees with Plaintiffs.

The plain meaning of "compensation" is "payment or remuneration for a service."[25] *See Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020) ("[W]e turn to the phrase's plain meaning at the time of enactment."). Administrative payments, though, are not "payment or remuneration" for the services agents and brokers provide "to enroll individuals in the Medicare Advantage plan that is intended to best meet their health care needs." 42 U.S.C. § 1395w-21(j)(2)(D). Rather, they "seek to *reimburse* agents and brokers for the costs incurred in rendering a *service other than enrollment*, such as their 'operational overhead.'"[26] Specifically, CMS defines administrative payments as "payments made for services other than enrollment of beneficiaries" such as "training, customer service, agent recruitment, operational overhead, or assistance with completion of health risk assessments." 42 C.F.R. § 422.2274(e)(1). This definition of "administrative payments" does not fall within the plain meaning of "compensation" because administrative payments are

---

[24] CMC Br. Supp. Mot. Summ. J. 19–21, ECF No. 51; ABC Br. Supp. Mot. Summ. J. 13–18, ECF No. 51.

[25] ABC Br. Supp. Mot. Summ. J. 13, ECF No. 51 (citing *Compensation*, BLACK'S LAW DICTIONARY (8th ed. 2004)); *see* CMC Br. Supp. Mot. Summ. J. 20, ECF No. 51 (same). As stated before, the Court consults the 2004 edition of Black's Law Dictionary as it was the current edition when 42 U.S.C. § 1395w-21(j)(2)(D) was enacted.

[26] CMC Br. Supp. Mot. Summ. J. 19–20, ECF No. 51 (emphasis added) (quoting 42 C.F.R. § 422.2274(e)(1)); *see* ABC Br. Supp. Mot. Summ. J. 13, ECF No. 51 ("[T]he administrative fees paid to FMOs are best understood as *reimbursements* for overhead and other hard costs incurred by independent agents and brokers." (emphasis added)).

"*reimbursements* for overhead and other hard costs incurred by independent agents and brokers."[27] Said simply, administrative payments are distinct from the enrollment process that agents and brokers facilitate. So, the plain meaning of the statutory text forecloses CMS regulating administrative payments as compensation.

CMS's previous regulations also support Plaintiffs' position that CMS should not treat administrative payments as compensation. For example, when CMS historically promulgated regulations following the enactment of § 1395w-21(j)(2)(D), CMS explicitly stated administrative payments were "not considered compensation." Medicare Program Revisions, 73 Fed. Reg. at 54238. Tellingly, CMS in 2021 agreed with a commenter who stated that an administrative payment "is a payment other than compensation because the payment is not for the sale or renewal of a policy." Contract Year 2022 Changes, 86 Fed. Reg. at 5993.

CMS posits that the Fixed Fee is a result of its "*broad* authority to promulgate 'fair marketing standards'" under 42 U.S.C. § 1395w-21(h)(4)(D) "that, at minimum, limit 'compensation other than as provided under guidelines established by' CMS."[28] CMS touts that "[n]either the individual words Plaintiffs pluck out of § 1395w-21(j)(2)(D) nor vague economic policy considerations can upset those *broad* delegations."[29] CMS's argument, though, is misguided.

It is true that CMS cited § 1395w-21(h)(4)(D) along with § 1395w-21(j)(2)(D) in the Final Rule as sources of authority to establish the Fixed Fee. Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30619. But § 1395w-21(h)(4)(D) does not give CMS the power to regulate "fair

---

[27] ABC Br. Supp. Mot. Summ. J. 13–14, ECF No. 51.
[28] CMS Br. Supp. Mot. Summ. J. 20, ECF No. 55 (emphasis added) (quoting 42 U.S.C. §§ 1395w-21(j)(2)(D), (h)(4)(D)).
[29] *Id.* (emphasis added).

marketing standards" as broadly as it purports.[30] Rather, § 1395w-21(h)(4)(D) articulates that "fair marketing standards . . . shall *only* permit a Medicare Advantage organization (and the agents, brokers, and other third parties representing such organization) to conduct the activities described in *subsection (j)(2)*." 42 U.S.C. § 1395w-21(h)(4)(D) (emphasis added).

As ABC explains, this "is nothing but an incorporation by reference of the guidelines that CMS is to establish under [§] (j)(2), which must stand on their own. In other words, [§] (h)(4)(D) cannot be read to authorize any regulation of compensation that is not already authorized by [§] (j)(2)."[31] So, § 1395w-21(h)(4)(D) does not prescribe such sweeping power to regulate fair marketing standards as CMS posits. Rather, CMS's power to regulate "fair marketing standards" in § 1395w-21(h)(4)(D) is cabined by § 1395w-21(j)(2)(D)'s narrow delegation of power to CMS to regulate the "use of compensation." The Court thus rejects CMS's argument that the Fixed Fee stems from its broad power to regulate fair marketing standards.

CMS also relies on *In re Riley*, 923 F.3d 433 (5th Cir. 2019), to argue that "[a] key problem for Plaintiffs' proposed line between reimbursements and payment for services is that the Fifth Circuit has rejected it."[32] *In re Riley* involved a bankruptcy dispute. *Id.* at 435. The Fifth Circuit addressed whether reimbursement of filing fees, credit counseling fees, and credit report fees "could be permissible as attorney compensation." *Id.* at 440. The bankruptcy court held it "lack[ed] the discretion to ever award debtor's counsel compensation that includes *reimbursement* for advancing the costs of those three fees." *Id.* at 441 (emphasis added).

But the Fifth Circuit rejected that conclusion. *Id.* The Fifth Circuit first looked to the plain meaning of "compensation," which it explained "is broad enough that it would generally be

---

[30] ABC Resp. and Reply 2, ECF No. 55.
[31] ABC Resp. and Reply 2, ECF No. 55
[32] CMS Br. Supp. Mot. Summ. J. 21, ECF No. 55.

understood to include reimbursement." *Id.* (citing *Compensation*, BLACK'S LAW DICTIONARY (6th ed. 1990); *Reimburse*, BLACK'S LAW DICTIONARY (6th ed. 1990)). The Fifth Circuit then turned to whether the operative statutory language "permitt[ed] the reimbursement of filing fees, credit counseling fees, and credit report fees." *Id.* The bankruptcy court said no, but the Fifth Circuit disagreed. *Id.*

According to the Fifth Circuit, the statutory language "says courts may allow compensation 'for representing the interests of the debtor in connection with the bankruptcy case[.]'" *Id.* at 443 (alteration in original) (quoting 11 U.S.C. § 330(a)(4)(B)). "A filing fee (and the other two fees) are, by any ordinary understanding of the words, 'interests of the debtor in connection with the bankruptcy case.'" *Id.* So, the statute allowed bankruptcy courts to grant "compensation to a Chapter 13 debtor's counsel even when the underlying activity fulfills a personal obligation of the debtor—such as advancing the cost of a filing fee—so long as that obligation is an interest of the debtor connected with the bankruptcy case." *Id.* In sum, the Fifth Circuit held that bankruptcy courts have "the discretion to compensate debtor's counsel for advancing the costs of filing fees, credit counseling fees, and credit report fees if they choose to do so." *Id.*

The Fifth Circuit's holding in *In re Riley*, though, is distinguishable from the instant action. CMS's argument that *In re Riley* "concluded that the plain meaning of compensation 'generally' includes reimbursement"[33] fatally ignores the specific bankruptcy context of the Fifth Circuit's decision. Thus, *In re Riley* is not particularly instructive to CMS's position here.

Moreover, as ABC explains, "[Medicare Advantage Organizations] pay FMOs for the *separate* and *distinct* service of establishing and administratively supporting networks of independent agents and brokers. [These Organizations] then separately pay commissions to agents

---

[33] *Id.* at 24.

and brokers for the sales services they provide."[34] Indeed, "this is wholly unlike a lawyer's payment of filing fee," as in *In re Riley*, "which is itself part of the service provided to the client."[35] In other words, the administrative payments here are not included in the services that agents and brokers provide to Medicare Advantage Organizations; they are separate and are thus not subsumed under the plain meaning of compensation. And so, the Fifth Circuit's holding that compensation "is broad enough that it would generally be understood to include reimbursement" is inapplicable to the context here. *In re Riley*, 923 F.3d at 441.

In sum, the Court concludes the Fixed Fee exceeds CMS's authority. After all, "judges need only fulfill their obligations under the APA to independently identify and respect . . . delegations of authority, police the outer statutory boundaries of those delegations, and ensure that agencies exercise their discretion consistent with the APA." *Loper Bright*, 603 U.S. at 404.

### 2. The Contract-Terms Restriction

Only CMC argues the Contract-Terms Restriction exceeds CMS's authority.[36] Specifically, CMC argues the Contract-Terms Restriction regulates terms that are not "compensation," and, consequently, exceeds CMS's authority for the same reasons as the Fixed Fee.[37] The Court agrees.

The Contract-Terms Restriction requires Medicare Advantage Organizations to provide that no part "of a contract with an agent, broker, or other [third-party organization] has a direct or indirect effect of creating an incentive that would reasonably be expected to inhibit an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of

---

[34] ABC Br. Supp. Mot. Summ. J. 14, ECF No. 51 (emphasis added).
[35] *Id.*
[36] CMC Br. Supp. Mot. Summ. J. 35, ECF No. 51.
[37] *Id.*

a beneficiary." Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30829. But, as CMC explains, the Contract-Terms Restriction includes "the same administrative payments as the Fixed Fee."[38] For the same reasons as the Fixed Fee, the Contract-Terms Restriction exceeds CMS's authority because it regulates administrative payments, and administrative payments are not "compensation" as used in 42 U.S.C. § 1395w-21(j)(2)(D).

Further, not only does the Contract-Terms Restriction erroneously regulate administrative payments, but it also regulates contract terms that do not sound in compensation—directly running afoul of Congress's mandate to regulate the "use of compensation." 42 U.S.C. § 1395w-21(j)(2)(D). Indeed, it regulates virtually any contract provision that could be construed as "inhibit[ing] an agent or broker's ability to objectively assess and recommend which plan best fits the health care needs of a beneficiary." Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30829. CMS in the Final Rule provided examples of "contract terms" it "proposed to prohibit." *Id.* at 30620. These examples included contract provisions "that specify *renewal* or other terms of a plan's contract with an agent broker or FMO contingent upon preferentially *higher rates of enrollment*." *Id.* But contract terms contemplating "renewal" or "higher rates of enrollment" have nothing to do with compensation.

CMS argues that "conditioning contract renewal based on a party achieving 'higher rates of enrollment'" squarely falls "within the agency's authority to limit the 'use of compensation' in such a way as to guard against perverse incentives."[39] Not so. "[A] renewal term governs whether plans and FMOs will continue to do business at all, not what carriers *pay* firms, agents, or brokers."[40] By CMS's logic, "it could regulate any contract terms because contracts, as a whole,

---

[38] CMC Reply 30, ECF No. 57 (citing Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30829).
[39] CMS Br. Supp. Mot. Summ. J. 35, ECF No. 55.
[40] CMC Reply 31, ECF No. 57 (emphasis added).

govern business relationships that involve payments. That proves too much, and nullifies Congress's phrase 'use of compensation.'"[41]

The Court thus concludes that the Contract-Terms Restriction exceeds CMS's authority as it oversteps CMS's narrow power to regulate the "use of compensation." 42 U.S.C. § 1395w-21(j)(2)(D).

### B.  Arbitrary and Capricious

Having concluded the Fixed Fee and Contract-Terms Restriction run afoul of the relevant statutory text, the Court could stop there. But Plaintiffs also argue the Final Rule is arbitrary and capricious. Specifically, both ABC and CMC contend the Fixed Fee constitutes arbitrary and capricious agency action.[42] Only CMC argues the Contract-Terms Restriction is arbitrary and capricious,[43] while only ABC argues the Final Rule's restrictions on the sharing of personal beneficiary data, i.e., the Consent Requirement, are arbitrary and capricious.[44]

The Court incorporates its reasoning from its July 3, 2024, Order, which held that the Fixed Fee and Contract-Terms Restriction are arbitrary and capricious. *Ams. for Beneficiary Choice*, 2024 WL 3297527, at *3–5. Specifically, the Court held "CMS never substantiated its decision to raise the fixed fee by $100 to account for administrative payments," "[t]he Final Rule also insufficiently addressed reliance interests," and "the Contract-Terms Restriction failed to provide fair notice of what was prohibited." *Id.* at *4. The Court also determined that CMS "failed to sufficiently respond to public comments" concerning both the Fixed Fee and Contract-Terms Restriction. *Id.* at *5.

---

[41] *Id.* (quoting 42 U.S.C. § 1395w-21(j)(2)(D)).
[42] CMC Br. Supp. Mot. Summ. J. 22–35, ECF No. 51; ABC Br. Supp. Mot. Summ. J. 20–33, ECF No. 51.
[43] CMC Br. Supp. Mot. Summ. J. 38–40, ECF No. 51.
[44] ABC Br. Supp. Mot. Summ. J. 35–37, ECF No. 51.

At the summary-judgment stage of litigation, CMS has failed to demonstrate otherwise. So, the Court concludes that in addition to exceeding CMS's authority, the Fixed Fee and Contract-Terms Restriction are arbitrary and capricious.

The Court briefly addresses CMS's supplemental authority. After the parties fully briefed their Motions for Summary Judgment, the Court allowed CMS to file supplemental authority, namely, the Supreme Court's decision in *FDA v. Wages & White Lion Investments, L.L.C.*, 145 S. Ct. 898 (2025), which vacated the Fifth Circuit's decision in *Wages & White Lion Investments, L.L.C. v. FDA*, 90 F.4th 357 (5th Cir. 2024).[45] In *Wages*, the Supreme Court confirmed that "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." 145 S. Ct. at 917 (alterations in original) (internal quotation marks and citations omitted). The Supreme Court explained that "[b]ased on the FDA's largely *noncommittal* guidance on scientific evidence and its specific reasons for rejecting respondents' applications," it could not "say that the agency deviated 'from a prior policy *sub silentio* or simply disregard[ed]' what it had previously said." *Id.* at 921 (first emphasis added) (second alteration in original) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

But here, CMS's historical positions—as demonstrated by previous regulations—cannot be understood as "noncommittal." Indeed, as explained in the Court's previous Order, "[t]he [Final] Rule never mentions CMS's prior understanding that administrative payments are 'not considered compensation' or are payments 'other than compensation.'" *Ams. for Beneficiary Choice*, 2024 WL 3297527, at *4 (quoting Medicare Program Revisions, 73 Fed. Reg. at 54239; Contract Year 2022 Changes, 86 Fed. Reg. at 5993). So, not only did CMS fail to sufficiently

---

[45] *See* CMS Notice Suppl. Authority, ECF No. 68.

explain its change in position, but its prior positions also never stated that administrative payments are compensation. In other words, CMS's prior regulations clearly affirmed that administrative payments were not considered compensation, which can hardly be interpreted as a "noncommittal" position. Thus, *Wages* is not particularly instructive here.

Now the Court turns to the Consent Requirement. Unlike the Fixed Fee and Contract-Terms Restriction, the Court in its July 3, 2024, Order determined ABC failed to show a substantial likelihood of success on the merits of its challenge to the Consent Requirement. *Ams. for Beneficiary Choice*, 2024 WL 3297527, at *6. ABC argued the Consent Requirement was in tension with HIPAA. *Id.* The Court at the then-preliminary injunction stage of litigation agreed with CMS's argument that "even if HIPAA might facilitate data sharing in some circumstances, that does not control whether CMS may limit certain harmful data-sharing practices under the Medicare statute." *Id.* (citation omitted).

At this summary-judgment juncture of litigation, the Court still agrees with CMS. ABC currently advances a similar argument as before; that is, "CMS failed to address the concern that the [Final] Rule is in significant respects more limiting than what HIPAA regulations require, and therefore that compliance will undermine the carefully reticulated HIPAA scheme that finely balances privacy interests with societal interests in the sharing of health information."[46] But "CMS expressly took steps to avoid any conflict with HIPAA, such as by explaining that CMS was not 'attempting to classify this information as [Personally Identifiable Information] or [Protected Health Information],' and explained it could nevertheless 'take steps within its authority' to protect beneficiaries."[47] ABC does not dispute this. The Court concludes CMS's promulgation of the

---

[46] ABC Br. Supp. Mot. Summ. J. 36, ECF No. 51.

[47] CMS Br. Supp. Mot. Summ. J. 42–43, ECF No. 55 (alterations in original) (quoting Changes to MA for Contract Year 2024, 89 Fed. Reg. at 30604).

Consent Requirement was not arbitrary and capricious. Thus, the Court **DENIES** ABC's Motion as it relates to the Consent Requirement.

In sum, the Court concludes the Fixed Fee and Contract-Terms Restriction are arbitrary and capricious.

## IV.    REMEDY

The Court now considers the proper remedy. Plaintiffs argue vacatur is the appropriate remedy.[48] The Court agrees.[49]

"When an agency action is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' the APA directs the reviewing court to 'hold unlawful and set aside [that] agency action.'" *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 120 F.4th 163, 177 (5th Cir. 2024) (quoting 5 U.S.C. § 706(2)). "In such circumstances, [the Fifth Circuit's] 'default rule is that vacatur is the appropriate remedy.'" *Id.* (quoting *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F..4th 846, 859 (5th Cir. 2022)).

Heeding the Fifth Circuit's "default rule," the Court concludes vacatur of the Fixed Fee and Contract-Terms Restriction is the proper remedy.

## V.    CONCLUSION

For the reasons stated above, Plaintiffs' Motions are **GRANTED in part** and **DENIED in part**, and Defendants' Motion is **GRANTED in part** and **DENIED in part**. For clarity, Plaintiffs' Motions are only denied insofar as Plaintiffs seek relief from the Consent Requirement, and Defendants' Motion is only granted insofar as Defendants seek relief from the Consent

---

[48] CMC Br. Supp. Mot. Summ. J. 40–42, ECF No. 51; ABC Br. Supp. Mot. Summ. J. 40–41, ECF No. 51.
[49] To the extent CMS argues that Plaintiffs lack associational standing, the Court disagrees and incorporates its standing analysis from its July 3, 2024, Order. *See* CMS Br. Supp. Mot. Summ. J. 49–50, ECF No. 55 (arguing the associational Plaintiffs lack standing); *Ams. for Beneficiary Choice*, 2024 WL 3297527, at *2–3 (holding that Plaintiffs demonstrated associational standing).

Requirement, that is, 42 C.F.R. §§ 422.2274(g), 423.2274(g). The Court hereby **VACATES** the Fixed Fee and Contract-Terms Restriction in the Final Rule, specifically, the provisions amending 42 C.F.R. §§ 422.2274(a), (c), (d), (e) and 423.2274(a), (c), (d), (e). Separate Final Judgment shall issue.

      **SO ORDERED** on this **18th day** of **August, 2025**.

 

 

Reed O'Connor

**UNITED STATES DISTRICT JUDGE**